# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No. 10-51480 |
| MISSISSIPPI RIVER CORPORATION, | : | Chapter 11 |
| Debtor. | : | Judge Hoffman |

---

**MOTION OF DEBTOR, MISSISSIPPI RIVER CORPORATION, FOR INTERIM AND FINAL ORDERS:  (1) AUTHORIZING DEBTOR TO OBTAIN SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364(C) AND (D), 503(B) AND 507, BANKRUPTCY RULES 2002, 4001 AND 9014, AND LOCAL RULES 4001-2 AND 4001-3; (2) GRANTING ADEQUATE PROTECTION; (3) MODIFYING THE AUTOMATIC STAY; (4) SCHEDULING AND APPROVING THE FORM AND METHOD OF NOTICE OF FINAL HEARING; AND (5) GRANTING OTHER RELATED RELIEF**

---

Mississippi River Corporation, the Debtor and Debtor-in-Possession ("Debtor" or "MRC") in the above-captioned Chapter 11 case, hereby moves this Court pursuant to §§ 105(a), 361, 362, 363, 364(c) and (d), 503(b) and 507 of Title 11 of the United States Code (the "Bankruptcy Code") and Bankruptcy Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rules 4001-2 and 4001-3, for the entry of both an interim and final order (1) authorizing and approving, pursuant to § 364(c) and (d) of the Bankruptcy Code, the Debtor to obtain debtor in possession financing from the Lender[1]; (2) authorizing and approving, pursuant to § 363 of the Bankruptcy Code, the Debtor's

---

[1] Except as otherwise defined in this Motion, capitalized terms herein shall have the same meaning as ascribed to them in the proposed *Interim Order Under 11 U.S.C. §§ 105(a),* 361, *362, 363, 364, 503(b) and 507, Federal Bankruptcy Rules 2002, 4001 and 9014, and Local Rules 4001-2 and 4001-3:  (i) Authorizing Debtor to Obtain Secured Post-Petition Financing and Use Cash Collateral; (ii) Granting Adequate Protection; (iii) Modifying The Automatic Stay; (iv) Setting Final Hearing; and (v) Granting Related Relief* (the "Interim Order") attached hereto as Exhibit A.

use of Cash Collateral of the Lender; and (3) granting the Lender (a) adequate protection, including, without limitation, adequate protection against the diminution in the value or amount of the Pre-Petition Collateral, (b) Replacement Liens, and (c) a super-priority administrative expense claim under § 507(b) of the Bankruptcy Code, subject to the limitations as more particularly set forth below; and (4) granting any such other further and related relief as the Court deems just and equitable.  In support of this Motion, the Debtor attaches and incorporates herein the following memorandum.

Respectfully submitted,


/s/ Richard K. Stovall
Thomas R. Allen      (0017513)
Richard K. Stovall   (0029978)
J. Matthew Fisher    (0067192)
Daniel J. Hunter      (0017536)
ALLEN KUEHNLE STOVALL & NEUMAN LLP
17 South High Street; Suite 1220
Columbus, OH 43215-4100
(614) 221-8500; FAX:  (614) 221-5988
Email:  allen@aksnlaw.com
Email:  stovall@aksnlaw.com
Email:  fisher@aksnlaw.com
Email:  hunter@aksnlaw.com
*Proposed Counsel for Debtor and Debtor in Possession, Mississippi River Corporation*

<u>**MEMORANDUM IN SUPPORT**</u>

<u>**BANKRUPTCY RULE 4001(c)(1)(B) AND (d)(1)(B) CONCISE STATEMENT OF
RELIEF REQUESTED**</u>

In accordance with Bankruptcy Rule 4001(c)(1)(B) and (d)(1)(B), the Debtor submits the following statement (the "Concise Statement") of the relief requested herein. Inasmuch as this statement is by nature a summary, it is qualified in all respects by this Motion and the terms of the Interim Order, which shall govern in the event of any inconsistency. However, the Debtor has made every effort to ensure that this summary is accurate.

The Debtor requests authority to obtain debtor-in-possession financing, pursuant to § 364(c) and (d)[2], from Supplier Finance Company, LLC, a Delaware limited liability company (the "Lender"), pursuant to the terms of the Interim Order and a final order to be entered after a final hearing. The terms of the DIP Credit Facility (as hereinafter defined) are embodied in that certain Senior Secured, Super-Priority Debtor-In-Possession Credit and Security Agreement (the "DIP Loan Agreement") attached to the Interim Order as Exhibit "B". The DIP Credit Facility, together with the use of Cash Collateral, will provide working capital to the Debtor for use in its operations in accordance with the Budget attached to the Interim Order as Exhibit "A". The DIP Credit Facility is "self-priming," in that it will be secured by a lien, under § 364(d), senior to that of the Lender's prepetition first mortgage liens and security interests. The Debtor also seeks authority to use Cash Collateral of the Lender, also in accordance with the Budget, and to provide adequate protection therefor.

