UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

In re:

**MISSISSIPPI RIVER CORPORATION,**

**Debtor.**

**Case No. 10-51480**

**Chapter 11**

**Judge John E. Hoffman, Jr.**

**MOTION OF MISSISSIPPI RIVER CORPORATION, DEBTOR AND DEBTOR IN POSSESSION, FOR AN ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL ITS ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES WITH CERTAIN EXCEPTIONS UNDER ASSET PURCHASE AGREEMENT, SUBJECT TO HIGHER AND BETTER OFFERS; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH; (III) APPROVING PROCEDURES FOR AN AUCTION; (IV) SCHEDULING AN AUCTION AND HEARING DATE RELATING THERETO; (V) APPROVING BREAK-UP FEE; AND (VI) APPROVING THE FORMS OF NOTICE RELATING TO SALE AND BIDDING PROCEDURES**

Mississippi River Corporation, as debtor and debtor in possession, ("Debtor" or "MRC") hereby moves (the "Motion") the Court for the entry of an order, pursuant to 11 U.S.C. Sections §§ 105, 363(b) & (f) and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, and Local Rule 6004-1: (i) authorizing the sale of substantially all of its assets to Mississippi Recycling Company, LLC (hereinafter "Buyer"), pursuant to the terms of the attached Asset Purchase Agreement, free and clear of liens, claims and encumbrances except those as set forth in the Purchase Agreement, all subject to higher and better offers after an auction, (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection with the sale of assets, (iii) approving procedures for the auction, (iv) scheduling the auction and hearing dates relating thereto, (v) approving a break-up fee, and (vi) approving the forms of notices thereof.

In support of this Motion, MRC respectfully represents as follows:

## JURISDICTION

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference entered in this district.   Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.   The matters raised herein constitute core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A), (N) & (O).

## INTRODUCTION

2.    By this Motion, the Debtor requests, *inter alia*, authorization to sell substantially all of its assets for approximately $8,138,213.54, which includes the assumption of the amounts of the loans to Debtor under the DIP Credit Facility with the Lender on modified terms (as those terms are defined in the Financings Orders described herein)[1], with certain adjustments (particularly relating to the amount owing on the post-petition working capital loan), the assumption of promissory notes with a current balance owing to Adams County, Mississippi in the amount of approximately $295,432.00 which are secured by the Debtor's Natchez manufacturing facility ("Natchez Mill"), the assumption of certain real and personal property taxes associated with the Natchez Mill for the years 2008 and 2009 which currently total approximately $658,781.54, and the assumption of certain other liabilities, all subject to and pursuant to the terms and under the conditions of the Asset Purchase Agreement between the Debtor and Purchaser dated February 16, 2010 (the "APA") subject to higher and better offers to be solicited pursuant to an auction process, as more fully described below. A copy of the APA is attached hereto as **Exhibit A**.

3.    The Debtor will consider higher and better qualifying bids for the Debtor's assets. If a higher and better qualifying bid for the Debtor's assets is received, the Debtor will have an

---

[1]   Lender is only offering the proposed Purchaser partial financing for the purchase of the Debtor's assets; the APA does not include such financing as a condition and Lender is not offering financing to any other prospective bidder.

auction (the "Auction") to select the highest and best bid for the Debtor's assets. To facilitate the

Auction, the Debtor requests that the Court approve various procedures and guidelines relating to

the bidding and sale of the Debtor's assets.  Included in these procedures is the request that the

Purchaser be paid $138,000 for a break-up fee in the event Purchaser is outbid by a qualified

buyer, to help reimburse Purchaser for its costs and expenses associated with being a stalking

horse bidder.

4.    In this regard, by this Motion, the Debtor requests that this Court enter the following

orders:

- **The Bidding Procedures Order**: The Debtor requests that the Court enter an order substantially in the form as the one attached hereto as **Exhibit B** (the "Bidding Procedures Order") approving: (i) the bidding procedures in substantially the form annexed as **Exhibit 1** to the Bidding Procedures Order (the "Bidding Procedures"), (ii) notice of the bid deadline, Auction and other dates and deadlines relating to the sale of the Debtor's assets, including the dates, times and place for the Auction and the hearing on the approval of the sale to the highest and best bidder, in substantially the form annexed as **Exhibit 2** to the Bidding Procedures Order (the "Bid Procedures and Sale Notice"); and (iii) notice to counterparties to the Debtor's executory contracts and leases that may be assumed and assigned pursuant to the contemplated sale, in substantially the form annexed as **Exhibit 3** to the Bidding Procedures Order (as described in more detail below, the "Cure Notice").

- **The Sale Order:** The Debtor further requests that this Court enter an order (the "Sale Order") substantially in the form attached hereto as **Exhibit C** (but subject to reasonable modification by any Winning Bidder (as defined *infra*)) based upon the outcome of the Auction and the Sale Hearing (defined *infra*) approving (i) the sale of the Debtor's assets free and clear of liens, claims and encumbrances under sections 363(b) & (f) of the Bankruptcy Code, and (ii) the assumption and assignment of certain executory contracts and unexpired leases in connection with such sale under section 365 of the Bankruptcy Code.

5.    Consequently, this Motion is divided into two parts. Part I constitutes the Debtor's

request for approval of the Bidding Procedures Order.  Part II constitutes the Debtor's request for

substantive relief - approval of the sale of substantially all of its assets, free and clear of liens,

claims and encumbrances, except those as set forth in the APA, and the corresponding assumption and assignment of any associated executory contracts and unexpired leases.

**BACKGROUND**

6.    MRC filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") on February 16, 2010, (the "Petition Date").    MRC is conducting its business and is operating as a debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.   MRC is an Ohio corporation originally formed in 1991.

7.    As of the Petition Date, MRC's books and records reflect that MRC had assets (at book value) for approximately $13,736,035.00 and liabilities of approximately $19,461,589.00. Management believes the fair market value of MRC's assets is substantially less than the stated book value.    For the calendar year ending 2009, MRC had sales totaling in excess of $37,569,136.   MRC is managed by an eight-person management team with many years of waste paper industry experience.   The MRC recycling division employs a total of sixty-nine (69) employees: twenty-eight (28) in production, sixteen (16) in maintenance, five (5) in the lab, eleven (11) in shipping/receiving, and nine (9) in administrative roles. Most of the departments are housed in MRC's Natchez Mill (as defined below).   North American Paper Company ("NAPCO"), a division of MRC, employs a total of six (6) employees.

8.    MRC, headquartered in Worthington, Ohio, is a leading producer of market de-inked recycled pulp ("MDIP") in the United States.   MRC was formed as a sister company to  NAPCO in 1990 in order to use a mothballed tissued/egg carton mill located in Natchez, Mississippi (the "Natchez Mill") to produce MDIP.   MRC began operations in 1991 and acquired the Natchez Mill shortly thereafter.   As part of a capital improvement to the Natchez Mill involving an addition to its warehouse facilities, MRC previously transferred to a local government authority,

and leases back with an option to purchase for a nominal amount at the end of the lease, a portion of the Natchez Mill.  In addition to the Natchez Mill, MRC utilizes an office in Appleton, Wisconsin.

