# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this *"Agreement"*) is entered into as of February 16, 2010, by and between **Mississippi River Corporation**, an Ohio corporation (the *"Seller"*), and **Mississippi Recycling Company LLC**, an Ohio limited liability company (the *"Buyer"*).

## Background Information

A.     Seller owns and operates a manufacturing facility in Natchez, Mississippi (*"Natchez Mill"*) that produces various grades of market deinked recycled pulp (*"MDIP"*) that can be converted into end products such as file folders, paper towels, tissue paper, copy paper, premium grade paper and food grade paper products.    Seller has interests in real estate, equipment, processes, trade secrets, intellectual property and other intangibles associated with its MDIP business.    Seller's NAPCO division serves as a broker-dealer of its paper and pulp products, and is involved in the purchase, storage, distribution and sale of its paper products. Collectively, Seller's ownership and leasehold rights in its real, personal and intangible property associated with its MDIP business and its NAPCO division broker-dealer business shall be referenced as the *"MDIP Systems"*.    Seller leases warehouses and offices in other states associated with its MDIP Systems.

B.     Buyer desires to purchase from Seller all of the assets and business operations of Seller associated with the MDIP Systems, and Seller desires to sell those assets and business operations to Buyer.

C.     Seller intends to file a chapter 11 bankruptcy case, and be a Debtor in Possession in the United States Bankruptcy Court, Southern District of Ohio, Eastern Division (*"Bankruptcy Court"*).  This Agreement and the sale referenced therein, will not be effective, as between the Seller and Buyer, unless and until the Buyer is approved by the Bankruptcy Court as the Highest Bidder as defined hereafter, and there is a final and non-appealable order of the Bankruptcy Court confirming the sale to Buyer, as set forth herein in §7 under Bankruptcy Bidding/Approval Procedures.

## Statement of Agreement

The parties acknowledge the accuracy of the foregoing Background Information, and in consideration of the mutual covenants hereinafter set forth, the parties hereby agree as follows:

§1.    Sale of Assets.    On the terms and subject to the conditions set forth in this Agreement, at the Closing (as hereinafter defined) Seller shall sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase and assume from Seller, all of Seller's assets and business operations related to the MDIP Systems, free and clear of all liens and claims, except Permitted Encumbrances and Assumed Liabilities as defined hereunder.    The assets to be sold and purchased pursuant to this Agreement include the following assets and properties (the *"Purchased Assets"*) and exclude assets identified below and/or under "Excluded Assets":

(a)     The parcels of real estate owned by Seller which constitutes part of the Natchez Mill and situated in Natchez, Mississippi, Adams County, subject to the secured debt owing to Adams County, Mississippi, and the condominium located in Bridgeport, Harrison County, West Virginia, all as more fully described on the attached Schedule l(a) (the *"Real Property"*).

(b)     The leasehold interest of Seller, as lessee, in the real property leased from Adams County for the Natchez Mill, and situated Natchez, Mississippi, Adams County, with a nominal purchase option at end of lease, as more fully described on the attached Schedule l(b) (the *"Assumed Natchez Mill Lease"*).

(c)     The leasehold interests of Seller, as lessee, in an office lease in Appleton, Wisconsin, an office lease in Worthington, Ohio, and an apartment lease in Natchez, Mississippi as more fully described on the attached Schedule l(c) (the *"Assumed Business Leases"*).

(d)     The machinery, equipment, fixtures and vehicles owned by Seller and used in connection with the MDIP Systems at the Natchez Mill and at the Assumed Business Leases sites, and which are described on the attached Schedule l(d) (the *"Equipment"*).

(e)     The leasehold interests of Seller, as lessee, in machinery, equipment, and vehicles leased by Seller and used in connection with the MDIP Systems at the Natchez Mill and the Assumed Business Leases sites, which are described on the attached Schedule l(e) (the *"Assumed Equipment Leases"*).     Collectively the Assumed Natchez Mill Lease, the Assumed Business Leases, and the Assumed Equipment Leases shall be referenced as the "Assumed Leases".

(f)     All licenses, permits, telephone numbers, fax numbers, internet domains, e-mail addresses, patents, trade secrets, goodwill, and other intangible and intellectual property, as may exist, to the extent the same is assignable, including by not limited to the property which is more fully described on the attached Schedule 1(f) (the *"Intangible Property"*).

(g)     Seller's contracts and agreements relating to the operation of the MDIP Systems, including all manufacturing and distribution, all operating rights, all marketing, material purchase and sale agreements, all delivery and service agreements, all transportation and supply contracts, all licenses, franchises, or other contractual rights to the operation of the MDIP Systems business and all other contracts or agreements material to the business and operation of the MDIP Systems, contracts relating the physical existence, development, improvement, leasing or operation of equipment, fixtures, inventory or other property in connection with the MDIP System, all of which contracts shall be assigned to and assumed by Buyer, and are described on the attached Schedule 1(g) (the *"Assumed MDIP Contracts"*).  The Assumed MDIP Contracts shall not include any other obligations not identified on Schedule 1(g) including without limitation the contracts that Seller currently has for the purchase of electricity and natural gas for the Natchez Mill.  The Assumed Leases and the Assumed MDIP Contracts shall be referred to hereafter as the *"Assumed Contracts"*.

(h)    All of Seller's inventory, materials and supplies, including wastepaper, MDIP and end products that has been purchased and/or manufactured for the MDIP Systems prior to the Closing Date (the *"Inventory"*); provided, however, that Inventory shall not include, and Purchaser shall not purchase under this Agreement, any inventory located at Seller's facilities and owned by International Paper.

(i)    All of Seller's accounts and notes receivable generated by the sale of MDIP and end products through the MDIP Systems, and amounts owing to Seller by shareholders under recourse and non-recourse note(s) as listed in Schedule 1(i) (collectively the *"Accounts and Notes Receivable"*).

(j)    All books of account, customer records, customer lists and other books and records relating exclusively to the MDIP Systems (the *"Books of Account"*).

(k)    All goodwill associated with the operation of the MDIP Systems (the *"Goodwill"*).

The foregoing, which are hereafter referred to collectively as the *"Purchased Assets"*, comprise substantially all of the property and assets used in the conduct and operation of the MDIP Systems as of the date of this Agreement. The Purchased Assets are sufficient to operate and conduct business with respect to the MDIP Systems as currently conducted, and, to the actual knowledge of Seller, no other assets or, rights are needed for the operation of the MDIP Systems as currently conducted.    As used in this agreement, the phrase "actual knowledge" or "Seller's knowledge" or similar phrase applicable to Seller means the actual knowledge of the current officers of Seller or matters which such officers could be reasonably expected to know through executing the duties normally associated with their offices with reasonable care.  At the Closing, Seller shall convey good and marketable title to the Purchased Assets to Buyer free and clear of all security interests, liens, restrictions and encumbrances, except as expressly provided herein to the contrary and except for Permitted Encumbrances.  For purposes of this Agreement *"Permitted Encumbrances"* shall mean: (i) liens for taxes, assessments, or other governmental charges or levies not yet due; (ii) applicable zoning laws and any restrictions of record; (iii) any liens reserved in leases for rent and for compliance with the terms of the leases in the case of leasehold estates; (iv) any liens, existing at the time of acquisition by Seller, upon real estate or rights in or relating to real estate acquired by Seller for transmission, distribution or right-of-way purposes; (v) easements or reservations in any property of Seller created for the purpose of roads, railroads, railroad side tracks, water and gas transmission and distribution mains, conduits, water power rights and building and use restrictions, none of which, to the actual knowledge of Seller, would interfere with the operation of the MDIP Systems as conducted as of the Closing Date; (vi) any obligations or duties, affecting the property of Seller, to any municipality or public authority with respect to any franchise, grant, license or permit, none of which, to the actual knowledge of Seller, would interfere with the operation of the MDIP Systems as conducted as of the Closing Date; and (vi) any liens contained in the Assumed Contracts.  The phrase "would interfere with the operation of the MDIP System" as used in this Paragraph does not mean that the particular encumbrance does not exist, but rather that if the encumbrance exists it has not been a problem or difficulty for Seller in the operation of the MDIP Systems.

§2.    Excluded Assets.  It is the intention of the Seller to sell all of its assets in existence as of the closing date, with the following exceptions: (a) Seller's interests in any amounts paid as a retainer for professional fees related to Seller's Chapter 11 bankruptcy case, (b) as set forth above in §1(h), the title to inventory held on consignment from International Paper, (c) any executory contracts which Buyer specifically advises Seller it will not assume, including but not limited to the contracts for the purchase of electric and natural gas for the Natchez Mill, and (d) all rights and avoidance claims of the Seller arising under Chapter 5 of the Bankruptcy Code ("*Avoidance Actions*")

§3.    Assumed Liabilities/Excluded Liabilities.  At the Closing, Buyer will assume: (i) the future payment and performance of the obligations accruing and arising after the Effective Time under the Assumed Contracts; (ii) the obligations owing to Adams County, Mississippi which will continue to be secured by the Natchez Mill property (both owned and leased) (the "*Adams County Liabilities*") which are further described on Schedule 3(ii) hereof; (iii) the real and personal property taxes owing and associated with the Real Property, including those identified in schedule 10(i) with regard to the Natchez Mill (the "*Real Property Taxes*"); (iv) the obligation of operating the MDIP Systems in accordance with all rules and regulations in effect at the Effective Time; and (v) all obligations accruing and arising after the Effective Time from Buyer's employment of Seller's employees, as described in §14, below.  Further, to the extent that there are any defaults under the Assumed Contracts and the specific amounts for which Seller is in default under such Assumed Contracts are identified as "Cure Amounts" and such amounts are approved by Order of the Bankruptcy Court, Buyer will assume the obligation to pay such Cure Amounts upon the assignment of such Assumed Contracts.    Otherwise, notwithstanding anything in the foregoing to the contrary, Buyer shall not assume, by virtue of this Agreement or the transactions contemplated hereby, any liabilities that are or give rise to the Permitted Encumbrances, or any liabilities that arose out of the operation or ownership of the MDIP Systems and Purchased Assets prior to the Effective Time, except as otherwise specifically provided in this Agreement ("*Excluded Liabilities*").

§4.    Purchase Price/Good Faith Deposit.  The purchase price for the Purchased Assets shall be approximately $8,138,213.54, which shall include $7,184,000.00 in cash, the assumption of the amounts for the Adams County Liabilities in the approximate amount of $295,432, the assumption of the amount of the Real Property Taxes owing which is currently estimated to be at least $658,781.54 and with additional liability accruing for 2010 with regard to the Natchez Mill (which current liabilities are set forth in schedule 10(i) hereof), and the assumption of remaining liabilities under the Assumed Contracts, including the Cure Amounts.  Within three (3) business days of the execution of this Agreement, Buyer shall pay a deposit of $100,000.00, which Buyer's counsel (identified in §20) shall hold in trust in a separate interest bearing bank account. The deposit, plus any accrued interest, shall be referenced hereafter as the "Good Faith Deposit". Buyer shall be entitled to the return of the Good Faith Deposit in the event Buyer is not the ultimate successful bidder pursuant to the procedure set forth in §7.

