**This document has been electronically entered in the records of the United States Bankruptcy Court for the Southern District of Ohio.**

**IT IS SO ORDERED.**

John E. Hoffman, Jr.
United States Bankruptcy Judge

**Dated: February 19, 2010**

_____

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| In re: | **Case No. 10 - 51480** |
| **MISSISSIPPI RIVER CORPORATION,** | Chapter 11 |
| Debtor. | **Judge Hoffman** |

**INTERIM ORDER UNDER 11 U.S.C. §§ 105(a), 361
362 AND 363 AND 364, FEDERAL BANKRUPTCY RULES 2002, 4001 AND 9014, AND
LOCAL RULES 4001-2 AND 4001-3: (I)  AUTHORIZING DEBTOR TO OBTAIN
SECURED POST-PETITION FINANCING AND USE CASH COLLATERAL; (II)
GRANTING ADEQUATE PROTECTION; (III) MODIFYING THE AUTOMATIC STAY;
(IV) SETTING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

This matter came before the Court for hearing on February 19, 2010 at 3:00 P.M. (the

"**Interim Hearing**") on the *Motion of Debtor, Mississippi River Corporation, for Interim and*

*Final Orders: (1) Authorizing Debtor to Obtain Secured Post-Petition Financing Pursuant to 11*

*U.S.C. §§ 105, 361, 362, 363, 364(c) & (d), 503(b) and 507, Bankruptcy Rules 2002, 4001 and*

*9014, and Local Rules 4001-2 and 4001-3; (2) Granting Adequate Protection; (3) Modifying the*

*Automatic Stay; (4) Scheduling and Approving the Form and Method of Notice of Final Hearing;*

*and (5) Granting Other Related Relief* (the "**Motion**") [Doc. No. 5], filed by Mississippi River Corporation, debtor and debtor-in-possession (the "**Debtor**") in the above-captioned chapter 11 case (the "**Case**"); the Debtor having filed a voluntary petition under chapter 11 of title 11, United States Code (the "**Bankruptcy Code**"), on February 16, 2010 (the "**Petition Date**"), and having requested in the Motion entry of interim and final orders:

(1)      authorizing and approving, pursuant to section 364(c) and (d) of the Bankruptcy Code, the Debtor to obtain debtor-in-possession financing from the Lender (as defined herein) pursuant to the terms and conditions of (a) the DIP Loan Agreement (as defined herein), (b) this Interim Order and any final order, (c) all ancillary documents referred to in the DIP Loan Agreement, this Interim Order and any final order and/or required to be executed by the Debtor in connection therewith (collectively, the "**DIP Financing Documents**"), and (d) the budget annexed as Exhibit "A" hereto (the "**Budget**") (collectively, the "**DIP Credit Facility**");

(2)      authorizing and approving, pursuant to section 363 of the Bankruptcy Code, the Debtor's use of Cash Collateral (as defined herein) of the Lender;

(3)      granting the Lender (a) adequate protection, including, without limitation, adequate protection against the diminution in the value or amount of the Pre-Petition Collateral (as defined herein), (b) Replacement Liens (as defined herein), and (c) a superpriority administrative expense claim under section 507(b) of the Bankruptcy Code, such Replacement Liens and section 507(b) superpriority administrative expense claim to be subject to the Carve-Out (as defined herein), and the liens, security interests and superpriority treatment granted to the Lender with respect to the DIP Credit Facility, as more particularly set forth herein; and

(4)      granting any further and related relief as the Court deems just and equitable.

Upon the record of the Case and the record of the Interim Hearing, good and sufficient cause appearing therefor, and it appearing to be in the best interests of the Debtor's estate and creditors;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW ON AN INTERIM BASIS FOR PURPOSES OF ENTERING THIS INTERIM ORDER:

A.     On the Petition Date, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Ohio (the "**Bankruptcy Court**").  The Debtor is continuing in the management and possession of its business and properties as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.     Consideration of the Motion constitutes a "core proceeding" as defined in 28 U.S.C. §§ 157(b)(2)(A), (D), (G), (K), (M) and (O).  This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.

C.     Sufficient and adequate notice of the Motion has been provided under the urgent circumstances present and based upon the notice sent to the Interim Noticed Parties (defined below), pursuant to Bankruptcy Rules 2002, 4001(b), (c) and (d) and 9014 and section 102(1) of the Bankruptcy Code, as required by sections 363(b) and 364(c) and 364(d) of the Bankruptcy Code, and no further notice of, or interim or preliminary hearing on, the Motion or this Interim Order is necessary or required.

D.     Supplier Finance Company, LLC, a Delaware limited liability company, (the "**Lender**") is willing to advance monies to the Debtor, and to consent to the use of Cash Collateral, only upon the terms and conditions contained in this Interim Order.

E.     The Debtor is unable to obtain sufficient levels of unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to maintain and conduct its business.

F.     The Debtor is unable to obtain the necessary financing as unsecured credit allowable under sections 364(a), (b) or (c)(1) of the Bankruptcy Code or as secured credit pursuant only to sections 364(c)(2) and (3).  Additionally, the Debtor is unable to procure the necessary financing on more favorable terms than those offered by the Lender or provided in this Interim Order.

G.     The credit and financial accommodations to be extended under the DIP Credit Facility are being extended by the Lender in good faith; the conditions required by the Lender in connection with the use of Cash Collateral are made in good faith; the Debtor and the Lender have negotiated the terms and conditions contained in this Interim Order in an arms' length, open and honest fashion; and the Lender is entitled to the protection of section 364(e) of the Bankruptcy Code.

H.     It is in the best interests of the Debtor's creditors and estate that it be allowed to finance its operations under the terms and conditions set forth herein.

I.     Notice of the relief sought by the Motion, and the Interim Hearing with respect thereto, pursuant to Bankruptcy Rules 2002 and 4001(b), (c) and (d) and Bankruptcy Code section 102(1), as required by Bankruptcy Code sections 363(b), 364(c) and (d), has been given to the following parties in interest:  the U.S. Trustee, the Lender and its counsel, the creditors holding the twenty (20) largest unsecured claims against the Debtor's estate, the Securities and Exchange Commission, the Internal Revenue Service, and all state and local taxing authorities concerning the Debtor (collectively, the "**Interim Noticed Parties**").

J.      Without prejudice to the rights of parties in interest as set forth in paragraph 12 below, the Debtor admits, stipulates, acknowledges and agrees that (collectively, paragraphs J(i) through J(iii) hereof shall be referred to herein as the "**Debtor's Stipulations**"):

(i)      <u>The Senior Secured Loan Indebtedness</u>.  Prior to the commencement of the Case, MRC's primary lender was The CIT Group/Equipment Financing, Inc. ("**CIT**").  MRC's obligations to CIT were evidenced, in part by that certain Second Amended and Restated Loan and Security Agreement dated as of March 14, 2006, together with all such other loan documents executed in connection therewith or relating thereto, as amended (collectively the "**Senior Secured Loan Documents**").  On or about February 8, 2010, CIT sold, assigned and transferred virtually all of its right, title and interest in and under the Senior Secured Loan Documents (with certain limited exceptions) to Lender, which is a wholly owned subsidiary of International Paper Company ("**International Paper**").  The total indebtedness claimed to be owing to Lender, as assignee of CIT under the Senior Secured Loan Documents, as of the Petition Date is in the amount of approximately $9,775,000.  The foregoing obligations, together with, as of the Petition Date, all fees, costs and expenses (including, but not limited to, attorneys' fees and expenses), and other charges, amounts and costs owing, accrued, accruing or chargeable in respect thereof, of any kind or nature, whether existing or contingent, payable to or for the benefit of any person or entity, pursuant to any of the foregoing agreements, instruments or documents, is herein referred to as the "**Senior Secured Indebtedness**."  MRC's obligations owing to Lender under the Senior Secured Loan Documents, including the Senior Secured Indebtedness, are secured by security interests created under the Senior Secured Loan Documents (the "**Pre-Petition Senior Liens**") in essentially all assets of MRC, including Accounts, Equipment, Inventory and other Goods, Documents of Title, General Intangibles, Investment Property, Real Property, and Other

Collateral, all as defined in the Senior Secured Loan Documents, (collectively, the "**Pre-Petition Collateral**");

(ii)      <u>Validity and Priority of Pre-Petition Senior Liens and Senior Secured Indebtedness</u>. (a) The Pre-Petition Senior Liens are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code, (b) the Senior Secured Obligations constitute legal, valid, binding and non-avoidable obligations of the Debtor that, except for the stay of enforcement arising from section 362 of the Bankruptcy Code, are enforceable in accordance with the terms of the Senior Secured Loan Documents, (c) no offsets, defenses, challenges, claims, or counterclaims of any kind or nature to any of the Senior Secured Indebtedness exist, and no portion of the Senior Secured Indebtedness is subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (d) the Debtor and its estate have no offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action, including without limitation claims under chapter 5 of the Bankruptcy Code, against the Lender and/or their agents, attorneys, advisors, professionals, officers, directors or employees.

(iii)      <u>Cash Collateral</u>.   All of the Debtor's cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents, whether original collateral or proceeds, products, rents or profits of other Pre-Petition Collateral or the proceeds thereof (the "**Cash Collateral**"), constitutes "cash collateral," as such term is defined in Bankruptcy Code section 363(a), of the Lender.

K.      The Debtor represents as follows:

(i)      that without the use of Cash Collateral and the financing proposed by the Motion, the Debtor will not have the funds necessary to pay post-petition payroll, payroll taxes, trade vendors, suppliers, overhead and other expenses necessary for the continued operation of the

Debtor's business and the management and preservation of the Debtor's assets and properties. The Debtor has requested that pursuant to this Interim Order and the Budget, the Lender make available to the Debtor Cash Collateral, and pursuant to the DIP Credit Facility, the Lender make loans and advances and provide other financial accommodations to the Debtor, to be used by the Debtor solely for the purposes set forth in the Budget. The DIP Credit Facility shall allow the Debtor to deposit all receivables and other collections into its accounts which will be swept by the Lender and the Debtor will then borrow on the line of credit subject to the limits provided in the Budget. The ability of the Debtor to continue its business under chapter 11 of the Bankruptcy Code depends upon the Debtor obtaining such financing from the Lender. The Lender is willing to make the Cash Collateral available, and is willing to make such loans and advances and provide such other financial accommodations on a secured basis, as more particularly described herein, solely in accordance with this Interim Order and pursuant to the terms and conditions of the DIP Credit Facility. Accordingly, the relief requested in the Motion is necessary, essential and appropriate for the continued operation of the Debtor's business, the management and preservation of its assets and properties, and is in the best interests of the Debtor, its estate and creditors;

(ii)     that it is unable to obtain the necessary financing as unsecured credit allowable under sections 364(a), (b) or (c)(1) of the Bankruptcy Code or as secured credit pursuant only to sections 364(c)(2) and (3), and that it is unable to procure the necessary financing on more favorable terms than those offered by the Lender or provided in this Interim Order;

(iii)     that the terms and conditions contained in this Interim Order governing the use of Cash Collateral and the DIP Credit Facility, pursuant to which the post-petition loans, advances, and other credit and financial accommodations will be made or provided to the Debtor by the Lender, have been negotiated honestly, openly and at arms' length and in good faith, and,

thus, in "good faith," as that term is used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtor, its estate and creditors. The Debtor further represents that the Lender is extending financing to the Debtor in good faith and the Lender is entitled to the benefits of the provisions of section 364(e) of the Bankruptcy Code; and

        (iv)    that the relief requested by the Motion is necessary to avoid immediate and irreparable harm to its estate.

L.      Good, adequate and sufficient cause has been shown to justify the granting of the relief requested in the Motion, and the immediate entry of this Interim Order, and such entry is necessary to prevent irreparable harm to the Debtor's estate. To the extent any objections were made to the relief sought in the Motion and the entry of this Interim Order (and not withdrawn prior to the entry of this Interim Order) such objections are hereby overruled.

M.     As of the date hereof, the Office of the United States Trustee has not appointed an official committee of unsecured creditors (the "**Committee**") under section 1102 of the Bankruptcy Code.

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.      <u>Motion Granted</u>. The Motion is GRANTED as set forth herein.

2.      <u>Authorization to Obtain Debtor-in-Possession Financing</u>. The Debtor is hereby authorized, whether prior or subsequent to the execution and delivery of any DIP Financing Documents, to borrow funds from, and incur debt to, the Lender under the DIP Credit Facility pursuant to the terms and provisions of that certain Debtor in Possession Loan Agreement by and between the Debtor and Lender in substantially the form as attached hereto as Exhibit "B" (the "**DIP Loan Agreement**").

3.      <u>Approval of DIP Credit Facility</u>. The proposed borrowings and other extensions of credit under the DIP Credit Facility are hereby approved. The Lender shall have the rights and the

obligations set forth in this Interim Order to make DIP Advances and/or other financial accommodations pursuant to the terms and conditions hereof and the DIP Loan Agreement.

4. <u>Authorization to Use Cash Collateral</u>. The Debtor is hereby authorized to use Cash Collateral, in accordance with the terms and conditions of this Interim Order.

5. <u>Budget Limitations on DIP Advances and Cash Collateral Usage</u>. All DIP Advances and Cash Collateral must be used strictly in accordance with the terms of the Budget. The Debtor shall not, without the prior written consent of the Lender, use DIP Advances or Cash Collateral with respect to any one expense line item in the Budget in excess of five percent (5%) of the amount identified in the Budget for that line item, or in excess of five percent (5%) of the aggregate amount identified in the Budget for the "Grand Total", in either case measured on a cumulative four-week basis. Any extension or other modification of the Budget shall be subject to the prior written approval of the Lender.

6. <u>Lender's Superpriority Claim</u>. For any and all obligations of the Debtor to the Lender under and pursuant to the DIP Credit Facility (the "**Post-Petition Obligations**"), and in addition to the rights granted below, subject to the Carve-Out, the Lender is hereby granted an allowed superpriority administrative claim in accordance with section 364(c)(1) of the Bankruptcy Code, having a priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtor (including, but not limited to, the Senior Secured Indebtedness, which for avoidance of doubt is not entitled to treatment as an ordinary or superpriority administrative claim except to the extent of any Adequate Protection Claim, as defined below, for diminution in value or as adequate protection for priming by the DIP Credit Facility), now in existence or hereafter incurred by the Debtor and over any and all administrative expenses or priority claims of any kind including as specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b) (to the extent permitted by law), 1113 and

1114 of the Bankruptcy Code, whether arising in the Case or in any superseding chapter 7 case concerning the Debtor (a **"Successor Case"**); provided, however, that the superpriority status of the Lender's allowed administrative claim granted hereunder shall not apply to proceeds of actions or claims arising under section 544 et seq. of the Bankruptcy Code.

7. <u>Lender's Collateral and Priority</u>. Pursuant to Bankruptcy Code sections 362, 363(e) and 364(c) and (d), as security for the prompt payment and performance of any and all Post-Petition Obligations incurred by the Debtor to the Lender, of whatever nature or description, the Debtor is hereby authorized to grant to the Lender, and upon the entry of this Interim Order shall be deemed hereby to have granted to the Lender, valid, binding, enforceable and perfected first priority liens, mortgages and security interests, superior to the liens, mortgages, security interests or other interests or rights of all other creditors (other than Adams County, Mississippi) of the Debtor's estate on property owned or leased by the Debtor, in and upon (i) all of the Pre-Petition Collateral and all proceeds thereof, and (ii) all of the Debtor's property and assets acquired by the Debtor on or after the Petition Date, of any kind or nature, whether real or personal, tangible or intangible, wherever located, and all proceeds of any and all of the foregoing (the property and assets referred to in clause (ii) is referred to as the "**Post-Petition Collateral**," and together with the property and assets in clause (i), the "**Collateral**"), and all proceeds of the Collateral, subject only to the Carve Out; provided, however, that the security interests granted hereunder shall not apply to actions or claims arising under section 544 et seq. of the Bankruptcy Code.

8. <u>Adequate Protection of Lender's Interests</u>. As adequate protection for any post-petition diminution in value of the Lender's interests in the Pre-Petition Collateral, including without limitation for any diminution in value resulting from the use of Cash Collateral, the use, sale or lease of any other Pre-Petition Collateral, subordination to the Carve-Out, or the imposition

of the automatic stay, the Lender is hereby granted a post-petition claim (the "**Adequate Protection Claim**") against the Debtor's estate. In order to secure the Adequate Protection Claim, the Lender is hereby granted a lien, mortgage and security interest (the "**Replacement Lien**") in and upon (a) the Pre-Petition Collateral and all post-petition proceeds of the Pre-Petition Collateral, and (b) the Post-Petition Collateral and all proceeds thereof, subject only to the Carve-Out, (ii) the liens granted to the Lender under paragraph 7 hereof, (iii) the liens and security interests existing on the Petition Date in favor of Adams County, Mississippi, and (iv) any liens, mortgages and security interests that may be granted to the Lender under paragraph 7 hereof. To further provide adequate protection for the Adequate Protection Claim, the Lender is granted an allowed superpriority administrative claim in accordance with section 507(b) of the Bankruptcy Code having a priority in right of payment over any and all administrative expenses or priority claims of any kind including as specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b) (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, whether arising in the Case or any Successor Case, but subject to the Carve-Out.

9.     Carve-Out. From the proceeds of its Collateral, subject to the terms of this Interim Order, Lender agrees to set aside, and otherwise permit the use of, (i) $100,000 for Debtor's counsel fees and expenses post-default, plus any pre-default fees and expenses incurred but unpaid, (ii) $25,000 for any Creditors' Committee counsel fees and expenses post-default, plus any pre-default fees and expenses incurred but unpaid, (iii) $15,000 for Debtor's financial professionals' fees and expenses post-default, plus any pre-default fees and expenses incurred but unpaid, and (iv) fees of the U.S. Trustee and the Clerk of the Bankruptcy Court (collectively, the "**Carve Out**"); provided, however, that the Carve Out does not apply to amounts in the Budget, which Budget controls on a pre-default basis. Notwithstanding any contrary provision of this Interim Order, the liens, mortgages and security interest and superpriority claims granted to the

Lender, and the Replacement Lien, shall be subject and subordinate to the Carve-Out. No portion of the Carve-Out may be used to litigate, object, contest or challenge in any manner or raise any defenses to the debt or collateral position of the Lender, whether by challenging the validity, extent, amount, perfection, priority or enforceability of the Pre-Petition Senior Loan Documents, the Senior Secured Indebtedness or the Pre-Petition Liens, or any other rights or interests or Replacement Liens with respect thereto or any other rights or interests of the Lender, or by seeking to subordinate or recharacterize the Senior Secured Indebtedness or to disallow any claim, mortgage, security interest, lien, or Replacement Lien, or by asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the Lender or its officers, directors, agents or employees. The Carve-Out shall not be used in connection with (i) preventing, hindering or delaying the Lender's enforcement or realization upon the Collateral in accordance with this Interim Order in connection with a post-default action, (ii) using or seeking to use Cash Collateral other than in accordance with the Budget or selling or otherwise disposing of the Collateral without the consent of the Lender, (iii) using or seeking to use any insurance proceeds related to the Collateral without the consent of the Lender; or (iv) obtaining credit or incurring debt secured by a lien senior to or pari passu with the Lender's liens or the Replacement Liens.

10.     <u>Carve-Out Event and Notice</u>.  Prior to the the giving of a Carve-Out Event Notice (as defined herein), the Debtor shall be permitted to pay compensation and reimbursement of expenses authorized to be paid under Bankruptcy Code sections 330 and 331 or otherwise pursuant to an order of this Court, but subject to the limitations contained in the Budget, as the same may be due and payable, and such payments shall not reduce the Carve-Out, subject to the right of the Lender,  the U.S. Trustee, and any other party in interest to object to such payments. Upon  the occurrence of a Termination Event (as defined in the DIP Loan Agreement) and the

giving of a notice by the Lender to the Debtor that a Termination Event has occurred (whether or not the Carve-Out is expressly referenced in such notice) (the "**Carve-Out Event Notice**"), the line item for professional fees and/or expenses of the Debtor and the Committee in the Budget shall no longer apply and the amount of such fees and expenses that are senior to the liens, mortgages and security interests and the superpriority claims granted herein to the Lender, and to the Replacement Lien, shall be limited to the amounts set forth in the DIP Loan Agreement (a "**Carve-Out Event**"), and, upon such occurrence, the Debtor, after receipt of the Carve-Out Event Notice from the Lender, shall provide immediate notice by facsimile to all professionals in the Case informing them that a Carve-Out Event has occurred and further advising them that the Debtor's ability to pay professionals is subject to the Carve-Out.

11. <u>Section 506(c) Waiver</u>. The Lender asserts that under the facts and circumstances of this Case there is no basis for a recovery under section 506(c) of the Bankruptcy Code and the Debtor, in any final order approving debtor-in-possession financing from the Lender and/or the use of Cash Collateral, which final order shall be in form and substance reasonably satisfactory to the Lender (the "**Final Order**"), intends to seek a waiver of any section 506(c) claims against the Lender.

