# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No. 10-51480 |
| MISSISSIPPI RIVER CORPORATION, | : | Chapter 11 |
| Debtor. | : | Judge John E. Hoffman Jr. |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF DEBTOR, MISSISSIPPI RIVER CORPORATION, FOR AN ORDER (1) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL ITS ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES WITH CERTAIN EXCEPTIONS UNDER ASSET PURCHASE AGREEMENT, SUBJECT TO HIGHER AND BETTER OFFERS; (2) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH; (3) APPROVING PROCEDURES FOR AN AUCTION; (4) SCHEDULING AN AUCTION AND HEARING DATE RELATING THERETO; (5) APPROVING BREAK-UP FEE; AND (6) APPROVING THE FORMS OF <u>NOTICE RELATING TO SALE AND BIDDING PROCEDURES</u>**
**(Related to Doc. No. 13)**

The Official Committee of Unsecured Creditors appointed in the above-captioned Chapter 11 case (the "Committee"), through its proposed counsel Schottenstein, Zox & Dunn Co., LPA, hereby submits its objection (the "Objection") to the entry of an order approving items (3)–(6) in the Debtor's Motion for an Order: (1) Authorizing the Sale of Substantially All Its Assets Free and Clear of Liens, Claims, and Encumbrances with Certain Exceptions Under Asset Purchase Agreement, Subject to Higher and Better Offers; (2) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; (3) Approving Procedures for an Auction; (4) Scheduling an Auction and Hearing Date Relating Thereto; (5) Approving Break-up Fee; and (6) Approving the Forms of Notice Relating to Sale

and Bidding Procedures [Doc. No. 13] (the "Sale Motion"), reserving its right to object to items (1) and (2) on or before the response deadline, which has not been set.[1]

## PROCEDURAL BACKGROUND

1. On February 16, 2010 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor, an Ohio corporation with its headquarters in Worthington, Ohio, is operating its business as a Debtor-in-Possession under Sections 1107(a) and 1108 of the Bankruptcy Code.

2. On the Petition Date the Debtor filed the Sale Motion, which seeks authority to sell substantially all of its assets to Mississippi Recycling Company, LLC ("Buyer" or "Stalking Horse Bidder"). The Debtor acknowledges that the Buyer is owned by three individuals who are insiders of the Debtor (the "Insiders"). (*See* Sale Motion at ¶ 40.) As identified in paragraph 40 of the Sale Motion, the Insiders are: Sharon Logan (the spouse of the Debtor's President and Chief Executive Officer Edward S. Logan, III); Gerald Lynn Patt (the Debtor's Vice-President of Manufacturing); and Tanya Smith Richardson (the Debtor's Product Development/Process Manager).

3. Under the terms of the proposed Asset Purchase Agreement ("APA") between the Debtor and the Buyer, the Buyer would become a "stalking horse bidder," would be deemed to be a qualified bidder, and in the event no other bidders make a qualified bid, would become the purchaser of the Debtor's assets for a $8,138,213.54 purchase price, subject to certain adjustments. (*See* APA § 4.) In the event that the Buyer does not become the purchaser of the

---

[1] The Notice of the Sale Motion filed at Doc. No. 22 indicates that the Debtor is currently seeking an Order only on items 3–6 (the "Sale Procedures") and will separately notice an objection deadline and hearing on items 1–2 (the "Sale"). To the extent this Objection does not address the Sale, the Committee reserves its right to further object to the Sale at such time as the Debtor seeks entry of an Order to approve the Sale. The Committee further reserves the right to incorporate by reference the arguments contained herein into any later-filed objection to the Sale. The failure to object to the Sale herein in no way constitutes a waiver of any objection the Committee may make at such time as the Debtor seeks this Court's approval of the Sale.

{H1830948.1 }  2

Debtor's assets, the APA proposes to pay the Buyer a $138,000 break-up fee (the "Break-Up Fee"). (*See* APA § 7(b)(vi).)

4. Also on the Petition Date, the Debtor filed a Motion for Interim and Final Orders: (1) Authorizing Debtor to Obtain Secured Post-Petition Financing and Use of Cash Collateral; (2) Granting Adequate Protection; (3) Modifying the Automatic Stay; (4) Setting Final Hearing; and (5) Granting Related Relief (the "Financing Motion") [Doc. No. 5].