The following table lists the material provisions of the DIP Credit Facility (including those provisions specified in Rule 4001(c)(1)(B)) and proposed use of Cash Collateral and

---

[2] All section references are to the Bankruptcy Code unless stated otherwise.

identifies their location within the DIP Loan Agreement, the Interim Order or elsewhere.  Except

as otherwise defined in this Memorandum in Support, capitalized terms used in the following

table shall have the same meaning as ascribed to them in the DIP Loan Agreement.

| Provision | Description | Location |
|---|---|---|
| Borrower | Debtor | DIP Loan Agreement Preamble; |
| Lender | Supplier Finance Company, LLC, a Delaware limited liability company . | DIP Loan Agreement Preamble; |
| DIP Credit Facility | $7.1 million principal amount, including an amortizing term loan of $3,100,000 (the "Term Loan") and a revolving credit facility of $4,000,000 (the "Working Line"). | DIP Loan Agreement Recitals; |
|  | The Term Loan will be used exclusively to "roll-up" a portion of Debtor's existing pre-petition senior secured credit facility. | DIP Loan Agreement ¶ 2.3; |
|  | Borrowing under the Working Line is limited to Budget amounts **[during period prior to Final Hearing].** | DIP Loan Agreement ¶ 2.3; Exhibit "D" (Budget); |
|  | Advances under the Term Loan and the Working Line are conditioned on certain conditions being satisfied. | DIP Loan Agreement ¶ 5.1; 5.2 |
| Purpose | Subject to the Budget and the general discretion of Lender set forth in the DIP Loan Agreement, proceeds of the Working Line shall be available exclusively for the purpose of funding costs and expenses related to the Case, working capital in the ordinary course of business of Debtor, the DIP Loan Agreement and the Collateral all as set forth in the Budget together with the following: (i) the costs of administering the DIP Facility, (ii) interest on the Revolving Note and the Term Note, (iii) the fees and expenses due and payable to Lender under the DIP Loan Agreement, (iv) the costs and expenses required to preserve, perfect, protect and enforce Lender's rights under any Order or under the DIP Loan Documents, or to collect the Obligations, (v) required fees of the United States Trustee, (vi) the reasonable costs, expenses and fees of Borrower's Professionals in connection with the Case, (vii) such other costs and expenses related to the Case, the | DIP Loan Agreement ¶ 2.3; 2.14 |

| Provision | Description | Location |
|-----------|-------------|----------|
| | DIP Loan Agreement or the Collateral as Lender may expressly approve, and (viii) capital expenditures in an amount to be determined and approved by Lender. The first advance (which will be non-cash and the sole advance under the Term Loan) under the Term Loan would be used to replace a portion of Debtor's existing pre-petition senior secured credit facility in an amount equal to $3,100,000. | |
| Term | Matures on the earlier of i) twelve months from closing, ii) the effective date of an Acceptable Plan, iii) consummation of a 363 sale pursuant to an Acceptable Sale Process, iv) the effective date of a plan other than an Acceptable Plan, v) consummation of a 363 sale pursuant to a process other than an Acceptable Sale Process, or vi) upon Lender's exercise of its right to terminate upon default. | DIP Loan Agreement ¶¶ 1.1; 2.11 |
| Acceptable Plan; Acceptable Sale Process | "Acceptable Plan" means a Chapter 11 plan of reorganization of Debtor that is in a form and substance satisfactory to Lender. "Acceptable Sale Process" means bid procedures that are acceptable to Lender and approved by an order of the Bankruptcy Court that provide (i) that Mississippi Recycling Company LLC, an Ohio limited liability company ("MRCL"), is the "stalking horse" bidder pursuant to an agreement acceptable to Lender pursuant to which MRCL would purchase specified assets of Debtor and assume certain liabilities or an interest in a reorganized Debtor, (ii) that any acceptable bid would include an assumption of both the Supply Agreement and License Agreement by and between IP and Debtor, (iii) for reimbursement to Lender of all Lender's fees, costs and expenses, including, without limitation, the fees and expenses of Lender's professionals and advisors, and (iv) a breakup fee of 2.00% of the stalking horse bid to be used to reimburse MRCL for certain fees and expenses. The stalking horse bid amount would be at least $8,100,000 and would include the assumption of Debtor's obligations to Adams County, Mississippi. | DIP Loan Agreement ¶ 1.1 |
| Fees and Expenses | Administrative Fee of $1500 per month; Field Examination Fee equal to all reasonable out of pocket fees, expenses and charges of third party appraisers and professionals employed by Lender to review, audit and appraise the Collateral plus reimbursement to Lender of | DIP Loan Agreement ¶ 2.10; 9.3 |