9.   On December 31, 1993, NAPCO was merged into MRC. Today, NAPCO operates as a division of MRC.  The NAPCO division still acts as a broker/dealer in paper and pulp products, maintaining its original focus on the by-products of primary grades of pulp and paper manufacturing process.  NAPCO engages in functions such as purchasing, storing, distributing, and selling various grades of pulp, paper, board, waste papers, as well as field rejects.

10. MRC's recycling division engages in the production of pulp by recycling waste paper.  MRC transports waste paper to its Natchez Mill via rail and trucks and subjects the waste paper to various washing cycles.  During this process, ink particles, glue and other impurities are removed from the waste paper.  It is then treated and bleached with chemicals to produce market deinked recycled pulp ("MDIP").  MRC manufactures various grades of MDIP pulp according to customers' specifications. Grades of MDIP pulp can be converted into end products such as file folders, paper towels, tissue paper, carbon paper, premium grade paper and food grade paper products.  MRC is the only company that is approved by the FDA whose recycled pulp can be used to manufacture food contact paper products.  MRC received a patent in May, 2008 for the development of a proprietary process that removes fluorescence from food grade pulp.  MDIP producers such as MRC sell their end products to tissue and paper manufacturers that make products containing recycled materials.  MRC provides unique pulp solutions that its customers cannot develop in-house.

11. The global economic crisis had adversely affected companies of all sizes across all industries. Previously sound companies are facing reduced demand from their customers and

constraints in financing.  The paper industry in the United States is comprised of many of MRC's customers such as publishers and coded/treated paper manufacturer's, stationery product manufacturers and paper wholesalers.  Although the U.S. paper market is the largest in the world, the production of paper products by the U.S. has declined over the past decade due to lower demand.  Despite the current economic downturn, sales of paperboard packaging and recycled paper products are expected to grow strongly over the next few years.  Players in the MDIP industry produce recycled pulp that paper manufacturers mix with virgin pulp to produce paper products that contain recycled content.

12. The global economic downturn negatively impacted MRC's operational performance. High costs of raw materials and other inputs over the past few years have had an adverse effect on MRC.  Regardless, MRC generated significant sales growth in fiscal year 2008 over fiscal year 2007.  The company generated approximately a 30% increase in revenue in fiscal year 2008 compared to fiscal year 2007, despite an almost 33% increase in costs of goods sold. However, during the fiscal year 2009, MRC was negatively impacted by the loss of Kimberly Clark Corporation and International Paper Company, a New York corporation ("International Paper"), businesses.  The job and tonnage requirements of MRC's remaining customers lead to lower revenue and reduction in gross margin.

13.  Prior to the commencement of the Case, MRC's primary lender was The CIT Group/Equipment Financing, Inc., a Delaware corporation ("CIT").  MRC's obligations to CIT were evidenced, in part, by that certain Second Amended and Restated Loan and Security Agreement dated as of March 14, 2006, together with all such other loan documents executed in connection therewith or relating thereto, as amended (collectively the "Senior Secured Loan Documents").  In late November, 2009, due to certain defaults of MRC under the Senior Secured

Loan Documents, CIT ceased funding under MRC's working capital credit facility. As a result, MRC ceased production at its Natchez Mill. The operations remained idle except for approximately one (1) week in December, 2009 during which time MRC restarted the mill to produce approximately 1,000 tons of recycled waste paper for one of MRC's largest customers. That customer paid all costs associated with the production run in December, 2009.

14. In early January, 2010, MRC entered into a Production and Consignment Agreement (the "Consignment Agreement") with International Paper, pursuant to which MRC agreed to produce and sell to International Paper approximately 4,000 tons of recycled de-inked pulp. All raw materials, inventory, chemicals, and finished product at MRC's plant were purchased by International Paper and subsequently consigned by International Paper to MRC to conduct and complete the required production runs under the Consignment Agreement. The production run during the month of January lasted approximately 19 days, and International Paper funded all of the related production costs. MRC and International Paper executed a First Amendment to the Consignment Agreement (the "First Amendment") in early February, 2010, extending the Consignment Agreement through February 22, 2010. Under the First Amendment, International Paper continued to hold and store its raw materials and products at MRC's Natchez Mill upon the same consignment terms as provided in the Production and Consignment Agreement. On February 15, 2010, International Paper and MRC entered into a Second Amendment to Production and Consignment Agreement (the "Second Amendment") further extending the term of the Agreement through and until April 30, 2010, and further extending the agreement of the parties that International Paper will continue to hold and store, on consignment, its inventory and raw materials in the Natchez Mill.

15. On or about February 8, 2010, CIT sold, assigned and transferred virtually all of its right, title and interest in and under the Senior Secured Loan Documents (with certain limited exceptions) to Supplier Finance Company, LLC, a Delaware limited liability company, (the "Lender"), which is a wholly owned subsidiary of International Paper. The total indebtedness claimed to be owing to Lender, as assignee of CIT under the Senior Secured Loan Documents, as of the Petition Date is in the amount of approximately $9,775,000. The foregoing obligations, together with, as of the Petition Date, all fees, costs and expenses (including, but not limited to, attorneys' fees and expenses), and other charges, amounts and costs owing, accrued, accruing or chargeable in respect thereof, of any kind or nature, whether existing or contingent, payable to or for the benefit of any person or entity, pursuant to any of the foregoing agreements, instruments or documents, is referred to as the "Senior Secured Indebtedness." MRC's obligations owing to Lender under the Senior Secured Loan Documents, including the Senior Secured Indebtedness, are secured by security interests created under the Senior Secured Loan Documents (the "Pre-Petition Senior Liens") in essentially all assets of MRC, including Accounts, Equipment, Inventory and other Goods, Documents of Title, General Intangibles, Investment Property, Real Property, and Other Collateral, all as defined in the Senior Secured Loan Documents.

16. As a condition to continuing financial accommodations by CIT, in March, 2009, MRC hired an investment banker, SSG Capital Advisors, LLC ("SSG") to assist MRC in marketing the sale of substantially all of its assets, and to identify potential purchasers for MRC's assets and business, with the consent and approval of CIT. A private placement memorandum was created and circulated in May, 2009. SSG actively marketed the sale of the Debtor's assets and business. SSG was ultimately able to identify two prospective acquirers who

submitted detailed letters of interest. However, in each case, SSG and MRC were ultimately unable to negotiate an acceptable purchase offer on terms and conditions acceptable to CIT.

17. Management of MRC believes that MRC's business is poised to succeed in this market environment due to several factors including but not limited to, its knowledgeable management team; the fact that it is the sole, FDA certified MDIP producer of pulp for use in food contact paper products; and, that MRC is a leader in the MDIP industry and has established a solid reputation with its vendors and customers as a trusted business partner. MRC has filed this chapter 11 proceeding in order to preserve the ongoing value of its assets and to provide a substantive and procedural mechanism for the realization of that value, so as to maximize the value of its assets for the benefits of all parties in interest.