§5.    Adjustments.  The parties shall effect the following pro-rations and adjustments at the Closing:

(a)  Customer Deposits. At the Closing, Seller shall provide Buyer with a list of deposits held by it and accrued interest on the deposits. Seller shall give Buyer a credit against the Purchase Price for the amount of deposits and interest held by it and Buyer shall assume the obligation of returning any and all deposits to customers. Attached hereto as Schedule 5(a) is a list of deposits and accrued interest as of the date of this Agreement, which Schedule shall be updated as of the Closing Date.

(b)  Real Estate Taxes. Real estate taxes for the year of the Closing or any prior year which may be payable with respect to Real Property owned by Seller shall not be credited against the cash portion of the Purchase Price, but instead shall be considered as part of the Purchase Price.

(c)  Prepaid Amounts. Prepaid amounts on existing transferable insurance policies and contracts which Buyer elects to assume, as well as on utilities (to the extent utilities are not shut off and new accounts opened), shall be prorated to the Closing Date and paid to Seller at the Closing, provided that Buyer shall have no obligation to adjust for any policies or contracts which it does not assume and shall, at least five days before the Closing Date, advise Sellers of those policies and contracts not to be assumed.

(d)  Cash Deposits; Bonds. If Seller has made a cash deposit under a supplier or contract assumed by Buyer under this Agreement, then Seller shall assign all rights to such deposit to Buyer at Closing and the Purchase Price will be increased by the amount of such cash deposit. If Seller has posted a cash bond with any regulatory or governmental authority in connection with the ownership or operation of the MDIP System, then Seller shall assign all rights to such bond to Buyer at Closing and the Purchase Price will be increased by the amount of such bond. Attached hereto as Schedule 5(d) is a list of all of Seller's cash deposits, cash bonds, surety bonds, and letters of credit posted in connection with the ownership or operation of the MDIP Systems as of the date of this Agreement, which Schedule shall be updated as of the Closing Date.

(e)  Working Capital Loan Reduction. The Purchase Price will be reduced to the extent of the difference between the $4,000,000.00 upper limit on the Working Capital Loan, as defined below and the balance owing on the Working Capital Loan as of the Closing Date. For instance, if the balance owing on the Working Capital Loan is $2,500,000 at the time of closing, the Purchase Price will be reduced by $1,500,000. Working Capital Loan means the Revolving Loan as defined in that certain Senior Secured, Super-Priority Debtor-In-Possession Credit and Security Agreement by and between Seller and Supplier Finance Company, LLC, a Delaware limited liability company ("*Lender*").

(f)  Cash on Hand. The Purchase Price shall be increased by the amount of cash, or funds on deposit which is actually transferred to Buyer on the Closing Date. It is anticipated that this amount will be little or nothing, as it is expected that all cash or other funds will be used to reduce the Working Capital Loan.

§6.  Allocation of Purchase Price. Seller will agree to reasonably allocate the Purchase Price as requested by Buyer. This allocation shall be binding on the parties, shall be

used for all purposes on their respective federal, state and local income tax returns, and shall be supported by them in any audits or other disputes or litigation involving any such returns. Seller and Buyer agree that they will each file Internal Revenue Service Form 8594 with their income tax return due after the date of Closing with the same allocations as requested by Buyer.

§7. <u>Bankruptcy Bidding/Approval Procedures</u>. Seller shall be a Debtor in Possession in a chapter 11 bankruptcy before the Bankruptcy Court. This Agreement, and the sale contemplated herein, will not effective, as between the Seller and Buyer, until the Confirmation Date as defined below.

(a)     Contemporaneously with Seller's filing of its Chapter 11 bankruptcy case, Seller shall file a motion seeking approval of the Bankruptcy Court to (i) sell the Purchased Assets free and clear of any interests or claims of creditors and other parties in interest (the "Sale Motion"), with the exception of Permitted Encumbrances and Assumed Liabilities, as set forth herein, and (ii) approve the bidding procedures set forth below, after notice to all parties in interest and a hearing if there is an objection.

(b)     Buyer's ability to purchase the Purchased Assets under the Agreement is subject to any interested party, who Seller determines is a qualified bidder, having an opportunity to make a higher monetary bid for the Purchased Assets at a public auction, under the same other terms and conditions as in this Agreement, with the following bidding procedures, or similar procedures as set forth in the Sale Motion to be approved by the Bankruptcy Court (the "*Bid Procedures*"):

i.      Any qualified bidder seeking to purchase the Purchased Assets shall be required to initially bid an amount which is at least $200,000 greater than the Purchase Price, with incremental bids of at least $50,000 thereafter;

ii.     All initial competing bids will be required to be made, in writing, by a date certain ("*Bidding Date*"), which date will be set approximately 30 days from the date of the Order from the Bankruptcy Court approving the Bidding Procedures and sale of Purchased Assets free and clear (the "*Sales Order*");

iii.    If, by the Bidding Date, there is at least one qualified bidder ("*Bidder*") who bids at least $200,000 greater than the Purchase Price, each Bidder and Buyer shall be notified of a public auction date ("*Public Auction*") to be held seven (7) days later at a place and time to be announced but which will likely be at the Bankruptcy Court, in Columbus, Ohio, and will be advised of the amount of the highest qualified bid;

iv.     At the Public Auction, each of the Bidders and Buyer shall have a final opportunity to further bid on the Purchased Assets, in increments of $50,000 each. Only Bidders and Buyer will be permitted to bid on the Purchased Assets at the Public Auction. At the close of the Public Auction, the highest Bidder ("*Highest Bidder*") shall be required to

execute a substantially similar Asset Purchase Agreement and to make a $100,000.00 good faith deposit ("*Deposit*"), via a certified bank check or other cash equivalents, on the same terms and conditions as in this Agreement, including, without limitation, assumption of the Supply Agreement and the License Agreement. Failure of the Highest Bidder to execute the Agreement or to make the Deposit at the Public Auction shall permit, but not require, Seller to proceed to close with the next highest Bidder, who shall be then treated as the Highest Bidder.

v.    If, by the Bidding Date, there are no qualified bidders who bid at least $200,000 greater than the Purchase Price, Buyer shall become the "Highest Bidder", and there shall be no Public Auction. After the determination of the Highest Bidder, Seller shall seek to obtain an additional order of the Bankruptcy Court confirming the sale to the Highest Bidder (the "*Confirmation Order*"). The date that the Confirmation Order is final and non-appealable shall be the Confirmation Date. After the Confirmation Date, the parties shall move towards closing as set forth in §8 and otherwise herein.

vi.    In the event there is a Public Auction and Buyer is not the Highest Bidder among the qualified Bidders, (a) the Agreement as between Seller and Buyer shall be terminated with no liability, one to the other, other than as set forth in this sub-paragraph; (b) Buyer shall be entitled to be paid a "Break Up Fee" of $138,000, which is approximately 2 % of the estimated Purchase Price hereunder, prior to adjustments, and which shall be due and payable at the time that Seller receives the full purchase price from the Highest Bidder; and (c) Seller shall forthwith return Buyer's Deposit.

c)    In advance of, or with any bid as set forth above, all interested bidders shall be required to provide written information to Seller to demonstrate such bidder's financial ability to close on the proposed transaction. Seller shall determine if such bidder is qualified based upon such information. Information regarding the bidder's financial ability to close on the transaction may include a letter from such bidder's bank or other financial institution showing sufficient amounts on deposit or availability of borrowing to close the transaction.

d)    Whether Buyer or any Highest Bidder is the ultimate purchaser of the Purchased Assets, by the time of the Bidding Date, Buyer or the Highest Bidder shall be deemed to have either satisfied or elected to have waived its Due Diligence investigation of the Purchased Assets, and shall have no further rights under §18(a) of the Agreement to terminate the Agreement.

e)    A Sales Order from the Bankruptcy Court, authorizing Seller to sell the Purchased Assets free and clear of any interests or claims (except for Permitted Encumbrances and Assumed Liabilities), shall be deemed to satisfy, in full, all obligations to sell the Purchased Assets free and clear of any interest or claim, and Seller's transfer to the Highest Bidder or Buyer pursuant to said Sales Order, as applicable, shall be deemed to be in full satisfaction of any

claims under §19(a) of the Agreement, except the same shall not be deemed to satisfy any obligations of Seller to pay any liabilities assumed by Seller at Closing.

f)     For the purpose of this Agreement, the date in which the Confirmation Order of the Bankruptcy Court approving the sale with the Highest Bidder becomes final and non-appealable shall be the Effective Date under the Agreement.

g)     The sale of the Purchased Assets to Buyer, free and clear of any claims or interest, shall not be free and clear of the Permitted Encumbrances or Assumed Liabilities as set forth herein.

h)     Seller shall be permitted, upon the execution of this Agreement, to share information regarding the Purchased Assets and to seek competitive bids from any interested parties.

§8.     Closing.  Subject to the satisfaction or waiver by the appropriate party of all of the conditions precedent to Closing specified in §§12 and 13 hereof, the consummation of the sale and purchase of the Purchased Assets and the other transactions contemplated by and described in this Agreement (the *"Closing"*) shall take place at the offices of Allen Kuehnle Stovall & Neuman, 17 South High Street, Columbus, Ohio 43215, on the last day of the month in which the conditions set forth in §§12 and 13 hereof are satisfied, unless extended to a later date by mutual agreement of the parties, at 10:00 a.m. local time (the *"Closing Date"*).  The Closing shall be effective as of 11:59 p.m. on the Closing Date (the *"Effective Time"*), or at such other time as the parties hereto may mutually designate in writing.

§9.     Representations and Warranties of Buyer.  Buyer hereby represents and warrants to Seller as follows:

(a)     Organization and Authority.     Buyer is an Ohio limited liability corporation, duly organized, validly existing and in good standing under the laws of the State of Ohio and has full corporate power, right and authority to own its properties and assets and to carry on its business as it is now being conducted, to purchase the Purchased Assets and to enter into and carry out the transactions contemplated by this Agreement.

(b)     Authorization.  This Agreement has been duly authorized, executed and delivered by Buyer, and no further limited liability company proceedings on the part of Buyer are or will then be necessary to authorize this Agreement and the transactions contemplated hereby.  This Agreement is the legal, valid and binding obligation of Buyer, enforceable in accordance with its terms, and in all respects, subject to the approval of the Bankruptcy Court.

(c)     Regulatory Filings.  No material filing with, authorization of, exemption by, or consent or approval of, any regulatory authority is necessary for the consummation by Buyer, of the transactions contemplated by this Agreement.