12. <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>. Nothing in this Interim Order shall prejudice the rights of any party in interest other than the Debtor to object to or challenge the Debtor's stipulations and agreements herein; *provided however,* that unless such other party in interest obtains proper standing and commences a contested matter or adversary proceeding raising such objection or challenge, including without limitation any claim against the Lender in the nature of a setoff, counterclaim or defense to the Senior Secured Indebtedness (including, but not limited to, those under sections 506, 544, 547, 548, 550 and/or 552 of the Bankruptcy Code or by way of suit against the Lender) within 75 days

after the entry of this Interim Order (the **"Challenge Period"**, and the date that is the next calendar day after the termination of the Challenge Period, in the event that no contested matter or adversary proceeding is commenced during the Challenge Period shall be referred to as the **"Challenge Period Termination Date"**), then, upon the Challenge Period Termination Date, any and all such challenges and objections by any party (including, without limitation, any chapter 11 or chapter 7 trustee appointed in the Case or in any Successor Case) shall be deemed to be forever waived, barred and discharged and the Debtor's Stipulations shall be binding on all persons, entities, creditors, interest holders and parties in interest in the Case or any Successor Case, and upon the Challenge Termination Period the Senior Secured Indebtedness shall be deemed to be fully and finally allowed under the Bankruptcy Code for all purposes in connection with this Case and any Successor Case. Only those parties in interest that have properly and with requisite standing initiated an adversary proceeding or contested matter challenging the Debtor's Stipulations prior to the Challenge Period Termination Date shall be permitted to prosecute such adversary proceeding or contested matter.

13.     <u>Limitation on Other Authorization for Cash Collateral Use, Obtaining Credit, Granting of Liens</u>. So long as there are any Post-Petition Obligations outstanding to the Lender under the DIP Credit Facility and until the Adequate Protection Claim is satisfied indefeasibly in full, unless the Lender shall have given their prior written consent, or this Court enters an order, upon proper notice to the Lender and after hearing, requiring that all the Debtor's obligations to the Lender and the Adequate Protection Claim be immediately satisfied in full, the Debtor shall neither seek any further orders in the Case, nor support any applications therefor, which authorize: (a) under Bankruptcy Code section 363, the use of Cash Collateral or the sale, use, or lease, other than in the ordinary course of business, of other property of the Debtor in which the Lender has an interest; or (b) the obtaining of credit or the incurring of indebtedness pursuant to Bankruptcy

Code section 364(c) or (d), or any other grant of rights against the Debtor and/or its estate, secured by a lien, mortgage or security interest in the Pre-Petition Collateral or the Post-Petition Collateral or entitled to priority administrative status which is equal or superior to that granted to the Lender herein; provided, however, that nothing herein restricts the Debtor from seeking Court approval to sell any of its assets.

14.    <u>Lender's Fees and Expenses</u>.  The Lender shall be entitled to charge the Debtor's accounts wherever located or receive reimbursement thereof, without application to the Court, upon five (5) Business Days' notice to the U.S. Trustee and the Debtor, for all of the Lender's reasonable fees and expenses, its attorneys' reasonable fees and expenses, and its other advisors' or professionals' reasonable fees and expenses, all such reasonable fees and expenses arising from or related to the DIP Credit Facility or any actions taken in connection with the Case, including, without limitation, the negotiating, closing, documenting and obtaining of Court approval thereof, and all proceedings in connection with the interpretation, amendment, modification, enforcement or carrying out of the DIP Credit Facility or this Interim Order at any time, and all reasonable expenses, costs and charges in any way or respect arising in connection therewith or related thereto, and all such foregoing reasonable fees and expenses shall constitute a part of the Post-Petition Obligations.

15.    <u>Insurance; Governmental Charges</u>.  The Debtor, at its expense, shall (a) continue to at all times keep the Collateral fully insured against all loss, peril and hazard and make the Lender co-insured and loss payee as its interests appear under such policies, and (b) pay any and all post-petition taxes, assessments and governmental charges with respect to the Collateral, whether or not the Debtor is obligated to do so under the Pre-Petition Senior Loan Documents, and will provide the Lender with proof thereof upon written demand and will give the Lender access to its records in this regard.

16. <u>Collateral Proceeds</u>. The Debtor shall hold all monies, checks, drafts and any other payments or collections received from its customers, account debtors and other parties, now or hereafter obligated to pay the Debtor for goods or services provided by the Debtor or for inventory or other property of the Debtor's estate, and all other proceeds of all Collateral, for the Lender, and turn over such proceeds to the Lender in accordance with the DIP Financing Documents and the Pre-Petition Senior Loan Documents.

17. <u>Modification of Automatic Stay</u>. The automatic stay provisions of Bankruptcy Code section 362 are hereby modified to permit (a) the Debtor to implement the terms of the DIP Credit Facility, (b) the Debtor to grant the Replacement Liens as adequate protection to the Lender, and (c) the Debtor to create, and the Lender to perfect, any and all liens, mortgagees and security interests granted to it hereunder; *provided, however,* that the Lender shall not be required to file UCC financing statements or other instruments with any other filing authority to perfect any lien, mortgage or security interest granted by this Interim Order or take any other action to perfect such liens, mortgages and security interests, and such liens, mortgages and security interests are hereby deemed perfected; *provided however,* that if the Lender shall, in its sole discretion, elect for any reason to file, record or serve any such financing statements or other documents with respect to such liens and security interests, the Debtor shall execute the same upon request and the filing, recording or service thereof (as the case may be) shall be deemed to have been made at the time and on the date required to implement the priority of such liens and security interests as provided in this Interim Order.

18. <u>No Impairment by Plan</u>. The time of payment of any and all Post-Petition Obligations of the Debtor arising out of or incurred pursuant to the DIP Credit Facility shall not be altered, extended or impaired by any plan or plans of reorganization that may hereafter be accepted or confirmed or any further orders of the Court which may hereafter be entered.

19.     Termination Events.  The occurrence of any one or more of the following events shall constitute a "**Termination Event**" under this Interim Order:

(i)     the Case is either dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(ii)    a trustee or an examiner with expanded powers is appointed in the Case;

(iii)   the Debtor ceases operation of its business or takes any material action for the purpose of effecting such cessation without the prior written consent of the Lender;

(iv)    this Interim Order is reversed, vacated, stayed, amended, supplemented or otherwise modified in a manner which shall materially and adversely affect the rights of the Lender hereunder or shall materially and adversely affect the priority of any or all of the Lender's claims, liens or security interests and which is not acceptable to the Lender;

(v)     the Final Order is not entered on or before thirty (30) days after the Petition Date;

(vi)    the Debtor's failure to comply with or perform the terms and provisions of this Interim Order or any DIP Financing Document, including, without limitation, using DIP Advances or Cash Collateral other than in accordance with the provisions of the Budget;

(vii)   any sale or other disposition of Collateral or Cash Collateral is approved without the consent of the Lender;

(viii)  any superpriority claim or lien equal or superior in priority to that granted to the Lender pursuant to this Interim Order or permitted hereunder shall be granted;

(ix)    the automatic stay of Bankruptcy Code section 362 is lifted so as to allow a party other than the Lender to proceed against any material asset (defined as having a value in excess of $100,000) of the Debtor; or

(x)    the Debtor shall have filed, or the Court shall have entered an order confirming, a plan of reorganization, which plan is not in form and substance acceptable to the Lender.

20.    <u>Remedies Upon Maturity/Termination</u>.

Upon the occurrence of the Maturity Date, or upon the occurrence of a Termination Event and the giving of the Remedies Notice (as defined below):

(a)    any and all Post-Petition Obligations shall be immediately due and payable, any obligation of the Lender to make DIP Advances or other financial accommodations under the DIP Credit Facility shall terminate, and the Debtor's authorization to use Cash Collateral shall terminate (subject to the provisions of paragraph 20(b) hereof);

(b)    the Debtor shall immediately segregate all Cash Collateral, and shall not be permitted to use Cash Collateral unless the Lender shall have given its prior written consent or the Court shall have entered an order, after a hearing upon notice to the Lender, authorizing such use; and

(c)    the Lender shall have the right, free of the restrictions of Bankruptcy Code section 362, (i) to take immediate reasonable action to protect and preserve the Collateral, and (ii) after giving five (5) Business Days' prior written notice of a Termination Event to the Debtor, the Office of the U.S. Trustee, and any Committee (the "**Remedies Notice**"), to exercise their rights and remedies pursuant to the DIP Financing Documents, the Pre-Petition Senior Loan Documents and/or applicable law, including, without limitation, to foreclose on all or any portion of the Collateral, collect accounts receivable and other monies owing to the Debtor and apply the proceeds thereof in satisfaction of the Post-Petition Obligations and the Senior Secured Indebtedness unless, prior to the passage of such five (5) Business Days, the Court shall have

entered an order, after a hearing upon notice to the Lender limiting or restraining the Lender from exercising any or all such rights and remedies.

21.  No Limitation on Further Relief.  Nothing in this Interim Order shall limit the rights of the Lender to seek further relief (including additional adequate protection), or modification or termination of the automatic stay in accordance with Bankruptcy Code section 362(d).

22.  Reporting Obligations.  Without limiting the Debtor's reporting or other obligations under the DIP Financing Documents or the Pre-Petition Senior Loan Documents:

(a)  the Debtor shall deliver weekly to the Lender, no later than the close of business each Wednesday, a breakdown by line-item, in the same format as the Budget, of the Debtor's actual cash receipts and disbursements for the immediately preceding week, and cumulatively for all preceding weeks after the Petition Date, which shows such actual receipts and disbursements for the applicable period compared to such receipts and disbursements for the applicable period as projected in the Budget, such report to be certified by the chief financial officer of the Debtor to be accurate to the best of his/her knowledge, information and belief;

(b)  the Debtor shall deliver to the Lender, no later than twenty (20) calendar days after the end of each month a copy of the Debtor's monthly operating report for such month as filed with the Court and with the office of the U.S. Trustee;

(c)  the Debtor shall deliver to the Lender, within five (5) calendar days of the Debtor's receipt thereof, copies of all financial statements which reflect the Debtor's assets and liabilities and results of operations; and

(d)  the Debtor shall permit representatives, agents and/or employees of the Lender to visit, inspect and have access to the Debtor's premises and books and records upon two (2) Business Days' notice, and shall cooperate and consult with, and provide to such

representatives, agents and/or employees all such information as they may reasonably request, and the Lender shall have the right to inspect, audit, examine, check, make copies of or extracts from the books, accounts, checks, orders, invoices, bills of lading, correspondence and other records of the Debtor, and the Debtor shall make all of same available to the Lender and its representatives for such purposes.

23.     <u>Books and Records</u>.  The Debtor is directed to keep its books and records of original entry current and updated, so that all business activity is posted to them in the ordinary course of the Debtor's business.

24.     <u>Good Faith</u>.  Pursuant to, and to the extent of, the provisions of Bankruptcy Code section 364(e), the validity of the Post-Petition Obligations and the validity or priority of the liens, mortgages and security interests authorized or granted by this Interim Order shall be binding on the Debtor, its estate and their successors and assigns even if this Interim Order is reversed or modified on appeal.

25.     <u>Additional Documents</u>.  The Debtor is hereby authorized to do and perform all acts and to make, execute and deliver all instruments and documents which may be required or necessary for the performance of its obligations hereunder and under the DIP Credit Facility.

26.     <u>Immediate Effect</u>.  As permitted by Bankruptcy Rule 6004(h), the Court hereby orders that this Interim Order shall become effective immediately.

27.     <u>Survival After Confirmation, Conversion or Dismissal</u>.  The provisions of this Interim Order and any actions taken pursuant thereto shall survive entry of any orders which may be entered confirming any plan of reorganization or which may be entered converting this Case from chapter 11 to chapter 7 of the Bankruptcy Code; *provided, further,* that the terms and provisions of this Interim Order, as well as the liens, mortgages and security interests granted thereunder, shall continue in this Case or any Successor Case and such liens, mortgages and

security interests and the Adequate Protection Claim shall maintain their priority as provided by this Interim Order.

28.     No Limitation of Modification of Order.  Nothing in this Interim Order shall limit the Lender's rights to seek modification of this Interim Order.

29.     No Prejudice of Rights Against Third Parties.  Nothing in this Interim Order shall in any way prejudice or compromise any rights that the Lender may have against parties other than the Debtor.

30.     Service of this Order.  Within three (3) Business Days after the entry of this Interim Order, the Debtor shall serve a copy on (a) the Office of the U.S. Trustee; (b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) all state and local taxing authorities concerning the Debtor; (e) counsel to any Committee, if any; (f) the creditors holding the 20 largest unsecured claims against the Debtor's estate; and (g) counsel to the Lender.

31.     Objection.  Any objection to the relief requested in the Motion on a permanent basis must (a) be filed in accordance with the Court's CM/ECF procedures or in writing with the Clerk of the Court, at 170 North High Street Columbus, Ohio 43215, by 4:00 p.m. (Eastern Time) on the date that is five (5) days prior to the date of the Final Hearing (the "**Objection Deadline**"), and (b) served so as to be actually received by the following parties by the Objection Deadline: (i) the U.S. Trustee, 170 North High Street, Suite 200, Columbus, OH 43215-2403; (ii) counsel to the Debtor, Allen Kuehnle Stovall & Neuman LLP, 17 South High Street, Suite 1220, Columbus, OH 43215, Attn: Richard K. Stovall, Esq.; (iii) counsel to the Lender, Graydon Head & Ritchey LLP, 511 Walnut Street, Cincinnati, OH 45202-3157, Attn: J. Michael Debbeler, Esq.; and (iv) counsel to any Committee then appointed in the Case.  **The Final Hearing shall be on March 15, 2010 at 2:00 P.M., Eastern Time.**  This Interim Order shall remain in effect until the Final Hearing.

32.     Binding Effect.  The provisions of this Interim Order shall be binding upon and inure to the benefit of the Lender, the Debtor, the Debtor's estate and their respective successors and assigns (including any trustee appointed as a representative of the Debtor's estate or in any Successor Case).

33.     Controlling Effect.  To the extent that any provision of this Interim Order conflicts with any provision of any of the Pre-Petition Senior Loan Documents, which shall remain in full force and effect, or any of the DIP Financing Documents, this Interim Order is deemed to control and shall supersede the conflicting provision(s).

34.     Reservations.  Notwithstanding any other provision of this Order, the Court reserves its judgment with respect to the issues of i) the propriety of the "roll-up" nature of the $3,100,000 Term Loan; ii) the allocation of the Creditor's Committee and Debtor's counsel fees under the Carve Out; and iii) and the superiority of the Lender's superpriority administrative claim hereunder over any claim allowed under section 503(b) of the Bankruptcy Code that may be incurred in this case after any conversion hereof to Chapter 7 of the Bankruptcy Code.


Copies to:     Default List plus attached service list

2/11/2010

## MISSISSIPPI RIVER CORP

| | 15-Feb | 22-Feb | 1-Mar | 8-Mar | 15-Mar | 22-Mar | 29-Mar | 5-Apr | 12-Apr | 19-Apr | 26-Apr | 3-May | 10-May | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | | | | |
| A/R Collections | | $106,479 | $57,627 | $0 | $9,984 | $436,702 | $298,052 | $1,003,900 | $1,009,000 | $997,190 | $983,245 | $1,200,390 | $1,220,870 | $7,149,349 |
| | | | | | | | | | | | | | | |
| Salary Payroll | $38,000 | $40,000 | | $43,000 | | $43,000 | | $43,000 | | | $43,000 | $43,000 | | $293,000 |
| Hourly Payroll | 8,500 | 8,500 | 38,466 | 38,466 | 30,038 | 30,038 | 30,038 | 38,466 | 30,038 | 38,466 | 30,038 | 38,466 | 38,466 | 397,986 |
| Office Expenses | 95 | | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 18,395 |
| Entergy Electric | | 120,000 | | 280,000 | | | 380,000 | | | | 380,000 | | | 1,160,000 |
| Office Equipment Leases | 1,475 | 830 | | | | | 940 | | | | 940 | | | 4,185 |
| MRC Property Insurance | 32,075 | | | | | | | | | | | | 32,075 | 64,150 |
| Liability Ins. | | 2,144 | | | 2,144 | | | | | | | 2,144 | | 6,432 |
| Forklift Leases | 5,072 | 5,213 | | | 5,250 | | | 5,250 | | | | | 5,250 | 26,035 |
| Travel Expense Reimbursements | 2,900 | | 1,000 | 1,200 | 1,000 | 1,200 | 1,000 | 1,200 | 1,000 | 1,200 | 1,000 | 1,200 | 1,000 | 14,900 |
| Building & Grounds Maintenance | 1,950 | | | 1,950 | | 2,000 | | 1,950 | | 2,000 | | 1,950 | 1,000 | 12,800 |
| Manufacturing Repairs & Maint. | | | 7,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 62,000 |
| Manufacturing Supplies | | | 6,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 61,000 |
| Vehicle Repairs & Maint. | | | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 6,600 |
| Outside Contractor Mill Repairs | 6,250 | | 6,250 | | | | | | | | | | | 12,500 |
| Lab Supplies | | | | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,100 |
| Lab Contract Labor | | 1,610 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 3,810 |
| Outside Contractors Computers, Scales | | | 4,400 | | | | 4,300 | | | | 4,300 | | | 13,000 |
| Pallet Removal | | | | | 1,500 | | | | | 1,500 | | | | 3,000 |
| Auto Expense | | | 150 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,150 |
| Telephone | 315 | 260 | | 3,000 | | | 3,500 | | | | | 3,500 | | 10,575 |
| Uniforms Expense | 280 | 260 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 1,950 |
| Employee Life & Disability Ins | 5,833 | | | 2,800 | | | | 2,800 | | | | 2,800 | | 14,233 |
| Employee Benefits Management Fee | 1,075 | | | 1,075 | | | | 1,075 | | | | 1,075 | | 4,300 |
| Telephone Service Agreement | 883 | | | | | | 883 | | | | | | | 1,766 |
| Co. Apartment Expenses | 108 | 700 | 690 | | 300 | | | | 300 | 690 | | | 300 | 3,778 |
| Propane / Fuel Oil | | 1,988 | 920 | 920 | 920 | 920 | 920 | 920 | 950 | 950 | 950 | 1,000 | 1,000 | 12,358 |
| Process Equipment Lease | 3,222 | | | 3,222 | | | | 3,222 | | | | 3,222 | | 12,888 |
| Co. Car Lease | | 415 | | | 415 | | | | 415 | | | | 415 | 1,660 |
| Water | 258 | | 600 | | | | 600 | | | | | 600 | | 2,058 |
| Machine Fabric | 13,915 | | | | | | | | | | | | | 13,915 |
| Trash Removal | 2,445 | 2,445 | | | 2,000 | | | | 2,000 | | | 2,000 | | 10,890 |
| Board of Supervisors State Loans | | 12,535 | | 12,535 | | | | 12,535 | | | | 12,535 | | 50,140 |
| Ms. Tax Commission - Sales Taxes | 14,505 | | | 3,000 | | | | 6,000 | | | | 6,000 | | 29,505 |
| Blue Cross Employee Health Ins | | | 23,000 | | | | 23,000 | | | | 23,000 | | | 69,000 |
| Liberty Mutual Ins Worker's Comp | | 8,803 | | | | | 8,803 | | | | | | | 17,606 |
| AKSN Bankruptcy Atty | 50,000 | | | | 30,000 | | | | 30,000 | | | | 30,000 | 140,000 |
| Creditor Committee's Counsel | | 25,000 | | | | | | | | | | | | 25,000 |
| MRC Financial Consultant | | 15,000 | | | | | | | | | | | | 15,000 |
| Medical Ins - Great West | 24,061 | | | | 45,000 | | | | 45,000 | | | | | 114,061 |
| Natural Gas | | 42,000 | | 54,000 | | | 90,000 | | | | 90,000 | | | 276,000 |
| Sludge Hauling | | 50,000 | | | 85,000 | | 102,000 | | | | 112,000 | | | 349,000 |
| Safety Equipment | | | 400 | 600 | 600 | 600 | 600 | 600 | 600 | 700 | 700 | 700 | 700 | 6,800 |
| Chemicals | | 111,870 | 64,344 | 46,224 | 141,570 | 74,200 | 74,200 | 127,960 | 62,872 | 87,104 | 76,302 | 109,174 | 127,960 | 1,103,780 |
| Waste Paper | | | | 285,000 | 936,750 | 505,750 | 465,000 | 465,000 | 465,000 | | 465,000 | 650,000 | 650,000 | 4,887,500 |
| DIP Facility Interest | | | | | | | | | | | | 64,000 | | 64,000 |
| | | | | | | | | | | | | | | |
| **MRC TOTAL** | $213,197 | $409,573 | $195,150 | $505,322 | $643,467 | $1,101,438 | $1,020,854 | $893,858 | $701,455 | $611,950 | $1,020,094 | $1,136,252 | $948,196 | $9,400,806 |
| | | | | | | | | | | | | | | |
| **CORPORATE OFFICE** | | | | | | | | | | | | | | |
| Salary Payroll | $39,000 | $39,000 | | $39,000 | | $39,000 | | | $39,000 | | $39,000 | | $39,000 | $273,000 |
| Inventory Ins | 1,250 | | | | | | | | | | | | | 1,250 |
| Life Insurance | 6,415 | | | | | | | 1,215 | | | | 3,779 | | 11,409 |
| Disability Ins | 2,107 | | 2,107 | | | | 2,107 | | | | | 2,107 | | 8,428 |
| Office Expenses | 490 | | 320 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 10,810 |
| W. Va Taxes & Expenses | | | | 1,372 | 300 | | 415 | 300 | | | | 300 | | 2,687 |
| Freight, Storage, Processing | | | | 1,300 | | | 800 | | | 400 | | 400 | | 2,900 |
| Corporate Office Rent | | | 3,508 | | | | 3,600 | | | | 3,600 | | | 10,708 |
| Accounting / Tax Returns | | | | | 25,000 | | | 25,000 | | | | | | 50,000 |
| Property Ins. | | | | | 5,700 | | | | | | | | | 5,700 |
| Office Rent Wisc. Office | | | 775 | | | | 775 | | | | | 775 | | 2,325 |
| Telephones | 803 | 1,025 | | | 400 | | 1,000 | 1,200 | | | 800 | 1,200 | | 6,428 |
| Computer Support & Internet | 250 | 220 | 1,110 | 66 | 250 | | 1,110 | 66 | 250 | | 213 | 965 | 250 | 4,750 |
| Auto | | | 800 | | 600 | | 600 | | 600 | | 600 | | 600 | 3,800 |
| Travel & Entertainment | | 2,200 | | 2,600 | | 2,200 | | 2,600 | | | 2,200 | 2,600 | | 14,400 |
| | | | | | | | | | | | | | | |
| **CORPORATE OFFICE TOTAL** | $50,315 | $42,445 | $8,620 | $44,038 | $34,550 | $43,200 | $10,407 | $31,081 | $41,150 | $4,400 | $45,188 | $12,051 | $41,150 | $408,595 |
| | | | | | | | | | | | | | | |
| **GRAND TOTAL** | $263,512 | $452,018 | $203,770 | $549,360 | $678,017 | $1,144,638 | $1,031,261 | $924,939 | $742,605 | $616,350 | $1,065,282 | $1,148,303 | $989,346 | $9,809,401 |
| | | | | | | | | | | | | | | |
| **NET CASH** | ($263,512) | ($345,539) | ($146,143) | ($549,360) | ($668,033) | ($707,936) | ($733,209) | $78,961 | $266,395 | $380,840 | ($82,037) | $52,087 | $231,524 | ($2,485,962) |
| | | | | | | | | | | | | | | |
| **DIP FACILITY UTILIZATION** | ($263,512) | ($609,051) | ($755,194) | ($1,304,554) | ($1,972,587) | ($2,680,523) | ($3,413,732) | ($3,334,771) | ($3,068,376) | ($2,687,536) | ($2,769,573) | ($2,717,486) | ($2,485,962) | |