5. On February 19, 2010, this Court entered an Interim Order: (I) Authorizing Debtor to Obtain Secured Post-Petition Financing and Use Cash Collateral; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Setting Final Hearing; and (V) Granting Related Relief (the "Interim Order") [Doc. No. 40]. Via the Interim Order, the Court set the Final Hearing on the Financing Motion for March 15, 2010 at 2:00 P.M. The result of the Final Hearing on the Financing Motion was that the Committee, the Debtor, and the Lender agreed to submit an Agreed Order to the Court reflecting the Court's concerns voiced at the Final Hearing.

6. Shortly before the Petition Date, the Debtor's primary lender was The CIT Group/Equipment Financing, Inc. ("CIT"). (*See* Sale Motion at ¶ 13.) According to the Sale Motion, just over a week before the Petition Date, CIT sold, assigned and transferred substantially all, but not all, of its interests under the Senior Secured Loan Documents[2] to Supplier Finance Company, LLC ("Lender"), which is a wholly owned subsidiary of International Paper Company ("International Paper"). (*See* Sale Motion at ¶ 15.) Under the terms of the APA, if the Stalking Horse Bidder is the ultimate purchaser of the Purchased Assets, then included in the purchase price will be the assumption of the loans to the Debtor from the

---

[2] As defined in the Sale Motion. All capitalized terms used but not defined herein have the meanings given in the Sale Motion or the APA.

Lender (which are the subject of the Financing Motion). (*See* Sale Motion at 11, ¶ 21.) If this Court enters a Final Order granting the relief sought in the Financing Motion and approves the sale of the Debtor's assets to the Stalking Horse Bidder, Lender will have financed not only the Debtor's pre-petition and post-petition debt, but the sale of the Debtor's assets to insiders of the Debtor. Furthermore, allowing the Lender to have its debt assumed by the Stalking Horse Bidder as part of the sale price effectively allows the Lender to use the Bankruptcy Code to credit bid on the Debtor's assets.

7. The United States Trustee's office filed a Notice of Appointment of Committee of Unsecured Creditors on February 24, 2010 [Doc. No. 47]. The members of the Committee are seven (7) trade creditors of the Debtor. The Committee contacted and engaged their proposed counsel on Monday, March 8, 2010. Proposed Counsel for the Committee has not had a significant opportunity to discuss or attempt to negotiate the relief sought in the Sale Motion with the Debtor or Buyer.

## THE OBJECTIONS

A. **The Bid Procedures and APA May Chill Competing Bids**

*The Bid Procedures Should be Modified to Allow Qualified Bidders to Submit Bids for Some, but not all of the Purchased Assets*

8. Included within the list of Purchased Assets is: (i) a condominium in Bridgeport, West Virginia used for entertainment of the Debtor's customers; (ii) office space in Appleton, Wisconsin, which is being currently rented month to month after the lease expired in December 2004; (iii) office space in Worthington, Ohio; and (iv) a leased apartment in Natchez, Mississippi. (*See* APA § 1(a), (c); APA Schedules 1(a) & 1(c).) In addition, the Debtor seeks to assign its interest in leases of personal property, including but not limited to office equipment (at

locations which are not specified in the Debtor's papers) and a 2007 Nissan Altima. (*See* APA, § 1(e); APA Schedules 1(e).)

9. As a package, the list of the Purchased Assets may have value to a buyer with principals related to the Debtor and which desires to conduct its business exactly as the Debtor did pre-petition. However, other possible bidders (with existing office space) who are interested only in the core set of assets required to operate the Natchez Mill are likely to have no interest in buying assets and assuming contracts and leases not necessary to operate the mill. By requiring that the these extraneous property interests be sold together with the core paper mill assets, the Debtor has created a disincentive to bidders other than the Stalking Horse because those bidders may be forced to pay value for assets it does not want or need. The inability of any potential bidder to carve out assets it does not want to purchase is a disincentive to bid on the assets as a whole. The Bid Procedures should permit potential buyers to submit bids for some or all of the Purchased Assets as part of the 363 Sale.