| Provision | Description | Location |
|---|---|---|
| | its attorneys fees and expenses. | |
| Interest Rate | Eleven percent (11%) per annum, compounded monthly. Upon the occurrence of an Event of Default, at the option of Lender, interest will be 16% per annum (but in no event greater than the maximum rate allowed by law), compounded monthly. | DIP Loan Agreement ¶ 1.1; 2.9 |
| Priority | Post-Petition Obligations have superpriority under § 364(c)(1) over all administrative expenses under §§ 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726(b) (to extent permitted by law), and 1114, or any other provision of the Bankruptcy Code, or otherwise; subject to Carve-Out and statutory U.S. Trustee fees. | Interim Order ¶ 6; DIP Loan Agreement ¶ ¶2.15; 3.1; 6.11 |
| | Section 507(b) priority is granted as adequate protection to for diminution in value of interests in Pre-Petition Collateral (as defined in the Interim Order, "Adequate Protection Claim") over all administrative expenses under §§ 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 546(c), 726(b) (to extent permitted by law), 1113 and 1114; subject to Carve-Out. | Interim Order ¶ 8 |
| Release | Debtor is releasing Lender and its affiliates (including International Paper Company) from all claims, including claims under Sections 541 through 550 of the Bankruptcy Code. | DIP Loan Agreement ¶ 2.16 |
| Waiver of Section 364 Priming Rights | Debtor is waiving any right under Section 364 of the Bankruptcy Code (or otherwise) to grant liens or claims of equal or greater priority to Lender's liens and claims. | DIP Loan Agreement ¶ 2.17 |
| Carve-Out | Includes (i) $100,000 for Debtor's counsel fees and expenses post-default, plus any pre-default fees and expenses incurred but unpaid, (ii) $25,000 for any Creditors' Committee counsel fees and expenses post-default, plus any pre-default fees and expenses incurred but unpaid, (iii) $15,000 for Debtor's financial professionals' fees and expenses post-default, plus any pre-default fees and expenses incurred but unpaid, and (iv) fees of the U.S. Trustee and the Clerk of the Bankruptcy Court. | Interim Order ¶ 9; DIP Loan Agreement ¶ 1.1 |
| Collateral | All obligations of Debtor under the DIP Facility are secured by a first priority, perfected, priming lien (other | Interim Order ¶ 7; DIP Loan Agreement |

| Provision | Description | Location |
|---|---|---|
| | than with respect to the liens of Adams County, Mississippi pursuant to the Adams County Mortgage) on and security interest in, substantially all of the assets of Debtor, including, without limitation, accounts receivable, inventory, equipment, unencumbered real estate, leasehold interests, intangibles, fixtures of Debtor, and subsidiary stock, subject to a the Carve-Out. All borrowings by Debtor, all reimbursement obligations with respect to letters of credit, all costs, fees and expenses of Lender and all other obligations owed to Lender are secured as described above and are charged to the loan account to be established under the DIP Facility. | ¶ 1.1; 4.1 |
| Advances | Advances under the Working Line will be made available based on Debtor's needs as set forth in the Budget. Lender will not be obligated to make any Advances unless such Advance is for a projected cash need set forth in the Budget and the conditions to Advances set forth in the DIP Loan Agreement are satisfied. | DIP Loan Agreement ¶ 2.1; 2.4; 5.2 |
| Collection of Accounts | Receivables and other funds deposited into Debtor's accounts will be swept into Lender's Collection Account and reduce the amounts outstanding under the Working Line pursuant to the terms of the DIP Loan Agreement. | DIP Loan Agreement ¶ 4.6 |
| Representations, Warranties, Covenants, and Indemnities | The DIP Loan Documents contain customary representations, warranties, covenants and indemnities (including an environmental indemnity) of Debtor | DIP Loan Agreement Article VI; Article VII; ¶ 9.4; 9.5 |
| No Contest of DIP Loan Documents | Debtor will not contest the validity, legality, binding effect or priority of the DIP Loan Documents. | DIP Loan Agreement ¶ 7.2(G) |
| Waiver of 506(c) Surcharge | Debtor will not attempt to prosecute any surcharge against the Collateral under Section 506 if the Bankruptcy Code, or otherwise. | Interim Order ¶ 11; DIP Loan Agreement ¶ 7.2(H) |
| Events of Default | The DIP Loan Documents contain customary events of default, including, without limitation, payment, cross-default, violation of covenants, breach of representations or warranties, environmental, challenges to DIP Loan Documents, judgments, ERISA and change of control. Additional events of default include, without limitation, | DIP Loan Agreement ¶ 8.1 |

| Provision | Description | Location |
|---|---|---|
| | the amendment, modification, reversal or stay of the Interim or the Final Bankruptcy Court Orders without the consent of Lender, the dismissal or the conversion of the bankruptcy cases, the appointment of an examiner with enlarged powers or a trustee, or the entry of material orders in the bankruptcy case granting relief from the automatic stay. | |
| Relief from Stay | Upon notice to the Bankruptcy Court, Lender is granted full and complete relief from the automatic stay. | Interim Order ¶ 17; DIP Loan Agreement ¶ 8.3 |
| Remedies | Upon the occurrence of any Event of Default, Lender will have, in addition to the specific rights and remedies listed in the DIP Loan Agreement and the other DIP Loan Documents, all those rights and remedies allowed by all applicable laws, including, without limitation, the Uniform Commercial Code. | DIP Loan Agreement ¶ 8.4; 8.5 |
| Debtor Stipulation Regarding Validity and Priority of Lender's Pre-Petition Liens and Indebtedness; Limitation on Challenge Period | Debtor is stipulating to the validity and priority of Lender's pre-petition liens and claims. Parties in interest (other than Debtor) will have 75 days after entry of Interim Order to challenge or object to Debtor's stipulation on these matters. Absent a proper and timely challenge, Debtor's stipulations will be binding on all parties, including any subsequent chapter 11 or chapter 7 trustee. | Interim Order ¶ J(II); ¶ 12 |

## **JURISDICTION**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the General Order of Reference entered in this district.  Venue is proper pursuant to 28

U.S.C. §§ 1408 and 1409.  The matters raised herein constitute core proceedings pursuant to 28

U.S.C. § 157(b)(2).