18. In order to provide a means for achieving the preservation of MRC's ongoing concern value, Lender has conditionally agreed to loan additional working capital on a post-petition basis, subject to the terms and conditions to be approved by this Court, with the understanding that the assets and business of MRC will be sold in its chapter 11 proceeding. To that end, Lender has consented to the sale of MRC's assets to Mississippi Recycling Company, LLC, an Ohio limited liability company ("Buyer"), on the terms and conditions of a certain Asset Purchase Agreement, free and clear of liens, claims and encumbrances except those as set forth in the Asset Purchase Agreement all subject to higher and better offers after an auction, and Lender's respective rights under 11 U.S.C. § 363(k).

19. After an analysis of its alternatives, the Debtor concluded in its reasonable business judgment, exercised pre-petition, to enter into the APA with Purchaser subject to its receipt of higher and/or better offers. In addition to making the highest and best bid for the Debtor's assets, the Debtor has been informed that Purchaser has the financial wherewithal and ability to

close the transactions contemplated. In addition, this is the first Purchaser that has been able to satisfy the concerns of the MRC's now current Lender. Because Purchaser is owned by parties that are related to or are part of current management as set forth in further detail below, the Debtor believes that the purchase will involve a more seamless transition which will be the least interruptive of MRC's current business operations.

20. The Debtor intends to treat the Purchaser and the APA as a stalking horse bid for its assets, and if no other higher or better bid(s) are received, then the APA with Purchaser will become the winning bid for the Debtor's assets as set forth therein (without the necessity of an Auction).

21. Generally speaking, and without otherwise limiting the terms and conditions of the APA, the APA provides for a sale of the Debtor's assets to Purchaser on the following principal terms[2]:

- The Debtor will sell and Purchaser will purchase substantially all of Debtor's assets free and clear of liens, claims and encumbrances, except certain Excluded Assets. Purchaser will also assume certain obligation of Debtor, including the Adams County Mississippi secured loans and real and personal property taxes associated with the Natchez Mill. The assets to be purchased (collectively as defined in the APA, the "Purchased Assets") will include: the portion of the Natchez Mill owned by Debtor, a lease associated with the remaining portion of the Natchez Mill, a condominium located in Bridgeport, West Virginia used for business purposes, certain leases of real property, contracts and purchase orders, intellectual property, other leases, machinery, equipment, inventory, accounts receivable, deposits and prepaid expenses, all cash and cash equivalents, all books, records, papers and instruments, all rights, privileges, permits, claims, setoffs, causes of action (except avoidance actions), and options of the Debtor, all goodwill, and all other tangible and intangible assets as may be set forth in greater detail in Paragraph 1 to the APA, and the accompanying schedules.

---

[2] This listing is a summary of what the Debtor believes are the principal terms of the APA and is provided for the convenience of the parties only. Although every effort has been made to accurately describe the principal terms of the APA, the summary is not intended to be a complete recitation of the APA's terms and conditions. To the extent there are inconsistencies between this summary and the APA, or other material terms of the APA have been excluded for the sake of brevity or generalization, the reader is advised, and encouraged, to consult the terms of the APA, the specific terms of which shall control. Terms not defined in this summary shall have the same meaning as under the APA.

- The purchase price for the Purchased Assets will be approximately $8,138,213.54, [which, for this buyer alone, includes the assumption of the amounts of the loans to Debtor under the DIP Credit Facility with the Lender on modified terms (as those terms are defined in the Financings Orders described herein)] with certain adjustments (particularly relating to the amount owing on the post-petition working capital loan), the assumption of promissory notes with a current balance owing to Adams County, Mississippi in the amount of approximately $295,432.00 which are secured by a portion (warehouse) of the Debtor's Natchez manufacturing facility ("Natchez Mill"), the assumption of certain real and property taxes associated with the Natchez Mill which currently total some $658,781.54, and the assumption of certain other liabilities of the Debtor, including the amounts necessary to cure monetary defaults under any assumed and assigned executory contracts or unexpired leases.

- If Purchaser is the winning bidder for the Purchased Assets, the Debtor will assume and assign to Purchaser the executory contracts and unexpired leases as set forth on the APA as the same shall be supplemented and filed with the Court. If Purchaser is not the winning bidder, Purchaser is to be paid $138,000 as and for a break-up fee, to help offset the costs that Purchaser has incurred in its due diligence and other costs.

- The sale to Purchaser under the APA is expressly subject to the Debtor's solicitation of higher and better offers pursuant to the Bidding Procedures, as more fully described below.

## RELIEF REQUESTED AND REASONS THEREFOR

22. The Debtor respectfully requests, pursuant to sections 105, 363(b) & (f), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006(a) entry of (a) the Bidding Procedures Order approving, *inter alia*, (i) the Bidding Procedures; (ii) the Bid Procedures and Sale Notice; and (iii) the Cure Notice; and (b) the Sale Order approving (i) the sale of the Debtor's assets free and clear of liens, claims and encumbrances except those as set forth in the APA, and (ii) the assumption(s) and assignments(s) of certain executory contracts and unexpired leases in connection with the sale of the Debtor's assets.

## PART I – REQUEST FOR APPROVAL OF BIDDING PROCEDURES

23.  In order to facilitate the orderly sale of the Debtor's assets, the Debtor requests that the Court approve the bidding and auction procedures set forth below and the manner in which notice of the Auction and Sale Hearing and proposed Cure Amounts (defined infra), if any, are to be provided to creditors, prospective purchasers, counterparties to executory contracts and unexpired leases and other parties in interest.

24.  As noted above, the Debtor proposes to consider alternative bids for its assets, in a manner which is substantially the same as the purchase described in the APA.

25.  The Debtor will consider the transaction contemplated by the APA, along with any and all other bids received for the Debtor's assets at the Auction, and will seek Bankruptcy Court approval of the transaction, that, in the Debtor's reasonable business judgment and in consultation with the Official committee of Unsecured Creditors (if one is appointed herein) (the "Committee"), and Lender, which will maximize the recovery for the Debtor's estate and creditors in this Case.

### The Bidding Procedures

26.  In an effort to ensure that maximum value is obtained for the Debtor's assets in a reasonably coordinated fashion, the Debtor requests that this Court approve the certain Bidding Procedures attached as Exhibit 1 to the attached Bidding Procedures Order, which provide as follows:

### Notice of Bid Procedures

- By the third business day following the Court's entry of the Bidding Procedures Order, the Debtor will serve a copy of the Bidding Procedures Order and the Bid Procedures and Sale Notice by first-class mail, postage prepaid, to all creditors and parties in interest including (1) any potentially interested purchasers identified by the Debtor and the Lender, (2) the Office of the United States Trustee, (3) counsel for the Debtor's Lender, (4) counsel for the Purchaser, (5)

counsel for the Official Committee of Unsecured Creditors, if any, (6) each counterparty to the Debtor's executory contracts and unexpired leases, (7) parties in interest that have requested notice, (8) all parties who are known to possess or assert a lien, claim, or encumbrance, or interest in or upon any of the Debtor's assets, (9) and all applicable federal, state and local regulatory or taxing authorities.