(d)     Satisfaction of Conditions.  Buyer is not, as of the date hereof, aware of any reason why the conditions set forth in §12 hereof would not be satisfied on the Closing Date.

(e)  Litigation.  As of the date of this Agreement, there is no action, suit or proceeding pending against, or to the actual knowledge of Buyer threatened against or affecting, Buyer or any affiliate of Buyer or any of their respective properties before any court or arbitrator or any governmental body, agency or official which in any manner challenges or seeks to prevent, enjoin, alter or materially delay any of the transactions contemplated hereby.

(f)  Brokers and Finders.  Neither Buyer nor any of its officers, directors, managers, members, or employees has employed any broker or finder or incurred any liability for any financial advisory fees, brokerage fees, commissions or finder's fees, and no broker or finder has acted directly or indirectly for Buyer in connection with this Agreement or the transactions contemplated hereby.

(g)  Financing.  Buyer currently has and at the Closing will have adequate capital and available funds to fulfill its obligations hereunder on the Closing Date.

§10.  Representations and Warranties of Seller.  Seller represents and warrants to Buyer as follows:

(a)  Organization and Authority.  Seller is a corporation organized, validly existing and in good standing under the laws of the State of Ohio and has full corporate power, right and authority to own its properties and assets and to carry on its business as it is now being conducted and, subject to the satisfaction of the conditions set forth in §12, to enter into and carry out its obligations under this Agreement.  Seller has all necessary governmental authorizations to own or lease its properties and assets and to carry on its business as now being conducted in all respects material to the financial condition or business of Seller.

(b)  Authorization.  Other than the filing for the approval of the Bankruptcy Court, this Agreement will be duly authorized, executed and delivered by Seller and no further corporate proceedings on the part of Seller are or will then be necessary to authorize this Agreement and the transactions contemplated hereby.  This Agreement is the legal, valid and binding obligation of Seller, enforceable in accordance with its terms, and in all respects, subject to the approval of the Bankruptcy Court.

(c)  Regulatory Filings.  Except as may be required for the transfer of certain of the intangible assets described in 1(f), Seller does not need to provide any material notice to, or obtain the authorization of exemption by, or consent or approval of, any regulatory authority for the consummation by Seller of the transactions contemplated by this Agreement.

(d)  Satisfaction of Conditions.  Seller has no actual knowledge, as of the date hereof, of any reason why the conditions set forth in §13 hereof would not be satisfied on the Closing Date.

(e)  Title to Purchased Assets.  Seller, subject to the approval of the Bankruptcy Court, now owns or will convey on the Closing Date marketable title to the Purchased Assets free and clear of all mortgages, security interests, leases, liens, encumbrances,

restrictions, conditions, encroachments, and other defects or claims except the Permitted Encumbrances and Assumed Liabilities, and Buyer agrees to accept those rights-of-ways and easements on the Closing Date "AS IS".

(f)     Litigation.  Other than with respect to the Seller's chapter 11 bankruptcy case and any actions by Seller and other parties with respect to such case, as of the date of this Agreement, to the actual knowledge of Seller there is no action, suit or proceeding pending against Seller or any affiliate of Seller or any of their respective properties before any court or arbitrator or any governmental body, agency or official which in any manner affects the MDIP System, or challenges title to or operation of the MDIP System, or challenges or seeks to prevent, enjoin, alter or materially delay any of the transactions contemplated hereby.

(g)     Purchased Assets.  The assets referenced herein and set forth in the schedules_attached hereto sets forth a list of all assets owned by the Seller within the MDIP Systems.

(h)     Contracts.  Except for the Assumed Contracts, Seller is not a party to or otherwise subject to any leases, contracts, agreements (oral or written), or documents which are material to the conduct of the MDIP Systems.  Except as otherwise disclosed on Schedule 10(h): (i) the Assumed Contracts are in full force and effect in all material respects and, as of the date of this Agreement, to the actual knowledge of Seller, (other than for the failure to pay the Cure Amounts) Seller has not received a notice of default, and Seller has not received a notice of termination with respect to such Assumed Contracts, and (ii) (other for the failure to pay the Cure Amounts) there has not occurred any event which would constitute a breach by the Seller of, or default by the Seller in, the performance of any covenant, agreement or condition contained in any of the Assumed Contracts, which breach or default would have a material adverse effect on the financial condition or business of the Seller and its subsidiaries taken as a whole.

(i)     Tax Returns; Audits.  Except as otherwise disclosed on Schedule 10(i): (i) to the extent applicable, Seller has filed with all appropriate governmental agencies all tax returns which it is required to file pertaining to the Purchased Assets; and (ii) to the Seller's actual knowledge, the amounts shown as owing on the returns are true and correct amounts and Seller has paid all taxes shown as due on such returns and all other taxes due and owing in the operation of the MDIP System, and is not delinquent in the payment of any taxes claimed to be due and owing by any federal, state or local taxing authority pertaining to this segment of Seller's business. Seller has not given any waiver or extension of any statute of limitations governing the time for assessment or collection of any federal, state or local tax which has not expired prior to the date hereof on the Purchased Assets to be transferred pursuant to this Agreement.  There have been no audits other than routine audits by any taxing or regulatory authority of the Seller, and none are pending, proposed, or threatened pertaining to the Purchased Assets.

(j)     Employees and Benefits.  Seller has provided to Buyer a complete list (as of the date set forth therein) of names, positions, and current annual salaries or wage rates and bonus and other compensation arrangements as of the date thereof of all full-time and part-time

employees of Seller employed exclusively in connection with the MDIP Systems. The list indicates whether each such employee is a part-time or full-time employee. There is no pending or, to Seller's actual knowledge, threatened employee strike, work stoppage or labor dispute. No collective bargaining agreement exists or is currently being negotiated by Seller, no demand has been made to Seller for recognition by a labor organization by or with respect to any employees employed with respect to the MDIP System, and no union organizing activities, to Seller's actual knowledge, are taking place. There is no unfair practice claim against the Seller with respect to the MDIP Systems before the State Employees Relation Board or National Labor Relations Board, or any strike, dispute, slowdown, or stoppage pending or, to Seller's actual knowledge, threatened against or involving the MDIP Systems. To Seller's actual knowledge, Seller is in material compliance with all federal and state laws respecting employment and employment practices, terms and conditions of employment, and wages and hours. Seller is not engaged in any unfair labor practices.

(k)    Regulatory Matters.    Seller has all permits, licenses, certificates of authority, orders and approvals of, and has made all filings and applications with, all state and federal public utilities authorities, required in order to permit Seller to carry on the business of the MDIP Systems as presently conducted. Seller is not in violation of, and has not infringed, any statute, regulation, ordinance, license or been subject to any judgment, ruling, injunction or order of any such authorities which violation would have a material adverse effect on the ability of Seller to consummate the transactions contemplated hereby and the ability of the Buyer to pursue the operation of the MDIP Systems as is contemplated by this Agreement.

(l)    Brokers and Finders.    Neither of Seller nor any of its officers, directors or employees has employed any broker or finder or incurred any liability for any financial advisory fees, brokerage fees, commissions or finder's fees, and no broker or finder has acted, directly or indirectly, for Seller in connection with this Agreement or the transactions contemplated hereby.

(m)    Complete System.    No property, assets, contracts, or licenses other than the Purchased Assets comprise the whole of the MDIP System, and no other, property, assets, contracts, or licenses are materially necessary to operate and conduct business with respect to the MDIP Systems.

(n)    Environmental and Regulatory Matters.    To Seller's actual knowledge: (i) Seller has all required material permits, licenses, certificates of authority, orders and approvals of, and has made all material filings and applications with, all local, state and federal regulatory agencies charged with regulating human health, workplace health, the environment, natural resources and energy, including, without limitation, the United States Environmental Protection Agency and the applicable state Department of Environmental Protection ("Environmental Agencies"); (ii) Seller is in material compliance with any and all applicable environmental and safety requirements, including federal, state, local laws, statutes, regulations, ordinances, orders, approvals, determinations, authorizations, common law and codes, which address public health and safety, worker health and safety, pollution or protection of the environment ("Environmental Requirement"); (iii) Except as described in the attached Schedule 10(n), no spills, leaks, discharges, injections, leaching, dumping, disposing or any other releases of any Hazardous Substances has occurred at, in, by, from or related to the Purchased Assets, Hazardous

Substances includes any substance regulated by any Environmental Requirement; (iv) Seller is not a party to any investigation, proceeding, enforcement action, corrective action, remediation, clean-up, lawsuit, negotiation or settlement initiated by any Environmental Agencies, citizens groups or individuals related to Hazardous Substances or any Environmental Requirement.

(o)     Acceptance of Purchased Assets "As Is".     Seller is making no representations or warranties other than those in this §10 as to the condition, state of repair, merchantability, or fitness for any particular purpose of any of the Purchased Assets and it is understood by the parties that the Purchased Assets are being transferred to Buyer "as is", nor does Seller make any representation or warranty as to the Purchased Assets for any purposes or needs of Buyer or as to the present or any future condition of the MDIP Systems. SELLER IS MAKING NO WARRANTIES TO BUYER, EITHER EXPRESS OR IMPLIED, REGARDING THE CONDITION, FITNESS FOR USE, FITNESS FOR ANY PARTICULAR PURPOSE OR MERCHANTABILITY OF ANY OF THE PURCHASED ASSETS. "Hazardous Substance" means, without limitation, any flammable explosives, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum based products, methane, hazardous materials, hazardous wastes, hazardous or toxic substances, wastes, waste petroleum products, waste natural gas products, materials, compounds, pollutants, contaminants, or related materials, as included or regulated by the Comprehensive Environmental Response, Compensation and Liability Act , 42 U.S.C. 9601.9675, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, et seq.), the Resource and Recovery Act, 42 U.S.C. 6901-6991, the Toxic Substances Control Act, as amended (15 U.S.C. Sections 2601, et seq.), the Water Quality Act of 1987 (33 U.S.C. Sections 1251, et seq.), the Clean Water Act, as amended (33 U.S.C. Section 1321, et seq.), or the Clean Air Act (42 U.S.C. 7401, et seq.).

§11.     Pre-Closing Covenants.     Prior to the Closing, the parties shall comply with the following covenants:

(a)     Conduct of Business.     At all times after the date of this Agreement and until the Closing Date, Seller shall use its best efforts to cause the value and/or operation of the Purchased Assets to be preserved, including, without limitation, operating the MDIP Systems in accordance with good business practices. During this period, Seller shall not (without Buyer's written consent): (i) purchase, sell, convey, lease, acquire, or transfer any real property, fixtures, machinery, equipment, signs, furniture, furnishings, or other assets which comprise the Purchased Assets, except inventories or supplies, or other assets purchased or sold in the usual and ordinary course of business, or (ii) enter into any agreement or transaction with respect to the MDIP Systems that is not in the usual and ordinary course of business.