Exhibit A

Senior Secured, Super-Priority
Debtor-In-Possession Credit and Security Agreement

BY AND BETWEEN

Mississippi River Corporation

AND

Supplier Finance Company, LLC

Dated as of February 16, 2010

TABLE OF CONTENTS

Page

ARTICLE I  DEFINITIONS ...........................................................................................1
    1.1    Definitions.........................................................................................1
    1.2    Accounting Terms and Determinations ..........................................12

ARTICLE II  THE LOANS............................................................................................12
    2.1    Advances Under the Revolving Loan .............................................12
    2.2    Advances Under the Term Loan ....................................................12
    2.3    Use of Proceeds............................................................................12
    2.4    Lender's Discretion to Make Advances..........................................13
    2.5    Submission of Budget ....................................................................13
    2.6    Method of Borrowing.....................................................................14
    2.7    Receipt and Application of Payments .............................................14
    2.8    Notes .............................................................................................15
    2.9    Interest...........................................................................................15
    2.10   Lender Fees ...................................................................................16
    2.11   Maturity.........................................................................................16
    2.12   Early Termination ..........................................................................16
    2.13   Over-Advances ..............................................................................16
    2.14   Approval of Deferred Maintenance and Capital Expenses...............16
    2.15   Super-Priority Nature of Obligations and Lender's Liens.................17
    2.16   Release ..........................................................................................17
    2.17   Waiver of any Priming Rights ........................................................17

ARTICLE III  STATUS OF OBLIGATIONS AND LIENS...........................................17
    3.1    Effect of Obligations and Priority of Liens.....................................17
    3.2    Payment of Obligations..................................................................18
    3.3    No Discharge; Survival of Claims ..................................................18

ARTICLE IV  SECURITY .............................................................................................18
    4.1    Grant of Security Interest in the Collateral .....................................18
    4.2    Identification of Collateral .............................................................18
    4.3    Perfection and Maintenance of Lien................................................18
    4.4    Limited License .............................................................................19
    4.5    Further Assurances.........................................................................19
    4.6    Handling of Proceeds of Collateral; Cash Dominion ......................19

ARTICLE V  CONDITIONS ..........................................................................................20
    5.1    General Conditions ........................................................................20
    5.2    Conditions to Advances .................................................................23

PPAB 1652943v5

ARTICLE VI    REPRESENTATIONS AND WARRANTIES ..................................................24
    6.1     Existence and Power.........................................................................................24
    6.2     Authorization; Validity; DIP Loan Documents ..............................................24
    6.3     No Conflict; Governmental Approvals.............................................................25
    6.4     No Defaults .......................................................................................................25
    6.5     Title to Collateral ............................................................................................25
    6.6     Taxes.................................................................................................................25
    6.7     Compliance With Laws ....................................................................................26
    6.8     Labor Matters...................................................................................................26
    6.9     Environmental Matters.....................................................................................26
    6.10    Litigation..........................................................................................................26
    6.11    Reorganization Matters....................................................................................26
    6.12    Insurance..........................................................................................................27
    6.13    Accuracy of Information..................................................................................27

ARTICLE VII   COVENANTS..............................................................................................27
    7.1     Affirmative Covenants of Borrower ...............................................................27
    7.2     Negative Covenants of Borrower.....................................................................32

ARTICLE VIII  EVENTS OF DEFAULT; REMEDIES; RELIEF FROM STAY ....................35
    8.1     Events of Default .............................................................................................35
    8.2     Termination and Acceleration..........................................................................36
    8.3     Relief from Stay ..............................................................................................37
    8.4     General Remedies.............................................................................................37
    8.5     Lender's Additional Rights and Remedies ......................................................37
    8.6     No Limitation on Rights and Remedies............................................................39
    8.7     Attorney-in-Fact...............................................................................................39

ARTICLE IX   MISCELLANEOUS .......................................................................................40
    9.1     No Waiver.........................................................................................................40
    9.2     Right of Setoff..................................................................................................40
    9.3     Costs and Expenses..........................................................................................41
    9.4     Environmental Indemnity ................................................................................41
    9.5     General Indemnity............................................................................................42
    9.6     Authority to Act ...............................................................................................42
    9.7     Notices..............................................................................................................42
    9.8     Governing Law; Waiver of Jury Trial .............................................................44
    9.9     Amendments and Waivers ...............................................................................44
    9.10    References; Headings for Convenience............................................................44
    9.11    Successors and Assigns.....................................................................................45
    9.12    NO ORAL AGREEMENTS, ENTIRE AGREEMENT ..................................45
    9.13    Severability.......................................................................................................45
    9.14    Counterparts.....................................................................................................45
    9.15    Resurrection of the Obligations .......................................................................45
    9.16    No Third Party Beneficiaries ...........................................................................46

9.17    Independence of Covenants .................................................................46
9.18    Conflicting Provisions ......................................................................46
9.19    Effectiveness of Agreement...............................................................46
9.20    No Usurious Amounts.......................................................................46
9.21    Obligations and Liabilities of Lender ...............................................46
9.22    Cooperation of Borrower ..................................................................46

## Exhibits

Exhibit A        Form of Interim Order
Exhibit B        Legal Description
Exhibit C-1      Form of Revolving Note
Exhibit C-2      Form of Term Note
Exhibit D        Budget

## Schedules

Schedule 6.6     Tax Matters
Schedule 6.9     Environmental Matters
Schedule 6.10    Litigation

* * * * *

## SENIOR SECURED, SUPER-PRIORITY
## DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT (this "Agreement"), dated as of the 16th day of February 2010 to be effective on the Effective Date (as defined below), is made and entered into by and between MISSISSIPPI RIVER CORPORATION, an Ohio corporation ("Borrower"), that is also the "Debtor" in the Chapter 11 case administered under Case No.[_____] (the "Case") before the United States Bankruptcy Court for the Southern District of Ohio, Western Division (the "Bankruptcy Court"), and SUPPLIER FINANCE COMPANY, LLC, a Delaware limited liability company ("Lender").

## RECITALS

WHEREAS, on the date hereof (the "Petition Date"), Borrower filed a voluntary petition with the Bankruptcy Court initiating the Case under Chapter 11 of the Code (as defined below), and Borrower has continued in possession of its assets and in the operation and management of its business pursuant to Sections 1107 and 1108 of the Code as a debtor-in-possession in the Case; and

WHEREAS, Borrower has requested that Lender enter into this Agreement to provide Borrower with (i) a revolving line of credit in a principal amount not to exceed Four Million Dollars ($4,000,000) (the "Revolving Loan"); and (ii) an amortizing term loan in the principal amount of Three Million One Hundred Thousand Dollars ($3,100,000) (the "Term Loan", and together with the Revolving Loan, collectively, the "Loans") with all of Borrower's obligations under the Loans being secured as provided in the Orders (as defined below) and in the Security Documents (as defined below), and the proceeds of the Loans being used only as expressly permitted by the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby mutually promise and agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions. In addition to the terms defined elsewhere in this Agreement or in any Exhibit or Schedule to this Agreement, when used in this Agreement, the following terms shall have the following meanings (such meanings shall be equally applicable to the singular and plural forms of the terms used, as the context requires):

"Acceptable Plan" means a Chapter 11 plan of reorganization of Borrower that is in a form and substance satisfactory to Lender.

"Acceptable Sale Process" means bidding procedures that are acceptable to Lender and approved by an order of the Bankruptcy Court in form and substance satisfactory to Lender and that provide (i) that MRCL is the "stalking horse" bidder pursuant to an agreement acceptable to

Lender pursuant to which MRCL shall purchase specified assets of Borrower or an interest in a reorganized Borrower, (ii) that any acceptable bid would include an assumption of the Supply Agreement and the License Agreement, and (iii) for reimbursement to Lender of all Lender's fees, costs and expenses, including, without limitation, the fees and expenses of Lender's professionals and advisors.

"Accounts" shall mean any and all of the Borrower's present and future (i) accounts (as defined in the Uniform Commercial Code), (ii) instruments, documents, chattel paper (including, without limitation, electronic chattel paper) (all as defined in the Uniform Commercial Code), (iii) unpaid seller's or lessor's rights (including, without limitation, rescission, replevin, reclamation, repossession and stoppage in transit rights) relating to the foregoing, including rights to returned, reclaimed or repossessed goods, (iv) reserves and credit balances arising in connection with or pursuant to this Agreement, (v) guaranties, other supporting obligations, payment intangibles and letter of credit rights (all as defined in the Uniform Commercial Code), (vi) insurance policies or rights relating to any of the foregoing, (vii) general intangibles pertaining to any of the foregoing (including rights to payment, including, without limitation, those arising in connection with bank and non-bank credit cards), and all books and records and any electronic media and software relating thereto, (viii) notes, deposits or other property of the Borrower's account debtors securing the obligations owed by such account debtors to the Borrower, and (ix) all proceeds of any of the foregoing.

"Acquisition" means any transaction, or any series of related transactions, consummated on or after the date of this Agreement, by which Borrower (i) acquires any going business or all or substantially all of the assets of any firm, corporation or division thereof, whether through purchase of assets, merger or otherwise or (ii) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the securities of a corporation which have ordinary voting power for the election of directors (other than securities having such power only by reason of the happening of a contingency) or a majority (by percentage of voting power) of the outstanding equity interests of another Person.

"Administrative Expenses" shall collectively mean, to the extent approved by the Bankruptcy Court if such approval is required under the Code, (i) all fees payable pursuant to 28 U.S.C. § 1930, (ii) all fees and expenses incurred by Borrower's Professionals, (iii) all fees and expenses incurred by Professionals retained by any statutory committee appointed in the Case, including, without limitation, the Committee, (iv) the actual and necessary costs and expenses involved in preserving the bankruptcy estate of Borrower, including wages, salaries and other general administrative expenses incurred by Borrower, and (v) all such other expenses incurred by Borrower as may be permitted by the Code or approved by the Bankruptcy Court.

"Administrative Fee" shall have the meaning set forth in Section 2.10 of this Agreement.

"Advance" means the single advance under the Term Loan and each principal disbursement of Revolving Loan proceeds made to Borrower in accordance with Article II of this Agreement.

"Affiliate" shall have the meaning set forth in the Code.

- 2 -

"Aggregate Revolving Loan Commitment" means the maximum amount of the Revolving Loan as may be reduced from time to time pursuant to the terms hereof. The initial Aggregate Revolving Loan Commitment is equal to Four Million Dollars ($4,000,000).

"Agreement" has the meaning set forth in the Preamble hereto.

"Availability Period" means the period during which Advances of the Revolving Loan shall be available hereunder, such period commencing on the Effective Date and ending on the Termination Date.

"Avoidance Actions" means any avoidance action of Borrower under Chapter 5 of the Code.

"Bankruptcy Court" shall have the meaning set forth in the Preamble to this Agreement.

"Borrower" shall have the meaning set forth in the Preamble to this Agreement.

"Borrower's Representative" means the person or persons authorized by resolution, duly authorized and adopted by the board of directors of Borrower in form acceptable to Lender, to communicate with Lender regarding matters pertaining to this Agreement.

"Budget" has the meaning set forth in Section 2.5 of this Agreement.

"Business" means the business of owning and operating the pulp mill business located on the Real Property (defined below), and all activities incident to conduct of such business.

"Business Day" means any day other than (i) a day on which dealings in U.S. Dollars are not carried on in the London interbank market, or (ii) a day on which Lender is authorized or required to be closed for business.

"Capitalized Lease" means any lease of property, whether real or personal, that is required to be capitalized on the balance sheet of the Person who is lessee under such lease.

"Capitalized Lease Obligations" means, with respect to any Person, as of the date of any determination thereof, the amount of the aggregate rental obligations due and to become due under all Capitalized Leases under which such Person is a lessee that would be reflected as a liability on a balance sheet of such Person as determined in accordance with GAAP.

"Carve-Out" has the meaning set forth in the Interim Order.

"Case" shall have the same meaning set forth in the Preamble to this Agreement.

"Change in Control" means (i) an event or series of events as a result of which any "person" or "group" (as such terms are used in Sections 13(d)(3) and 14(d) of the Exchange Act) (excluding Borrower or any wholly owned Subsidiary thereof) is or becomes, directly or indirectly, the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, whether or not applicable) of more than fifty percent (50%) of the combined voting power of the then outstanding securities entitled to vote generally in elections of directors, managers or

trustees, as applicable, of Borrower or any successor entity ("Voting Stock"), (ii) the completion of any consolidation with or merger of Borrower into any other Person, or any sale, conveyance, transfer or lease by Borrower of all or substantially all of its assets to any Person, or any merger of any other Person into Borrower in a single transaction or series of related transactions, and, in the case of any such transaction or series of related transactions, the outstanding common stock of Borrower is changed or exchanged as a result, unless the stockholders of Borrower immediately before such transaction own, directly or indirectly, immediately following such transaction, at least fifty-one percent (51%) of the combined voting power of the outstanding voting securities of the Person resulting from such transaction in substantially the same proportion as their ownership of the Voting Stock immediately before such transaction, or (iii) the occurrence of any event whereby less than a majority of the members of the board of directors of Borrower shall be persons who either (a) were serving as directors on the Effective Date or (b) were nominated as directors and approved by the vote of the majority of the directors who are directors referred to in clause (a) or this clause (b).

"Code" means Title 11 of the United States Code, as previously and hereafter amended, and codified as 11 U.S.C. §§ 101, *et seq.*

"Collateral" means the Real Property and the Personal Property and all accessions, replacements and substitutions therefor and all proceeds thereof (other than the Avoidance Actions, but including the proceeds of Avoidance Actions to the extent that the Carve-Out is utilized).

"Collection Account" means an account of Lender at a bank to be determined by Lender.

"Collection Days" shall mean a period of one (1) Business Day after the deposit of proceeds of Collateral or other monies into Lender's Collection Account, for which interest may be charged on the aggregate amount of such deposits at the rate provided for in Section 2.9 of this Agreement.

"Committee" means an official committee of unsecured creditors appointed in the Case by the United States Trustee, if any.

"Consignment Agreement" means that certain Production and Consignment Agreement, dated as of January 11, 2010, by and between IP and Borrower, as amended by that certain First Amendment to Production and Consignment Agreement, dated as of February 1, 2010, as further amended by that certain Second Amendment to Production and Consignment Agreement, dated as of February 15, 2010.

"Contractual Obligation", as applied to any Person, means any provision of any equity or debt securities issued by that Person or any indenture, mortgage, deed of trust, security agreement, pledge agreement, guaranty, contract, undertaking, agreement or instrument, in any case in writing, to which that Person is a party or by which it or any of its properties is bound, or to which it or any of its properties is subject.

"Credit Amount" means the maximum aggregate principal amount at any time outstanding under the Loans, which shall be not more than the sum of Seven Million One Hundred Thousand Dollars ($7,100,000).

"Debtor" has the meaning set forth in the Preamble of this Agreement.

"Default" means the occurrence of any event or condition specified in Section 8.1 hereof, whether or not any requirement for notice or lapse of time or other condition precedent has been satisfied.

"Default Rate" means a per annum rate of interest equal the Note Rate plus five percent (5%) but in no event greater than the maximum rate allowed by law.

"Depository Account" shall mean each bank account (and the related lockbox, if any) subject to Lender's control that is established by Lender or the Borrower pursuant to Section 4.6 of this Agreement.

"Depository Account Control Agreement" shall mean a three-party agreement in form and substance satisfactory to Lender among Lender, the Borrower and the bank which will maintain a Depository Account, (a) which provides Lender with control of such Depository Account and provides for the transfer of funds in a manner consistent with the provisions of Section 4.6 of this Agreement, and (b) pursuant to which such bank agrees that (i) all cash, checks, wires and other items received or deposited into the Depository Account are the property of Lender, and (ii) except as otherwise provided in the Depository Account Control Agreement, such bank has no lien upon, or right to set off against, the Depository Account and any cash, checks, wires and other items from time to time on deposit therein.

"DIP Loan Documents" means this Agreement, the Revolving Note, the Term Note, the Security Documents and all other agreements, documents and instruments now or hereafter delivered to Lender with respect to or in connection with or pursuant to this Agreement, and executed by or on behalf of Borrower, all as the same may from time to time be amended, modified, extended or renewed.

"Dollars" and "$" means, unless otherwise provided in this Agreement, dollars of the United States of America.

"Early Termination Notice" has the meaning set forth in Section 2.12 of this Agreement.

"Effective Date" means the effective date of this Agreement as determined pursuant to Section 9.19 of this Agreement.

"Environmental Law" means any federal, state or local statute, law, rule, regulation, order, consent decree, judgment, permit, license, code, deed restriction, common law, treaty, convention, ordinance or other governmental requirement, domestic or foreign, relating to public health, safety or the environment, including, without limitation, those relating to releases, discharges or emissions to air, water, land or groundwater, to the use of groundwater, to the use and handling of polychlorinated biphenyls or asbestos, to the disposal, treatment, storage or management of hazardous or solid waste, hazardous substances or crude oil, or any fraction

- 5 -

thereof, to exposure to toxic or hazardous materials, to the handling, transportation, discharge or release of gaseous or liquid hazardous substances, in each case applicable to any of the Real Property or the operation, construction or modification of any such Real Property, including, without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § §9601 et seq., the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§6901 et the Hazardous Materials Transportation Act, the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1976, the Safe Drinking Water Control Act, the Clean Air Act of 1966, the Toxic Substances Control Act of 1976, the Occupational Safety and Health Act of 1977, the Emergency Planning and Community Right-to-Know Act of 1986, the National Environmental Policy Act of 1975, the Oil Pollution Act of 1990, and any amendments to these laws, and any successor statute of similar import, together with any rules and regulations promulgated thereunder.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, together with the regulations thereunder, in each case as in effect from time to time.

"Event of Default" has the meaning set forth in Section 8.1 of this Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities Exchange Commission.

"Field Examination Fee" shall have the meaning set forth in Section 2.10 of this Agreement.