10. Likewise, the Bid Procedures should provide that Qualified Bids will be evaluated based on the comparative price and terms for the property sought to be acquired by the Qualified Bidder. While it is easier to evaluate bids which are for all of the Debtor's assets and, on its face, there appears to be value in selling all of the Debtor's assets, this is not necessarily the case. For example, the Committee has been contacted by a potential bidder that will pay comparative value for the Debtor's assets as long as it is not required to assume all of the Debtor's executory contracts and unexpired leases. This bidder obviously deems it more valuable, should it be the successful bidder, that it keep its options open with respect to the Debtor's suppliers and customers. The Bid Procedures should provide some flexibility to the Debtor, Committee and/or Lender to evaluate competing bids for less than the entire list of the Purchased Assets.
{H1830948.1}                                5

11. In addition, the Bid Procedures and APA should not require that the Debtor assume and assign to the successful bidder the Debtor's executory contracts with International Paper Company ("International Paper") as a condition to the sale. The grounds in support of this objection are more fully set forth in the Committee's Objection to the Debtor's Motion for an Order Authorizing the Assumption of Certain Executory Contracts with International Paper Company (the "IP Contracts Motion"), which are incorporated herein by reference, and, for the sake of brevity will not be restated.

12. The Committee reserves the right to make additional arguments in support of this Objection after it has the opportunity to review the terms of the IP Contracts.

***The Bid Procedures Should be Modified to Avoid the Appearance of Favoritism or Impropriety to the Stalking Horse Bidder Because it is an Insider of the Debtor.***

13. The proposed Bid Procedures should be modified to provide the Committee with the sole or greater voice in determining whether a bid should be considered a Qualified Bid. As currently drafted, it is in the Debtor's discretion "in consultation with the Lender" to determine whether or not a bid should be considered a Qualified Bid. (*See* Sale Motion at 13, ¶ 26.) The Committee objects to the Debtor being given such wide latitude to decide who is a qualified bidder because the Stalking Horse Bidder is an insider of the Debtor, and the Debtor has numerous perceived incentives to prefer the Stalking Horse Bidder over competing bidders. In addition, the Lender is also not an unbiased arbiter of who should be deemed a qualified bidder because the Stalking Horse Bidder will simply assume the DIP Credit Facility as a majority of its purchase price and has already agreed to assume the Debtor's executory contracts with International Paper, the parent of the Lender. To avoid the appearance of any favoritism or impropriety, the Committee respectfully requests that this Court provide it, as the only non-

interested constituency to the 363 Sale the sole or greater voice in determining who qualifies to bid on the Purchased Assets, as well as determining who has submitted the highest and best bid for the Purchased Assets.

14. In addition, the Debtor requests permission to reserve "the right to limit access to certain due diligence information and otherwise manage the process of providing due diligence information to Qualified Bidders who may be direct competitors of the Debtor."

15. First, it must be noted that the Debtor's requested reservation of rights provides the Stalking Horse Bidder with an incredible advantage because, as "insiders" of the Debtor, the owners of the Stalking Horse Bidder already possess this knowledge. Second, the Debtor's reservation is overbroad. It does not define or limit the scope of information the Debtor deems confidential. Because of the insider relationship between the Debtor and the Stalking Horse Bidder, the Debtor will be more inclined to shield, as confidential, information which may be critical to a possible bidder in deciding whether to submit a bid.

16. In addition, the Debtor's proposed reservation of rights does not benefit the estate because it is unnecessary. The Debtor's Motion makes clear that the Debtor intends to sell all, or substantially all of its assets as part of this Chapter 11 case. Shortly after the 363 Sale closes, the Debtor will be out of business. Any restriction on the provision of due diligence information to "direct competitors of the Debtor" serves no purpose because it is common knowledge that the Debtors will be out of business. The only possible justification for the Debtor seeking to protect any of its business information is that the Debtor is seeking to prefer the Stalking Horse Bidder (as "insiders of the Debtor") over other potential purchasers by ensuring that the Stalking Horse Bidder is the sole entity with access to information the Debtor feels would be advantageous to a competitor.