**BACKGROUND**

2.     MRC filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") on February 16, 2010, (the "Petition Date").  MRC is conducting its business and is operating as a debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  MRC is an Ohio corporation originally formed in 1991.

3.     As of the Petition Date, MRC's books and records reflect that MRC had assets (at book value) for approximately $13,736,035.00 and liabilities of approximately $19,461,589.00. Management believes the fair market value of MRC's assets is substantially less than the stated book value.   For the calendar year ending 2009, MRC had sales totaling in excess of $37,569,136.  MRC is managed by an eight-person management team with many years of waste paper industry experience.   The MRC recycling division employs a total of sixty-nine (69) employees: twenty-eight (28) in production, sixteen (16) in maintenance, five (5) in the lab, eleven (11) in shipping/receiving, and nine (9) in administrative roles. Most of the departments are housed in MRC's Natchez Mill (as defined below).   North American Paper Company ("NAPCO"), a division of MRC,  employs a total of six (6) employees.

4.     MRC, headquartered in Worthington, Ohio, is a leading producer of market de-inked recycled pulp ("MDIP") in the United States.  MRC was formed as a sister company to NAPCO in 1990 in order to use a mothballed tissued/egg carton mill located in Natchez, Mississippi (the "Natchez Mill") to produce MDIP.  MRC began operations in 1991 and acquired the Natchez Mill shortly thereafter.   As part of a capital improvement to the Natchez Mill involving an addition to its warehouse facilities, MRC previously transferred to a local government authority, and leases back with an option to purchase for a nominal amount at the

end of the lease, a portion of the Natchez Mill.  In addition to the Natchez Mill, MRC utilizes an office in Appleton, Wisconsin.

5.      On December 31, 1993, NAPCO was merged into MRC. Today, NAPCO operates as a division of MRC.  The NAPCO division still acts as a broker/dealer in paper and pulp products, maintaining its original focus on the by-products of primary grades of pulp and paper manufacturing process.  NAPCO engages in functions such as purchasing, storing, distributing, and selling various grades of pulp, paper, board, waste papers, as well as field rejects.

6.      MRC's recycling division engages in the production of pulp by recycling waste paper.  MRC transports waste paper to its Natchez Mill via rail and trucks and subjects the waste paper to various washing cycles.  During this process, ink particles, glue and other impurities are removed from the waste paper.  It is then treated and bleached with chemicals to produce market deinked recycled pulp ("MDIP").  MRC manufactures various grades of MDIP pulp according to customers' specifications. Grades of MDIP pulp can be converted into end products such as file folders, paper towels, tissue paper, carbon paper, premium grade paper and food grade paper products.  MRC is the only company that is approved by the FDA whose recycled pulp can be used to manufacture food contact paper products.  MRC received a patent in May, 2008 for the development of a proprietary process that removes fluorescence from food grade pulp.  MDIP producers such as MRC sell their end products to tissue and paper manufacturers that make products containing recycled materials.  MRC provides unique pulp solutions that its customers cannot develop in-house.

7.      The global economic crisis had adversely affected companies of all sizes across all industries. Previously sound companies are facing reduced demand from their customers and constraints in financing.  The paper industry in the United States is comprised of many of MRC's

customers such as publishers and coded/treated paper manufacturer's, stationery product manufacturers and paper wholesalers. Although the U.S. paper market is the largest in the world, the production of paper products by the U.S. has declined over the past decade due to lower demand. Despite the current economic downturn, sales of paperboard packaging and recycled paper products are expected to grow strongly over the next few years. Players in the MDIP industry produce recycled pulp that paper manufacturers mix with virgin pulp to produce paper products that contain recycled content.

8. The global economic downturn negatively impacted MRC's operational performance. High costs of raw materials and other inputs over the past few years have had an adverse effect on MRC. Regardless, MRC generated significant sales growth in fiscal year 2008 over fiscal year 2007. The company generated approximately a 30% increase in revenue in fiscal year 2008 compared to fiscal year 2007, despite an almost 33% increase in costs of goods sold. However, during the fiscal year 2009, MRC was negatively impacted by the loss of Kimberly Clark Corporation and International Paper Company, a New York corporation ("International Paper"), businesses. The job and tonnage requirements of MRC's remaining customers lead to lower revenue and reduction in gross margin.