- Interested bidders requiring information about the bid qualification process, the Purchased Assets or the Debtor's business should contact the Debtor's counsel, Richard K. Stovall and Thomas R. Allen, Allen Kuehnle Stovall & Neuman LLP, LLC, 17 South High Street, Suite 1220, Columbus, Ohio 43215, Phone: 614.221.8500, Fax: 614.221.8500, E-mail: stovall@aksnlaw.com.

## Qualified Bidders

- Persons seeking to submit a Qualified Competing Bid (defined *infra*) pursuant to the Bidding Procedures and desiring to participate in the Auction must deliver to the Debtor's Counsel, Richard K. Stovall and Thomas R. Allen, Allen Kuehnle Stovall & Neuman LLP, 17 South High Street, Suite 1220, Columbus, Ohio 43215, Phone: 614.221.8500, Fax: 614.221.8500, E-mail: stovall@aksnlaw.com, the following:

  i) an executed confidentiality agreement, a copy of which is available from the Debtor's Counsel;

  ii) financial and other information that will allow the Debtor in consultation with the Lender, and the Committee (if any), to make a reasonable determination as to such person's financial capability to consummate a purchase of the Debtor's assets within the timeframe set forth for closing and provide adequate assurance of future performance of any executory contracts and unexpired leases, and

  iii) other documentation in form and substance reasonably satisfactory to the Debtor as may subsequently be requested by the Debtor, from time to time.

- A person who complies with all the requirements set forth in the Bidding Procedures may be determined by the Debtor in consultation with the Lender to be a "Qualified Bidder." Purchaser is deemed to be a Qualified Bidder.

- Qualified Bidders desiring to conduct due diligence shall contact the Debtor's Counsel and will be provided access to an electronic data room provided that the Debtor reserves the right to limit access to certain due diligence information and otherwise manage the process of providing due diligence information to Qualified Bidders who may be direct competitors of the Debtor. All due diligence efforts undertaken by Qualified Bidders must be completed by the date bids are due; and

after such date, the Debtor shall have no obligation to furnish any additional due diligence information relating to the Debtor's business or the Purchased Assets.

### Form of Competing Bids

- In order for the Debtor to be able to quickly compare and contrast the differing terms of any bids, all bids of a Qualified Bidder must be in writing, and be submitted under substantially the same form as the APA. Each Qualified Bidder must submit an executed "clean" version of its bid, together with a black lined version to reflect any proposed changes in the terms and conditions of its bid as compared against the APA.[3] It is noted that the Purchaser has agreed to assume the amounts due on the loans under the DIP Credit Facility pursuant to an agreement with the Lender. All other bidders must pay cash.

- If any bids are conditioned upon the assumption and assignment of any executory contract and/or unexpired leases of the Debtor, then such Qualified Bidder submitting such bid shall be required to provide evidence of its ability to provide adequate assurance of future performance of such contract or lease in addition to assumption of the Cure Amount associated with such executory contract or unexpired lease.

- All bids must be submitted in writing so that they are actually received by no later than _____ [___], 2010, at 12:00 noon (the "Bid Deadline") by the Debtor's Counsel at his e-mail address or fax to: Richard K. Stovall and Thomas R. Allen, Allen Kuehnle Stovall & Neuman LLP, LLC, 17 South High Street, Suite 1220, Columbus, Ohio 43215, Fax: 614.221.8500, E-mail: stovall@aksnlaw.com.

### Terms for Qualified Competing Bids

- Unless otherwise waived by the Debtor in writing, the Debtor after consultation with the Lender will qualify a competing bid (a "Qualified Competing Bid") only if such bid:

    (i)     is accompanied by an earnest money deposit of at least $100,000;

    (ii)    exceeds the Purchase Price set forth in Section 4 of the APA without adjustment by more than the aggregate amount of

         a) an initial overbid amount of $200,000 ("Overbid Amount"); and

         b) be submitted on terms no less favorable and no more burdensome to the Debtor than under the APA including that the competing bidder will assume the Assumed Liabilities;

---

[3] In order to facilitate the submission of a party's bid, such party may request a Microsoft Word™ copy of the APA from the Debtor's Counsel, which counsel will promptly provide.

(iii)    identifies the proponents of the bid;

(iv)    discloses the bidder's relationship to or connection with any party in interest in this Case or affirmatively discloses that it has no relationship or connection to or with any party in interest in this Case, discloses an officer or representative who is authorized to appear on behalf of the bidder;

(v)    provides sufficient indicia that the bidder is financially capable and has the requisite corporate or similar authority to sign and consummate a binding and enforceable asset purchase agreement and or assignment agreement and that any representative acting on behalf of such bidder is legally empowered, by a power of attorney or otherwise, to execute the bid on behalf of the bidder;

(vi)    does not contain any contingencies as to the validity, effectiveness, and/or binding nature of the offer, including, without limitation, contingencies for approvals, financing, due diligence or inspection;

(vii)    contains an acknowledgment that: (a) the bidder has had an opportunity to examine the Purchased Assets and liabilities of the Debtor prior to making its offer, (b) the bidder has relied solely upon its own independent review, investigation and/or inspection of any documents in making its bid, (c) the bidder did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection with the Debtor's implementation of the Bidding Procedures, (d) the bidder agrees to be bound by the terms and conditions of the Bidding Procedures, and (e) the competing proposal is irrevocable until (y) fifteen (15) days after the entry of an order by the Bankruptcy Court approving such bid as the highest and best bid and authorizing the Debtor to enter into an agreement with respect thereto; and (z) until ten (10) days following the closing of the transactions contemplated under the Winning Bid (defined *infra*), if such bid is approved by the Bankruptcy Court as the Back-Up Bid (defined *infra*);

(viii)    contains a representation that such bidder has no agreement with any other bidder concerning the price to be paid for the Purchased Assets;

(ix)    is not subject to termination, except on the same terms as set forth in the APA, and along with any higher or better bid submitted by such bidder at the Auction, is irrevocable until 48 hours after the closing of a sale to a third party of the assets subject to such bid;

(x) does not request or entitle the bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment;

(xi) does not include any modifications to the APA that the Debtor does not deem acceptable; and

(xii) identifies, with particularity, each and every executory contract or unexpired lease the assumption and assignment which is a condition to closing.

(xiii) must be in cash payable via wire transfer.