(b)     Governmental Approvals.     Other than Bankruptcy Court approval, no further approvals, authorizations and clearances of governmental and regulatory authorities are required to consummate the transactions contemplated hereby, other than the government approvals which may be required to transfer certain of the intangible property listed on 1(f), the risk of which approval shall be borne by Buyer and shall not be a condition of closing.

(c)    <u>Consents</u>. In the case of Assumed Contracts, and in conjunction with the sale of Purchased Assets, Seller shall make all reasonable efforts to obtain an Order of the Bankruptcy Court, allowing the Seller to assume and assign the Assumed Contracts, as permissible under the United States Bankruptcy Code. Otherwise, Buyer shall use its best reasonable efforts to obtain such consents promptly. Seller shall use reasonable efforts in assisting Buyer in obtaining any such required consents. Buyer shall be obligated to pay any fees charged in connection with obtaining any such consents.

(d)    <u>Release of Liens</u>. Seller shall use its best efforts to arrange for the release prior to or as of the Effective Time of any and all pledges, liens or other encumbrances on any of the Purchased Assets by way of an Order of the Bankruptcy Court, selling free and clear of such liens and encumbrances, other than Permitted Encumbrances and Assumed Liabilities.

§12.    <u>Conditions to Obligations of Buyer</u>. The obligations of Buyer to be performed under this Agreement at the Closing shall be subject to the satisfaction of the following conditions (unless waived in writing by Buyer):

(a)    <u>Representations and Warranties</u>. Seller's representations and warranties as set forth in §10 of this Agreement shall be true and correct in all material respects as of the Closing Date as if such representations and warranties were made as of the Closing Date.

(b)    <u>Performance of Agreement</u>. All covenants, conditions and other obligations under this Agreement that are to be performed or complied with by Seller on or prior to the Closing Date, shall have been fully performed and complied with in all material respects, including, without limitation, Seller's obligation to deliver the executed instruments and documents in accordance with §15.

(c)    <u>No Adverse Proceeding</u>. There is no pending or threatened claim, action, litigation or proceeding against Buyer, Seller, or the Purchased Assets for the purpose of or that would have the effect of enjoining or preventing the consummation of this Agreement, or otherwise claiming that this Agreement or the consummation hereof is illegal.

§13.    <u>Conditions to Obligations of Seller</u>. The obligations of Seller to be performed at the Closing under this Agreement shall be subject to the satisfaction of the following conditions (unless waived in writing by Seller):

(a)    <u>Representations and Warranties</u>. Buyer's representations and warranties as set forth in §9 of this Agreement shall be true and correct in all respects as of the Closing Date as if such representations and warranties were made as of the Closing Date.

(b)    <u>Performance of Agreement</u>. All covenants, conditions and other obligations under this Agreement that are to be performed or complied with by Buyer on or prior to the Closing Date shall have been fully performed and complied with in all material respects, including, without limitation, Buyer's obligation to deliver the executed instruments and documents in accordance with §16.

(c)     <u>No Adverse Proceeding</u>. There is no pending or threatened claim, action, litigation or proceeding against Buyer, Seller, or the Purchased Assets for the purpose of or that would have the effect of enjoining or preventing the consummation of this Agreement, or otherwise claiming that this Agreement or the consummation hereof is illegal.

(d)     <u>No Change</u>. There shall have been no adverse material change in the financial or business condition of the business and operation of the Buyer.

(e)     <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have approved the transfer of the Purchased Assets to Buyer, free and clear of all claims not assumed by the Buyer, and the assumption and assignment of the Assumed Contracts, pursuant to the terms of this Agreement.

§14.   <u>Employees</u>. Buyer will offer employment to those employees of Seller on terms that are substantially similar to those in effect for each respective employee on the Closing Date. Buyer will employ all of Seller's employees accepting such offer as of the Closing Date; however, Buyer may terminate the employment of any such employee following the Closing Date in Buyer's discretion, or pursuant to the terms of any employment agreement between Buyer and the employee, if applicable.

§15.   <u>Closing Deliveries by Seller</u>. At the Closing, Seller shall deliver or cause to be delivered, the following closing documents:

(a)     <u>Closing Statement</u>. A Closing statement showing the Purchase Price and all charges or credits to Buyer or Seller provided for herein.

(b)     <u>Asset Purchase Agreement</u>. An executed counterpart of this Agreement.

(c)     <u>Deeds</u>. Good and sufficient limited warranty and/or fiduciary deeds, which shall be in a form and substance reasonably satisfactory to Buyer, conveying good and marketable title to the Real Property to Buyer, free and clear of all liens and encumbrances, except for Permitted Encumbrances and Assumed Liabilities. Buyer shall, at its option, purchase title insurance for the Real Property.

(d)     <u>Bankruptcy Court Approvals</u>. To the extent obtained by Seller, orders from the Bankruptcy Court approving the sale to Buyer, free and clear of the claims not assumed by the Buyer, and authorizing the assumption and assignment of the Assumed Contracts, all as set forth in §7.

(e)     <u>Schedule of Customer Deposits</u>. A schedule of customer deposits being held for return to MDIP System's customers, determined as of the Closing Date.

(f)     <u>Schedule of Accounts Receivable</u>. A schedule of the Accounts Receivable on the books of the Seller as of the Closing Date.

(g)    Bill of Sale.  A good and sufficient general conveyance, assignment and assumption and bill of sale, in a form reasonably acceptable to the parties, conveying all of Seller's right, title and interest in and to the Purchased Assets free and clear of all liens and encumbrances, except for Permitted Encumbrances and Assumed Liabilities.

(h)    Certificates of Title.  Motor vehicle certificates of title to any vehicles included as part of the Equipment, duly endorsed for transfer to Buyer.

(i)    Contracts.  Other than as ordered by the Bankruptcy Court, good and sufficient assignments and assumptions of the Assumed Contracts, which shall be in form and substance reasonably acceptable to the parties.

(j)    Resolutions.  Resolutions of the board of directors of Seller authorizing the execution and delivery of this Agreement by Seller and the performance of its obligations hereunder, certified by the secretary of the Seller.

(k)    Officer's Certificate.  A certificate of the vice-president of Seller to the effect that Seller's representations and warranties set forth in §9 of this Agreement are true and correct as of the date thereof and as to fulfillment of Seller's pre-Closing covenants and conditions.

(l)    Non-Foreign Seller Affidavit.  An affidavit that Seller is not a non-resident *"alien"*, *"foreign corporation"*, *"foreign partnership"*, *"foreign trust"* or *"foreign estate"* within the meaning of the Internal Revenue Code and Regulations thereunder, executed by the vice-president of Seller.

(m)    Other.  Such other separate instruments of sale, assignment or transfer that Buyer may reasonably deem necessary or appropriate in order to perfect, confirm or evidence title to all or any part of the Purchased Assets.

§16.    Deliveries by Buyer.  At the Closing, Buyer shall deliver or cause to be delivered the following Closing documents:

(a)    Asset Purchase Agreement.  An executed counterpart of this Agreement.

(b)    Bill of Sale.  An executed counterpart to the Bill of Sale described in §15(g), above.

(c)    Contracts.  Other than as ordered by the Bankruptcy Court, an executed counterpart to the assignment and assumption of Assumed Contracts described in §15(i), above.

(d)    Officers' Certificate.  A certificate of the President and Secretary or, as the case may be, the General Manager of Buyer to the effect that (i) Buyer's representations and warranties set forth in §9 hereof are true and correct as of the date hereof; and (ii) Buyer has fulfilled all pre-Closing covenants and conditions.

(e)     Resolutions.  Resolutions of the directors or members, as the case may be, of Buyer authorizing the execution and delivery of this Agreement by Buyer and the performance of its obligations hereunder, certified by the secretary or General Manager of Buyer.

(f)     Purchase Price.  A bank check or other form of payment reasonably acceptable to Seller for the Purchase Price, with credit given to Buyer in the amount of the Good Faith Deposit.

(g)     Bankruptcy Court Approvals.  To the extent obtained by Seller, orders from the Bankruptcy Court approving the sale of the Purchased Assets to Buyer.

(h)     Other Documents.  Such other Closing documents as may be reasonably requested by Seller or its counsel.

§17.   Additional Obligations.  The parties shall comply with the following covenants, as applicable:

(a)     Further Assurances.  At or after Closing Date, the parties shall prepare, execute and deliver such further instruments of conveyance, sale, assignment, assumption or transfer, and shall take or cause to be taken such other or further action as either party shall reasonably request at any time or from time to time in order to perfect, confirm or evidence in Buyer title to all or any part of the Purchased Assets or to consummate in any other manner, the terms and conditions of this Agreement.

§18.   Termination.

(a)     Termination by Buyer.  This Agreement may be terminated and cancelled prior to the Closing by the Buyer if: (i) (A) any of the representations or warranties of Seller contained in this Agreement shall prove to be inaccurate in any material respect, or any covenant, agreement, obligation, or condition to be performed or observed by Seller under this Agreement has not been performed or observed in any material respect at or prior to the time specified in this Agreement, and (B) such inaccuracy or failure shall not have been cured within 15 business days after written notice of such occurrence from Buyer to Seller; or (ii) any permanent injunction or other order of the Bankruptcy Court or other competent authority preventing consummation of the transactions contemplated by this Agreement shall have become final and non-appealable.

(b)     Termination by Seller.  This Agreement may be terminated and cancelled prior to the Closing by the Seller if: (i) (A) any of the representations or warranties of Buyer contained in this Agreement shall prove to be inaccurate in any material respect, or any covenant, agreement, obligation, or condition to be performed or observed by Buyer under this Agreement has not been performed or observed in any material respect at or prior to the time specified in this Agreement, and (B) such inaccuracy or failure shall not have been cured within 15 business days after written notice of such occurrence from Seller to Buyer; or (ii) any permanent injunction or other order of the Bankruptcy Court or other competent authority

preventing consummation of the transactions contemplated by this Agreement shall have become final and non-appealable.

§19. <u>Indemnification</u>. The representations and warranties of the parties set forth in this Agreement shall survive the Closing. The parties shall have the following indemnification obligations:

(a) <u>Seller Indemnification Obligation</u>. Seller shall indemnify and save harmless Buyer against and from any and all losses, damages, liabilities, or claims ("*Claims*") arising directly or indirectly out of:

(i) Any liabilities relating to Seller's conduct of the Business prior to the Closing, or any other liabilities of Seller, which are not assumed by Buyer at the Closing;

(ii) Any failure of any representation or warranty by Seller to have been correct and complete when made;

(iii) Any failure by Seller to pay any liabilities assumed by Seller at the Closing or to perform any obligations assumed by Seller pursuant to this Agreement.

(iv) Any failure by Seller to fully perform and observe all obligations and conditions to be performed or observed by Seller under this Agreement (whether such failure is innocent, negligent, or intentional).