"Final DIP Payment Date" means the date when all of the following events have occurred: (i) the Availability Period either has expired or has been terminated; (ii) the principal of and interest on the Revolving Loan, the Term Loan and all Lender Fees shall have been paid in full; and (iii) all other Obligations (other than any unmatured indemnity obligations) shall have been satisfied.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be reasonably satisfactory in form and substance to Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to Lender, which, among other matters but not by way of limitation, authorizes Borrower to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other DIP Loan Documents, as the case may be, and provides for the super-priority of Lender's Liens and claims.

"GAAP" means the consistent application of such generally accepted accounting principles as may then be applicable in the United States of America.

"Governmental Authority" means any nation or government, any federal, state, local or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative authority or functions of or pertaining to government, including, without limitation, any authority or other quasi-governmental entity established to perform any of such functions.

"Indebtedness" means, with respect to any Person, without duplication, all indebtedness, liabilities and obligations of such Person including, without limitation, all (i) obligations of such Person for borrowed money or for the deferred purchase price of property or services (including, without limitation, all notes payable and all obligations evidenced by bonds, debentures, notes or other similar instruments), (ii) obligations (other than judgment liens) secured by any lien on, or payable out of the proceeds of production from, any property or assets owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligations, (iii) indebtedness, liabilities and obligations of third parties, including, without limitation, joint ventures and partnerships of which such Person is a venturer or general partner, recourse to which may be had against such Person, (iv) obligations created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, notwithstanding the fact that the rights and remedies of the seller, lender or lessor under such agreement in the event of default are limited to repossession or sale of such property, (v) Capitalized Lease Obligations of such Person, (vi) all accounts payable of such Person, (vii) all indebtedness, liabilities and obligations of such Person under guarantees or endorsements, and (viii) all obligations of such Person, contingent or otherwise, relative to the face amount of letters of credit (as may be reduced pursuant to their terms), whether or not drawn.

"Indemnified Liabilities" has the meaning set forth in Section 9.5 of this Agreement.

"Indemnitees" has the meaning set forth in Section 9.4 of this Agreement.

"Interim Order" means, collectively, the order of the Bankruptcy Court entered in the Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Code and Bankruptcy Rule 4001 and other applicable law), together with all extension, modifications, and amendments thereto, in form and substance reasonably satisfactory to Lender, which, among other matters but not by way of limitation, authorizes, on an interim basis, Borrower to execute and perform under the terms of this Agreement and the other DIP Loan Documents, substantially in the form of Exhibit A attached hereto.

"IP" means International Paper Company, a New York corporation.

"IRS" means the Internal Revenue Service and any Person succeeding to the functions thereof.

"IRS Code" means the Internal Revenue Code of 1986, as amended, and any successor statute of similar import, together with the regulations thereunder, in each case as in effect from time to time. References to sections of the IRS Code shall be construed to also refer to any successor sections.

"Lender" has the meaning set forth in the Preamble to this Agreement.

"Lender Fees" has the meaning set forth in Section 2.10 of this Agreement.

"License Agreement" means that certain License Agreement, dated as of February 15, 2010, by and between IP and Borrower.

"Lien" means any interest in the Collateral securing an obligation owed to, or a claim by, a Person who is not the owner of the Collateral, whether such interest is based on common law, statute or contract, including, without limitation, any security interest, mortgage, deed of trust, deed to secure debt, hypothecation, prior claim, right of retention, right in rem, pledge, assignment, judgment lien, deemed trust or other lien or encumbrance of any kind or nature whatsoever, any conditional sale or trust receipt, and any consignment or bailment for security purposes, so long as such interest is secured by value. The term "Lien" shall include, without limitation, reservations, exceptions, encroachments, easements, servitudes, rights-of-way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting the Real Property.

"Loans" means the Revolving Loan and the Term Loan made available to Borrower pursuant to Article II of this Agreement in an aggregate outstanding principal amount not exceeding the Credit Amount.

"Material Adverse Effect" means a material adverse effect on (a) the Collateral, assets, liabilities, business, operations, prospects, income or condition (financial or otherwise) of Borrower, such materiality being measured with respect to an individual asset or Real Property or with respect to the Business, as the context requires, (b) the ability of Borrower to perform its obligations under this Agreement or any other DIP Loan Document, or (c) the ability of Lender to enforce the Obligations or its rights and remedies under this Agreement or any of the other DIP Loan Documents.

"MRCL" means Mississippi Recycling Company LLC, an Ohio limited liability company.

"Notes" means, collectively, the Revolving Note and the Term Note.

"Note Rate" means a fixed rate of interest equal to eleven percent (11%) per annum on the outstanding principal balance of the Notes.

"Obligations" means, without duplication, any and all present and future Indebtedness (including, without limitation, principal of the Revolving Loan, interest thereon, principal of the Term Loan, interest thereon, Lender Fees, collection costs and expenses, attorneys' fees and other amounts), liabilities and obligations of Borrower evidenced by or arising under or in connection with this Agreement, the Revolving Note, the Term Note and/or any of the other DIP Loan Documents, whether direct or contingent, due or to become due or now existing or hereafter arising.

"Orders" means, collectively, the Interim Order and the Final Order.

"Permitted Liens" means any of the following: (a) Liens for property taxes and assessments or governmental charges or levies; (b) (i) deposits to secure the performance of bids, tenders, trade contracts or leases (other than Capitalized Leases) or to secure statutory obligations, surety or appeal bonds or other Liens of like general nature incurred in the ordinary course of business and not in connection with the borrowing of money or the acquisition of inventory or other Real Property, and (ii) Liens (other than any Liens imposed by ERISA) arising in the ordinary course of business or incidental to the ownership of the Collateral (including Liens in connection with worker's compensation, unemployment insurance and other like laws, carrier's, mechanic's, materialmen's, repairmen's, vendor's, warehousemen's and attorneys' liens and statutory landlords' liens); provided in each ease that payment thereof is not then required by Section 7.1(d) or 7.1(e); (c) survey exceptions, issues with regard to the merchantability of title, easements or reservations, or rights of others for rights-of-way; servitudes, utilities and other similar purposes, or zoning or other restrictions as to the use of real properties, which could not reasonably be expected to have a Material Adverse Effect; (d) Liens permitted by Lender in writing; (e) Liens in respect of judgments or awards, the Indebtedness with respect to which is permitted by Section 7.2(a)(v); (f) Liens created under the DIP Loan Documents; (g) Liens permitted pursuant to any order of the Bankruptcy Court; (h) Liens in favor of Adams County, Mississippi pursuant to that certain Land Deed of Trust recorded in the Office of the Chancery Clerk of Adams County, Mississippi (the "Recording Office") in Book 476 at Page 33, that certain Land Deed of Trust recorded in the Recording Office in Book 513 at Page 647 and that certain Land Deed of Trust recorded in the Recording Office in Book 659 at Page 307 (collectively, the "Adams County Mortgage"); and (i) Liens with respect to which perfection is permitted under § 362 of the Code.

"Person" means any natural person or recognized legal entity of any kind whatsoever, including, without limitation, any individual, sole proprietorship, partnership, joint venture, trust, trustee, unincorporated organization, association, corporation, limited liability company, institution, entity or Governmental Authority.

"Personal Property" means all of the personal property, tangible or intangible, now owned, leased or otherwise acquired or hereafter owned, leased or otherwise acquired by Borrower or any Subsidiary, including, without limitation, (a) goods, accounts, general intangibles, investment property, instruments, letters of credit, letter-of-credit rights, deposit accounts, documents, chattel paper and all other personal property of any kind or character, including such items of personal property as presently or hereafter defined in the Uniform Commercial Code, (b) furniture, furnishings, equipment, machinery, money, insurance proceeds, accounts, contract rights, software, trademarks, goodwill, promissory notes, electronic and tangible chattel paper, payment intangibles, documents, trade names, licenses and/or franchise agreements, rights under leases of fixtures or other personal property or equipment, inventory, all refundable fees, deposits or other funds deposited by or on behalf of Borrower, (c) reserves, escrows or impounds and all deposit accounts (including accounts holding security deposits) maintained by Borrower, (d) plans, specifications, shop drawings and other technical descriptions, (e) leases, subleases, licenses, concessions, occupancy agreement, rental contracts, and other agreements (written or oral), together with all guarantees, letters of credit and other credit support, modifications, extensions and renewals thereof, (f) insurance policies, unearned premiums and proceeds therefrom, (g) all mineral, water oil and gas rights, (h) patents, tradenames, trademarks, service marks, logos, copyrights, goodwill, books and records, and other

- 9 -

general intangibles, (i) awards, remunerations, reimbursement, settlement or compensation made by any Governmental Authority and, (j) all of the rents, revenues, issues, income, proceeds, profits, and other payments with respect to the foregoing, (k) all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages and appurtenances appertaining to the foregoing and (l) all accessions, replacements and substitutions for any of the foregoing and all proceeds thereof.

"Petition Date" has the meaning set forth in the Recitals to this Agreement.

"Post-Petition" means, when used with respect to any Indebtedness, obligation, liability, claim or other related matter, that such Indebtedness, obligation, liability, claim or other related matter arose on or after the Petition Date.

"Pre-Petition" means, when used with respect to any Indebtedness, obligation, liability, claim or other related matter, that such Indebtedness, obligation, liability, claim or other related matter arose prior to the Petition Date.

"Pre-Petition Payment" means any payment (by way of adequate protection or otherwise), directly or indirectly, of principal or interest or otherwise on account of any Pre-Petition Indebtedness or trade payables or other Pre-Petition claims against Borrower, including without limitation, the providing of a letter of credit or other security to provide assurance of any such payment.

"Professional Fee Reserve" means the amount of any unpaid professional fees and expenses specified in the Budget that were incurred by the professionals retained by Borrower, the Committee, and any trustee, examiner or other representative appointed in the Case and that are allowed by order of the Bankruptcy Court; provided, however, that in no event shall such fees and expenses exceed One Hundred Forty Thousand Dollars ($140,000).

"Professionals" means the attorneys, accountants and other professional consultants retained by any Person to provide representation or advice in connection with the Case, the Real Property, this Agreement or the transactions contemplated hereby; provided that in the case of Borrower, such term shall refer only to Professionals retained Post-Petition by Borrower or the Committee pursuant to order of the Bankruptcy Court.

"Real Property" means all of the real property now owned or leased or hereafter owned or leased by Borrower, including, without limitation, (a) the real property described in Exhibit B attached hereto, together with any greater estate therein as hereafter may be acquired by Borrower (the "Land"), (b) all buildings, structures and other improvements, now or at any time situated, placed or constructed upon the Land (the "Improvements"), and (c) all materials, supplies, equipment, apparatus and other items of personal property now owned or hereafter acquired by Borrower and now or hereafter attached to, installed in or used in connection with any of the Improvements or the Land, and water, gas, electrical, storm and sanitary sewer facilities and all other utilities whether or not situated in easements (the "Fixtures").

"Released Parties" has the meaning set forth in Section 2.16 of this Agreement.

"Releasing Parties" has the meaning set forth in Section 2.16 of this Agreement.

"Restricted Payment" means (i) any dividend or other distribution, direct or indirect, on account of any equity interests of Borrower now or hereafter outstanding, (ii) any redemption, retirement, purchase or other acquisition for value, direct or indirect, of any equity interests of Borrower now or hereafter outstanding, (iii) any redemption, purchase, retirement, defeasance, prepayment or other acquisition for value, direct or indirect, of any Indebtedness subordinated to the Obligations, and (iv) any payment of a claim for the rescission of the purchase or sale of, or for material damages arising from the purchase or sale of, any Indebtedness (other than the Obligations) or any equity interests of Borrower or of a claim for reimbursement, indemnification or contribution arising out of or related to any such claim for damages or rescission.

"Revolving Credit Availability" means, at any particular time, the amount by which (a) the Aggregate Revolving Loan Commitment at such time (or, prior to the entry of the Final Order by the Bankruptcy Court, $1,000,000) exceeds (b) the sum of (i) the Revolving Credit Obligations outstanding at such time and (ii) the Professional Fee Reserve at such time.

"Revolving Credit Obligations" means, at any particular time, the outstanding principal amount of the Revolving Loan at such time.

"Revolving Loan" has the meaning set forth in the Recitals to this Agreement.

"Revolving Loan Account" means the account on Lender's books, in the Borrower's name, in which the Borrower will be charged with all Obligations as provided in Section 2.7(c).

"Revolving Note" means the Revolving Promissory Note evidencing the Revolving Loan and payable by Borrower to Lender in a principal amount of up to Four Million Dollars ($4,000,000), the form of which is attached to this Agreement as Exhibit C-1.

"Security Documents" shall have the meaning set forth in Section 4.4 of this Agreement.

"Subsidiary" means (a) any corporation of which more than fifty percent (50%) of the issued and outstanding voting capital stock is at the time owned directly or indirectly by Borrower and/or any one or more Subsidiaries, or (b) any partnership, limited liability company, business trust, or any other similar entity of which more than fifty percent (50%) of the voting interests is at the time owned directly or indirectly by Borrower and/or any one or more Subsidiaries.

"Supply Agreement" means that certain Recycled Pulp Supply Agreement, dated as of February 15, 2010, by and between IP and Borrower.

"Term Loan" has the meaning set forth in the Recitals to this Agreement.

"Term Note" means the Term Promissory Note evidencing the Term Loan and payable by Borrower to Lender in a principal amount of Three Million One Hundred Thousand Dollars ($3,100,000), the form of which is attached to this Agreement as Exhibit C-2.

"Termination Date" means the earliest to occur of (a) twelve (12) months following the Effective Date, (b) the effective date of an Acceptable Plan, (c) consummation of a sale under Section 363 of the Code pursuant to an Acceptable Sale Process, (d) the effective date of a plan of reorganization of Borrower other than an Acceptable Plan, (e) consummation of a sale under Section 363 of the Code other than a sale pursuant to an Acceptable Sale Process, or (f) the date upon which Lender shall elect to terminate the Availability Period and accelerate the Obligations in accordance with Section 2.12 or 8.2 of this Agreement.

1.2     Accounting Terms and Determinations.  Except as otherwise specified in this Agreement, all accounting terms used in this Agreement shall be interpreted, all accounting determinations hereunder shall be made and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP as in effect from time to time, applied on a basis consistent (except for changes accompanied by a concurrence from Borrower's independent certified public accountants) with the most recent audited financial statements of Borrower delivered to Lender.

## ARTICLE II
## THE LOANS

2.1     Advances Under the Revolving Loan. Subject to the terms and conditions set forth in this Agreement, and so long as no Default or Event of Default has occurred and is continuing, during the Availability Period, Lender may make Advances to Borrower under the Revolving Loan from time to time on a revolving basis, in an aggregate principal amount at any one time outstanding not to exceed the Revolving Credit Availability at such time; provided, however, that at no time shall the amount of the Revolving Loan exceed the Aggregate Revolving Loan Commitment. During the Availability Period, Borrower may borrow, repay and re-borrow proceeds of the Revolving Loan in accordance with this Agreement. If at any time the amount outstanding under the Revolving Loan exceeds the Revolving Credit Availability, then Borrower shall immediately repay the Revolving Loan in the amount of such excess. The Revolving Loan, the Term Loan and all of the other Obligations of Borrower to Lender shall constitute one general obligation of Borrower secured by the Collateral as provided in Article IV of this Agreement.

2.2     Advances Under the Term Loan.  Subject to the terms and conditions set forth in this Agreement, Lender shall make a single advance (or, in Lender's sole discretion, a single credit against Borrower's Pre-Petition loans from Lender) in the amount of the Term Loan on the Effective Date. The Term Loan is not a revolving loan and amounts repaid under the Term Loan may not be re-borrowed.

2.3     Use of Proceeds.  The proceeds of the Term Loan shall be used exclusively to pay down the balance of Borrower's Pre-Petition loans from Lender to be applied in Lender's sole discretion. Subject to the general discretion of Lender set forth in Section 2.4 below, proceeds of the Revolving Loan shall be available exclusively for the purpose of funding such costs and expenses related to the Case, Borrower's operation of the Business (including payroll, insurance and mill operations), this Agreement and the Collateral all as set forth in the Budget together with the following: (i) the costs of administering the Revolving Loan and the Term Loan in accordance with the terms of this Agreement, (ii) interest on the Revolving Note and the Term

Note, (iii) the Administrative Fee and any other fees due and payable to Lender, including, without limitation, the Field Examination Fee, (iv) the reimbursement of any and all costs incurred by Lender in connection with the transaction contemplated by the DIP Loan Documents, including, without limitation, all fees and expenses of Professionals retained by Lender in analysis or negotiation of any aspect of such transaction, including further, without limitation, the negotiation and drafting of the DIP Loan Documents (or any amendments thereto), (v) the costs and expenses required to preserve, perfect, protect and enforce Lender's rights under any Order or under the DIP Loan Documents, or to collect the Obligations, including, without limitation, all filing and recording fees and reasonable fees and expenses of attorneys, accountants, appraisers and other professionals incurred by Lender in connection with any of the foregoing, (vi) required fees of the United States Trustee, (vii) the reasonable costs, expenses and fees of Borrower's Professionals in connection with the Case, and (viii) such other costs and expenses related to the Case, this Agreement or the Collateral as Lender may expressly approve.

2.4     Lender's Discretion to Make Advances.

(a)     Borrower acknowledges and agrees that under no circumstance shall Lender be obligated in any manner to make any Advance requested by Borrower hereunder unless such Advance is for a projected cash need set forth in the Budget and Borrower is in full and complete compliance with all terms, covenants, conditions and agreements set forth in this Agreement and the DIP Loan Documents.

(b)     Notwithstanding any contrary provision set forth in this Agreement, Lender shall at all times have the right, but not the obligation, to fund Advances to or for the benefit of Borrower in excess of amounts required under the Budget if deemed necessary or appropriate by Lender, including, without limitation, any fee or cost referenced or described in Section 2.10 of this Agreement. Nothing in this Agreement shall limit the right of Lender to make such Advances as may from time to time be necessary for the protection and preservation of the Collateral.

2.5     Submission of Budget. Borrower shall prepare and submit to Lender for Lender's approval at such periodic intervals as Lender may reasonably require, a rolling 13-week budget or budgets in a form acceptable to Lender, showing the projected cash needs of Borrower (the "Budget"), each of which shall be updated by Borrower from time to time as necessary to maintain the accuracy of the projections set forth in such Budget. Any updates to be Budget by Borrower will be subject to Lender's approval. Each Budget shall include, at a minimum, a good faith projection of all costs and expenses to be incurred in connection with the ongoing improvements, management and operation of the Collateral including, without limitation, deferred maintenance and capital expenses approved under Section 2.14 below, general and administrative expenses, debt service payments, adequate protection payments and other expenses to be incurred by Borrower for the applicable period, together with projected cash receipts and an estimate of gross and net operating income for the applicable period. Each Budget and all modifications thereto shall be subject to the review and approval of Lender, acting in a commercially reasonable manner. The Budget for the initial thirteen (13) weeks of the Availability Period and attached as Exhibit D to this Agreement at its execution is approved and accepted by Lender.

2.6    Method of Borrowing.

(a)    With respect to each requested Advance pursuant to an approved Budget, at Lender's option, Lender may require Borrower's Representative so give not less than forty-eight (48) hours notice to Lender of the Business Day upon which such Advance is to be made, specifying:

(i)    the requested date of such Advance, which shall be a Business Day;

(ii)    the aggregate principal amount of such Advance;

(iii)    that on the date of, and after giving effect to, such Advance, no Default or Event of Default has occurred and is continuing;

(iv)    that on the date of, and after giving effect to, such Advance, all of the representations and warranties of Borrower contained in this Agreement and the DIP Loan Documents are true and correct in all material respects as if made on and as of the date of such Advance (except to the extent that such representations and warranties expressly relate solely to an earlier date, in which case such representations and warranties shall have been true and correct on and as of such earlier date); and

(v)    that such Advance is in accordance with, and will be used to fund current expenses of Borrower set forth in, the most recent Budget approved by Lender.

(b)    A notice given under Section 2.6(a) above shall not be revocable by Borrower.

(c)    In the event that Lender shall elect to fund the requested Advance in whole or in part, then proceeds of the Revolving Loan shall be delivered to Borrower by wire transfer or inter-bank transfer to an account designated by Borrower.

2.7    Receipt and Application of Payments.

(a)    Borrower shall make each payment under this Agreement without set-off, counterclaim or deduction and free and clear of all taxes not later than 9:00 A.M. (Central Prevailing Time) on the day when due in lawful money of the United States of America in immediately available funds to the Collection Account. If Borrower shall be required by law to deduct any taxes from any payment to Lender under any DIP Loan Document, then the amount payable to Lender shall be increased so that, after making all required deductions, Lender receives an amount equal to that which it would have received if no such deductions were made. For purposes of computing interest and fees, all payments shall be deemed received by Lender one (1) Business Day following receipt of immediately available funds in the Collection Account. For purposes of determining the Credit Amount and the Revolving Credit Availability, payments shall be deemed

received by Lender upon receipt of immediately available funds in the Collection Account.