17. The Committee objects to, and seeks an extended time for competing bids to be submitted. Under the APA, all competing bids will be required to be made in writing within approximately thirty days after this Court approves the Sale and Sale Procedures. (*See* APA § 7(b)(ii).) Thirty days is too short of a time for other potential bidders to: 1) receive notice of this Court's order approving the Bid Procedures; 2) conduct due diligence; 3) organize significant capital to qualify as a qualified bidder; and 4) prepare and submit its qualified bid. The short stated timeframe for receipt of the qualified bids is highlighted by the fact that the Debtor has not identified how it will determine who is a "potential bidder" and how it will provide notice of the Court's order approving the Bid Procedures. The Committee respectfully asserts that a forty-five to sixty (45-60) day window is more appropriate and will provide other possible bidders the opportunity to determine if they seek to become qualified bidders.

18. Moreover, given the short timeframe, there should be some specific guidelines on when and to whom the Debtor will send notice and the Order establishing the Bidding Procedures in order to maximize the potential for competing bids.

B. **The Purchased Assets Should Not Include the Shareholder Notes**

19. The Purchased Assets under the APA include the right to collect amounts due on several promissory notes executed by the Debtor's shareholders pre-petition (the "Shareholder Notes"). (*See* APA § 1(i); APA Schedule 1(i).) According to Schedule 1(i) to the APA, only one of the Shareholder Notes is a recourse note whereby the maker is personally liable for the amounts due. That recourse note, in the principal amount of $183,390.46, was executed by Edward S. Logan, III, the Debtor's President and Chief Executive Officer and husband of the majority owner of the Stalking Horse Bidder. The remaining seven Shareholder Notes allegedly

are nonrecourse (the "Nonrecourse Shareholder Notes"); limiting the Debtor's recovery to "the Shareholder's shares in the Company and any dividends and distributions thereon."

20. Because the Debtor's assets will be liquidated as part of this Chapter 11 case, and assuming that the unsecured creditors are not paid in full, the Debtor's shareholders can expect to receive no recovery on their equity interests. Based upon these assumptions, the Committee assumes that the Nonrecourse Shareholder Notes will have no value to a competing qualified bidder as they cannot be collected.

21. However, the Shareholder Notes, even the Nonrecourse Shareholder Notes, may have some value to the Debtor's estate, and by extension, to the unsecured creditors. At this stage of the Chapter 11 case, the Committee has been unable to conduct an investigation of the transfers to the Shareholders which are evidenced by the Shareholder Notes. To the extent that these transfers may be avoided as preferential, fraudulent or other avoidable transfers under the Bankruptcy Code, the Shareholders may be pursued personally for the amounts of the loans, plus interest. The Committee should be permitted time to investigate the circumstances giving rise to those transfers. Any disposition of the right to collect for those transfers should be preserved in the estate until this investigation is completed.

C. **The Break-Up Fee is Inappropriate in this Case**

22. The APA requires that the Stalking Horse Bidder receive a $138,000 Break-Up Fee (the "Break Up Fee") from the proceeds of the 363 Sale should the Stalking Horse Bidder not be the successful bidder at the 363 Sale. (*See* Sale Motion at 18, ¶ 27; APA at § 7(b)(vi).) The Debtor asserts that the Break Up Fee is appropriate because it is designed to reimburse the Stalking Horse Bidder's fees and costs associated with its due diligence in submitting its bid. Stated earlier, the owners of the Stalking Horse Bidder are: 1) the wife of a shareholder, director

and current president of the Debtor; and 2) two members of the Debtor's management team. It is hard to believe that this bidder would have had to do any investigation of the Debtor's assets or business to determine whether or not to submit its Stalking Horse Bid. The Committee opposes the Break-Up Fee because it is inappropriate in this case.