9. Prior to the commencement of the Case, MRC's primary lender was The CIT Group/Equipment Financing, Inc., a Delaware corporation ("CIT"). MRC's obligations to CIT were evidenced, in part, by that certain Second Amended and Restated Loan and Security Agreement dated as of March 14, 2006, together with all such other loan documents executed in connection therewith or relating thereto, as amended (collectively the "Senior Secured Loan Documents"). In late November, 2009, due to certain defaults of MRC under the Senior Secured Loan Documents, CIT ceased funding under MRC's working capital credit facility. As a result,

MRC ceased production at its Natchez Mill. The operations remained idle except for approximately one (1) week in December, 2009 during which time MRC restarted the mill to produce approximately 1,000 tons of recycled waste paper for one of MRC's largest customers. That customer paid all costs associated with the production run in December, 2009.

10.     In early January, 2010, MRC entered into a Production and Consignment Agreement (the "Consignment Agreement") with International Paper, pursuant to which MRC agreed to produce and sell to International Paper approximately 4,000 tons of recycled de-inked pulp. All raw materials, inventory, chemicals, and finished product at MRC's plant were purchased by International Paper and subsequently consigned by International Paper to MRC to conduct and complete the required production runs under the Consignment Agreement. The production run during the month of January lasted approximately 19 days, and International Paper funded all of the related production costs. MRC and International Paper executed a First Amendment to the Consignment Agreement (the "First Amendment") in early February, 2010, extending the Consignment Agreement through February 22, 2010. Under the First Amendment, International Paper continued to hold and store its raw materials and products at MRC's Natchez Mill upon the same consignment terms as provided in the Production and Consignment Agreement. On February 15, 2010, International Paper and MRC entered into a Second Amendment to Production and Consignment Agreement (the "Second Amendment") further extending the term of the Agreement through and until April 30, 2010, and further extending the agreement of the parties that International Paper will continue to hold and store, on consignment, its inventory and raw materials in the Natchez Mill.

11.     On or about February 8, 2010, CIT sold, assigned and transferred virtually all of its right, title and interest in and under the Senior Secured Loan Documents (with certain limited

exceptions) to Supplier Finance Company, LLC, a Delaware limited liability company, (the "Lender"), which is a wholly owned subsidiary of International Paper. The total indebtedness claimed to be owing to Lender, as assignee of CIT under the Senior Secured Loan Documents, as of the Petition Date is in the amount of approximately $9,775,000. The foregoing obligations, together with, as of the Petition Date, all fees, costs and expenses (including, but not limited to, attorneys' fees and expenses), and other charges, amounts and costs owing, accrued, accruing or chargeable in respect thereof, of any kind or nature, whether existing or contingent, payable to or for the benefit of any person or entity, pursuant to any of the foregoing agreements, instruments or documents, is referred to as the "Senior Secured Indebtedness." MRC's obligations owing to Lender under the Senior Secured Loan Documents, including the Senior Secured Indebtedness, are secured by security interests created under the Senior Secured Loan Documents (the "Pre-Petition Senior Liens") in essentially all assets of MRC, including Accounts, Equipment, Inventory and other Goods, Documents of Title, General Intangibles, Investment Property, Real Property, and Other Collateral, all as defined in the Senior Secured Loan Documents.

12.     As a condition to continuing financial accommodations by CIT, in March, 2009, MRC hired an investment banker, SSG Capital Advisors, LLC ("SSG") to assist MRC in marketing the sale of substantially all of its assets, and to identify potential purchasers for MRC's assets and business, with the consent and approval of CIT. A private placement memorandum was created and circulated in May, 2009. SSG actively marketed the sale of the Debtor's assets and business. SSG was ultimately able to identify two prospective acquirers who submitted detailed letters of interest. However, in each case, SSG and MRC were ultimately unable to negotiate an acceptable purchase offer on terms and conditions acceptable to CIT.

13.     Management of MRC believes that MRC's business is poised to succeed in this market environment due to several factors including but not limited to, its knowledgeable management team; the fact that it is the sole, FDA certified MDIP producer of pulp for use in food contact paper products; and, that MRC is a leader in the MDIP industry and has established a solid reputation with its vendors and customers as a trusted business partner.  MRC has filed this chapter 11 proceeding in order to preserve the ongoing value of its assets and to provide a substantive and procedural mechanism for the realization of that value, so as to maximize the value of its assets for the benefits of all parties in interest.

14.     In order to provide a means for achieving the preservation of MRC's ongoing concern value, Lender has conditionally agreed to loan additional working capital on a post-petition basis, subject to the terms and conditions to be approved by this Court, with the understanding that the assets and business of MRC will be sold in its chapter 11 proceeding.  To that end, Lender has consented to the sale of MRC's assets to Mississippi Recycling Company, LLC, an Ohio limited liability company ("Buyer"), on the terms and conditions of a certain Asset Purchase Agreement, free and clear of liens, claims and encumbrances except those as set forth in the Asset Purchase Agreement all subject to higher and better offers after an auction, and Lender's respective rights under 11 U.S.C. § 363(k).