**Earnest Money Deposit Requirement**

- As stated above, all bids shall be accompanied by an initial deposit (the "Earnest Money Deposit") of $100,000. The Earnest Money Deposit shall be in the form of a certified check or wire transfer payable to the Debtor. All Earnest Money Deposits shall be held by the Debtor, without interest, until such time as the bids are officially rejected by the Debtor. Such Earnest Money Deposits shall be forfeited in the event that (i) with respect to any Winning Bid (defined *infra*), such winning bidder defaults or (ii) with respect to any Back Up Bid (defined *infra*), any Back Up Bidder for an accepted Back Up Bid defaults.

- Any bid that does not comply with the foregoing requirements may not be considered by the Debtor, in its sole and absolute discretion, after consultation with the Committee (if any) and the consent of the Lender. Moreover, the Debtor may, after consultation with the Committee (if any) and the Lender, reject any bid that it deems to be: (i) inadequate or insufficient; or (ii) contrary to the interests of the Debtor or its estate. Any such rejection of a bid may be made at any time prior to Court approval.

**Confidentiality**

- All bids shall be kept confidential with access restricted to the Debtor, the Lender, the Committee (if any) and any of their respective professionals, provided, however, that the Debtor shall be permitted to share information concerning the bidder's financial condition with counterparties to its executory contracts and unexpired leases, as requested, sufficient to permit such parties to assess the bidder's ability to provide adequate assurance of future performance of such executory contracts or unexpired leases.

- The Debtor may request such additional information from a bidder as necessary in order to evaluate the bidder's ability to consummate a transaction and to fulfill its obligations in connection therewith and such bidder shall be obligated to provide such additional information as a precondition to participating further in the Auction.

**Auction Details**

- If the Debtor receives one or more Qualified Competing Bids submitted by a Qualified Bidder (other than the Purchaser), the Debtor will conduct the Auction. (Otherwise, the Debtor shall seek Bankruptcy Court approval to consummate the APA with the Purchaser at the Sale Hearing). The Auction will be conducted at the offices of Allen Kuehnle Stovall & Neuman LLP, LLC, 17 South High Street, Suite 1220, Columbus, Ohio 43215 on _____ [__], 2010, beginning at 9:00 a.m. Eastern Standard Time. All Qualified Bidders that have submitted a Qualified Competing Bid shall appear in person at the Auction or through a duly authorized representative. If multiple Qualified Competing Bids are received, each Qualified Bidder shall have the right to continue to improve its bid at the Auction, with bid increments set at $50,000 (the "Minimum Overbid Amount"). The Debtor shall conduct an open Auction on the record and recorded by a court reporter. Qualified Bidders shall be permitted to caucus privately among themselves (but not with other Qualified Bidders) at any time, with or without the participation of the Debtor and its advisors; provided, however, the Debtor reserves the right to impose uniform reasonable time restrictions on such caucuses so that the Auction may continue and be completed in an orderly and timely manner. The Debtor may adopt such other rules for the Auction (including rules that may depart from those set forth herein) that it anticipates will result in the highest or otherwise best value for its estate and that are not inconsistent with any Bankruptcy Court order, provided that any changed or additional rules for the Auction are not materially inconsistent with these Bidding Procedures and are communicated to all participants at or prior to the Auction.

- Any and all disputes related or pertaining to, or resulting or arising from, the marketing process, the Auction, the sale of the Purchased Assets, and/or the conduct of the Debtor and/or any of its professionals, shall be adjudicated solely by this Court. The submission of a bid shall constitute express consent by the bidder to the exclusive jurisdiction of the Court for all such matters.

- Nothing in the Bidding Procedures Order or the Bidding Procedures shall deprive the Lender from its respective rights under 11 U.S.C. § 363(k) which rights extend to its full pre-petition debt and the amount of new funds loaned under the DIP Credit Facility.

**Selection of Winning Bid**

- At the conclusion of the Auction, subject to Court approval, the Debtor may select the winning bid after consultation with the Committee (if any) and the Lender and any of their professionals (the "Winning Bid") and a back-up bid ("Back-Up Bid") (if any). The Debtor will accept a Winning Bid only when (a) the Court has approved the Winning Bid and Winning Bidder, (b) the Sale Order approving such Winning Bid has been docketed, and (c) definitive documentation

has been executed and delivered by the Debtor.

**Break-up Fee**

- In the event that Purchaser is not the Winning Bidder, Purchaser will receive a break-up fee, to be paid from the proceeds of the eventual sale to the Winning Bidder, in the amount of $138,000.

**Report of Sale**

- In accordance with Bankruptcy Rule 6004(f), the Debtor shall promptly file with the Court a notice of the selection of the Winning Bid and the Back-Up Bid, if any, which shall include a statement of the property to be sold, the identification of the Winning Bidder and Back-Up Bidder, and the price to be received under such bids for the Debtor's property.

**Court Approval After Hearing**

- Pursuant to the proposed Bidding Procedures Order, if approved, a hearing with respect to the approval of the Winning Bid and Back-Up Bid and to confirm the results of the Auction (the "Sale Hearing"), will be held before the Honorable _____, United States Bankruptcy Judge at the United States Bankruptcy Court for the Southern District of Ohio, 170 N. High St., Courtroom A, Columbus, Ohio 43215 on [_____], 2010, at ___:00 a.m. (subject to and contingent upon the Court's availability). Pursuant to the proposed Bidding Procedures Order, the Debtor proposes that objections, if any, to the relief requested to be approved at the Sale Hearing (other than an objection to a proposed purchaser's ability (other than Purchaser's) to provide adequate assurance of future performance which may be made at the Sale Hearing) must be filed with the Court and served so as to be actually received by no later than [_____], 2010, at 4:00 p.m. by the Office of the United States Trustee, counsel for the Debtor, counsel for the Debtor's Lender, counsel for the Purchaser, and counsel for the Official Committee of Unsecured Creditors, if any.

- The proposed Bidding Procedures Order provides that the failure of any objecting person or entity to timely file and serve its objection in accordance with this Bidding Procedures Order shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion or the consummation and performance of the Sale as contemplated by the terms of the APA or alternatively by the terms of the Winning Bid with the Winning Bidder (including the transfer of the Purchased Assets free and clear of all Liens, claims, encumbrances and interests as part of the Sale).

**Closing**

- The closing of the Sale to the Winning Bidder shall occur in accordance with the

terms of such bidder's executed APA, unless otherwise agreed to in writing by the Debtor, or as otherwise provided by an order of the Court. Except as otherwise provided by further order of the Court, at the closing, the Winning Bidder shall pay the balance of any purchase price by wire transfer or an endorsed bank or certified check.

### Failure To Consummate Purchase

- As set forth above, all bids submitted by any Qualified Bidder at the Auction shall be irrevocable until 48 hours after the closing of a sale to the Winning Bidder of the assets subject to the Winning Bid. If, for any reason, the Winning Bidder fails to consummate a purchase of the assets, or any part thereof, the Back-Up Bid will automatically be deemed to be the highest and best bid with respect to such assets, and the Debtor, after consultation with the Committee (if any) and the Lender, shall be authorized, but not required, to affect the sale of such assets to the Back-Up Bidder as soon as it is commercially reasonable without further order of the Bankruptcy Court. If the failure to consummate the purchase is the result of a breach by the Winning Bidder, its Earnest Money Deposit shall be forfeited to the Debtor and the Debtor specifically reserves the right to seek all available damages from such Winning Bidder.