(b) <u>Buyer Indemnification Obligation</u>. Buyer shall indemnify and save harmless Seller against and from any and all losses, damages, liabilities, or claims arising directly or indirectly out of:

(i) Any liabilities resulting from Buyer's conduct of the business after the Closing;

(ii) Any failure by Buyer to pay any liabilities assumed by Buyer at the Closing or to perform any obligations assumed by Buyer pursuant to this Agreement.

(iii) Any failure of any representation or warranty by Buyer to have been correct and complete when made; and

(iv) Any failure by Buyer to fully perform and observe all obligations and conditions to be performed and observed by Buyer under this Agreement (whether such failure is innocent, negligent, or intentional).

(c) <u>Amount Limitations</u>. In determining the amount of losses, damages, liabilities, or claims, there shall be deducted the amount, if any, of available insurance with respect to the event giving rise to such losses, damages, liabilities, or claims.

(d)     Expiration of Indemnity for Representations. Notwithstanding the foregoing to the contrary, the parties' obligations of indemnity shall terminate one year after the Closing Date, except for obligations of indemnity under § 19b(i), and § 19b(ii). If prior to the date of such termination a notice of a claim is given, then the party giving notice shall not be precluded from pursuing that claim following the expiration of such one year period.

(e)     Indemnification for Third Party Claims. If either party (the *"Indemnified Party"*) determines to seek indemnification under this Section from the other party (the *"Indemnifying Party"*) with respect to a claim resulting from the assertion of liability by a third party, the Indemnified Party shall give written notice to the Indemnifying Party which notice shall set forth such material information with respect to such claim as is then reasonably available. The Indemnifying Party shall be entitled, if it so elects by written notice to the Indemnified Party, to assume the defense of such asserted liability or claim with counsel reasonably satisfactory to the Indemnified Party. Notwithstanding the foregoing: (i) the Indemnified Party shall have the right to employ its own counsel in any such case, but the fees and expenses of such counsel shall be payable by the Indemnified Party; and (ii) the rights of the Indemnified Party to be indemnified shall not be adversely affected by its failure to give notice pursuant to the foregoing provisions unless, and, if so, only to the extent that the Indemnifying Party is materially prejudiced by such failure.

(f)     No Setoff. There shall be no right of set off with respect to amounts payable as a result of a claim for indemnity against any amount owed to the party which is required to provide indemnification pursuant to this Agreement.

(g)     Exclusive Remedy. The parties agree that any remedies which may arise under the Asset Purchase Agreement are covered by and included within this §19. This §19 shall provide the sole and exclusive remedy for any and all liabilities, demands, claims, actions or causes of action, assessments, losses, fines, penalties, costs (including reasonable attorneys' and expert witness fees), damages and expenses, including, without limitation, those asserted by any federal, state, local or foreign governmental entity, public utilities commission, franchise authority, third party, or former or present employee, sustained or incurred by Buyer or Seller, or their successors or assigns.

§20.     Notices. Any notice or other communication required or desired to be given to any party under this Agreement shall be in writing and shall be deemed given when: (a) delivered personally to an officer of that party, or (b) deposited in the United States mail, first class, postage prepaid, express mail service, addressed to that party at the following address or at any other address hereafter designated by that party in writing to the party giving notice:

**Notice to Seller:**

Mississippi River Corporation
Attention: Ronald A. Lisko
150 E. Wilson Bridge Rd, Suite 250
Worthington, Ohio 43085

with a copy to:

Richard K. Stovall, Esq.
Allen Kuehnle Stovall & Neuman
17 South High Street, Suite 1220
Columbus, OH 43215
Phone:  (614) 221-8500
Fax:     (614) 221-5988
Email: *stovall@aksnlaw.com*

**Notice to Buyer:**
Mississippi Recycling Company LLC
Edward S. Logan, III
1080 South Sunbury Road
Westerville, OH 43081

with a copy to:

John H. Kozich, Esq.
Harris, McClellan, Binau & Cox,  P.L.L.
Huntington Plaza, Suite 950
37 West Broad Street
Columbus, Ohio 43215
Phone: (614) 464-2572
Fax:     (614) 464-2245
Email: jkozich@hmbc.com


§21.   <u>Governing Law</u>.   All questions concerning the validity or meaning of this Agreement or relating to the rights and obligations of the parties with respect to performance under this Agreement shall be construed and resolved under the laws of Ohio, exclusive of conflicts of law.   All parties to this Agreement hereby designate the Bankruptcy Court in Franklin County, Columbus, Ohio as the court of jurisdiction and venue for any action or proceedings relating to this Agreement, hereby irrevocably consent to such designation, jurisdiction and venue and hereby waive any objections or defenses relating to jurisdiction or venue with respect to any action or proceeding initiated in any such court.

§22. <u>Recording and Transfer Fees</u>. Except as otherwise provided in this Agreement, each party shall pay its own costs and expenses in connection with the negotiation, execution and consummation of this Agreement. All recording fees, transfer taxes, and fees and expenses relating to the conveyances, assignments and transfers under this agreement shall be paid by Buyer.

§23. <u>Execution of Documents</u>. Each party to this Agreement and its successors and assigns shall execute, acknowledge or verify and deliver any and all documents which from time to time may be reasonably requested by any other party to this Agreement to carry out the purposes and intent of this Agreement.

§24. <u>Severability</u>. The intention of the parties to this Agreement is to comply fully with all laws and public policies, and this Agreement shall be construed consistently with all laws and public policies to the extent possible. If any court of competent jurisdiction determines it is impossible to construe any provision of this Agreement consistently with any law or public policy and consequently holds that provision to be invalid, such holding shall in no way affect the validity of the other provisions of this Agreement, which shall remain in full force and effect.

§25. <u>Non-waiver</u>. No failure by any party to insist upon strict compliance with any term of this Agreement, to exercise any option, enforce any right, or seek any remedy upon any default of any other party shall affect, or constitute a waiver of, the first party's right to insist upon such strict compliance, exercise that option, enforce that right, or seek that remedy with respect to that default or any prior, contemporaneous, or subsequent default; nor shall any custom or practice of the parties at variance with any provision of this Agreement affect, or constitute a waiver of, any party's right to demand strict compliance with all provisions of this Agreement.

§26. <u>No Third Party Benefit</u>. This Agreement is intended for the exclusive benefit of the parties to this Agreement and their respective successors and assigns, and nothing contained in this Agreement shall be construed as creating any rights or benefits in or to any third party.

§27. <u>Captions</u>. The captions of the various sections of this Agreement are not part of the context of this Agreement, but are only labels to assist in locating those sections, and shall be ignored in construing this Agreement.

§28. <u>Complete Agreement</u>. This document (including its schedules and exhibits), contains the entire agreement between the parties and supersedes all prior or contemporaneous discussions, negotiations, representations, or agreements relating to the subject matter of this Agreement. No changes to this Agreement shall be made or be binding on any party unless made in writing and signed by each party of this Agreement.

§29.  Successors.  This Agreement shall be binding upon, inure to the benefit of, and be enforceable by and against the respective heirs, personal representatives, successors and assigns of each party to this Agreement, provided that Buyer shall not assign its rights under this Agreement except to an affiliate with the express written consent of Seller, provided that Buyer shall remain liable for all obligations under this Agreement following any permitted assignment.

§30.  Execution.  This Agreement may be executed in one or more counterparts, including by email and facsimile, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

In Witness Whereof, the parties have caused their duly authorized representatives to execute this Asset Purchase Agreement as of the date first written above.

**SELLER**
**Mississippi River Corporation**

By: _____

Ronald A. Lisko, Vice-President

**BUYER**
**Mississippi Recycling Company LLC**

By: _____

Edward S. Logan, III, General Manager

21

## Schedule l(a)

## Real Property

1. Natchez Mill: 323 Market Street, Natchez, MS, in name of Seller, located in Adams County, Mississippi and including buildings and land (approximately 470,000 square footage, not including leased property) which are further described in Mississippi Valley Title Insurance Company/Old Republic National Title Insurance Company Title Commitment File No. *MRC* 12 09 Owners (Natchez Mill Title Commitment). Property will be sold subject to Deed of Trust debt securing Promissory Note in original amount of $1,000,000 to Adams County, Mississippi, with an approximate balance as of January 2010 of $114,271 and to Deed of Trust debt securing Promissory Note in the original amount of $720,000 to Adams County, Mississippi, with an approximate balance as of January 2010 of $181,161.00, the liability for which is being assumed by Buyer.

Also the Natchez Mill is subject to the lien for personal and real estate taxes owing for 2008 and 2009 in the approximate amount of $ 658,781.54, as detailed in schedule 10(i) hereof, the liability for which is being assumed by Buyer. The Natchez Mill is also subject to Permitted Encumbrances, as set forth in the Natchez Mill Title Commitment.

The legal description to the Natchez Mill is as follows:

Situated in ADAMS County, State of MISSISSIPPI, to wit:

**TRACT 1**:

Description of a 96.77 acre tract, portion of a 102.12 acre tract, American Tissue Corporation of Majorca Plantation, situated in Township 7 North, Range 3 West, Adams County, Mississippi.

Beginning at Southeast corner of a 102.12 acre tract, acquired by American Tissue Corp. per deed recorded in Deed Book 17-E, on Page 411, of the Records of Adams County, Mississippi.