(b)     Payments received by Lender in respect of the Obligations shall be applied by the Lender in the following order: (i) first, to pay all reasonable out-of-pocket costs and expenses of Lender incurred in connection with the collection and enforcement of the Obligations or of the security interests granted to Lender; (ii) second, to pay Obligations in respect of any fees, expenses, reimbursements or indemnities then due to Lender (other than as covered by clause (i) above); (iii) third, to pay interest (including default interest) on the then outstanding principal balance of the Revolving Loan and then the Term Loan; and (iv) fourth, to pay any outstanding principal balance under the Revolving Loan and then the Term Loan.

(c)     Lender may charge the Revolving Loan Account for all loans and advances made by Lender to Borrower or for Borrower's account, and for all any other Obligations, including, without limitation, out-of-pocket expenses, and other amounts chargeable under this Agreement when due and payable hereunder.  Subject to the provisions of Section 2.7(b) above, Lender will credit the Revolving Loan Account with all amounts received by Lender from each Depository Account or from others for Borrower's account, including, without limitation, all amounts received by Lender in payment of Accounts.  In no event shall prior recourse to any Account or other security granted to or by Borrower be a prerequisite to Lender's right to demand payment of any of the Obligations.  Lender shall have no obligation whatsoever to perform in any respect any of Borrower's contracts or obligations relating to the Accounts.

2.8     Notes.  The Revolving Loan, all Advances thereof, and all interest accruing thereon, shall be evidenced by and payable in accordance with the Revolving Note and as provided in the Interim Order and, when applicable, the Final Order.  The Term Loan, the Advance thereof, and all interest accruing thereon, shall be evidenced by and payable in accordance with the Term Note and as provided in the Interim Order and, when applicable, the Final Order.

2.9     Interest.

(a)     Prior to the occurrence of an Event of Default, the outstanding principal balance of the Revolving Loan and the Term Loan shall bear interest at the Note Rate compounded monthly. Upon the occurrence of any Event of Default, and for as long as the same shall remain outstanding, at the option of Lender, all Obligations of Borrower shall bear interest at the Default Rate compounded monthly.  Acceptance by Lender of a payment of Default Rate interest will not be deemed to cure or waive any default under any DIP Loan Document.

(b)     All interest accruing on the Revolving Loan, the Term Loan or on any other Obligation hereunder shall be computed on the basis of a year of three hundred sixty (360) days and paid for the actual number of days elapsed (including the first day, but excluding the last day).

(c)     Borrower hereby authorizes Lender to make Advances under the Revolving Loan for payment of accrued and unpaid interest to Lender with respect only to the DIP Loan Documents as and when the same shall be due and payable.

2.10    Lender Fees. In consideration of Lender's prior commitment to extend the credit evidenced hereby, as well as Lender's actual extension of credit pursuant to this Agreement, Borrower shall pay the following fees to Lender (collectively, the "Lender Fees"):

(a)     a fee equal to One Thousand Five Hundred Dollars ($1,500) per month, payable in advance (the "Administrative Fee"), with the payment of such fee to be made on a monthly basis to the Collection Account pursuant to Section 2.7 hereof and contemporaneously with the interest payments due to Lender under the Revolving Note and the Term Note; and

(b)     a fee equal to all reasonable out-of-pocket expenses and charges of third party appraisers and professionals employed by Lender to review, audit and appraise the Collateral (the "Field Examination Fee").

Borrower hereby authorizes and directs that Lender make such Advances under the Revolving Loan as may be necessary for the purpose of paying the Administration Fee, any Field Examination Fee, interest pursuant to the Revolving Note, and the other fees and costs described in Sections 2.3(i), 2.3(iii), 2.3(iv) and 2.3(vi) hereof as and when the same shall be due and payable.

2.11    Maturity. All Obligations of Borrower shall be due and payable in full on the Termination Date.

2.12    Early Termination. Lender shall be entitled, upon written notice to Borrower, to terminate the Availability Period and declare all Obligations to be immediately due and payable upon the occurrence of, and at any time during the continuation of any Event of Default hereunder that is not cured as provided in Article VIII of this Agreement (an "Early Termination Notice").

2.13    Over-Advances. Any unintended over-advance by Lender shall constitute an additional Obligation of Borrower hereunder, and shall be fully secured by the Collateral as provided in this Agreement.  Borrower shall immediately repay any such over-advances by Lender.

2.14    Approval of Deferred Maintenance and Capital Expenses. Acting in consultation with one another, Lender and Borrower shall determine the appropriate scope of deferred maintenance or capital improvements, if any, to be undertaken from time to time within the Real Property. Borrower shall develop complete cost estimates for all such improvement activity, supported by appropriate backup, and shall submit the same to Lender for review and approval or disapproval prior to entering into any agreement to cause such improvement to be made. Once approved by Lender, all improvement costs shall be reflected in the Budget to be prepared and submitted by Borrower pursuant to Section 2.5 of this Agreement.

- 16 -

2.15    Super-Priority Nature of Obligations and Lender's Liens. The priority of Lender's Liens on the Collateral shall be set forth in the Interim Order and the Final Order, which shall in each case, be subject to the approval of Lender.

2.16    Release. Borrower hereby acknowledges effective upon entry of the Order, that neither Borrower nor any of its Affiliates, shareholders, officers, agents or employees have any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of Borrower's or its Affiliates, shareholders, officers, agents or employees' liability to repay Lender as provided in this Agreement and the other DIP Loan Documents or to seek affirmative relief or damages of any kind or nature from Lender. Borrower, on behalf of its bankruptcy estates, and on behalf of all their successors, assigns, shareholders, officers, agents or employees and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever release and discharge Lender and all of Lender's past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, (and each of its Affiliates) and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the other DIP Loan Agreements, the Interim Order, the Final Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

2.17    Waiver of any Priming Rights. Upon the Effective Date, and on behalf of itself and its estates, and for so long as any Obligations shall be outstanding, Borrower hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations.

## ARTICLE III
## STATUS OF OBLIGATIONS AND LIENS

3.1    Effect of Obligations and Priority of Liens. Borrower hereby covenants, represents and warrants that, upon entry of the Interim Order (to the extent of the Obligations approved therein) and the Final Order, the Lien against the Collateral securing the Obligations shall, in each case, prime any Liens on the Collateral and, as of the Petition Date and pursuant to Section 364(d) of the Code constitute perfected priming Liens on the Collateral that are senior to

- 17 -

(a) all Permitted Liens, (b) Liens in favor of Lender with respect to the Pre-Petition loans, and (c) Liens in favor of any party (whether of record or otherwise) claiming to have an interest in the Collateral. Notwithstanding the foregoing, the Adams County Mortgage shall not be primed pursuant to the Interim Order or the Final Order and the Adams County Mortgage shall be entitled to such priority as is provided by applicable law.

3.2 <u>Payment of Obligations</u>. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

3.3 <u>No Discharge; Survival of Claims</u>. Borrower agrees that (a) its Obligations hereunder and under the other DIP Loan Documents shall not be discharged by the entry of an order of the Bankruptcy Court confirming any Acceptable Plan or other reorganization plan, dismissing the Case or converting the Case to a case under Chapter 7 of the Code (and Borrower, pursuant to Section 1141(d)(4) of the Code, hereby waives any such discharge with respect to such obligations), and (b) the Liens granted to Lender pursuant to the Final Order and described in Section 3.1 and Article IV shall not be affected in any manner by the entry of an order confirming any Acceptable Plan or other reorganization plan, dismissing the Case or converting the Case to a case under Chapter 7 of the Code.

<div align="center">

**ARTICLE IV**
**SECURITY**

</div>

4.1 <u>Grant of Security Interest in the Collateral</u>. As security for the prompt satisfaction of all Obligations, Borrower hereby grants, bargains, sells, conveys, mortgages, assigns, transfers, and sets over to Lender, and grants to Lender (for itself and its affiliates), its successors and assigns, a priming Lien upon and security interest in all of Borrower's right, title and interest in and to the Collateral.

4.2 <u>Identification of Collateral</u>. No submission by Borrower to Lender of a schedule or other particular identification of Collateral shall be necessary to vest in Lender security title to and a perfected lien or security interest in each and every item of Collateral now existing or hereafter created and acquired, but rather such title, lien and security interest shall vest in Lender upon the Effective Date or immediately upon the creation or acquisition of any item of Collateral hereafter created or acquired, as the case may be, without the necessity for any other or further action by Borrower or by Lender.

4.3 <u>Perfection and Maintenance of Lien</u>.

(a) Pursuant to the terms of the Interim Order and, as applicable, the Final Order, the Lien and security interest of Lender in and to all Collateral described in this Agreement or in any other Security Document shall be perfected automatically and without further action of Lender. No filing or registration of any kind shall be required in order to perfect the Liens granted in this Agreement or in any other Security Document. Nevertheless, Lender may elect, out of an abundance of caution and in order to remove uncertainty, to file or record all such financing statements, mortgages, security agreements, fixture filings or other evidences of perfection as Lender may deem

<div align="center">

- 18 -

</div>

appropriate, and no such filing or recording shall in any manner alter, diminish or otherwise limit the automatic perfection of all Liens in favor of Lender granted by the Orders.

(b)     Borrower authorizes Lender to file one or more financing statements to perfect Lender's Lien in the Collateral pursuant to the Uniform Commercial Code, such financing statements to be in form and substance acceptable to Lender.

(c)     Borrower hereby appoints Lender as its attorney-in-fact (without requiring Lender to act as such) to file any financing statement in the name of Borrower, and to perform all other acts that Lender deems appropriate to perfect and continue Lender's Lien and to protect and preserve the Collateral.

4.4     Limited License.  Borrower hereby irrevocably grants to Lender a royalty-free, non-exclusive license, including the right to sublicense, to use Borrower's trademarks, copyright, patents and other proprietary and intellectual property rights, in connection with (a) the advertisement for sale, and the sale or other disposition of, any finished goods inventory by Lender in accordance with the provisions of this Agreement, and (b) the manufacture, assembly, completion and preparation for sale of any unfinished inventory by Lender in accordance with the provisions of this Agreement.

4.5     Further Assurances. In connection with Lender's Lien, Borrower shall:

(a)     execute and deliver, or cause to be executed and delivered, all such additional mortgages, assignments, pledge agreements, security agreements, affidavits, documents and instruments (collectively referred to in this Agreement as the "Security Documents"), including amendments thereto and continuations thereof, in form satisfactory to Lender as Lender may from time to time specify;

(b)     pay, or reimburse Lender upon demand for the payment of, all costs, expenses and taxes incurred in filing or recording the same in such jurisdictions as Lender may designate; and

(c)     take such other steps as Lender, from time to time, may direct to protect, perfect, and maintain Lender's Lien upon the Collateral.

4.6     Handling of Proceeds of Collateral; Cash Dominion.  Borrower, at its expense, will enforce and collect payments and other amounts owing on all Accounts in the ordinary course of Borrower's business subject to the terms hereof.

(a)     Collection of Accounts and Other Proceeds.  Borrower agrees to direct its account debtors to send payments on all Accounts directly to a lockbox associated with a Depository Account, and to include on all of Borrower's invoices the address of such lockbox as the sole address for remittance of payment.  Notwithstanding the foregoing, should Borrower receive any payment on an Account or other proceeds of the sale of Collateral, including, without limitation, checks, cash, receipts from credit card sales and receipts, notes or other instruments or property with respect to any Collateral, Borrower

- 19 -

agrees (i) to hold such proceeds in trust for Lender, separate from Borrower's other property and funds, and (ii) to deposit such proceeds directly into the Depository Account within two (2) Business Days after receipt.

(b) <u>Transfer of Funds from Depository Accounts</u>. Funds remaining on deposit in a Depository Account shall be transferred to Lender's Collection Account on each Business Day in accordance with the terms and provisions of the applicable Depository Account Control Agreement, and Borrower shall take all actions reasonably required by Lender or any bank at which a Depository Account is maintained in order to effectuate the transfer of funds in this manner. Subject to charges for Collection Days, all amounts received from a Depository Account and any other proceeds of the Collateral deposited into Lender's Collection Account will, for purposes of calculating Revolving Credit Availability and interest, be credited as provided in Section 2.7(b) of this Agreement on the date of deposit in Lender's Collection Account. No checks, drafts or other instruments received by Lender shall constitute final payment to Lender unless and until such instruments have actually been collected.

(c) <u>New Depository Accounts</u>. Borrower shall not open any lockbox or new bank account into which proceeds of Collateral are to be delivered or deposited unless concurrently with the opening of such lockbox and/or bank account, Lender, Borrower and the bank which will maintain such lockbox or at which such account will be maintained, execute a Depository Account Control Agreement with respect to such lockbox and/or related bank account. Upon compliance with the terms set forth above, such lockbox and/or bank account shall constitute a Depository Account for purposes of this Agreement.

## ARTICLE V
## CONDITIONS

5.1 <u>General Conditions</u>. Notwithstanding any provision contained in this Agreement to the contrary, Lender shall be entitled, in its sole discretion, to require that any one or more of the following conditions be satisfied as of the date of the initial Advance and in connection with any subsequent Advance (unless waived by Lender in its sole discretion):

(a) this Agreement and the other DIP Loan Documents, duly authorized and executed, shall have been delivered to and received by Lender;

(b) a certified copy of resolutions of Borrower, duly adopted and signed by Borrower which authorize the Case and the execution, delivery and performance of the DIP Loan Documents shall have been received by Lender;

(c) Lender shall have received a copy of all organizational documents and shareholders' agreements of Borrower;

(d) Lender shall have received certificates of good standing for Borrower from its state of formation and from any other state in which Borrower is required to qualify to conduct its business;

(e)     Lender shall have received an incumbency certificate which shall identify by name and title and bear the signature of Borrower, who shall be the Person executing any of the DIP Loan Documents delivered at or prior to the Effective Date;

(f)     Lender shall have received a certificate, in form and substance satisfactory to Lender, signed by an authorized officer of Borrower, stating that (i) on the date of this Agreement all the representations in this Agreement are true and correct in all material respects (unless such representation and warranty is made as of a specific date, in which case, such representation and warranty shall be true in all material respects as of such date), (ii) Borrower is in compliance with this Agreement, and (iii) no Default or Default condition has occurred;

(g)     Lender shall have received satisfactory evidence that the security interests and Liens in favor of Lender (i) are valid, enforceable, properly perfected in a manner acceptable to Lender and (ii) shall constitute super-priority perfected priming Liens pursuant to Section 364(d) of the Code senior to all other Liens;

(h)     Lender shall have received evidence reasonably satisfactory to Lender that there exists no injunction or temporary restraining order which, in the reasonable judgment of Lender, would prohibit the making of the Loans and the execution, delivery and performance of the DIP Loan Documents or any litigation seeking such an injunction or restraining order or which could reasonably be expected to result in a Material Adverse Effect;

(i)     Lender shall have received evidence reasonably satisfactory to Lender that Borrower has received all necessary or appropriate third party governmental waivers, approvals and consents required for the execution, delivery and performance of the DIP Loan Documents;

(j)     Lender shall have received evidence reasonably satisfactory to Lender that, there exists no action, suit, investigation, litigation, or proceeding pending or threatened in any court or before any arbitrator or Governmental Authority that in Lender's reasonable judgment could reasonably be expected to have a Material Adverse Effect;

(k)     Lender shall have received evidence reasonably satisfactory to Lender that Borrower shall have filed the Case with the Bankruptcy Court;

(l)     Lender shall have received evidence that all "first day orders," have been or will be entered at or about the time of the commencement of the Case, all in form and substance satisfactory to Lender;

(m)     Lender shall have received evidence reasonably satisfactory to Lender that no litigation commenced which has not been stayed by the automatic stay or by the Bankruptcy Court and which, if successful, would have a Material Adverse Effect, or which would challenge the transactions contemplated by this Agreement;

(n)     the Bankruptcy Court shall have entered and Lender shall have received a copy of the Interim Order, which shall contain a finding that Lender has extended this Agreement and the credit facilities set forth in this Agreement in good faith;

(o)     all fees and expenses due hereunder shall have been paid by Borrower;

(p)     Lender shall have received all information, approvals, documents or other instruments as Lender may reasonably request;

(q)     Lender shall have received such financial and other information regarding Borrower as Lender may reasonably request;

(r)     Lender shall have received short-term and long-term projections, including, without limitation, balance sheets, profit and loss statements and statements of cash flows for Borrower;

(s)     Borrower shall have in effect insurance satisfactory to Lender, and such insurance shall include liability insurance for which Lender is named as an additional insured and property insurance with respect to the Collateral for which Lender is named as loss payee;

(t)     Lender shall have received an opinion from Borrower's outside counsel in form and substance satisfactory to Lender;

(u)     no Default or Event of Default under this Agreement shall have occurred;

(v)     except for subsequent changes consented to in writing by Lender after the Effective Date, or as permitted pursuant to this Agreement or the other DIP Loan Documents, all of the representations and warranties of Borrower contained in this Agreement and any other DIP Loan Document, including, without limitation, any Budget or request for an Advance, shall be true and correct in all material respects on and as of the date of such Advance, as if made on and as of such date (except to the extent that such representations and warranties expressly relate solely to an earlier date, in which case such representations and warranties shall have been true and correct on and as of such earlier date);

(w)     no change resulting in a Material Adverse Effect shall have occurred since the Effective Date;

(x)     Borrower shall have filed a motion to assume, and be performing under, the Supply Agreement and the License Agreement;

(y)     Lender shall have received the Budget, which shall be satisfactory to Lender in its sole discretion; and

(z)     Lender shall have received such other documents as Lender or its counsel may have reasonably requested.

- 22 -

5.2     Conditions to Advances.  Lender shall not be required to make any Advance, unless on the applicable Advance date, both before and after giving effect to such Advance:

(a)     on the date of, and immediately before and after giving effect to each Advance, no Default or Event of Default under this Agreement shall have occurred, and be continuing;

(b)     the representations and warranties contained in this Agreement are true and correct in all material respects as of such Advance date (except for those made as of a particular date which shall be true and correct as of such date);

(c)     the amount of such requested Advance shall not make the aggregate amount outstanding exceed the Revolving Credit Availability or such lesser as may have been approved pursuant to the Orders or any order modifying, reversing, staying or vacating such order shall have been entered, or any appeal of such order shall have been timely filed;

(d)     Borrower shall have complied with Section 2.6 of this Agreement;

(e)     the Bankruptcy Court shall have entered the Interim Order and, when applicable, the Final Order;

(f)     neither the Interim Order nor the Final Order shall have been vacated, stayed, reversed, modified or amended without Lender's consent and shall otherwise be in full force and effect;

(g)     no motion for reconsideration of the Interim Order or the Final Order shall have been timely filed;

(h)     no appeal of the Interim Order or the Final Order shall have been timely filed and such order in any respect is the subject of a stay pending appeal;

(i)     Borrower shall not, in Borrower's business judgment reasonably exercised, have sufficient available cash or other immediately available funds on hand to meet general working capital obligations; and

(j)     all orders entered by the Bankruptcy Court on or prior to the entry of the Final Order shall be reasonably satisfactory in form and substance to Lender and its counsel.

Each notice given under Section 2.6 of this Agreement with respect to an Advance shall constitute a representation and warranty by Borrower that the conditions contained in this Section have been satisfied.

PPAB 1652943v5

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement and to make the Loans and the other financial accommodations to Borrower described herein, Borrower hereby represents and warrants to Lender as follows:

6.1    <u>Existence and Power</u>. Borrower (a) is a corporation duly incorporated, validly existing and in good standing under the laws of the jurisdiction of its incorporation, (b) subject to entry of the Interim Order (or the Final Order, when applicable), has all requisite powers and authority and all governmental and regulatory licenses, authorizations, consents and approvals required to carry on the Business as presently conducted and as proposed to be conducted, and (c) is qualified to transact business as a foreign entity in, and is in good standing under the laws of, all states in which it is required by applicable law to maintain such qualification and good standing except for those states in which the failure to qualify or maintain good standing could not reasonably be expected to have a Material Adverse Effect.  Borrower does not have any Subsidiaries.

6.2    <u>Authorization; Validity; DIP Loan Documents</u>.

(a)    Upon the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), Borrower has the requisite power and authority to execute, deliver and perform each of the DIP Loan Documents that are to be executed by it or that have been executed by it as required by this Agreement and the other DIP Loan Documents on or prior to Effective Date and to file any documents which must be filed by it or which have been filed by it as required by this Agreement, the other DIP Loan Documents or otherwise on or prior to the Effective Date with any Governmental Authority.

(b)    The execution, delivery, performance and filing, as the case may be, of each of the DIP Loan Documents which must be executed or filed by Borrower or which have been executed or filed as required by this Agreement, the other DIP Loan Documents or otherwise on or prior to the Effective Date and to which Borrower is party, and the consummation of the transactions contemplated thereby, have been duly authorized by all requisite actions (including, without limitation, any required shareholder approval) of Borrower and, if necessary, the shareholders of Borrower, and such approvals have not been rescinded. No other action or proceedings on the part of Borrower are necessary to consummate such transactions.