23. "In the bankruptcy context . . . the Court must be necessarily wary of any potential detrimental effect that an allowance of such a [break-up] fee would visit upon the debtor's estate." *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992). In "bankruptcy pre-plan confirmation sales of assets . . . an allowance of such fees is to be highly scrutinized in view of the uncertainty of the dividends, if any, to be received by claimants of the debtor's estate." *Id*. at 195 (further stating that "[t]his concern is of particular relevance as it applies to the face of unsecured claimants"). Further, "[a] break-up fee should not be authorized as an administrative expense where it is ill-defined, not correlated to an actual transactional cost or expense incurred by the negotiating bidder, and otherwise cannot be addressed under a specific provision of § 503(b)." *Id*. at 196.

24. While the Debtor attempts to justify the payment of the Break Up Fee by asserting its purpose is to reimburse the Stalking Horse Bidder's fees and costs, the Debtor does not provide any detail of what fees and costs are being reimbursed. Based upon the incestuous relationship of the parties to the Stalking Horse Bid, this Court should strictly scrutinize the Debtor's and Stalking Horse Bidder's request and, and disallow the Break Up Fee as part of the Sale Procedures.

25. Should the Court be inclined to award some break up fee, which it should not, it must be noted that the amount of the Break Up Fee is also questionable. In its papers, the Debtor asserts that the amount of the Break Up Fee is roughly two percent (2%) of the Purchase Price to

be paid under the APA. However, the Court is sure to note that the Purchase Price to be paid by the Stalking Horse Bidder under the APA is not necessarily going to be approximately $8.1 Million. The APA provides that the Purchase Price will be reduced by the amount that the Lender does not advance funds to the Debtor under the $4 million revolving loan granted as part of the DIP Facility.[3] Accordingly, the "purchase Price under the APA could be no greater than the $8.1 Million set forth in the Debtor's papers, but could be as little as $4.1 Million in the unlikely event that the post petition working capital line of credit is paid in full on the sale date."

26. For this reason, the Committee also objects to the amount of any initial overbid that a bidder seeking to qualify as a bidder will need to meet, as well as the bid increments for the conduct of the auction sale. The APA and Bid Procedures require any qualified bidder to bid in an amount at least $200,000 greater than the Purchase Price, and that bid increments are to begin at $50,000 in advance of the highest Qualified Bid.. (*See* APA § 7(b)(i).) However, as is stated above, the Stalking Horse Bidder's asserted Purchase Price could be as little as $4.1 Million, or as much as $8.1 Million, depending on the Debtor's use of the post petition working capital line of credit. To ensure that possible bidders are not prejudiced and forced to submit bids well in excess of the Purchase Price, the Court should require that Qualified Bids be made at a fixed price more commensurate with the actual purchase price to be paid, or assumed by the Stalking Horse Bidder. The Committee suggests that Qualified Bids be submitted in an amount equal to $8.15 Million.

27. In addition, the Bid Procedures already provide that when bidding in increments of $200,000 has stopped, the Debtor will be permitted to allow bids in increased $50,000 increments to determine if a greater purchase price may be obtained. Because of the uncertainty

---

[3] Using the Debtor's example directly set forth in the APA, the Purchase Price could be reduced by as much as $1.5 million if the Debtor borrows only $2.5 Million under the post petition working capital loan.

about the Stalking Horse Bidder's asserted Purchase Price, and in order to avoid any appearance of bias to the Stalking Horse Bidder, the Committee suggests that bid increments at the auction remain constant in $50,000 increments.

## CONCLUSION

The Committee respectfully requests that any Order entered on the Sale Motion address the issues and concerns raised by the Committee herein and at any hearing on the Sale Motion.

Dated: March 19, 2010

Respectfully submitted,

/s/ Robert M. Stefancin
Victoria E. Powers (0054589)
Tyson A. Crist (0071276)
Linda Mindrutiu (0082341)
Erik J. Stock (0083728)
SCHOTTENSTEIN ZOX & DUNN CO., LPA
250 West Street, Suite 700
Columbus, OH 43215
Tel: (614) 462-5010
Fax: (614) 222-3478
Email: vpowers@szd.com
tcrist@szd.com
lmindrutiu@szd.com
estock@szd.com

and

Robert M. Stefancin (0047184)
1350 Euclid Ave., Suite 1400
Cleveland, OH 44115
(216) 394-5068; Fax: (216) 394-5085
Email: rstefancin@szd.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*