**RELIEF REQUESTED**

15.     Consistent with the Debtor's and the Lender's commitment to swiftly achieving their collective overall goal of effectuating a sale of substantially all of the Debtor's assets under the supervision and protection of this Court, the parties have, in good faith, negotiated the terms and conditions for post-petition financing and use of cash collateral available for Debtor in its operations, pending successful completion of its sale efforts.  Those negotiations have resulted in

14

the proposed *Interim Order Under 11 U.S.C. §§ 105(a), 361, 362, 363, 364, 503(b) and 507, Federal Bankruptcy Rules 2002, 4001 and 9014, and Local Rules 4001-2 and 4001-3: (i) Authorizing Debtor to Obtain Secured Post-Petition Financing and Use Cash Collateral; (ii) Granting Adequate Protection; (iii) Modifying The Automatic Stay; (iv) Setting Final Hearing; and (v) Granting Related Relief* (the "Interim Order") attached hereto as **Exhibit A** pursuant to which the Debtor seeks authority from this Court to enter into with the Lender for the reasons set forth below.

16.     By this Motion, the Debtor seeks entry of an interim and final order:

(a)     authorizing and approving, pursuant to section 364(c) and (d) of the Bankruptcy Code, the Debtor to obtain debtor-in-possession financing from the Lender pursuant to the terms and conditions of (a) the DIP Loan Agreement, (b) the Interim Order and any final order, (c) all ancillary documents referred to in the DIP Loan Agreement, the Interim Order and any final order and/or required to be executed by the Debtor in connection therewith, and (d) the Budget (collectively, the "DIP Credit Facility"), which includes, *inter alia*, senior liens, mortgages and security interests, superior to the liens, mortgagers, security interests or rights of all other creditors of the Debtor's estate, in and upon all of the Pre-Petition Collateral and all proceeds thereof, and all of the Debtor's property and assets acquired by the Debtor on or after the Petition Date, subject only to the Carve Out, and further subject to the Adams County Mortgage;

(b)     authorizing and approving, pursuant to section 363 of the Bankruptcy Code, the Debtor's use of Cash Collateral of the Lender;

(c)     granting the Lender (a) adequate protection, including, without limitation, adequate protection against the diminution in the value or amount of the Pre-Petition Collateral, (b) Replacement Liens, and (c) a super-priority administrative expense claim under section

507(b) of the Bankruptcy Code, such Replacement Liens and section 507(b) super-priority administrative expense claim to be subject to the Carve-Out and the liens, security interests and super-priority treatment granted to the Lender with regard to the DIP Credit Facility, as more particularly set forth in the Interim Order; and

      (d)      granting any further and related relief as the Court deems just and equitable.

17. The reasons supporting the Debtor's need to incur the obligations under the DIP Credit Facility are compelling. As described in more detail below, the funds made available under the DIP Credit Facility are critical for the Debtor to continue its ordinary course, day to day operations and to maintain the going concern value of its business for the ultimate benefit of the creditors herein. The Debtor has determined, without immediate access to working capital provided by the DIP Credit Facility, it lacks sufficient liquidity to maintain its operations and reorganize its financial affairs in a manner consistent with its developed exit strategy. It is imperative that the Debtor maintain its operations in order to realize upon its going concern value. Without a sufficient source of post-petition financing available to the Debtor to fund operations, the viability of the Debtor's business is seriously threatened. The DIP Credit Facility provides the Debtor with the necessary liquidity and financing to preserve the value of its estate and operate toward successfully consummating its sale as a going concern as contemplated herein.

18. Accordingly, absent timely approval of this Motion, the Debtor will be unable to meet its necessary, ordinary course of business expenditures, which are critical to the Debtor's ability to maintain the integrity of its ongoing operations, preserve the going concern value of its estate, and ultimately consummate a successful sale of its business. Additionally, the DIP Credit Facility will be used to fund the Debtor's professional fees and other extraordinary items

incurred in this case. It is anticipated, as set forth in the "DIP Advances" line of the Budget, that the Debtor will receive from the DIP Credit Facility up to $1,000,000 of incremental borrowings following the entry of the Interim Order and up to $6,100,000 of additional incremental borrowings following the entry of a final order (assuming the final order is entered by March 15, 2010), resulting in an aggregate advance under the Working Line of $4,000,000 and under the Term Loan of $3,100,000. The DIP Credit Facility will be implemented with a sweep provision where the receivables and other funds deposited into MRC's accounts will be swept and applied to the line of credit which will in turn be accessed by MRC's borrowings on the line of credit in accordance with the Budget and the terms of the DIP Loan Agreement.

## DESCRIPTION OF THE DIP CREDIT FACILITY

19. The DIP Credit Facility is comprised of an aggregate $7,100,000 debtor-in-possession credit facility, including a amortizing term facility in the amount of $3,100,000 (the "Term Loan") and a revolving credit facility in the amount of $4,000,000 (the "Working Line"). The Term Loan will be used to "roll-up" a portion of Debtor's existing pre-petition senior secured credit facility in an amount equal to approximately $3,100,000. Lender has the right to establish reserves in the reasonable business judgment of Lender which are customary in transactions of this nature. The principal terms of the DIP Credit Facility are set forth in the Concise Statement.