### Return of Earnest Money Deposits

- Promptly after a Winning Bid has been selected and sale of the assets to the Winning Bidder has been approved by the Bankruptcy Court and has closed, any Earnest Money Deposits of the Qualified Bidders who are not the Winning Bidder shall be returned.

### Notice Procedures with Respect to Executory Contracts and Leases

27. Under Bankruptcy Rules 2002 and 6004, unless the Court shortens the time period for cause shown, the Debtor is required to provide twenty-one (21) days' notice to its creditors and other parties in interest of a sale of its assets outside the ordinary course of business, including disclosure of the time and place of any public (auction) sale, the terms and conditions of the sale, and the deadline for filing any objections. See Fed. R. Bankr. P. 2002(a)(2), (c) & 6004. Additionally, Bankruptcy Rule 6006 provides where a debtor chooses to assume, reject or assign an executory contract or unexpired lease, that such request be made by motion under 9014 with notice given to the counterparty to the unexpired contract or lease "as the court may direct."

See Fed. R. Bankr. P. 6006. In the instant case, counterparties to the Debtor's executory contracts and unexpired leases shall be served a copy of this Motion and the Debtor's subsequently filed and served "Cure Notice" in sufficient time that such parties will have at least twenty-one (21) days to object to the sale or the proposed assumption and assignment of their executory contract or lease and the Cure Amount, if any, proposed to be paid. In order to provide counterparties notice of the Debtor's intent to assume and assign (or reject), the Debtor proposes to serve the notice attached to the Bidding Procedures Order as Exhibit "3" (the "Cure Notice"), identifying, *inter alia*, the Cure Amount of such contracts, on the counterparties to executory contracts and unexpired leases which may be assumed, assigned or rejected in connection with the sale of the Debtor's assets at Auction.

28. Recent amendments to Bankruptcy Rule 6006 limit the availability of a debtor to assume or assign multiple executory contracts or unexpired leases under one motion unless "(1) all executory contracts or unexpired leases to be assumed or assigned are between the same parties or are to be assigned to the same assignee; (2) the trustee seeks to assume, but not assign to more than one assignee, unexpired leases of real property, or (3) the court otherwise authorizes the motion to be filed." See Fed. R. Bankr. P. 6006(e). For the sake of administrative convenience and to save time and costs to the estate, the Debtor respectfully requests this Court approve this Motion despite the fact that the relief sought hereunder could potentially trigger Rule 6006(e)'s limitation on omnibus assumptions and assignments. The purpose of the 2007 Amendments to Rule 6006 was "to ensure that the nondebtor parties to the contracts and leases receive effective notice of the motion." See Fed. R. Bankr. P. 6006, Advisory Committee Note – 2007 Amendment. In the instant Case, the non-debtor counterparties clearly will receive effective and meaningful notice of the Debtor's intent to assume and assign their contracts to

Purchaser or to the Winning Bidder under an alternative transaction or potentially reject such contracts or leases through their receipt of the Motion and the subsequent Cure Notice.

**Approval of Bid Procedures**

29.   Within the framework established by the DIP Order, the Debtor believes that the foregoing Bidding Procedures will provide a reasonable and appropriate framework for selling the Debtor's assets, one which will enable it to effectively review, analyze and compare all bids received in order to maximize the return received for the Debtor's assets.   The Debtor therefore believes that approval of the Bid Procedures is in the best interest of the Debtor's estate. Consequently, the Debtor respectfully requests that this Court approve the Bidding Procedures under Part I of this Motion.

30.   The proposed Bid Procedures, Sale Notice and Cure Notice comply with Bankruptcy Rules 2002(a)(2) & (c) and 6004 and 6006 and includes all the information necessary to enable interested parties to meaningfully participate in the Auction and the Sale Hearing if they desire to do so.

31.   The Debtor proposes to serve the Bid Procedures and Sale Notice within three (3) business day after the entry of the Bidding Procedures Order, by first class mail, to all creditors and parties in interest, including, specifically, (1) any potentially interested purchasers identified by the Debtor or Lender (2) the Office of the United States Trustee, (3) counsel for the Debtor's Lender, (4) counsel for the Purchaser, (5) counsel for the Official Committee of Unsecured Creditors, if any, (6) each counterparty to the Debtor's executory contract s and unexpired leases, (7) parties in interest that have requested notice, (8) all parties who are known to possess or assert a lien, claim, or encumbrance, or interest in or upon any of the Debtor's assets, (9) any applicable federal, state and local regulatory or taxing authorities.

32.  The Debtor shall further file with this Court a report of the results of the Auction ("Sale Report") promptly after it concludes identifying the highest and best bid, *i.e.*, the Winning Bid selected by the Debtor and its principal terms. The report shall identify, among other things, (i) the proposed purchaser of the assets, (ii) the assets to be acquired, (iii) the consideration to be paid by such purchaser for the assets, (iv) the material terms upon which such purchase are based, (v) any material executory contracts and unexpired leases to be assumed and assigned to the purchaser. The Debtor will append to its Sale Report as an exhibit a copy or copies of the asset purchase agreement selected as the Winning Bid. If no Qualified Competing Bids are received for any of the Debtor's assets, the Debtor will dispense with the need for the Auction and promptly file a Sale Report which discloses that it failed to receive any Qualified Competing Bids and identifying the Purchaser as the Winning Bidder.

33.  The Debtor submits that the notice to be provided through the Bid Procedures and Sale Notice, this Motion, the Cure Notice and the Sale Report, and the method of service proposed herein constitutes good and adequate notice of the sale of the Debtor's assets, the assumption, assignment or rejection of the Debtor's executory contracts and unexpired leases, the fixing of the Cure Amount related thereto, and the proceedings to be had in connection therewith.

## **PART II –Request for Approval of Sale of Assets**

### **The Sale of the Debtor's Assets**

34.  The sale of substantially all the Debtor's assets and assumption and assignment of its executory contracts should be approved under section 363(b) and (f) as a reasonable and appropriate exercise of the Debtor's business judgment. Section 363 of the Bankruptcy Code

provides in pertinent part: (b)(1) The trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, … 11 U.S.C. § 363(b).

35. Section 363(b) grants the Bankruptcy Court wide latitude to approve a sale of substantially all of a debtor's assets in the exercise of its discretion where a sound business purpose dictates such action. *See Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986). *See also In re Baldwin United Corp.*, 43 B.R. 905 (Bankr. S.D. Ohio 1984) (Bankruptcy Court's power to authorize a sale under Section 363(b) of the Code is to be exercised at its discretion utilizing a flexible case-by-case approach).