Thence from said POINT OF BEGINNING, go along the Westerly right of way of Majorca Road North 21 degrees 12 minutes 46 seconds East for 289.56 feet; North 68 degrees 47 minutes 14 seconds West for 50.00 feet; along the arc of a curve to the right, having a radius of 968.12 feet for a distance of 245.00 feet; North 35 degrees 42 minutes 46 seconds East for 208.60 feet; and North 54 degrees 17 minutes 14 seconds West for 50.00 feet; thence leaving said right of way go South 88 degrees 36 minutes 05 seconds West for 162.86 feet; thence North 73 degrees 34 minutes 00 seconds West for 263.47 feet; thence South 30 degrees 18 minutes 00 seconds West for 143.36 feet; thence North 87 degrees 27 minutes 06 seconds West for 85.11 feet; thence North 36 degrees 48 minutes 46 seconds West for 154.98 feet; thence North 44 degrees 37 minutes 18 seconds East for 160.04 feet; thence North 44 degrees 43 minutes 45 seconds East for 526.04 feet; thence South 37 degrees 27 minutes 45 seconds East for 48.80 feet; thence South 36 degrees 43 minutes 55 seconds East for 166.26 feet; thence South 35 degrees 33 minutes 06 seconds East for 207.95 feet to the Westerly right of way of Majorca Road; thence along the Westerly right of way of Majorca Road North 02 degrees 02 minutes 14 seconds West for 100.00 feet along the arc of a curve to the right, having a radius of 915.65 feet for a distance of 126.63 feet; South 84 degrees 06 minutes 48 seconds East for 85.00 feet; along the arc of a curve to the right, having a radius of 830.65 feet for a distance of 298.31 feet; North 26 degrees 27 minutes 46 seconds East for 100.00 feet along the arc of a curve to the left, having a radius of 596.11 feet for a distance of 561.82 feet, North 27 degrees 32 minutes 14 seconds West for 247.00 feet, along the arc of a curve to the right, having a radius of 505.74 feet for a distance of 81.48 feet to the Northeast corner of within

described tract; thence leaving the Westerly right of way of Majorca Road go North 72 degrees 47 minutes 22 seconds West along the Southerly boundary of a 65.77 acre tract acquired by Adams County from Diamond National Corp., per deed recorded in Deed Book 10-A, on Page 347 of the Records of Adams County, Mississippi for 1436.03 feet to the center of a bayou; thence along the present centerline of said bayou the following bearings and distances:

South 37 degrees 02 minutes 58 seconds West for 89.41 feet; South 39 degrees 14 minutes 07 seconds East for 85.63 feet; South 07 degrees 26 minutes 33 seconds West for 43.80 feet; South 72 degrees 39 minutes 53 seconds West for 90.60 feet; South 52 degrees 29 minutes 18 seconds West for 97.58 feet; South 29 degrees 08 minutes 03 seconds West for 47.62 feet; South 02 degrees 12 minutes 28 seconds West for 148.30 feet; South 15 degrees 22 minutes 18 seconds West for 57.40 feet; South 80 degrees 49 minutes 18 seconds West for 36.76 feet; North 47 degrees 56 minutes 37 seconds West for 85.20 feet; South 66 degrees 02 minutes 18 seconds West for 24.39 feet; South 00 degrees 01 minutes 13 seconds West for 64.04 feet; South 39 degrees 20 minutes 37 seconds East for 69.00 feet; and South 25 degrees 33 minutes 17 seconds East for 42.25 feet; thence along the center of same bayou as existed in or prior to December 1963, the following bearings and distances:

South 34 degrees 48 minutes 49 seconds West for 292.47 feet; South 67 degrees 18 minutes 46 seconds West for 43.40 feet; South 38 degrees 10 minutes 46 seconds West for 18.30 feet to the North boundary of an I.C. Railroad 'tract, recorded in Deed Book 6-I, on Page 24 of the Records of Adams county, Mississippi; thence along the Northerly and Easterly boundaries of said I.C. Railroad Tract the following bearings and distances:

North 81 degrees 50 minutes 46 seconds East for 16.50 feet; South 64 degrees 09 minutes 14 seconds East for 157.90 feet; South 54,degrees 24 minutes 46 seconds West for 190.00 feet; South 51 degrees 39 minutes 46 seconds West far 110.00 feet; South 40 degrees 29 minutes 46 seconds West for 158.00 feet; and South 62 degrees 13 minutes 46 seconds West for 93.60 feet to the most Southerly corner thereof; thence South 07 degrees 48 minutes 46 seconds West along the Easterly right of way of I.C. Railroad for 49.00 feet; thence along the Easterly boundary of I.C. Railroad property the following bearings and distances:

South 01 degrees 08 minutes 46 seconds West for 216.00 feet; South 06 degrees 21 minutes 14 seconds East for 199.80 feet; South 12 degrees 08 minutes 46 seconds West for 149.00 feet; South 21 degrees 24 minutes 46 seconds West for 111.20 feet; North 61 degrees 45 minutes 14 seconds West for 32.70 feet; and South 07 degrees 12 minutes 46 seconds West for 103.00 feet to the Northerly right of way of Port Road; thence along the Northerly right of way of Port. Road along the arc of a curve to the left, having a radius of 1096.62 feet for a distance of 317.29 feet; South 72 degrees 49 minutes 14 seconds East for 801.30 feet; along the arc of a curve to the right, having a radius of 2914.93 feet for a distance of 179.76 feet; and South 69 degrees 17 minutes 14 seconds East far 671.90 feet to the Point of Beginning. Within described tract containing 96.77 acres, more or less, being a portion of a 102.12 acre tract, American Tissue Corp portion
of Majorca Plantation, situated is Township 7 North, Range 3 West, Adams County, Mississippi. The above described tract being all lands acquired by Mississippi River corporation per deed recorded in Deed Book 19-B, on Page 171, of the records of Adams County, Mississippi, and all of the lands acquired by Mississippi River Corporation per deed recorded in

Deed Book 19-A, on Page 470 of the records of Adams County, Mississippi.

**LESS AND EXCEPT:**

From the Southeast corner of 102.12 acre tract acquired by American Tissue Corp. per deed recorded in Deed Book
17-F, on Page 411 of the records of Adams County, Mississippi, go North 00 degrees 31 minutes 31 seconds East for 1669.3 feet to the most Southerly corner of a 2.32 acre tract, thence along the

Southeasterly boundary of said 2.32 acre tract, North 44 degrees 43 minutes 02 seconds East for 406.00 feet to the Point of Beginning, being a point on the Northwesterly boundary of within described tract.

Thence from said Point of Beginning continue North 44 degrees 43 minutes 02 seconds East along the Southeasterly boundary of said 2.32 acre tract and an extension thereof for 126.00 feet; thence South 45 degrees 16 minutes 58 seconds East for 287.78 feet to the Westerly right of way of Majorca Road, SAP 1(18), being also the Easterly boundary of Mississippi River Corporation lands per deed recorded in Deed Book 19-B, on Page 171 of the records of Adams County, Mississippi; thence along said boundary being the arc of a curve to the right having a radius of 596.11 feet for 339.96 feet and South 26 degrees 27 minutes 46 seconds West for 26.41 feet; thence leaving said boundary go North 76 degrees 52 minutes 10 seconds West for 251.69 feet; thence North 45 degrees 16 minutes 58 seconds West for 243;06 feet; thence North 44 degrees 43 minutes 02 seconds East for 307.00 feet, thence North 45 degrees 16 minutes 58 seconds West for 29.00 feet to the Point of Beginning. Within described tract containing 3.77 acres, more or less, being a portion of Majorca Plantation, portion of lands acquired by Mississippi River Corporation, per deed recorded in Deed Book 19-B, on Page 171 of the records of Adams County, Mississippi, and further, being depicted as a portion of Parcel 70, Group A, Tax Map No. 44, Adams County, Mississippi.

**LESS AND EXCEPT:**

2.00 ACRE PORTION OF MISSISSIPPI RIVER CORPORATION PROPERTY
PORTION OF PARCEL 70.1, TAX MAP 44
SITUATED IN SECTION 54, T7N-R.3W
ADAMS COUNTY, MISSISSIPPI

The following description is based on the Mississippi State Plane, West Zone, NAD 83 Projection, and the bearings shown are on this grid.

From a 1" iron rod found at the Southeasterly corner of a 102.12 acre tract as described by deed recorded in deed book 17-B, page 411, of the records of Adams County, Mississippi, being the point of intersection of the Westerly right-of-way line of Majorca Road with the Northerly right-of-way line of Port Road, run N 46° 48' 28" W for a distance of 893.47' feet to a 5/8" iron rod set at Northeasterly corner of within described tract for the point of beginning, at N 739167.45 E 1955158.98 on the above referenced coordinate system.

Together with a right of access over, on and across the adjacent property of the Grantor, Mississippi River Corporation for the sole and exclusive purpose of maintaining the aforesaid 2.0 acres conveyed herein and specifically the electric utility power line area as shown and depicted on the aforesaid plat (Exhibit "A").

**TRACT 2:**

From the Southeast corner of a 102.12 acre tract, acquired by American Tissue Corp. by deed recorded in Deed Book 17-E, on Page 411 of the Records of Adams County, Mississippi, run North 25 degrees 59 minutes 20 seconds East for 1207.75 feet to a point on the Easterly right of way line of Majorca Road, SAP 1(8), for the Point of Beginning, being the Southwesterly corner of within described tract.

Thence from the said Point of Beginning, run Northerly along the Easterly right of way line of Majorca Road, SAP 1(8), being the arc of a curve to the right having a radius of 705.65 Feet, for a distance of 295.28 feet; thence run North 26 degrees 27 minutes 46 seconds East along said right of way for 85.00 feet; thence run South 72 degrees 46 minutes East

for 98.38 feet; thence run South 30 degrees 03 minutes West for 116.60 feet; thence run South 15 degrees 39 minutes West for 56.04 feet; thence run South 11 degrees 13 minutes East for 110.22 feet; thence run South 6 degrees 18 minutes West for 104.68 feet; thence run North 75 degrees 37 minutes

West for 146.12 feet to the Point of Beginning. The within described tract contains 1.00 acre, more or less.

## TRACT 3:

That certain property situated in Township 7 North, Range 3 West, Adams County, Mississippi, and described as follows:
From the southeast corner of a 102.12 acre tract acquired by American Tissue Corp. per deed recorded in Deed book 17-E, on Page 411 of the records of Adams County, Mississippi, go North 37 degrees 26 minutes East for 609.67 feet to the Point of Beginning, being a point on the Easterly right of way of Majorca Road, SAP 1(8), being also the Southwest corner of within described tract.

Thence from said Point of Beginning go the following bearings and distances along the Easterly right of way of Majorca Road, SAP 1(8):

North 35 degrees 42 minutes 47 seconds East for 109.42 feet; North 54 degrees 17 minutes 13 seconds West for 10.00 feet; along the arc of a curve to the left having a radius of 567.04 feet for 373.60 feet; North 02 degrees 02 minutes 13 seconds West for 100.00 feet; and along the arc of a curve to the right having a radius of 705.65 feet for 55.72 feet to the Southwest corner of a 1.00 acre tract, portion of property of Adams County; thence South 75 degrees 37 minutes East along the Southerly boundary of said 1.00 acre tract for 146.12 feet; thence leaving the Southerly boundary of said 1.00 acre tract, go South 35 degrees 59 minutes West for 13.20 feet; thence South for 585.06 feet; thence West for 197.28 feet; thence North 72 degrees 12 minutes West for 99.98 feet to the Point of Beginning. Within described tract contains 2.47 acres, more or less.

## AND ALSO:

Water Well Site 1, portion of 102.12 acre tract, portion of Majorca Plantation, situated in Township 7 North, Range 3 West, Adams County, Mississippi, further described as follows:
From the southeast corner of a 102.12 acre tract, acquired by American Tissue Corp. per deed recorded in need Book 17-F, Page 411, of the records of Adams County, Mississippi, go along the Northerly right of way of Port Road North 69 degrees 17 Minutes 14 Seconds West for 671.90 feet; thence along the arc of a curve to the left, having a radius of 2914.93 feet for 179.80 feet; thence North 72 degrees 49 minutes 14 seconds West for 801.24 feet; thence along the arc of a curve to the right, having a radius of 1096.62 feet for 295.05 feet to the Point of Beginning, being the Southeast corner of within described tract.