(c)    Each of the DIP Loan Documents to which Borrower is a party has been duly executed, delivered or filed, as the case may be, by it and, upon the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, is in full force and effect and no material term or condition thereof has been amended, modified or waived from the terms and conditions contained in the DIP Loan Documents delivered to Lender pursuant to Section 5.1(a) without the prior written consent of Lender and any other requisite parties hereto, and Borrower has, and, to Borrower's knowledge,

- 24 -

all other parties thereto have, performed and complied with all the terms, provisions, agreements and conditions set forth therein and required to be performed or complied with by such parties on or before the Effective Date and no unmatured default, default or breach of any covenant by any such party exists thereunder. All representations and warranties made in this Agreement and the DIP Loan Documents are true and correct as of the date hereof, and any future DIP Loan Documents not executed contemporaneously with the execution of this Agreement, when executed and delivered in accordance with this Agreement, will constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their respective terms.

6.3     No Conflict; Governmental Approvals. The execution, delivery and performance of each of the DIP Loan Documents to which Borrower is a party do not and will not (a) conflict with the certificate or articles of incorporation, shareholders' agreement, close corporation agreement, or other management agreement (or other applicable constituent documents) of Borrower, (b) require any approval of Borrower's board of directors or shareholders except such as have been obtained, (c) conflict with, result in a breach of or constitute (with or without notice or lapse of time or both) a default under (i) to Borrower's knowledge, any applicable law (including, without limitation, any Environmental Law) or (ii) after giving effect to the Interim Order (or Final Order, as applicable), any Contractual Obligation of Borrower, or require termination of any Contractual Obligation, except such breach, default or termination which individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect, or (d) result in or require the creation or imposition of any Lien whatsoever upon any of the property or assets of Borrower (except as expressly contemplated by the DIP Loan Documents and approved by the Bankruptcy Court). Except for the entry of the Orders, the execution, delivery and performance of each of the DIP Loan Documents to which Borrower is a party do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by any Governmental Authority, except filings, consents or notices that have been made, obtained or given, or that, if not made, obtained or given, individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect.

6.4     No Defaults. Other than with respect to non-payment as set forth in the schedules filed with the Bankruptcy Court, Borrower is not in default in the performance, observance or fulfillment of any (a) Contractual Obligation of Borrower or (b) judgment, order, writ, injunction, decree or decision of any court or of any Governmental Authority. There exists no Default or Default condition.

6.5     Title to Collateral. Borrower is the sole and absolute owner of all Collateral, free and clear of all Liens, other than Permitted Liens. Borrower enjoys peaceful and undisturbed possession of all Collateral in all material respects.

6.6     Taxes. Except as set forth on Schedule 6.6, Borrower has filed or caused to be filed all federal, state and local or other (including foreign) tax returns which are required to be filed by it and has paid or caused to be paid all taxes as shown on said returns on any assessment received by it, to the extent that such taxes have become due. Borrower has no knowledge of any proposed tax assessment against Borrower that will have or could reasonably be expected to have a Material Adverse Effect.

6.7    Compliance With Laws.  Borrower has complied in all material respects with all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, certificates, franchises, permits, licenses, authorizations, directions and requirements of all Governmental Authorities.

6.8    Labor Matters. No attempt to organize the employees of Borrower and no labor disputes, strikes or walkouts affecting the operations of Borrower, is pending, or, to Borrower's knowledge, threatened, planned or contemplated which could reasonably be expected to have a Material Adverse Effect.

6.9    Environmental Matters.  Except as set forth on Schedule 6.9 attached hereto, (a) the operations of Borrower comply in all material respects with applicable Environmental Laws, (b) Borrower has all permits, licenses or other authorizations required under applicable Environmental Laws and is in material compliance with such permits, licenses or other authorizations, (c) neither Borrower nor any of its respective present property or operations, or, to Borrower's knowledge, any of its past property or operations, are subject to or the subject of, any investigation, any judicial or administrative proceeding, order, judgment, decree, settlement or other agreement respecting (i) any material violation of applicable Environmental Law, (ii) any material remedial action, or (iii) any material claims or liabilities arising from the release or threatened release of a contaminant into the environment, (d) there is not now, nor to Borrower's knowledge has there ever been, on or in the property of Borrower any landfill, waste pile, underground storage tanks, aboveground storage tanks, surface impoundment or hazardous waste storage facility of any kind, any polychlorinated biphenyls (PCBs) used in hydraulic oils, electric transformers or other equipment, or any asbestos containing material which, in each case, could give rise to a material claim or liability under applicable Environmental Law, and (e) Borrower has no material contingent obligation in connection with any release or threatened release of a contaminant into the environment.

6.10    Litigation.  Except as set forth on Schedule 6.10 attached hereto, there exist no actions, suits or proceedings of any kind by or against Borrower pending, or to Borrower's knowledge, threatened in any court or before any arbitrator or Governmental Authority, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

6.11    Reorganization Matters.

(a)    The Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (i) the motion seeking approval of the DIP Loan Documents and the Interim Order and Final Order, (ii) the hearing for the approval of the Interim Order, and (iii) the hearing for the approval of the Final Order. Borrower has given, and shall continue to give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in such order, as applicable.

(b)    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Case having priority over all administrative expense claims and unsecured claims against Borrower now existing or hereafter arising,

- 26 -

of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Code or otherwise, as provided under Section 364(c)(l) of the Code, subject, as to priority only to the extent expressly contemplated by the Interim Order or the Final Order and with respect to obligations resulting from statutory fees assessed by the Office of the United States Trustee.

(c)     After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral.

(d)     The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended.

(e)     Notwithstanding the provisions of Section 362 of the Code, and subject to the applicable provisions of the Interim Order or Final Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Lender shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court.

6.12    Insurance. The Borrower maintains, and has caused each Subsidiary to maintain, with financially sound and reputable insurance companies, insurance on all of its property in such amounts, subject to deductibles and self-insurance retentions, and covering such properties and risks, as is consistent with sound business practices.

6.13    Accuracy of Information. The information, exhibits and reports furnished by Borrower to Lender in connection with the negotiation of, or compliance with, the DIP Loan Documents, the representations and warranties of Borrower contained in the DIP Loan Documents, and all certificates and documents delivered to Lender pursuant to the terms thereof, taken as a whole, do not contain as of the date thereof any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein or therein, in light of the circumstances under which they were made, not misleading in any material respect. In addition, all financial projections, if any, that have been prepared by Borrower and made available to Lender have been prepared in good faith based upon reasonable assumptions at the time such assumptions were prepared.

## ARTICLE VII
## COVENANTS

7.1     Affirmative Covenants of Borrower. Borrower covenants and agrees that until the Final DIP Payment Date:

(a)     Information. Borrower shall deliver to Lender:

- 27 -

(i) copies of all financial statements from time to time prepared with respect to Borrower, whether prepared internally or by Borrower's Professionals, promptly following the preparation of such financial statements;

(ii) within ninety (90) days after the close of Borrower's fiscal year, a copy of an annual financial statement of Borrower including a balance sheet as of the end of each such fiscal year, a statement of earnings and surplus for such fiscal year, and a statement of cash flow for such fiscal year;

(iii) within thirty (30) days of filing, furnish Lender with copies of the state and federal tax returns filed with respect to Borrower, with all schedules and supporting documentation;

(iv) promptly upon, and in any event within two (2) Business Days of becoming aware of the occurrence of any event which constitutes a Default, notice of such occurrence together with a detailed statement by a responsible officer of Borrower of the steps being taken by Borrower to cure the effect of such event; and

(v) with reasonable promptness, such further information regarding the business, affairs and financial condition of Borrower as Lender may from time to time reasonably request.

(b) <u>Compliance with Laws</u>. Unless prohibited by the Bankruptcy Court or Code, Borrower shall observe and comply in all material respects with all such laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, certificates, franchises, permits, licenses, authorizations, directions and requirements of all Governmental Authorities, as may be applicable to the Business.

(c) <u>Payment of Indebtedness</u>. In addition to Borrower's obligations to pay the Obligations from time to time, Borrower shall pay and discharge any and all other Indebtedness incurred by Borrower after the Effective Date (unless prohibited by any Bankruptcy Court orders with respect to such other Post-Petition Indebtedness) payable by Borrower, as the case may be, and any interest or premium thereon, when due in accordance with the agreement, document or instrument relating to such Indebtedness; <u>provided</u>, <u>however</u>, that Borrower shall not be required to pay any such Indebtedness (excluding the Obligations) that is being contested in good faith and by appropriate proceedings being diligently conducted and for which adequate provision in accordance with GAAP has been made, except that Borrower shall pay or cause to be paid any such Indebtedness forthwith upon the commencement of proceedings to sell, seize or collect any Collateral or otherwise foreclose any Lien that is attached as security therefor, unless such sale, seizure, collection or foreclosure is properly stayed by the filing of an appropriate bond or Bankruptcy Court order.

(d) <u>Payment of Taxes</u>. Unless otherwise provided by the Code or Bankruptcy Court, Borrower shall pay and discharge all Post-Petition taxes, assessments and governmental charges or levies imposed upon it, or upon its income and profits, prior to

the date on which penalties might attach thereto and all lawful claims which, if unpaid, might become a Lien upon the assets of Borrower; provided, however, that Borrower shall not be required to pay and discharge any such tax, assessment, charge, levy or claim that is being contested in good faith and by appropriate proceedings being diligently conducted and for which adequate provision in accordance with GAAP has been made, except that Borrower shall pay or cause to be paid all such taxes, assessments and governmental charges forthwith upon the commencement of proceedings to sell, seize or collect any Collateral or otherwise foreclose any Lien that is attached as security therefor, unless such sale, seizure or collection or foreclosure is properly stayed by the filing of an appropriate bond or Bankruptcy Court order.

(e)     Payment of Claims. To the extent incurred by Borrower after the Effective Date, Borrower shall promptly pay and discharge all (i) trade accounts payable in accordance with usual and customary business practices, and (ii) claims for work, labor or materials which if unpaid might become a Lien upon any of the Collateral; provided, however, that Borrower shall not be required to pay any such account payable or claim that is being contested in good faith and by appropriate proceedings being diligently conducted and for which adequate provision in accordance with GAAP has been made, except that Borrower shall pay or cause to be paid all such accounts payable and claims forthwith upon the commencement of proceedings to sell, seize, or collect any Collateral or otherwise foreclose any Lien which is attached as security therefor, unless such sale, seizure, collection or foreclosure is properly stayed by the filing of an appropriate bond or Bankruptcy Court order.

(f)     Insurance. Borrower shall maintain with financially sound and reputable insurance companies, insurance on all its Real Property and other Collateral in such amounts and against such risks as Lender shall reasonably require which shall at least be equal to such coverage and amounts as are usually insured against in the same general area by companies engaged in the same or a similar business. All such insurance may be subject to reasonable deductible amounts. Borrower shall deliver to Lender certificate(s) of insurance on the date hereof and upon the annual (or other shorter period of time) renewal of such policies specifying the details of all insurance then in effect; together with a certificate of an officer of Borrower that all premiums then due have been paid. Borrower shall notify Lender immediately in writing of any material fire or other casualty to or accident involving any of the Collateral, whether or not such fire, casualty or accident is covered by insurance. Borrower shall notify promptly the insurance company and submit an appropriate claim and proof of claim to the insurance company if any Collateral is damaged or destroyed by fire or other casualty. Borrower shall not declare or agree with underwriters that any Collateral is a compromised, agreed, arranged or constructive total loss without the prior written consent of Lender.

(g)     Maintenance of Collateral. Subject to the Budget and Advance request approval, Borrower shall at all times maintain, protect and keep in good repair, working order and condition (ordinary wear and tear excepted), all Collateral.

(h)     Maintenance of Intellectual Property. Borrower shall obtain or maintain in full force and effect, all licenses, franchises, intellectual property, permits, authorizations and other rights as are necessary for the conduct of the Business.

(i)     Existence. Borrower shall do all things necessary to (i) preserve and keep in full force and effect at all times its legal existence, and (ii) be duly qualified to do business in all jurisdictions where the nature of its business or its ownership of the Collateral requires such qualification, except for those jurisdictions in which the failure to qualify could not reasonably be expected to have a Material Adverse Effect.

(j)     Notice of Claim. Borrower shall promptly, and in any event within two (2) Business Days, notify Lender of (i) the arising of any Post-Petition litigation or dispute, threatened against or affecting assets of Borrower, and (ii) any default under any Post-Petition contract to which Borrower is a party.

(k)     Maintenance of Books and Records, Consultations, Audits and Inspections, and Reporting. Borrower shall maintain books and records in accordance with GAAP and in which full, true and correct entries shall be made of all dealings and transactions in relation to the Collateral and the conduct of the Business. Borrower shall permit Lender (and any Professional appointed by Lender) to discuss the affairs, finances and accounts of Borrower with Borrower's Professionals, all at such reasonable times and as often as Lender may reasonably request. Borrower shall also permit inspection of its Real Property and other Collateral, books and records by Lender (and any Person appointed by Lender) during normal business hours and at other reasonable times.

(l)     Further Assurances. Borrower shall execute and deliver to Lender, at any time and from time to time, any and all further agreements, documents and instruments, and take any and all further actions which may be required under applicable law, or which Lender may from time to time reasonably request, in order to effectuate the transactions contemplated by this Agreement.

(m)     Agreements. Borrower shall not default under any Post-Petition indenture, contract, agreement, lease or other instrument to which Borrower is a party or by which Borrower or any Collateral is bound or affected.

(n)     State of Organization; Location of Chief Executive Office. Borrower shall not change its state of organization, principal place of business or chief executive office, unless Borrower has obtained Lender's prior written consent and has taken such action as is necessary to cause the security interest of Lender in the Collateral to continue to be a first priority perfected security interest.

(o)     Use of Proceeds. Borrower covenants and agrees that the proceeds of the Loans will be used solely for the purposes permitted by this Agreement.

(p)     Access to Information. Borrower shall provide full access to Lender or to any Professional designated by Lender to Borrower's management and technical personnel, as well as physical access to Borrower's premises, at all reasonable times, for

the purpose of allowing Lender or any such designated Person to monitor Borrower's activities and to provide technical support and assistance in connection with the operation of the Business.

(q) <u>Labor Matters</u>. Borrower shall notify Lender in writing, promptly upon learning of (i) any material labor dispute to which Borrower may become a party, including, without limitation, any strikes, lockouts or other disputes relating to Borrower's plants and other facilities, and (ii) any Worker Adjustment and Retraining Notification Act liability incurred with respect to the closing of any plant or other facility of Borrower.

(r) <u>Other Indebtedness</u>. Borrower shall deliver to Lender (i) a copy of each regular report, notice or communication regarding potential or actual defaults (including any accompanying officer's certificate) delivered by or on behalf of Borrower to or from the holders of any Indebtedness pursuant to the terms of the agreements governing such Indebtedness, such delivery to be made at the same time and by the same means as such notice of default is delivered to such holders, and (ii) a copy of each notice or other communication received by Borrower from the holders of any Indebtedness regarding potential or actual defaults pursuant to the terms of such Indebtedness, such delivery to be made promptly after such notice or other communication is received by Borrower.

(s) <u>Other Reports</u>. Borrower shall deliver to Lender copies of all financial statements, reports and notices, if any, sent or made available generally by Borrower to its shareholders. Borrower shall include Lender on its standard distribution lists for all press releases made available generally by Borrower to the public concerning material developments in the Business.

(t) <u>Environmental Notices</u>. Immediately after receipt by Borrower, Borrower shall deliver to Lender a copy of (i) any notice or claim to the effect that Borrower is or may be liable to any Person as a result of the release by Borrower or any other Person of any contaminant into the environment, and (ii) any notice alleging any violation of any applicable Environmental Law by Borrower.

(u) <u>Chapter 11 Proceedings</u>. Borrower shall provide to Lender copies of all pleadings, motions, applications, financial information and other documents filed by or on behalf of Borrower with the Bankruptcy Court in the Case and any subsequent case under Chapter 7 of the Code, or distributed by or on behalf of Borrower to any official committee or the United States Trustee in the Case.

(v) <u>ERISA Compliance</u>. Borrower shall establish, maintain and operate all plans to comply in all material respects with the provisions of ERISA and shall operate all plans and other pension and employee benefit plans to comply in all material respects with the applicable provisions of the Code, all other applicable laws, and the regulations and interpretations thereunder and the respective requirements of the governing documents for such plans and other pension and employee benefit plans.

(w) Environmental Compliance. The Borrower shall comply with all applicable Environmental Laws.

7.2 Negative Covenants of Borrower. Borrower covenants and agrees that until the Final DIP Payment Date:

(a) Limitation on Indebtedness. Borrower shall not incur or be obligated on any Indebtedness other than (i) the Obligations to Lender hereunder, (ii) indebtedness owing to Borrower's Professionals, (iii) Indebtedness relating to employee benefit plans, (iv) Indebtedness in respect of taxes, assessments, governmental charges or levies and claims for labor, materials and supplies to the extent that payment therefor shall not then be required to be made in accordance with the provisions of Section 7.1(d) or Section 7.1(e), (v) Indebtedness in respect of judgments or awards (which do not constitute an Event of Default under Section 8.1) that have been in force for less than the applicable period for taking an appeal and for which adequate provision as determined in accordance with GAAP has been made so long as execution is not levied thereunder and in respect of which Borrower shall at the time in good faith be prosecuting an appeal or proceedings for review and a suspending appeal bond in the full amount of such judgment or award shall have been obtained by Borrower with respect thereto, (vi) current liabilities of Borrower incurred in the ordinary course of business and not incurred through (A) the borrowing of money, or (B) the obtaining of credit except for credit on an open account basis customarily extended and in fact extended in connection with normal purchases of goods and services, (vii) endorsements for collection, deposits or negotiation and warranties of products or services, in each case incurred in the ordinary course of business, (viii) Indebtedness in respect of performance, surety or appeal bonds obtained in the ordinary course of the Business, and (ix) Indebtedness existing as of the Petition Date.

(b) Due on Sale, Consolidation, Merger, Sale of Assets, Dissolution, Etc. Borrower shall not (i) directly or indirectly merge into or with or consolidate with any other Person or permit any other Person to merge into or with or consolidate with it, or (ii) sell, assign, lease, license, transfer, abandon or otherwise dispose of any of the Collateral, except as authorized and approved by Lender (with all proceeds thereof being applied to the Obligations) and by the Bankruptcy Court and except as provided in an Acceptable Plan or an Acceptable Sales Process.

(c) Changes in Nature of Business. Borrower shall not engage in any business if, as a result, the general nature of the business which would then be engaged in by Borrower, considered as a whole, would be substantially changed from the Business.

(d) Change in Control. Borrower shall not allow any Change in Control to occur except pursuant an Acceptable Plan or an Acceptable Sales Process.

(e) Ownership of Subsidiaries. Borrower shall not acquire or cause to be formed any Subsidiaries.

(f)     Liens. Other than Permitted Liens, Lender's Liens with respect to the Pre-Petition loan(s), any recorded Liens of record and the Liens created pursuant to this Agreement and its approval by the Bankruptcy Court, Borrower shall not mortgage or encumber any of its Real Property or Personal Property or suffer any Liens to exist on any of its Real Property or Personal Property without the prior written consent of Lender.

(g)     No Contest. Borrower shall not contest the validity, legality, binding effect or priority of the DIP Loan Documents.

(h)     No Surcharge. Borrower shall not attempt to prosecute any surcharge against the Collateral under Section 506 of the Code or otherwise.

(i)     Sales of Assets. Borrower shall not consummate any sale of its assets, except (i) sales with Lenders' prior written consent, (ii) the sale of inventory in the ordinary course of business, and (iii) the sale or other disposition of any obsolete, excess, damaged or worn out equipment disposed of in the ordinary course of business.

(j)     Investments. Borrower shall not directly or indirectly make or own any investment, except (i) investments in cash and cash equivalents, (ii) permitted existing investments disclosed to Lender in an initial amount not greater than the amount thereof on the Effective Date, (iii) investments in trade receivables or received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business, and (iv) investments consisting of deposit accounts maintained by Borrower.

(k)     Contingent Obligations. The Borrower shall not make or suffer to exist any contingent obligation, except by endorsement of instruments for deposit or collection in the ordinary course of business.

(l)     Restricted Payments. The Borrower shall not declare or make any Restricted Payment.  IN ADDITION, BORROWER SHALL NOT MAKE ANY PAYMENT ON ACCOUNT OF, PURCHASE, DEFEASE, REDEEM, PREPAY, DECREASE OR OTHERWISE ACQUIRE OR RETIRE FOR VALUE ANY PRE-PETITION INDEBTEDNESS OTHER THAN, PRIOR TO THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT, PAYMENT OF (A) PRE-PETITION EMPLOYEE WAGES, BENEFITS AND RELATED EMPLOYEE TAXES AS OF THE PETITION DATE, (B) PRE-PETITION SALES, USE AND REAL PROPERTY TAXES, (C) AMOUNTS APPROVED IN ACCORDANCE WITH OTHER "FIRST DAY" ORDERS SATISFACTORY TO LENDER, AND (D) CURE AMOUNTS SATISFACTORY TO THE LENDER UNDER ASSUMED LEASES AND EXECUTORY CONTRACTS).