## APPROVAL OF THE DIP FINANCING AND USE OF CASH COLLATERAL IS WARRANTED UNDER THE CIRCUMSTANCES

20. The Debtor submits that ample justification exists for the approval of the Debtor's use of Cash Collateral and approval of the Debtor entering into the proposed DIP Credit Facility under §§ 363 and 364 of the Bankruptcy Code. The Debtor believes that its ability to use Cash Collateral and enter into the DIP Credit Facility is critical to the success of this case. Without the

use of Cash Collateral and the ability to obtain advances under the DIP Credit Facility, the Debtor will be unable to operate its business and, therefore, unable to preserve the value of its business as a going concern pending a successful sale of its operations in this case. Specifically, absent the DIP Credit Facility, the Debtor will be unable to raise sufficient capital to continue to manage and operate its business which, in the Debtor's opinion, is the critical step to a successful sale of its business as a going concern. In short, the ultimate success of the Debtor's case hinges upon its ability to use Cash Collateral and entering into and drawing funds under the DIP Credit Facility.

## THE NECESSARY SHOWINGS UNDER § 364

21.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with a specialized priority or with security. If a debtor cannot obtain post-petition credit on an unsecured basis or an administrative expense basis under § 503, § 364(c) authorizes a court to allow a debtor to obtain post-petition credit, repayment of which is entitled to either (i) super-priority administrative expense status, (ii) secured by a senior lien on unencumbered property, (iii) secured by a junior lien on unencumbered property, or (iv) any combination of the foregoing. In addition, § 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien only if the debtor is unable to obtain such credit otherwise and the existing secured creditors' interests in the collateral are adequately protected.

22.     The Debtor is convinced that it would not be able to obtain financing by merely offering a prospective lender an administrative expense claim or a junior lien – particularly given the current economic climate. Consequently, the Debtor focused its efforts and negotiations with the Lender, engaging in extensive discussions with it to try to obtain the best possible terms for

the Debtor's post-petition financing. The Debtor, in the exercise of its prudent business judgment and consistent with its fiduciary duties, has concluded that the terms and conditions of the DIP Credit Facility are fair and reasonable under the circumstances.

23. The Debtor submits that the interest rate proposed under the DIP Credit Facility is more than reasonable given the state of the Debtor's financial affairs and the unfavorable credit climate in today's economy. Further, the Debtor is certain that it would not be able to obtain unsecured credit allowed under § 503(b)(1) of the Bankruptcy Code as an administrative expense, or credit secured solely by liens and security interests junior to those of the Lender. Rather, the circumstances of this case require the Debtor to obtain its financing under § 364(d) of the Bankruptcy Code by granting the Lender a priming lien senior to all pre-existing liens, mortgages or security interests in and to the Debtor's assets.

24. Significantly, the priming lien offered the Lender under the DIP Credit Facility to secure the Post-Petition Obligations primes, for all intents and purposes, only the Pre-Petition Liens held by the Lender. It is not intended to prime any lien held by Adams County, Mississippi with respect to any asset of the Debtor pursuant to the Adams County Mortgage. Any other party which may have or claim to have an interest in and to any of the Debtor's property are wholly unsecured pursuant to § 506(a) of the Bankruptcy Code based upon a recent appraisal of the Debtor's property. As such, they are not entitled to adequate protection under § 364(d)(1)(B) as they have no "interest … on the property of the estate on which such senior … lien is proposed to be granted." *See United States v. Ron Pair Enters.*, 489 U.S. 235, 239 (1989) (§ 506(a) "provides that a claim is secured only to the extent of the value of the property on which the lien is fixed; [and] the remainder of that claim is considered unsecured."); *see also Assocs. Commer. Corp. v. Rash*, 520 U.S. 953, 961 (1997) ("The first sentence, in its entirety, tells us that a

secured creditor's claim is to be divided into secured and unsecured portions, with the secured portion of the claim limited to the value of the collateral").

25.      The terms of the DIP Credit Facility, and the accompanying Interim Order, were negotiated in good faith and at arm's length.  Accordingly, the Lender should be provided with the benefit of the protections afforded by § 364(e) of the Bankruptcy Code, such that if any of the provisions of the Interim Order or any final order are later modified, vacated, stayed, or terminated by subsequent order of this or any other court, the Lender shall be fully protected with respect to any amounts previously disbursed.

26.      Accordingly, the Debtor requests authority to enter into the DIP Credit Facility and to borrow funds from the Lender on the secured and administrative super priority basis described above, pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code, and to take the other actions contemplated and requested herein.

## NEED FOR INTERIM FINANCING AND USE OF CASH COLLATERAL PENDING THE FINAL HEARING

27.      Pursuant to Bankruptcy Rule 4001(b) and (c), a minimum of fourteen (14) days' notice is required before a final hearing on this Motion may commence.  However, such Rule provides that the Court may conduct a hearing before such fourteen (14) days period expires, but may authorize the use of only that amount of cash collateral and the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.  Fed.R. Bankr. P. 4001(b)(2) and (c)(2).