36. For a sale of substantially all of a debtor's assets outside a plan of reorganization, the Sixth Circuit has determined only that "there must be some articulated business justification … for using, selling, or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)." Id. at 389 (citing with approval *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983)). See also *In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 210 (Bankr. S.D. Ohio 2008) (adopting Stephens Industries standard).

37. In *Stephens Industries*, the Sixth Circuit reviewed a Bankruptcy Court's order authorizing the sale of substantially all of the assets of a radio station outside a plan of reorganization over the objection of its secured lender. The lender was the prior owner of the station that had financed the Debtor's installment purchase of the radio station and taken in return a note and security interest in the station's assets. Discussing the standard which a bankruptcy court should apply in reviewing a sale application, the Sixth Circuit indicated a bankruptcy judge should "'expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.'" *Stephens*, 789 F.2d at 389 (citing Lionel, 722 F.2d at 1071). In affirming the Bankruptcy Court's decision to approve the sale in Stephens

Industries, the Sixth Circuit importantly noted that "the trustee was unable to operate the radio station at a profit," and that the trustee "faced the prospect of shutting down operations because [the debtor's] dilapidated equipment was failing and [the debtor] could not meet payroll and other necessary operating expenses. *Id*. at 387. Additionally, although the Bankruptcy Court had expressed some dissatisfaction "with the evidence as to the nature and extent of the advertising done by the debtor in possession in an attempt to effectuate a sale of the debtor's radio station," it also recognized that "the debtor is without funds to continue operation of the station while attempting to effectuate a better sale." *Id*. Under these circumstances, the Sixth Circuit concluded that the debtor's circumstances presented a sufficient business justification to authorize the sale and that the Bankruptcy Court did not abuse its discretion in approving it.

38. In the instant case, the Debtor similarly submits that its decision to sell its assets (in accordance with the Bidding Procedures) is a sound exercise of its business judgment and should be approved. First, like in Stephens Industries, absent the continuing infusion of monies from the Lender in accordance with the DIP Credit Facility[4], which (unless terminated earlier based on a default thereunder) is set to expire by its terms at the conclusion of the sale described herein, Debtor likely would be unable to continue its operations and would be forced to liquidate. If forced to liquidate, the Debtor would not be able to realize its substantial going concern value for the benefit of its creditors and other parties in interest. On the other hand an asset sale under the proposed Bidding Procedures will be a going-concern sale that is designed to maximize the financial recovery to the estate. In short, if a going-concern sale is not consummated, a liquidation and significant resulting loss of value to the estate will likely follow. Lending under

---

[4] Contemporaneously herewith, the Debtor and Lender are filing a motion to obtain secured post-petition financing. In the Motion and proposed Order, the DIP Credit Facility is designed to propose working capital to the Debtor for use in its operations in accordance with the agreed and proposed Budget attached to the motion.

the proposed DIP Credit Facility is conditioned, in part, on the Debtor seeking a sale of substantially all of its assets.

39. In addition, the incidental impact of Debtor's bankruptcy to interested stakeholders will be minimized by the asset sale. For example, the Debtor anticipates that many of its executory contracts will be assumed, the Debtor's offices will not be shuttered; and the Winning Bidder may hire back many of Debtor's current employees. The terms of the APA are such that, initially, the Purchaser would initially employ all of the Debtor's current employees, subject to the Purchaser's rights to terminate any such employees after the closing. It is anticipated that Purchaser, if the Winning Bidder, will retain most of the Debtor's current employees.

40. The proposed purchaser, Mississippi Recycling Company, LLC is owned by three individuals, who would be considered insiders to the Debtor.[5] The three owners are as follows: Sharon Logan (60%), the spouse of Edward S. Logan, III, Gerald Lynn Patt, Vice-President of Manufacturing for the Debtor (20%), and Tanya Smith Richardson, Product Development/Process Manager for the Debtor (20%). Edward S. Logan III owns 25.5537 per cent of the Debtor, and is the current President and Chief Executive Officer. This is a unique situation where the "insiders" have a better knowledge of the potential for the Debtor's business, and are in the best position to utilize current business strategies to guide the business in the future. Based upon the amount owing Lender which (not including the DIP Credit Facility is currently in excess of $9,775,000, and that the Debtor's prior sales efforts with its former Lender ("CIT") were unsuccessful, there is no real basis to believe that the assets of the Debtor could be sold for more than what is owed Lender. While the Debtor believes that this the proposed sale would maximize the value to the Lender, just as important is that it would keep the Debtor's pulp

---

[5] While the owners of the proposed purchaser, Mississippi Recycling Company, LLC, are insiders of the Debtor, technically, under 11 U.S.C. § 101(31), the corporate purchaser would not be considered an insider.

recycling business going, and allow it to continue employing its some 68 employees, and servicing its customers.

41. The Debtor further submits that the terms and conditions of the APA are independently fair and reasonable and that it obtained a fair price for its assets under the APA. Furthermore, the purchase price will be exposed to the market and subject to higher and better offers to be received at Auction. This, presumably, will result in the Debtor receiving the highest and best purchase price available under current market conditions. Finally, the Debtor believes it has negotiated the APA with Purchaser in good faith and at arms' length.

42. The alternative to the Debtor's sale of its assets under the APA would be a fire sale liquidation of its assets which clearly would not bring close to the amount being realized under the APA. For all these reasons, the Debtor submits that its decision to sell its assets free of all liens, claims and interests under the terms of the APA (subject to higher and better bids, in accordance with the proposed Bidding Procedures), is a sound exercise of its business judgment and because a going-concern sale will maximize the value and recovery to all major constituents, the proposed procedures for the asset sale should be approved.

43. Section 363(f) of the Bankruptcy Code further permits the trustee to sell property under subsection (b) "free and clear of any interest in such property of an entity other than the estate," see 11 U.S.C. § 363(f), however under subsection (f) the trustee can only do so if:

1.   applicable non-bankruptcy law permits sale of such property free and clear of such interest;

2.   such entity consents;

3.   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

4.   such interest is in bona fide dispute; or

5.  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. See 11 U.S.C. § 363(f).

44.  In the instant case, subsection 363(f) is satisfied because Lender, who is the pre-petition and DIP Lender (Supplier Finance Company, LLC), has consented to the Debtor's sale of its assets under the Bidding Procedures, free and clear of their liens, claims, and encumbrances with their liens to attach to the proceeds of the sale.  The sale is subject to the lien of Adams County, Mississippi and the Purchaser is assuming that debt and the debt due the Lender under the DIP Credit Facility on modified terms.  Those creditors whose debts are being assumed as part of this transaction are retaining their liens.  Accordingly, the Court should authorize the Debtor to sell its assets under the APA free and clear of any and all liens, claims and encumbrances that may be asserted (other than the assumed debts), with any such claims, liens, and encumbrances attaching to the proceeds of the sale in the same order and priority as existing at the time of the sale.