Thence from said Point of Beginning continue along the Northerly right of way of Port Road, being the arc of a curve to the Right having a radius of 1096.62 feet for 22.75 feet to the Easterly boundary of I. C. Railroad property; thence North 07 degrees 12 minutes 46 seconds East along the Easterly boundary of I. C. Railroad property for 20.00 feet; thence leaving said boundary, go South 82 degrees 47 minutes 14 seconds East for 20.00 feet; thence south 07 degrees 12minutes 46 seconds West for 29.74 feet to the Point of Beginning. Being the same property excepted as Tract 1, per deed recorded in the Deed Book 17-E, Page 411 of the records of Adams County, Mississippi.

Water Well Site 2, portion of 102.12 acre tract, portion of Majorca Plantation, situated in Township 7 North, Range 3 West, Adams County, Mississippi.

From the Southeast corner of a 102.12 acre tract, acquired by American Tissue Corp. per deed recorded in need Book 17-E, Page 411 of the records of Adams County, Mississippi, go along the Northerly right of way of Port Road, North 69 degrees 17 minutes 14 seconds West for 671.90 feet, thence along the arc of a curve to the left, having a radius of 2914.93 feet for 179.80 feet to the Point of Beginning, being the Southeast corner of within described tract.

Thence from said Point of Beginning, go North 72 degrees 49 minutes 14 seconds West along the Northerly right of way of Port Road for 20.00 feet; thence leaving said right of way North 17 degrees 10

minutes 46 seconds East far 20.00 feet; thence south 72 degrees 49 minutes 14 seconds East for 20.00 feet; thence South 17 degrees 10 minutes 46 seconds

West for 20.00 feet to the Point of Beginning. Being the same property excepted as Tract 2, per deed recorded in Deed Book 17-E, Page 411 of the records of Adams County, Mississippi.

Water Well Site 3, portion of 102.12 acre tract, portion of Majorca Plantation, situated in Township 7 North, Range 3 West, Adams County, Mississippi.

From the Southeast corner of a 102.12 acre tract, acquired by American Tissue Corp. per deed recorded in Deed Book 17-E, Page 411 of the records of Adams County, Mississippi, being the Southeast corner of within described tract.

Thence from said Point of Beginning, go North 69 degrees 17 minutes 14 seconds West along the Northerly right of way of Port Road for 20.00 feet; thence leaving said right of way go North 21 degrees 12 minutes 46 seconds East for 20.00 feet; thence South 69 degrees 17 Minutes 14 seconds East for 20.00 feet to the Westerly right of way of Majorca Road; thence South 21 degrees 12 minutes 46 seconds West along the Westerly right of Way of Majorca Road for 20.00 feet to the Point of Beginning. Being the same property excepted as Tract 3, per deed recorded in need Book 17- E, Page 411 of the records of Adams County, Mississippi.

2. West Virginia Condominium: in name of Seller, located in Bridgeport, Simpson District, Harrison County, West Virginia, of approximately 1,816 square feet used for customer/vending entertaining, which is further described in Chicago Title Insurance Company Commitment *No. 1752.* Subject to Permitted Encumbrances set forth in the title commitment, and real estate taxes for the year 2009 and subsequent years.

The legal description for the West Virginia Condominium is as follows:

All that certain tract or parcel of land, known and designated as Townhouse Unit 209, together with all buildings and improvements thereon and appurtenances thereunto belonging, situate in Emberwood Subdivision, Simpson-Outside District, Harrison County, West Virginia, and being more particularly bounded and described as follows:

Beginning at a 3/4" iron rod set said point bears North 21° 50' 18" East, a distance of 195.46 feet from a concrete monument found; thence with a common corner of Lot No. 209 and Lot No. 208, North 21° 50' 18" East, a distance of 37.43 feet to a 3/4" iron rod set; thence leaving said 3/4" iron rod set and with a common line of Lot No. 209 and Lot No. 117, South 72° 56' 40" East, a distance of 132.61 feet to a 3/4" iron rod set at a common corner of Lot No. 209 and Lot No. 117 and the western right of way of Road "A"; thence leaving said 3/4" iron rod set and with the western right of way of Road "A", South 23° 15' 04" West, a distance of 36.00 feet to a 3/4" iron rod set at a common corner of Lot No. 209 and Lot No. 208; thence leaving said western right of way of Road "A" and with a common line of Lot No. 209 and Lot No. 208, North 73° 35' 59" West, a distance of 131.85 feet to the Place of Beginning, and containing 4,829 square feet, or 0.11 acres, more or less.

## Schedule 1 (b)

## Assumed Natchez Mill Lease

Seller is lease under Lease with Adams County, Mississippi, dated April 13, 1995, re 3.77 acres which are part and parcel of Natchez Mill, with building containing approximately 80,000 square feet of warehouse space. Lease is connected to Promissory Note evidencing Seller's initial debt to Lessor of $1,000,000, upon which, as of January 2010, there is an approximate balance owing of $114,271. There is an option to purchase real estate of $1 to be exercised upon payment in full of Promissory Note.

## Schedule 1(c)

## Assumed Business Leases

1.  Appleton, WI – 800 square feet of office space, leased at a base rent of $775 a month, expired 12/31/2004 and currently renting month to month. (Current)

2.  Worthington, OH – 2,591 square feet of office space, mainly supporting NAPCO division operations, leased at a base rent of $1,781.31 a month, expiring October 31, 2010. Last Extension of Lease dated October, 15, 2009. (Current)

3.  Natchez, MS – apartment lease dated January 5, 2010 for 125 Lower Woodville Road, Apt No. 1170, leased for a base rent of $690.09 a month. Lease expires July 2010. (Current)

**Equipment**

**Includes the following equipment, but is not limited to:**

| Qty | Description |
| --- | --- |
| 1 | Pulper - FiberPrep Model 40M3, High Consistency |
| 1 | Pulper Feed Conveyor - Karl W Schmidt Model SS-111-P |
| 1 | Scavenger - FiberPrep/Lamort Model V |
| 1 | Voith Contaminex |
| 1 | RimPac Skip-Hoist Loader Reject Conveyor |
| 1 | Pulper - Fiberprep Hydrapulper |
| 2 | Back-up Pulping System - Black-Clawson Hydrapulpers, 6000 pound capacity |
| 1 | Back-up Pulping System - Morden Hydrapulper 6000 pound capacity |
| 2 | Voith High Density Cleaners, 250 TPD |
| 2 | Voith Screens 420 gpm |
| 2 | Primary Coarse Screens - CH3 Fiber Prep |
| 2 | Secondary Coarse Screens - CH5 Fiber Prep |
| 3 | Fine Screens - Sunds T9 |
| 4 | Fine Screens - Sunds T6 |
| 64 | Voith Flotation Cells 1320 gallon |
| 90 | Celleco Model Cleanpac 700s |
| 158 | Celleco Model Cleanpac 350s |
| 462 | Celleco Model Cleanpac 270s |
| 1 | Voith Model RS20 Reject Sorter |
| 1 | Wedge - Fields & Boyd Model 120 -WT Dewatering Press |
| 1 | Kneader - Ahlstrom Kamyr Model H - 2000 MDR Kneader |
| 1 | Model HPA Heater, Static Pulp Heater |
| 2 | Model T-15B Mixers |
| 1 | PO Bleach Tower |
| 1 | FAS Bleach Tower |
| 1 | FAS Chemical Feed System |
| 48 | Voith Flotation Cells 1320 gallon |
| 1 | Seenumatic Flotation Cell |
| 2 | Hymac Model 96x192 Decker Filters |
| 1 | Fields & Boyd Wet Lap Machine |
| 1 | Fields & Boyd Cutter Layboy Unit |
| 1 | Cranston Baling and Handling System |
| 1 | Andritz Model Wetlap Machine |

| | |
|---|---|
| 1 | Andritz Model CLR 12188 Cutter Layboy Unit |
| 1 | Neilson & Hiebert Systems Baling and Handling Systems |
| 1 | Wastewater Treatment Clarifier 80' Diameter |
| 1 | Wastewater Treatment Clarifier 50' Diameter |
| 1 | Wastewater Treatment Clarifier 60' Diameter |
| 26 | Aeration Lagoons Aerators |
| 2 | Parkson Filter Presses |
| 1 | Press Technology Model 36200 Screw Press |
| 3 | Cleaver Brooks Boilers |
| 3 | Alfa-Laval Thermal Model 1H Heat Exchangers |
| 3 | Ingersoll-Rand Rotary Screw Air Compressor |
| 1 | Poseidon Saturn S600 DAF Clarifier |
| 1 | Poseidon Saturn S1500 DAF Clarifier |

**In addition, Seller has office equipment, such as computers, fax machines, adding machines, etc. used in each of its offices.**

## Schedule 1(e)

## Equipment Leases

**TOYOTA FINANCIAL SERVICES**
**FORK TRUCK LEASES: (All expired leases**
**are currently on a month to month basis)**

| YEAR | MAKE | MODEL | LEASE DATE | EXPIRES | LEASE# | SERIAL# | MONTHLY PAYMENT |
|------|------|-------|------------|---------|--------|---------|-----------------|
| 2009 | TOYOTA | 8FGU25 | 4/30/2009 | 5/31/2012 | LA70739 | 19188 | $ 470.06 |
| 2009 | TOYOTA | 8FGU25 | 6/23/2009 | 7/31/2012 | LA70739 | 19248 | $ 470.06 |
| 2006 | TOYOTA | 7FGU25 | 10/16/2006 | 10/16/2009 | LA49674 | 83952 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 10/16/2006 | 10/16/2009 | LA49674 | 84587 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 10/16/2006 | 10/16/2009 | LA49674 | 84589 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 1/29/2007 | 2/26/2010 | LA49674 | 84611 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 1/29/2007 | 2/26/2010 | LA49674 | 84636 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 1/29/2007 | 2/26/2010 | LA49680 | 84686 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 1/29/2007 | 2/26/2010 | LA49680 | 84688 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 1/29/2007 | 2/26/2010 | LA49680 | 84698 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 1/29/2007 | 2/26/2010 | LA49680 | 84590 | $ 451.77 |
|  |  |  |  |  | TOTAL: |  | $ 5,006.05 |

**XEROX CAPITAL SERVICES**
**COPIER - XEROX WORKCENTER 265**
60 Month Lease          Serial# UTU-907296
Beginning
01/01/07
Ending 01/01/12
Monthly Payment        $660.03

**De Lage Laden**
Fax Machine
Monthly Payment        $57.50

**NISSAN MOTOR ACCEPTANCE CORPORATION**
**2007 NISSAN ALTIMA**

36 Month Lease          VIN# 1N4BL21E27C154505
Beginning
10/31/07
Ending 11/04/10
Monthly Payment        $435.34

**Tech Pap-Lease**
**to own-18months**
**12 months left (5**
**behind)**
Process Dirt
Counter
Monthly Payment        $3,222.00

## Schedule 1(f)

## Intangible Property

The following is not intended to be a complete list of intangible property, but an identification of specific property:

1.     Trademark of MRC initially issued on US Patent and Trademark Office Principal Register on January 10, 1995, under Registration No. 1,873,053, and renewed for additional 10 years to January 2015.