(m)     Acquisitions. The Borrower shall not make any Acquisitions.

(n)     Suspension of Business.  Borrower shall not voluntarily suspend the Business except in accordance with Borrower's historical practices relating to inventory calculation, maintenance outages and year-end holidays.

(o)     Dividends and Distributions.  Borrower shall not declare or pay any dividends on its capital stock, directly or indirectly purchase, redeem, or otherwise acquire shares of its capital stock, make any distributions of cash, property or assets to, any Person, other than distributions for the sole purpose of payment of income taxes actually due and payable to the extent such income taxes are attributable to ownership of stock of Borrower.

(p)     Related Party Transactions.  Borrower shall not, directly or indirectly, enter into or permit to exist any transaction, including, without limitation, any purchase, sale, lease, loan or exchange or property, with any shareholder, officer, director, parent (direct or indirect), Subsidiary (direct or indirect) or other Person or entity otherwise affiliated with Borrower, unless (i) such transaction otherwise complies with the provisions of this Agreement (including through an Acceptable Plan or an Acceptable Sales Process, (ii) such transaction is for the sale of goods or services rendered in the ordinary course of the Business and pursuant to the reasonable requirements of Borrower, and upon standard terms and conditions and fair and reasonable terms, no less favorable to Borrower than such entity could obtain in a comparable arms length transaction with an unrelated third party, and (iii) no Event of Default shall have occurred and remain outstanding at the time such transaction occurs, or would occur after giving effect to such transaction.

(q)     Capital Expenditures. Other than as provided in Section 2.14 of this Agreement, Borrower shall not expend, or be committed to expend, amounts for capital expenditures from and after the Effective Date until (A) all of the Obligations (other than contingent indemnity obligations) shall have been fully and indefeasibly paid and satisfied in cash and (B) all financing arrangements among Borrower and Lender pursuant to the DIP Loan Documents shall have been terminated.

(r)     Cancellation of Indebtedness. Without the prior written consent of Lender, Borrower shall not cancel any claim or debt owing to it.

(s)     Repayment of Indebtedness. Except as specifically permitted hereunder, Borrower shall not, without the express prior written consent of Lender or pursuant to an order of the Bankruptcy Court after notice and hearing, make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the filing of the Case that is subject to the automatic stay provisions of the Code whether by way of "adequate protection" under the Code or otherwise.

(t)     Reclamation Claims. Borrower shall not enter into any agreement to return any of its inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(g) of the Code or allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims

based upon any such return pursuant to Section 553(b)(l) of the Code or otherwise without Lender's prior written consent.

(u)     Chapter 11 Claims. Borrower shall not incur, create, assume, suffer to exist or permit any other super-priority administrative claim which is *pari passu* with or senior to the claims of Lender against Borrower, except as set forth herein, in the Interim Order or in the Final Order.

## ARTICLE VIII
## EVENTS OF DEFAULT; REMEDIES; RELIEF FROM STAY

8.1     Events of Default. The occurrence of any of the following events or circumstances shall constitute an event of default (each, an "Event of Default") hereunder:

(a)     subject to Lender's obligation to fund interest and Lender Fees pursuant to the terms of this Agreement, Borrower shall fail to pay any of the Obligations when due and such failure shall continue unremedied for three (3) Business Days after written notice thereof shall have been given to Borrower by Lender;

(b)     any representation or warranty of Borrower made in this Agreement, or in any other DIP Loan Document or in any certificate, agreement, instrument or statement furnished or made or delivered pursuant to this Agreement by Borrower or in connection herewith or therewith, shall prove to have been untrue or incorrect in any material respect when made or effected;

(c)     Borrower shall fail to perform or observe any term, covenant, or agreement (other than failure to pay when due any of the Obligations) contained in this Agreement or in any other DIP Loan Document, and such failure shall continue unremedied for fifteen (15) days after written notice thereof shall have been given to Borrower by Lender, or if Borrower shall fail to perform, or otherwise cause or permit a default under, any term, condition, provision or requirement contained in the Interim Order or the Final Order;

(d)     this Agreement or any of the other DIP Loan Documents shall at any time for any reason (other than cancellation by Lender) cease to be in full force and effect or shall be declared to be null and void by a court of competent jurisdiction, or if the validity or enforceability thereof shall be contested or denied by Borrower in writing, or if the transactions contemplated hereunder or thereunder shall be contested by Borrower;

(e)     the Case shall be dismissed or converted to a case under Chapter 7 of the Code, or Borrower shall file a motion or other pleading seeking the dismissal of the Case under Section 1112 of the Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Code, a responsible officer or an examiner with enlarged powers relating to the operation of the Business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Code) under Section 1106(b) of the Code shall be appointed in the Case and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof; or an application shall be filed by Borrower

- 35 -

for the approval of a superpriority claim in the Case that is senior to the claims of Lender against Borrower hereunder, or there shall arise or be granted any such senior claim;

(f)     other than the relief granted in favor of Lender under the Interim Order and the Final Order, the Bankruptcy Court shall (i) enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Code to the holder or holders of any Permitted Lien (A) to permit foreclosure or (B) to authorize the grant of a deed in lieu of foreclosure or the like in respect of any of the Collateral, unless the party seeking the entry of such order first satisfies any and all Liens created in favor of Lender under this Agreement through the payment to Lender of the Obligations, or (ii) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying the Interim Order or the Final Order, as applicable;

(g)     Borrower shall be in default under any Post-Petition Indebtedness, subject to any applicable cure period and except to the extent performance is excused by the Code;

(h)     the Final Order shall not have been entered by the Bankruptcy Court on or before March 15, 2010, or such other date as agreed to in writing by Lender in its sole discretion;

(i)     except as permitted by the Interim Order or the Final Order, as applicable, Borrower shall make any Pre-Petition Payment other than Pre-Petition Payments or adequate protection payments authorized by the Bankruptcy Court;

(j)     Borrower (or any successor in interest to Borrower, including, without limitation, any trustee in the Case) shall assert any claim for costs or expenses of administration of the Case against any of the Collateral, pursuant to Section 506(c) of the Code or otherwise;

(k)     any change having a Material Adverse Effect shall have occurred since the Effective Date; or

(l)     any default or event of default by Borrower under the Supply Agreement, the License Agreement or any other agreement between Borrower and Lender, IP or any of their Affiliates.

8.2    <u>Termination and Acceleration</u>. If an Event of Default shall have occurred, then Lender may, in its sole and absolute discretion, declare that any obligation of Lender to make Advances under this Agreement have terminated, whereupon such obligation shall immediately and forthwith terminate, and Lender may, in its sole and absolute discretion, declare all Obligations to be forthwith due and payable, whereupon all of the Obligations shall become and be immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Borrower, and exercise any and all other rights and remedies which it may have under any of the DIP Loan Documents or under applicable law; <u>provided, however</u>, that upon the occurrence of any event described in Section 8.1(e), the discretion of Lender to make Advances under this Agreement shall automatically terminate and

all Obligations shall automatically become immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Borrower, and Lender may exercise any and all other rights and remedies which it may have under any of the DIP Loan Documents or under applicable law.

8.3    Relief from Stay. Borrower acknowledges that pursuant to the Orders, effective at any time upon notice to the Bankruptcy Court filed by Lender, Lender has been granted full and complete relief from stay to pursue any and all remedies to which it may be entitled, including, without limitation, the right to demand immediate possession of the Collateral, or any portion thereof, and to liquidate the same in the manner provided by applicable law but with notice of any such action provided to the Bankruptcy Court and to any creditor of Borrower entitled to notice with respect to the Collateral. Prior to any such notice to the Bankruptcy Court, all Collateral shall remain property of the bankruptcy estates of Borrower, subject to disposition as provided in this Agreement.

8.4    General Remedies. Upon the occurrence of any Event of Default, Lender shall have, in addition to the rights and remedies given it by this Agreement and the other DIP Loan Documents, all those allowed by all applicable laws, including, without limitation, the Uniform Commercial Code. Without limiting the generality of the foregoing, Lender may immediately, without notice, except to the Bankruptcy Court and creditors entitled to notice in accordance with Section 8.3, sell at public or private sale or otherwise realize upon, the whole or, from time to time, any part of the Collateral, or any interest which Borrower may have in the Collateral, subject to the rights of holders of any senior Lien upon the Collateral.

8.5    Lender's Additional Rights and Remedies. Upon the occurrence of any Event of Default and except as may otherwise be prohibited or expressly provided for to the contrary under applicable law, in addition to any rights or remedies Lender may otherwise have under this Agreement, any other DIP Loan Documents, or under applicable laws, without notice, Lender shall have the right to take any or all of the following actions at the same or different times, in each case subject to the rights of holders of any senior Lien upon the Collateral; provided, however, that Lender shall provide prior or contemporaneous telephonic and electronic notice to any creditor of Borrower entitled to notice with respect to any affected Collateral and to the Bankruptcy Court in accordance with Section 8.3 of the exercise of any or all of the stated rights and remedies:

(a)    to cancel Lender's obligations arising under this Agreement;

(b)    to institute appropriate proceedings to specifically enforce performance of the terms and conditions of this Agreement;

(c)    to take immediate possession of the Collateral;

(d)    to appoint or seek appointment of a receiver, without notice and without regard to the solvency of Borrower or the adequacy of the security, for the purpose of preserving the Collateral, preventing waste, and to protect all rights accruing to Lender by virtue of this Agreement and the other DIP Loan Documents. All expenses incurred in connection with the appointment of such receiver, or in protecting, preserving, or

improving the Collateral, shall be charged against Borrower and shall be secured by Lender's Lien;

(e)     to proceed to perform any and all of the duties and obligations and exercise all the rights and remedies of Borrower contained in any contracts of Borrower as fully as Borrower could itself;

(f)     to require Borrower to open all mail only in the presence of a representative of Lender, who may take therefrom any remittance on the Collateral;

(g)     to exercise any and all rights and remedies of Borrower under or in connection with any contracts or otherwise in respect of the Collateral, including, without limitation, any and all rights of Borrower to demand or otherwise require payment of any amount under, or performance of any provision of, any contract or agreement forming a part of the Collateral;

(h)     to foreclose Lender's security interests in the Collateral by any available procedure under the DIP Loan Documents or pursuant to applicable law;

(i)     to charge interest on the Obligations at the Default Rate.

(j)     to enter upon the premises of Borrower or any other place or places where the Collateral is located and kept, and through self-help and without judicial process, without first obtaining a final judgment or giving Borrower notice and opportunity for a hearing on the validity of Lender's claim, without any pre-seizure hearing as a condition to repossession through court action and without any obligation to pay rent to Borrower, to remove the Collateral therefrom to the premises of Lender or any other location designed by Lender, for such time as Lender may desire, in order effectively to collect or liquidate the Collateral;

(k)     to collect, receive, appropriate, repossess and realize upon the Collateral, or any part thereof, and to sell, lease, assign, give option or options to purchase, or sell or otherwise dispose of and deliver the Collateral (or contract to do so), or any part thereof, in one or more parcels, at public or private sale or sales, at any exchange broker's board or at any of Lender's offices or elsewhere, at such prices as Lender may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  Lender shall have the right upon any such public sale or sales, and to the extent permitted by law, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption, which equity of redemption Borrower hereby releases.  Borrower waives all claims, damages, and demands against Lender arising out of the repossession, retention or sale of the Collateral;

(l)     to use, and to permit any purchaser of any of the Collateral from Lender to use without charge, Borrower's labels, general intangibles, and advertising matter or any property of a similar nature, as it pertains to, or is included in, any of the Collateral, in marketing for rent, advertising for sale, preparing for sale, or selling any Collateral, and

- 38 -

Borrower's rights under all licenses and all franchise agreements shall inure to the benefit of Lender;

(m)     to send any written notice to Borrower required by applicable law or this Agreement in the manner set forth in this Agreement; and any notice sent by Lender in such manner at least ten (10) Business Days (counting the date of sending) prior to the date of a proposed disposition of the Collateral shall be deemed to be reasonable notice (provided, however, that nothing contained in this Agreement shall be deemed to require ten (10) Business Days' notice if, under the applicable circumstances, a shorter period of time would be allowed under applicable law); and

(n)     to exercise, in addition to all other rights which it has under this Agreement or other applicable law, all of the rights and remedies of a secured party upon default under the Uniform Commercial Code or other applicable law.

8.6     No Limitation on Rights and Remedies. The enumeration of the powers, rights and remedies in this Article VIII shall not be construed to limit the exercise thereof to such time as an Event of Default occurs if, under applicable law or any other provision of this Agreement or any other DIP Loan Document, Lender has any of such powers, rights and remedies regardless of whether an Event of Default has occurred, and any limitation contained in this Agreement or in any of the other DIP Loan Documents as to Lender's exercise of any power, right or remedy for a period of time only during the continuance of an Event of Default shall only be applicable at such time as Lender shall have actual knowledge that such Event of Default is no longer continuing and for a reasonable time thereafter as may be necessary for Lender to cease the exercise of such powers, rights and remedies (it being expressly understood and agreed that until such time as Lender shall obtain such knowledge and after the expiration of such reasonable time, Lender shall have no liability whatsoever for the commencement of or continuing exercise of any such power, right or remedy).

8.7     Attorney-in-Fact. Borrower hereby constitutes and appoints Lender, or any other Person whom Lender may designate, as Borrower's attorney-in-fact (such appointment being coupled with an interest and being irrevocable until Lender's Liens and claims shall have been satisfied), at Borrower's sole cost and expense, to exercise any one or more of the following rights and powers at any time after the occurrence and during the continuance of an Event of Default (and all acts of such attorney-in-fact or designee taken pursuant to this Section are hereby ratified and approved by Borrower, and said attorney or designee shall not be liable for any acts or omissions nor for any error of judgment or mistake of fact or law); provided, however, that Lender shall provide prior or contemporaneous telephonic and electronic notice to Borrower and any creditor of Borrower entitled to notice with respect to any affected Collateral and to the Bankruptcy Court in accordance with Section 8.3 of the exercise of any or all of the stated rights and powers:

(a)     to sell or assign any of the Collateral upon such terms, for such amounts and at such time or times as Lender deems advisable, and to execute any bills of sale or assignments in the name of Borrower in relation thereto;

(b)     to take control, in any manner, of any item of payment on, or proceeds of, Collateral;

(c)     to prepare, file and sign Borrower's name on any proof of claim in bankruptcy or similar document against any customer of Borrower;

(d)     to prepare, file and sign Borrower's name on any notice of lien, assignment or satisfaction of lien or similar document in connection with the Collateral;

(e)     to sign or endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, warehouse receipt or similar document or agreement relating to the Collateral;

(f)     to use the information recorded on or contained in any data processing equipment and computer hardware and software relating to the Collateral to which Borrower has access;

(g)     to enter into contracts or agreements for the management of the Collateral and the further construction or completion thereof as said attorney-in-fact or designee or Lender may from time to time deem appropriate and charge Borrower's account for any costs thereby incurred;

(h)     to receive, take, endorse, assign and deliver in Lender's name or in the name of Borrower any and all checks, notes, drafts and other instruments;

(i)     to receive, open and dispose of all mail addressed to Borrower and to notify postal authorities to change the address for the delivery thereof to such address as Lender may designate; and

(j)     to do all acts and things necessary, in Lender's discretion, to fulfill Borrower's obligations under this Agreement and to otherwise carry out the purposes of this Agreement.

## ARTICLE IX
## MISCELLANEOUS

9.1     No Waiver. No failure or delay by Lender in exercising any right, remedy, power or privilege hereunder or under any other DIP Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The remedies provided in this Agreement and in the other DIP Loan Documents are cumulative and not exclusive of any remedies provided by law. Nothing in this Agreement contained shall in any way affect the right of Lender to exercise any statutory or common law lien or right of setoff.

9.2     Right of Setoff. Upon the occurrence and during the continuance of any Event of Default, Lender is hereby authorized at any time and from time to time, without notice to Borrower (any such notice being expressly waived by Borrower) and to the fullest extent permitted by law, to setoff and apply any and all deposits (general or special, time or demand,

provisional or final) at any time held by Lender and any and all other indebtedness at any time owing by Lender or its affiliates to or for the credit or account of Borrower, including, without limitation, amounts owed by IP to Borrower under the Supply Agreement, against any and all of the Obligations. Lender agrees to promptly notify Borrower after any such setoff and application made by Lender; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application. The rights of Lender under this Section 9.2 are in addition to any other rights and remedies (including, without limitation, other rights of setoff) which Lender may have. Nothing contained in this Agreement or any other DIP Loan Document shall impair the right of Lender to exercise any right of setoff or counterclaim it may have against Borrower and to apply the amount subject to such exercise to the payment of indebtedness of Borrower unrelated to this Agreement or the other DIP Loan Documents.

9.3    Costs and Expenses. Borrower agrees to pay Lender upon demand (a) any and all out-of-pocket costs and expenses and all reasonable attorneys' or other Professionals' fees of Lender in connection with the preparation, documentation, negotiation, execution, amendment, modification, administration, extension and/or renewal of the DIP Loan Documents and the analysis or negotiation of any aspect of the related transactions, (b) obtaining the approval of the DIP Loan Documents by the Bankruptcy Court, (c) the preparation and review of pleadings, documents and reports related to the Case and any subsequent case under Chapter 7 of the Code, attendance at meetings, court hearings or conferences related to the Case and any subsequent case under Chapter 7 of the Code, and general monitoring of the Case and any subsequent case under Chapter 7 of the Code, (d) out-of-pocket costs and expenses and all reasonable attorneys' fees of Lender in connection with the preparation of any waiver or consent hereunder or under any DIP Loan Document, (e) if an Event of Default occurs, all out-of-pocket costs and expenses and all reasonable attorneys' fees incurred by Lender in connection with such Event of Default and collection and other enforcement proceedings resulting therefrom, (f) actual costs, internal charges and out-of-pocket expenses (including, without limitation, reasonable attorneys' and paralegals' fees and time charges of attorneys and paralegals for Lender, which attorneys and paralegals may be employees of Lender) paid or incurred by Lender in connection with the collection of the Obligations and enforcement of the DIP Loan Documents, and (g) other reasonable attorneys' or Professionals' fees and out-of-pocket costs and expenses incurred by Lender relating to or arising out of or in connection with this Agreement or any of the other DIP Loan Documents. Borrower further agrees to pay or reimburse Lender for any stamp or other taxes or costs which may be payable with respect to the execution, delivery, recording and/or filing of any of the DIP Loan Documents.  In addition, Borrower agrees to reimburse Lender, promptly after Lender's request therefor, for each audit, or other business analysis performed by or for the benefit of Lender in connection with this Agreement or the other DIP Loan Documents in an amount equal to Lender's then customary charges for each person employed to perform such audit or analysis, plus all reasonable costs and expenses (including, without limitation, travel expenses) incurred by Lender in the performance of such audit or analysis. All of the obligations of Borrower under this Section. 9.3 shall survive the satisfaction and payment of the Obligations and the termination of this Agreement.

9.4    Environmental Indemnity. Borrower hereby agrees to indemnify Lender, and the officers, directors, employees, agents and affiliates of Lender (collectively, the "Indemnitees") and hold the Indemnitees harmless from and against any and all losses, liabilities, damages, injuries, costs, expenses and claims of any and every kind whatsoever (including, without

- 41 -

limitation, reasonable court costs and attorneys' fees and expenses) which at any time or from time to time may be paid, incurred or suffered by the Indemnitees, with respect to or as a direct or indirect result of (i) the violation by Borrower of any Environmental Laws and (ii) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from, properties owned or operated by Borrower of any hazardous substances or any other hazardous or toxic waste, substance or constituent or other substance (including, without limitation, any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under the Environmental Laws). The provisions of and undertakings and indemnification set out in this Section. 9.4 shall survive the satisfaction and payment of the Obligations and the termination of this Agreement; provided that Borrower shall have no obligation to an Indemnitee hereunder with respect to indemnified liabilities arising from the gross negligence or willful misconduct of that Indemnitee. All sums due Lender hereunder shall be obligations of Borrower, due and payable immediately without demand.

9.5     General Indemnity. In addition to the payment of expenses pursuant to Section 9.3, whether or not the transactions contemplated hereby shall be consummated, Borrower hereby agrees to indemnify and pay the Indemnitees and hold the Indemnitees harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnitees shall be designated a party thereto), that may be imposed on, incurred by or asserted against the Indemnitees due to (a) an event or claim in any manner relating to or arising out of this Agreement or any of the other DIP Loan Documents, (b) the use or intended use of the proceeds of any Advance hereunder, and (c) the management, operation and development of the Collateral and the Business (collectively, the "Indemnified Liabilities"); provided, however, that Borrower shall have no obligation to an Indemnitee hereunder with respect to Indemnified Liabilities arising from the gross negligence or willful misconduct of that Indemnitee. To the extent that the undertaking to indemnify, pay and hold harmless set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. The provisions of the undertakings and indemnification set out in this Section 9.5 shall survive satisfaction and payment of the Obligations and the termination of this Agreement. All sums due Lender hereunder shall be obligations of Borrower, due and payable immediately without demand.