28.      As noted above, it is critical to the success of this Chapter 11 case that the Debtor be able to obtain post-petition financing and be authorized to use cash collateral.  Based on the status of the Debtor's business, it is critical that the Debtor be permitted to enter into the DIP Credit Facility and to draw funds thereon sooner than the fourteen (14) days' notice required

under Bankruptcy Rule 4001 for a final hearing on this Motion. Accordingly, Debtor seeks interim approval of this Motion as permitted by Bankruptcy Rule 4001. The DIP Credit Facility provides for the interim advances under the Budget of up to $1,000,000. This amount is necessary to provide the Debtor with immediate operating capital. Without the immediate availability of such working capital, the Debtor does not believe that it can continue its business operations in the period before a final hearing. The Debtor believes that it will suffer immediate and irreparable harm in the absence of an Interim Order authorizing interim use of cash collateral and approval of interim borrowings under the DIP Credit Facility. In the absence of immediate post-petition financing and use of cash collateral, the Debtor's attempts to remain as a going concern would be immediately and irreparably jeopardized.

## NOTICE WITH RESPECT TO INTERIM ORDER

29.     The Debtor believes that the terms and conditions of the DIP Credit Facility represent the most favorable option for post-petition financing, and that the Debtor's ability to use Cash Collateral and obtain advances under the DIP Credit Facility is necessary, appropriate and essential to avoid immediate and irreparable harm to the Debtor, its estate and its creditors. The Debtor respectfully requests that, pending a final hearing on the Motion, the terms and provisions of the DIP Credit Facility be implemented and approved on an emergency interim basis, to the extent of authorizing the Debtor to obtain interim post-petition financing in an aggregate amount not to exceed $1,000,000, on the terms and subject to the conditions set forth in the Interim Order.

30.     Accordingly, given the exigencies of the situation and the timing of the filing of the Debtor's Chapter 11 petition and the Debtor's immediate need for the DIP Credit Facility, the Debtor submits that the notice provided herein is sufficient and appropriate under the circumstances of this case. The Debtor will provide written notice to (a) the Office of the United

States Trustee; (b) the Debtor's twenty (20) largest unsecured creditors as identified in its chapter 11 filing (and as identified on the Service List); (c) International Paper Company and Supplier Finance Company, LLC (c/o its counsel, Michael J. Debbeler, Esq., Graydon Head & Ritchey, LLP, 1900 Fifth Third Center, 511 Walnut Street, Cincinnati, OH 45202, and James Bruce, Esq., Parker Poe, 200 Meeting Street, Suite 201, Charleston, SC 29401-3156; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; and (f) all state and local taxing authorities concerning the Debtor (collectively, the "Interim Noticed Parties").

## NOTICE AND SERVICE WITH RESPECT TO FINAL ORDER

31.     Pursuant to Bankruptcy Rule 4001, the Debtor respectfully requests that the Court set a date for a final hearing as soon as practicable after the Petition Date and that the Debtor be authorized to provide notice of such final hearing on this Motion by serving a copy of this Motion (to the extent not previously served), together with the Interim Order in accordance with the terms of the Interim Order as soon as practical after entry of the Interim Order, upon the Interim Notice Parties.

## COMPLIANCE WITH L.B.R. 4001-2 AND L.B.R.4001-3

32.     The summary of the terms required by L.B.R. 4001-2(b)(2) is attached hereto as **Exhibit B**.

33.     The checklist required by L.B.R. 4001-2(b)(3) is attached hereto as **Exhibit C**, which highlights location of certain provisions, as required under L.B.R. 4001-2(b)(2), contained in the proposed Interim Order.  The Lender is unwilling to make the post-petition financing available without such provisions.

34.     Attached hereto, collectively, as **Exhibit D** are copies of all documents by which the interests of all entities in cash collateral, or in the collateral affected by the DIP Credit

Facility, were created or perfected, as required under L.B.R. 4001-2(b)(4) and L.B.R. 4001-3(c)(7).

## **NO PREVIOUS REQUESTS**

35.     No previous motion or other requests for relief sought in this Motion have been made to this or any other court.

## **FINAL HEARING**

36.     If no written objections are filed by a party in interest, the Debtor requests that the Interim Order be deemed a Final Order for all purposes.   If, however, a Final Hearing is necessary, the Debtor requests that a Final Hearing on this Motion be scheduled for such date as the Court may deem appropriate.

**WHEREFORE**, the Debtor requests that the Court (i) issue the Interim Order substantially in the form annexed hereto; (ii) after the Final Hearing, issue the Final Order, substantially in the form to be filed with the Court; and (iii) grant such other and further relief as the Court deems just and proper.

Respectfully submitted,


/s/ Richard K. Stovall
Thomas R. Allen      (0017513)
Richard K. Stovall   (0029978)
J. Matthew Fisher    (0067192)
Daniel J. Hunter      (0017536)
ALLEN KUEHNLE STOVALL & NEUMAN LLP
17 South High Street; Suite 1220
Columbus, OH 43215-4100
(614) 221-8500; FAX:   (614) 221-5988
Email:  allen@aksnlaw.com
Email:  stovall@aksnlaw.com
Email:  fisher@aksnlaw.com
Email:  hunter@aksnlaw.com
*Proposed Counsel for Debtor and Debtor in Possession, Mississippi River Corporation*