### Assumption and Assignment of Executory Contracts and Unexpired Leases

45.  To facilitate and affect the sale of the Debtor's assets, the Debtor also seeks authority to assume and assign certain executory contracts and unexpired leases to the purchaser of its assets at the Auction to the extent requested. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases subject to approval of the Bankruptcy Court as follows:

(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c) and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –

(A) cures or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any

provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under the unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

* * *

(f)(2) The trustee may assign an executory contract or unexpired lease of the debtor only if –

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease

See 11 U.S.C. §§ 365(a), (b)(1), (f)(2).

46. Accordingly, section 365 authorizes the proposed assumptions and assignments, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.

47. Based on the APA and the discussions related thereto, the Debtor anticipates that Purchaser will seek to assume the Debtor's Natchez Mill lease, the Dublin Ohio office lease, and a warehouse lease in Appleton, Wisconsin – all unexpired leases of non-residential real property, and that Purchaser will seek to take assignment of certain of the Debtor's licenses and sub - licenses of intellectual property and other executory contracts and leases.

**Cure Amounts**

48.  In order that prospective purchasers, including Purchaser, are aware of the extent of financial liability that may accompany the assumption and assignment of an executory contract or lease, the Debtor needs to accurately determine the extent of the "cure amounts," if any, that are due or claimed to be due a counterparty to an executory contract or lease. Consequently, along with the Bid Procedures and Sale Notice, the Debtor intends to file with the Court and serve upon the parties to the Debtor's executory contracts and unexpired leases that the Debtor believes may be subject to assumption and assignment (or rejection), a list and description of all of their executory contracts and unexpired leases that may be assumed and assigned (together, the "Executory Contracts"), and the cure amount (the "Cure Amount"), if any, reflected in the Debtor's books and records as of the date such list is filed with the Court.

49.  The Debtor requests in accordance with its Cure Notice, that objections, if any, to the Cure Amount should be in writing, filed and served so as to be actually received by the parties no later than a date to be set by the Court which will provide at least twenty-one (21) days notice. The Debtor requests that any party failing to object to the proposed assumption and assignment of its Executory Contract and the listed Cure Amount (if any) by that objection date, be deemed to consent to the assumption and assignment of its Executory Contract under section 365 of the Bankruptcy Code and this Motion, including, but not limited to, being bound by the Cure Amount for all purposes in the Case. Moreover, the Debtor requests that each such party be deemed to consent to the assumption and assignment of its contract or lease, notwithstanding any anti-alienation provisions or other restrictions on assignment contained in such contracts or leases.

50. Under the APA, Purchaser will assume the Cure Amounts for all Executory Contracts it takes assignment of from the Debtor.

51. In connection with the Sale Hearing, the Debtor will provide evidence that all requirements for the assumption and/or assignment of the Executory Contracts proposed to be assigned to Purchaser under the APA, or another bidder under an alternative transaction will be satisfied. Indeed, it is an express condition of the Bidding Procedures that potential bidders submit sufficient financial information to the Debtor so that the Debtor can assess the bidder's ability to comply with section 365. The Debtor will provide to all parties to Executory Contracts to be assumed and assigned such adequate assurance information, if requested, and the Sale Hearing will provide the counterparties to these contracts and leases an opportunity to be heard.[6]

52. Thus, the Debtor submits that by the conclusion of the Sale Hearing, assumption and assignment of the executory contracts and unexpired leases should be approved.

**Rejection of Unsold Contracts and Leases**

53. In the event the Debtor deems it appropriate at the conclusion of the Auction, the Debtor reserves the right to request authority at the Sale Hearing to reject any or all of its unsold and unassigned executory contracts and unexpired leases (except those IP Executory Contracts which are to be assumed with International Paper Company). After conducting the Auction, any unsold executory contracts and unexpired leases are likely valueless to the Debtor and might only create a potential administrative expense burden on the Debtor's estate.

---

[6] Upon request, the Debtor will provide information as to the ability of Purchaser to provide adequate assurance of future performance. Accordingly, the Debtor requests that such parties shall raise objections to Purchaser's ability to provide adequate assurance of future performance by March 20, 2009, failing which the Debtor requests they be deemed to consent that Purchaser has provided, or can provide adequate assurance of future performance. Because parties will not have the same opportunity to obtain financial information from other prospective purchasers regarding their respective ability to provide adequate assurance of future performance, the Debtor proposes that objections to the ability of a purchaser (other than Purchaser) to provide adequate assurance of future performance may be raised at the Sale Hearing.

54.  Therefore, the Debtor requests authority, upon notice to counterparties to the unassumed executory contracts and unexpired leases, to reject, as of the date of the Sale Hearing, some or all of its unsold executory contracts and unexpired leases which the Debtor believes will have no value to the estate.

## WAIVER OF FED. R. BANK. P. 6004(h) AND 6006(d)

55.  Time is of the essence in completing this transaction. The notices contemplated in this Motion are calculated to give reasonable notice to all affected parties. Accordingly, Debtor asserts that cause exists to waive the requirements of Rules 6004(h) and 6006(d) of the Bankruptcy Rules, and requests that the Sale Order provide that it shall be effective immediately and that the 14-day stays shall not apply.

## WAIVER OF S.D. OHIO L.B.R. 9013-2 LIMITS

56.  Finally, the Debtor respectfully requests that due to the complexities of the instant motion and the corresponding need for elaboration herein, it waive the otherwise applicable page limitations for motions contained under S.D. Ohio L.B.R. 9013-2.

## NOTICE

57.  This case has just been filed, so no trustee, examiner or statutory committee has been appointed in MRC's Chapter 11 case.  Notice and a copy of this Motion has been provided to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) MRC's twenty (20) largest unsecured creditors as identified in its chapter 11 filing (c) Lender, (d) Adams County, Mississippi. Notice of the filing of this Motion has been provided to all creditors.  MRC submits that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

58.  No prior request for the relief sought in this Motion has been made to this Court or any other court.

**WHEREFORE:** the Debtor respectfully requests that the Court grant the relief requested in this Motion, including entering, after notice to parties in interest, the Bidding Procedures Order (and accompanying exhibits) in substantially the form annexed hereto as Exhibit B, and enter, after determination of the Winning Bidder and the Sale Hearing, the Sale Order in substantially the form annexed hereto as Exhibit C, and grant the Debtor such other and further relief as this Court deems just and proper.

Dated:  February 16, 2010

_____/s/ Richard K. Stovall_____
Richard K. Stovall      (0029978)
Thomas R. Allen         (0017513)
J. Matthew Fisher       (0067192)
Daniel J. Hunter        (0017536)
ALLEN KUEHNLE STOVALL & NEUMAN LLP
17 South High Street, Suite 1220
Columbus, OH 43215
(614) 221-8500; FAX:  (614) 221-5988
Email:  stovall@aksnlaw.com
Email:  allen@aksnlaw.com
Email:  fisher@aksnlaw.com
Email:  hunter@aksnlaw.com
*Proposed Counsel for Debtor and Debtor in Possession*