2.     Trade name of NAPCO, or North American Paper Company. NAPCO was previously a separate corporation that was merged into Seller in 1993.

3.     May 2008 United States Patent NO. 7,377,993 B2, regarding fully recycled pulp use in manufacturing food-contact paper packaging materials.

4.     Approval from FDA regarding process to manufacture food-contact paper packaging material from fully recycled pulp, to the extent assignable, dated September 24, 2004.

5.     Certificate of Conformity and the like from various countries relating to recycled products for food packaging, to the extent assignable, including but not limited to letters and or certificates, and their replacements and extensions thereof:
      (a) from Bureau of Chemical Safety, Ottawa, Ontario, dated March 22, 2005 and September 13, 2005 regarding acceptability, and statement of no reason to object to the post-consumer recycled pulp for the manufacture of paperboard for food contact applications; and
      (b) from Germany approval letter of December 5, 2006, approving Uncoated Cup, Recycle Cup, Coated Aseptic, Coated Aseptic/D, PQR/Printkote/Coated Cup and Pressed Tray as board grades used for food packaging and the manufacture of drinking cups as set forth therein.

## Schedule I(g)

## Assumed MDIP Contracts

Pulp Supply Agreement, dated February 15, 2010, by and between International Paper Company and Mississippi River Company (the "Supply Agreement")

License Agreement, dated February 15, 2010, by and between International Paper Company and Mississippi River Company (the "License Agreement")

Production and Consignment Agreement, dated January 11, 2010, by and between International Paper Company and Mississippi River Company, First Amendment to Production and Consignment Agreement, dated February 1, 2010, and Second Amendment to Production and Consignment Agreement, dated February 15, 2010.

Otherwise, there are no existing contracts, but customers order on a spot basis.

Notes Receivable

## SHAREHOLDER NOTES RECEIVABLE

### RECOURSE NOTE RECEIVABLE

| Shareholder | Principal Amount | Balance Due at January 31, 2010 |
|---|---|---|
| Ed Logan | $181,675 | $183,390.46 |

### * NONRECOURSE NOTES RECEIVABLE

| Shareholder | Principal Amount | Balance Due at December 31, 2008 |
|---|---|---|
| Ed Logan | $291,326 | $400,128 |
| Ron Lisko | 291,326 | 400,128 |
| Bob Adelman | 291,326 | 400,128 |
| Bob Snyder | 58,265 | 80,024 |
| Joe Albrycht | 135,952 | 186,729 |
| Barb Burkhart | 19,422 | 26,678 |
| George Matthews | 38,843 | 53,347 |

\*      Recourse on these Notes is limited to the Shareholder's shares in the Company and any dividends and distributions thereon.  No payments have been made on these Nonrecourse Notes since December 31, 2008.  Interest has continued to accrue on these Notes at the Applicable Federal Rate for demand instruments promulgated by the Internal Revenue Service.

## Schedule 3(ii)

## Adams County Liabilities

1. Promissory Note to Adams County, Mississippi in the original amount of $1,000,000, dated April 13, 1995 (with additional loan agreements) with a January 2010 balance owing of approximately $114,271. Loan secured by a Deed of Trust, dated April 13, 1995, to creditor granting a security interest in the Seller's interest in certain warehouse space which is part of the Natchez Mill complex, and payments on loan are also considered as payment on Lease to Adams County of a certain warehouse space referenced in Schedule 1(b).

2. Promissory Note to Adams County, Mississippi in the original amount of $720,000 with a January 2010 balance owing of approximately $181,161.00. Loan secured by a Deed of Trust, dated December 21, 1992, to creditor granting a security interest in Seller's interest in certain warehouse space which is part of the Natchez Mill complex.

## Schedule 5(a)

## Deposits and Accrued Interest

None.

## Schedule 5(d)

## Deposits and Bonds

Seller has on deposit with two golf courses the following amounts. These amounts were paid for business purposes and permits limited playing at these sites. Seller does not believe that these deposits would be refundable:

Wedgewood Country Club, Powell Ohio -          $25,000.00

Pete Dye Country Club, Bridgeport, West Virginia - $32,000.00

## Schedule 10(h)
## Contract Issues

Seller is not aware of any contract issues, other than the following:

Seller is in default on its lease payments as follows:

| Lease Name | Amount | Month Past Due | Description |
|---|---|---|---|
| Adams County, MS Board of Supervisors | $5,262.68 | November | 720,000 Bond CDBGEDL |
| | $5,262.68 | December | |
| | $5,262.68 | January | |
| | $5,262.68 | February | |
| | | | |
| | $7,272.22 | November | 1,000,000 MDECD CAP Loan |
| | $7,272.22 | December | |
| | $7,272.22 | January | |
| | $7,272.22 | February | |
| | $50,139.60 | | |
| | | | |
| De Lage Laden | $57.50 | January | Fax Machine |
| | $60.54 | February | |
| | $118.04 | | |
| | | | |
| TechPap | $3,222.00 | October | Dirt Counter |
| | $3,222.00 | November | |
| | $3,222.00 | December | |
| | $3,222.00 | January | |
| | $3,222.00 | February | |
| | $16,110.00 | | |
| | | | |
| Toyota Motor Credit | $4,568.89 | November | Forktruck |
| | $502.96 | December | |
| | $4,704.86 | December | |
| | $508.31 | January | |
| | $4,729.78 | January | |
| | $508.31 | February | |
| | $135.54 | February | Late fee invoice Forktruck |
| | $15,658.65 | | |
| | | | |
| Xerox | $115.56 | January | Usage |
| | $660.03 | January | Copier Lease |
| | $115.56 | February | Usage |
| | $660.03 | February | Copier Lease |
| | $18.49 | January | Late Fees |
| | $1,569.67 | | |

## Tax Issues

Related to Natchez Mill:

Real and Personal Property Taxes Due for Year Ending 12/31/2008 – Due 01/31/09

| | PPIN | 2008 TAXES DUE 39,844.00 | 2.00% INTEREST | PAID 3/31/09 | BAL-ANCE TAX ONLY | 5.00% INTEREST | PAID 39,993.00 | BAL-ANCE TAX ONLY | 12.00% INTEREST 1/31/10 | BALANCE DUE |
|---|---|---|---|---|---|---|---|---|---|---|
| BUILDING & LAND | 17027 | 150,486.00 | | | 150,486.00 | 7,524.30 | 158,010.30 | | | |
| | | | 0.00 | | | | | | | |
| INVENTORY | 1735 | 22,066.50 | 441.33 | 22,507.83 | | | | | | |
| | | | 0.00 | | | | | | | |
| MACHINERY | 736 | 51,086.90 | 1,021.74 | 52,108.64 | | | | | | |
| | 804 | 14,669.31 | 293.39 | 14,962.70 | | | | | | |
| | 1211 | 68,497.09 | | | 68,497.09 | | | 68,497.09 | 8,219.65 | $ 76,716.74 |
| | 1909 | 25,935.87 | | | 25,935.87 | | | 25,935.87 | 3,112.30 | $ 29,048.17 |
| | 2488 | 13,731.58 | | | 13,731.58 | | | 13,731.58 | 1,647.79 | $ 15,379.37 |
| | 2350 | 5,450.49 | | | 5,450.49 | | | 5,450.49 | 654.06 | $ 6,104.55 |
| | 2641 | 14,048.11 | | | 14,048.11 | | | 14,048.11 | 1,685.77 | $ 15,733.88 |
| | 2783 | 11,937.49 | | | 11,937.49 | | | 11,937.49 | 1,432.50 | $ 13,369.99 |
| | 2884 | 17,404.52 | | | 17,404.52 | | | 17,404.52 | 2,088.54 | $ 19,493.06 |
| | 2983 | 9,316.44 | | | 9,316.44 | | | 9,316.44 | 1,117.97 | 10,434.41 |
| | 3086 | 10,417.54 | | 10,625.89 | | | | | | |
| | 3159 | 11,912.27 | | | 11,912.27 | | | 11,912.27 | 1,429.47 | $ 13,341.74 |
| | 3270 | 10,511.79 | | | 10,511.79 | | | 10,511.79 | 1,261.41 | $ 11,773.20 |
| | 3374 | 4,146.55 | | | 4,146.55 | | | 4,146.55 | 497.59 | $ 4,644.14 |
| TOTAL PAID: | | 441,618.45 | 1,756.45 | 100,205.06 | 343,378.20 | 7,524.30 | 158,010.30 | 192,892.20 | 23,147.06 | $ 216,039.26 |

Real and Personal Property Taxes Due for Year Ending 12/31/2009 – Due 01/31/10

|  | PPIN | 2009<br>TAXES DUE<br>1/31/2010 |
| --- | --- | --- |
| **BUILDING &<br>LAND** | PPIN 17027 | $ 170,612.66 |
| **INVENTORY** | PPIN 1735 | $ 27,730.42 |
| **MACHINERY** | PPIN 736 | $ 50,803.53 |
|  | PPIN 804 | $ 14,591.45 |
|  | PPIN 1211 | $ 68,098.54 |
|  | PPIN 1909 | $ 18,463.16 |
|  | PPIN 2488 | $ 9,883.93 |
|  | PPIN 2350 | $ 4,297.10 |
|  | PPIN 2641 | $ 11,619.66 |
|  | PPIN 2783 | $ 9,898.89 |
|  | PPIN 2884 | $ 14,282.09 |
|  | PPIN 2983 | $ 7,882.36 |
|  | PPIN 3086 | $ 9,030.35 |
|  | PPIN 3159 | $ 10,275.29 |
|  | PPIN 3270 | $ 9,324.21 |
|  | PPIN 3374 | $ 3,648.68 |
|  | PPIN 3479 | $ 2,299.96 |
| **TOTAL:** |  | **$ 442,742.28** |

In addition, Seller owes the following sales tax liabilities to the State of Mississippi:

| Mississippi Tax<br>Commission | | | |
| --- | --- | --- | --- |
|  | $5,970.00 | October | Mississippi Sales Tax |
|  | $5,194.00 | November | |
|  | $3,341.00 | December | |
|  | $273.00 | January | |
|  | $14,778.00 | | |
| State Tax Commission | $2,880.00 | December | Estimated tax payment for 4th Q 09 |

**Schedule 10(n)**

## Environmental Matters

Seller is not aware of any Environmental Matters to be disclosed.