9.6     Authority to Act. Lender shall be entitled to act on any notices and instructions (telephonic or written) believed by Lender in good faith to have been sent or delivered by any person identifying himself as Borrower's Representative, regardless of whether such notice or instruction was in fact delivered by such person, and Borrower hereby agrees to indemnify the Indemnities and hold the Indemnities harmless from and against any and all losses and expenses, if any, ensuing from any such action.

9.7     Notices. All notices and other communications given or made pursuant to this Agreement will be in writing and shall be given by personal delivery, sent by a nationally recognized and reputable overnight courier service or sent by facsimile transmission to the

- 42 -

parties at the following addresses (or at such other address for a party as is specified by like changes of address):

<div style="margin-left: 2em;">

To Borrower:     Mississippi River Corporation
150 E. Wilson Bridge Road
Suite 250
Worthington, Ohio 43085
Attn: Edward S. Logan, III
Fax No.: (614) 846-7893
Telephone No.: (601) 445-1835

with a copy to:     Harris, McClellan, Binau & Cox PLL
37 W. Broad Street, Suite 950
Columbus, Ohio 43215
Attn: John H. Kozich, Esq.
Fax No.: (614) 464-2245
Telephone No.: (614) 464-2572

and a copy to:     Allen Kuehnle Stovall & Neuman LLP
17 S. High Street
Suite 1220
Columbus, Ohio 43215-3441
Attn: Thomas R. Allen, Esq.
Fax No.: (614) 221-5988
Telephone No.: (614) 221-8500

To Lender:     Supplier Finance Company, LLC
c/o International Paper Company
6400 Poplar Avenue
Memphis, Tennessee 38197
Attn: Damien J Bukowy
Fax No.: (901) 214-9950
Telephone No.: (901) 419-1714

with a copy to:     Supplier Finance Company, LLC
c/o International Paper Company
6400 Poplar Avenue
Memphis, Tennessee 38197
Attn: Matthew L. Barron, Esq.
Fax No.: (901) 214-3488
Telephone No.: (901) 419-4332

</div>

| with a copy to: | Parker Poe Adams & Bernstein LLP |
| | 200 Meeting Street, Suite 301 |
| | Charleston, South Carolina 29401 |
| | Attn: James S. Bruce, Esq. |
| | Fax No.: (843) 727-2680 |
| | Telephone No.: (843) 727-2657 |
| | |
| and a copy to: | Graydon Head & Ritchey LLP |
| | 1900 Fifth Third Center |
| | 511 Walnut Street |
| | Cincinnati, OH 45202 |
| | Attn: J. Michael Debbeler, Esq. |
| | Fax No.: (513) 651-3836 |
| | Telephone No.: (513) 621-6464 |

Notice shall be deemed received (a) on the Business Day following the date on which it is deposited with a nationally recognized and reputable overnight courier service, (b) on the date on which it is delivered personally, and (c) when sent by facsimile with confirmation of receipt received by sender. In addition, all notices delivered pursuant to this Section 9.7 shall be accompanied by a contemporaneous courtesy telephone call to the other parties.

9.8    Governing Law; Waiver of Jury Trial. This Agreement and all of the other DIP Loan Documents shall be governed by and construed in accordance with the internal laws of the State of New York, the Code, and United States federal laws, as applicable. BORROWER AND LENDER IRREVOCABLY WAIVE THE RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION IN WHICH BORROWER AND LENDER ARE PARTIES RELATING TO OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER DIP LOAN DOCUMENTS. BORROWER AND LENDER AGREE THAT THE BANKRUPTCY COURT SHALL RETAIN JURISDICTION OVER ALL CASES, CONTROVERSIES OR DISPUTES ARISING UNDER THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT, AND THAT THE EXCLUSIVE VENUE OF ANY SUCH MATTERS SHALL BE IN THE BANKRUPTCY COURT.

9.9    Amendments and Waivers. Any provision of this Agreement or any of the other DIP Loan Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by Borrower and Lender; provided, however, that Lender may in its sole discretion waive any provision of this Agreement or any of the other DIP Loan Documents without the necessity of a writing signed by Borrower.

9.10    References; Headings for Convenience. Unless otherwise specified in this Agreement, all references in this Agreement to Article and Section numbers refer to Article Section numbers of this Agreement and all references in this Agreement to Exhibits or Schedules refer to the Exhibits and Schedules that are annexed to this Agreement; such Exhibits and Schedules also are incorporated into this Agreement by the references to such Exhibits and Schedules in this Agreement. The Article and Section headings are furnished for the convenience of the parties and are not to be considered in the construction or interpretation of this Agreement. The words "in this Agreement," "hereof," "herein" and "hereunder" and words of similar import

- 44 -

when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

9.11    Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns, except that Borrower may not assign or otherwise transfer any of its rights or delegate any of its obligations under this Agreement.

9.12    NO ORAL AGREEMENTS, ENTIRE AGREEMENT. ORAL AGREEMENTS OR COMMITMENTS TO LEND MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT, INCLUDING, WITHOUT LIMITATION, PROMISES TO EXTEND OR RENEW SUCH DEBT, ARE NOT ENFORCEABLE, AND TO PROTECT BORROWER AND LENDER FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENT REACHED BY BORROWER AND LENDER COVERING SUCH MATTERS ARE CONTAINED IN THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS, WHICH AGREEMENT AND OTHER DIP LOAN DOCUMENTS ARE A COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN BORROWER AND LENDER, EXCEPT AS BORROWER AND LENDER MAY LATER AGREE IN WRITING TO MODIFY THEM. THIS AGREEMENT EMBODIES THE ENTIRE AGREEMENT AND UNDERSTANDING BETWEEN THE PARTIES TO THIS AGREEMENT AND SUPERSEDES ALL PRIOR AGREEMENTS AND UNDERSTANDINGS (ORAL OR WRITTEN) RELATING TO THE SUBJECT MATTER HEREOF.

9.13    Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation. If the Bankruptcy Court declares that any term or provision hereof is invalid or unenforceable, the parties hereto agree that the Court shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

9.14    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. It shall not be necessary that all parties execute the same counterpart.

9.15    Resurrection of the Obligations. To the extent that Lender receives any payment on account of any of the Obligations, and any such payment or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside, subordinated and/or required to be repaid to a trustee, receiver or any other Person under any contract, bankruptcy act, state or federal law, common law or equitable cause, then, to the extent of such payment received, the Obligations or part thereof intended to be satisfied and any and all Liens upon or pertaining to any Collateral and created and/or existing prior to such time in favor of Lender as security for the payment of such Obligations shall be revived and continue in full force and effect, as if such payment had not been received by Lender and applied on account of the Obligations.

- 45 -

9.16    No Third Party Beneficiaries. This Agreement is solely for the benefit of the parties and is not a stipulation for the benefit of any other Person except for any successor or assignee of Lender.

9.17    Independence of Covenants. All of the covenants contained in this Agreement and the other DIP Loan Documents shall be given independent effect so that if a particular action, event or condition is prohibited by any one of such covenants, the fact that it would be permitted by an exception to, or otherwise be in compliance within the provisions of, another covenant shall not avoid the occurrence of a Default or Event of Default if such action is taken, such event occurs or such condition exists.

9.18    Conflicting Provisions. In the event any of the terms and provisions of this Agreement conflict with any terms and provisions contained in any other DIP Loan Document, the terms and provisions of this Agreement shall govern; provided that, nothing in this Agreement shall be construed to limit the Collateral encumbered by the DIP Loan Documents.

9.19    Effectiveness of Agreement. This Agreement and the other DIP Loan Documents shall be binding and effective only upon entry of, and pursuant to the authority granted by, the Interim Order and, when entered, the Final Order.

9.20    No Usurious Amounts.  Notwithstanding anything contained herein to the contrary, Borrower does not agree and shall not be obligated to pay interest hereunder at a rate which is in excess of the maximum rate permitted by applicable federal or state law. If by the terms of this Agreement or any other DIP Loan Document, Borrower is at any time required to pay interest at a rate in excess of such maximum rate, the rate of interest hereunder, or thereunder, shall be deemed to be immediately reduced to such maximum legal rate and the portion of all prior interest payments in excess of such maximum legal rate shall be applied to and shall be deemed to have been payments in reduction of the outstanding principal balance of the Loans.  Borrower agrees that in determining whether or not any interest payable under this Agreement or any other DIP Loan Documents exceeds the highest rate permitted by law, any non-principal payment, including, without limitation, late charges, shall be deemed to the extent permitted by law to be an expense, fee or premium rather than interest.

9.21    Obligations and Liabilities of Lender.  Lender shall not be deemed to have assumed any liability or responsibility to Borrower or any third Person for the correctness, validity or genuineness of any instruments or documents that may be released or endorsed to Borrower by Lender (which shall automatically be deemed to be without recourse to Lender in any event), or for the existence, character, quantity, quality, condition, value or delivery of any goods purporting to be represented by any such documents; and Lender, by accepting such security interest in the Collateral, or by releasing any Collateral to Borrower, shall not be deemed to have assumed any obligation or liability to any supplier or account debtor or to any other third party, and Borrower agrees to indemnify and defend Lender and hold it harmless in respect to any claim or proceeding arising out of any matter referred to in this Section 9.21.

9.22    Cooperation of Borrower. Upon reasonable request by Lender, Borrower shall provide such information or assistance as may be necessary or appropriate to the successful management and improvement (and sale, upon Bankruptcy Court approval) of the Collateral and

the Business, it being acknowledged that Borrower may have information, expertise or ownership of assets useful in connection with the management and improvement of the Collateral and the Business. Borrower shall provide full access to Lender of all such books, records, plans, specifications, permits, trademarks, trade names and similar assets, as well as all documents and data, as may be necessity for the continued management, development and sale of the Collateral and/or the Business as presently marketed and branded, and shall execute such documents confirming such rights as Lender may reasonably request.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Borrower and Lender have caused this Agreement to be properly executed and delivered as of the date first written above.

**BORROWER:**

MISSISSIPPI RIVER CORPORATION

By:_____

     Name:

     Title:

**LENDER:**

SUPPLIER FINANCE COMPANY, LLC

By:_____

     Name:

     Title:

## Exhibit A

### Form of Interim Order

*See attached.*

# Exhibit B

## Legal Description

*See attached.*

## Exhibit C-1

## Form of Revolving Note

REVOLVING PROMISSORY NOTE

$4,000,000.00                                        February __, 2010

FOR VALUE RECEIVED, MISSISSIPPI RIVER CORPORATION, an Ohio corporation, as a debtor-in-possession under Chapter 11 of the Code ("Borrower"), promises to pay to the order of SUPPLIER FINANCE COMPANY, LLC, a Delaware limited liability company ("Lender"), the principal sum of Four Million Dollars ($4,000,000), or if different from such amount, the aggregate unpaid principal amount of all Advances under the Revolving Loan made by Lender to Borrower pursuant to Article II of the Credit Agreement identified and defined below, together with interest thereon at the rates set forth in the Credit Agreement. Such payments shall be made in immediately available funds on the dates and in the manner specified in the Credit Agreement, together with interest on the unpaid principal amount hereof at the rates and on the dates determined in accordance with the Credit Agreement. Borrower shall pay the principal of (together with the accrued and unpaid interest on) the Advances under the Revolving Loan in full on the Termination Date and as otherwise set forth in the Credit Agreement.

Lender is hereby authorized to record on a schedule attached hereto, or otherwise record in accordance with its usual practice, the date and amount of each Advance under the Revolving Loan and the date and amount of each principal payment hereunder.

This Revolving Promissory Note (this "Note") is executed and delivered under and pursuant to, and is entitled to the benefits of, that certain Senior Secured, Super-Priority Debtor-In-Possession Credit and Security Agreement dated as of the date hereof (as amended, modified, supplemented or restated from time to time, the "Credit Agreement") by and between Borrower and Lender. Reference is hereby made to the Credit Agreement for a statement of the terms and conditions governing this Note, including the terms and conditions under which this Note may be prepaid or its maturity date accelerated. Each capitalized term used herein and not defined herein shall have the meaning ascribed thereto in the Credit Agreement. The Credit Agreement, among other things, provides for the making of Advances under the Revolving Loan by Lender to Borrower from time to time on a revolving basis, in an aggregate principal amount at any one time outstanding not to exceed the Revolving Credit Availability at such time. At no time shall the amount of the Revolving Loan exceed the Aggregate Revolving Loan Commitment.

This Note is secured by the Collateral.

Borrower hereby waives presentment, demand, protest and notice of any kind. No failure to exercise, and no delay in exercising, any rights hereunder on the part of the holder hereof shall operate as a waiver of such rights.

This Note shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the day and year first set forth above.

MISSISSIPPI RIVER CORPORATION

By:_____
    Name:
    Title:

# Exhibit C-2

## Form of Term Note

TERM PROMISSORY NOTE

$3,100,000.00                                                    February ___, 2010

FOR VALUE RECEIVED, MISSISSIPPI RIVER CORPORATION, an Ohio corporation, as a debtor-in-possession under Chapter 11 of the Code ("Borrower"), promises to pay to the order of SUPPLIER FINANCE COMPANY, LLC, a Delaware limited liability company ("Lender"), the principal sum of Three Million One Hundred Thousand Dollars ($3,100,000), or if different from such amount, the aggregate unpaid principal amount of the Term Loan made by Lender to Borrower pursuant to Article II of the Credit Agreement identified and defined below, together with interest thereon at the rates set forth in the Credit Agreement.. Such payments shall be made in immediately available funds on the dates and in the manner specified in the Credit Agreement, together with interest on the unpaid principal amount hereof at the rates and on the dates determined in accordance with the Credit Agreement. Borrower shall pay the principal of (together with the accrued and unpaid interest on) the Term Loan in full on the Termination Date and as otherwise set forth in the Credit Agreement.

Lender is hereby authorized to record on a schedule attached hereto, or otherwise record in accordance with its usual practice, the date and amount of each principal payment hereunder.

This Term Promissory Note (this "Note") is executed and delivered under and pursuant to, and is entitled to the benefits of, that certain Senior Secured, Super-Priority Debtor-In-Possession Credit and Security Agreement dated as of the date hereof (as amended, modified, supplemented or restated from time to time, the "Credit Agreement") by and between Borrower and Lender. Reference is hereby made to the Credit Agreement for a statement of the terms and conditions governing this Note, including the terms and conditions under which this Note may be prepaid or its maturity date accelerated. Each capitalized term used herein and not defined herein shall have the meaning ascribed thereto in the Credit Agreement. The Credit Agreement, among other things, provides that the Term Loan is not a revolving loan and amounts repaid under the Term Loan may not be re-borrowed.

This Note is secured by the Collateral.

Borrower hereby waives presentment, demand, protest and notice of any kind. No failure to exercise, and no delay in exercising, any rights hereunder on the part of the holder hereof shall operate as a waiver of such rights.

This Note shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the day and year first set forth above.

MISSISSIPPI RIVER CORPORATION

By:_____
    Name:
    Title:

# Exhibit D

## Budget

*See attached.*

## Schedule 6.6

## Tax Matters

DELINQUENT REAL ESTATE TAXES DUE TO ADAMS COUNTY, MISSISSIPPI FOR 2008 AND 2009 IN THE ESTIMATED AMOUNT OF $658,000.00

FRANCHISE TAXES DUE TO THE STATE OF MISSISSIPPI IN THE ESTIMATED AMOUNT OF $2,900.00

SALES TAXES DUE TO STATE OF MISSISSIPPI FOR OCTOBER, 2009 THROUGH JANUARY, 2010 IN THE AMOUNT OF $14,758.00

## Schedule 6.9

## Environmental Matters

NONE

## Schedule 6.10

## Litigation


NATIONWIDE FREIGHT SYSTEMS, INC. V. NORTH AMERICAN PAPER COMPANY
CASE NO. 10M3000141, CIRCUIT COURT OF COOK COUNTY, ILLINOIS, THIRD MUNICIPAL
DISTRICT

BALCONES RECYCLING V. MISSISSIPPI RIVER CORPORATION
CASE NO. 09CV-09-13388, FRANKIN COUNTY COMMON PLEAS COURT, COLUMBUS, OHIO

WATKINS & EAGER JANUARY 26,2010 DEMAND LETTER REGARDING MISSISSIPPI RIVER
CORPORATION DEBT TO R.W. DELANEY CONSTRUCTION, INC.

***INTERNATIONAL PAPER AND SUPPLIER FINANCE COMPANY, LLC***

International Paper Company
c/o James Bruce, Esq.
Parker Poe
200 Meeting Street, Suite 301
Charleston, SC  29401-3156
*Counsel for International Paper Company*

International Paper Company, LLC
c/o Cara R. Hurak, Esq.
Graydon Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH  45202
*Counsel for International Paper*

Supplier Finance Company, LLC
c/o James Bruce, Esq.
Parker Poe
200 Meeting Street, Suite 301
Charleston, SC  29401-3156
*Counsel for Supplier Finance Company, LLC*

Supplier Finance Company, LLC
c/o J. Michael Debbeler, Esq.
Graydon Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH  45202
*Counsel for Supplier Finance Company, LLC*

***MISSISSIPPI RECYCLING COMPANY, LLC***

Mississippi Recycling Company, LLC
c/o John Kozich, Esq.
Harris McClellan Binau & Cox, PLL
37 West Broad Street, Suite 950
Columbus, OH  43215-4159

***TOP 20 UNSECURED CREDITORS***

Balcones Recycling
Attn:  Rusty Getter
13921 Senlac Drive, Suite 20
Farmers Branch, TX 75234

Burrows Paper Corp.
501 West Main Street
Little Falls, NY 13365

Caraustar Recovered Fiber Group
Attn: Greg Cottrell
5000 Austell Power Springs Road #300
Austell, GA 30106

Continental Paper Grading
Attn:  Marck St. Cyr
1623 South Lumber
Chicago, IL  60616

Corrugated Services
Attn:  Marty Rusk
855 East Highway 80
Forney, TX  75126-0847

Dedicated Logistical Svc., Inc.
Attn:  Gary
236 Grand Steeple Drive
Collierville, TN  38017

Harcros Chemicals
Attn:  Rick Wingo
1496 Highway 150
Bessemer, AL 35022

Ideal Chemical & Supply Co.
Attn:  Tammy Mathis
4025 Air Park Street
Memphis, TN 38118

International Dioxcide Inc.
Attn:  Pam Rossi
40 White Cap Drive
North Kingstown, RI 02852

International Paper Company
Attn:  Damien Bukowy
6400 Poplar Avenue
Memphis, TN  38197

Kemira Chemicals
Attn:  Jo Jaeger
316 Municipal Airport
Bartow, FL 33830

Medina Paper
Attn:  Dan O'Connor
370 Lake Road
Medina, OH  44256

Mid America Recycling
Attn:  Cliff Ladzinski
552 S. Washington St. #120
Naperville, IL 60540

Midwest Fibre Sales Corp.
Attn:  Alan Wilcox
911 N. Farm Road 123
Springfield, MO  65802

MST Express, Inc.
125 Snyder
New Albany, MS 38652

R.W. Delaney Construction Co..
Attn:  Doug
155 River Terminal Road
Natchez, MS  39120

Recycling Services, Inc.
Attn: John Hart
2426 Broadway
Alexandria, LA 71302

Rock-Tenn
Attn:  Scott Campbell
504 Thrasher Street
Norcross, GA  30071

Total Logistics, Inc.
PO Box 2060
Jackson, MS 39225

Waste Management
W 132 B10487 Grant Drive
Germantown, WI  53022

## *U.S. SECURITIES AND EXCHANGE COMMISSION*

U.S. Securities & Exchange Commission
175 W. Jackson Blvd., #900
Chicago, IL  60604

## *THE INTERNAL REVENUE SERVICE*

Internal Revenue Service
Insolvency Group
PO Box 21126
Philadelphia, PA 19114

## *ALL STATE AND LOCAL TAXING AUTHORITIES CONCERNING THE DEBTOR*

State of Ohio, Department of Taxation
Attn.: Bankruptcy Division
PO Box 530
Columbus, OH  43266-0030

Ohio Bureau of Workers' Compensation
Attn: Law Section Bankruptcy Unit
PO Box 15667
Columbus, OH  43215-5667

Ohio Department of Job and Family Services
Revenue Recovery – Litigation
PO Box 182404
Columbus, OH  43218-2404

Ohio Attorney General
State Office Tower
30 E. Broad Street, 17th Floor
Columbus, Ohio 43215-3428

Mississippi Tax Commission
1577 Springridge Road
Raymond, MS 39154

Reynolds Atkins, Tax Assessor
Adams County Courthouse
1 Old Courthouse Road
Natchez, MS 39121

Adams County Board of Commissioners
PO Box 1008
Natchez, MS  39121

<div align="center">###</div>