**This document has been electronically entered in the records of the United States Bankruptcy Court for the Southern District of Ohio.**

**IT IS SO ORDERED.**



John E. Hoffman, Jr.
United States Bankruptcy Judge

**Dated: May 25, 2010**

_____

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

In re:

**MISSISSIPPI RIVER CORPORATION,**

**Debtor.**

**Case No. 10-51480**

**Chapter 11**

**Judge John E. Hoffman, Jr.**

**ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS TO SUCCESSFUL BIDDER AT AUCTION; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING OTHER RELATED RELIEF**

This matter coming before the Court on the Motion of Debtor for an Order (I) Authorizing the Sale of Substantially all its Assets Free and Clear of Liens, Claims and Encumbrances under Asset Purchase Agreement, Subject to Higher and Better Offers, (II) Approving the Procedures for an Auction, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (IV) Scheduling an Auction and a Hearing Date Relating Thereto, (V) Approving Break-Up Fee, and (VI) Approving the Forms of Notice Thereof (the "Sale Motion") seeking approval of, among other things, (i) the institution of bidding procedures employed in connection with the Debtor's proposed sale of substantially all of the Debtor's assets to Mississippi Recycling Company, LLC

(the "Stalking Horse") pursuant to the terms and conditions of an Asset Purchase Agreement ("Stalking Horse APA") subject to higher or otherwise better bids, and (ii) the scheduling of a bid submission deadline, auction, and sale hearing and objection deadline and the approval of the sale of substantially all of the Debtor's assets to the Stalking Horse under the Stalking Horse APA subject to higher and better bids being received at auction, and the Debtor's assumption and assignment of certain of its executory contracts and unexpired leases in connection therewith, and the Court having entered its *Agreed Order Authorizing and Approving the Bidding Procedures for an Auction Sale of the Debtor's Assets, Scheduling an Auction Date and Sale Hearing Date and the Deadline for Objections to the Proposed Sale and Approving Notices to Creditors and Parties In Interest* on April 19, 2010 [Docket No. 106] (the "Bidding Procedures Order"), and Mississippi River Pulp, LLC ("Buyer") having been determined by the Debtor and the Official Committee of Unsecured Creditors (the "Committee") to be the bidder whose asset purchase agreement ("APA," a copy of which is attached hereto as Exhibit A) reflected the highest and best bid (the "Winning Bid"), and a hearing ("Sale Hearing") having been held on the Sale Motion and to consider approval of the Winning Bid on May 21, 2010; and all creditors and parties in interest having been afforded an opportunity to be heard with respect to the Sale Motion and all relief sought thereunder, and the Court being otherwise duly advised and informed in the premises and all objections having been resolved or overruled for the reasons stated on the record and all capitalized terms not defined in this Order having the same meanings as in the Sale Motion, APA and Bidding Procedures Order,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue of this case and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought in the Sale Motion are sections 105(a), 363(b), (f), (m) and (n), and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 6004-1.

B.      On March 22, 2010 this Court entered the Final Order Under 11 U.S.C. §§ 105(a), 361, 362, 363 and 364, Federal Bankruptcy Rules 2002, 4001 and 9014, And Local Rules 4001-2 And 4001-3: (I) Authorizing Debtor To Obtain Secured Post-Petition Financing And Use Cash Collateral; (II) Granting

Adequate Protection; (III) Modifying The Automatic Stay; And (IV) Granting Related Relief (the "Financing Order"), approving, among other things, the use of cash collateral and the extension of the postpetition financing on a secured basis by the Lender (as defined in the Financing Order).

C.      The Lender has a security interest in substantially all of Debtor's prepetition and postpetition assets to secure the prepetition indebtedness and the Post-Petition Obligations (as defined in the Financing Order).

D.      The Debtor has conducted a thorough and adequate search for potential purchasers for the Purchased Assets.  The Debtor and its professionals marketed the Purchased Assets and conducted the sale process in accordance with the Bidding Procedures Order.  Based upon the record of these proceedings, all creditors and equity holders, all other parties-in-interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Purchased Assets.

E.      Proper, timely, adequate and sufficient notice of the Sale Motion, the Bidding Procedures Order, the Sale Hearing, and the transactions contemplated by the APA and this Order (the "Transactions"), including, where appropriate, notice with respect to the assumption and assignment of the Assumed Contracts, has been provided in accordance with sections 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006, and 9014 of the Bankruptcy Rules to, inter alia: (a) all entities known to have expressed an interest in the Purchased Assets; (b) all entities known to have asserted any Lien, Claim, Interest or Encumbrance in or upon any of the Purchased Assets; (c) all federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Sale Motion; (d) Adams County, Mississippi; (e) counsel for the Committee; and (f) counsel for the Lender.  Such notice was good, sufficient and appropriate under the circumstances, a reasonable opportunity to object and be heard with respect to the Sale Motion and the relief requested therein was afforded to all interested persons and entities, and no other or further notice of the Sale Motion, the Sale Hearing, or the Transactions, including, without limitation, notice regarding the assumption and assignment of the Assumed Contracts is or shall be required.

F.      As demonstrated by (i) the testimony and/or other evidence proffered at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtor has conducted the sale process fairly and openly in a manner reasonably calculated to produce the highest and best offer for the Purchased Assets under the circumstances and in compliance with the Bidding Procedures Order, including holding an Auction on May 18, 2010 at which Buyer was determined to be the Winning Bidder with the Winning Bid by the Debtor and Committee.  The Sale Hearing was held and the highest and best offer received by the Debtor for the Purchased Assets at or before the Sale Hearing was the offer by Buyer, as such offer is reflected in the APA.

G.      Approval of the APA and consummation of the Transactions, including the sale of the Purchased Assets to Buyer at this time, is in the best interests of the Debtor, its creditors, its estate, and other parties in interest.  The Debtor has established that strong business reasons exist for (i) selling the Purchased Assets to Buyer outside the ordinary course of business and outside a plan and (ii) the assumption and assignment of the Assumed Contracts as specified in the APA.  Such business reasons include, but are not limited to the following: (i) the APA constitutes the highest or otherwise best offer for the Purchased Assets; (ii) the APA and the closing thereon will present the best opportunity to realize the value of the Purchased Assets and avoid decline and devaluation of the Debtor's business; (iii) there is substantial risk of deterioration of the value of the Purchased Assets; and (iv) the APA and the closing thereon will produce higher value than could be obtained in a liquidation sale or any other presently available restructuring alternative.  Pursuant to the APA, Buyer is not purchasing all of the Debtor's assets in that Purchaser is not purchasing any of the Excluded Assets and Buyer is not holding itself out to the public as a continuation of the Debtor.  Those of the Debtor's employees who are to be employed by Buyer

pursuant to section 14 of the APA are being hired under new employment contracts or other arrangements to be entered into or to become effective at or after the time of the Closing. The Transactions do not amount to a merger of Buyer and the Debtor and/or the Debtor's estate.

H. Upon review of the evidence presented or proffered, the Court finds that the APA was negotiated, proposed and entered into by the Debtor and the Buyer without collusion, in good faith, and from arm's-length bargaining positions. The terms of the APA are fair and reasonable and the total consideration provided by Buyer for the Purchased Assets constitutes (a) reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Conveyance Act, and (b) fair value under the Uniform Fraudulent Transfer Act for the Purchased Assets. Neither the Debtor, nor the Buyer have engaged in any conduct that would cause or permit the APA or any part of the Transactions provided for herein to be avoided, or for the imposition of costs and damages against the Buyer, under section 363(n) of the Bankruptcy Code. The Buyer is not an insider of the Debtor as that term is defined in section 101(31) of the Bankruptcy Code.

I. Upon review of the evidence presented or proffered, the Court finds that the Buyer is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. The Buyer will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the sale of the Purchased Assets pursuant to the APA.

J. Except as otherwise set forth herein, the Debtor is the sole and lawful owner of the Purchased Assets. Subject to certain exceptions set forth herein, the Debtor may sell the Purchased Assets to the Buyer free and clear of all Liens, Claims, Interests and Encumbrances (as defined herein) in accordance with, and to the extent permitted by, section 363(f) of the Bankruptcy Code because, with respect to each creditor asserting a Lien, Claim, Interest or Encumbrance, one or more of the standards set forth in section 363(f)(1)-(5) has been satisfied. As a condition of purchasing the Purchased Assets, the Buyer requires that the Purchased Assets be sold free and clear of all Liens, Claims, Interests and Encumbrances, except those explicitly and expressly assumed by the Buyer in the APA. Accordingly, the transfer of the Purchased Assets to the Buyer is or will be a legal, valid and effective transfer of the Purchased Assets, and will vest the Buyer with all right, title and interest in and to the Purchased Assets, free and clear of all Liens, Claims, Interests and Encumbrances except those explicitly and expressly assumed by the Buyer in the APA pursuant to, and to the fullest extent permitted by, section 363(f) of the Bankruptcy Code and all other applicable laws. Except as otherwise expressly set forth in the APA, the transfer of the Purchased Assets to Buyer does not and will not subject Buyer to any liability whatsoever with respect to the operation of the Debtor's business and/or the ownership of the Purchased Assets prior to the Closing.

K. Except as set forth herein, non-debtor parties holding valid Liens, Claims, Interests and Encumbrances in or with respect to the Purchased Assets who did not object to the Sale Motion or those whose objections were withdrawn are deemed to have consented to the sale of the Purchased Assets free and clear of their Liens, Claims, Interests and Encumbrances in or with respect to the Purchased Assets pursuant to section 363(f)(2) of the Bankruptcy Code.

L. The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assumed Contracts to Buyer in connection with the consummation of the Transactions, and the assumption, assignment, and sale of the Assumed Contracts is in the best interest of the Debtor, its estate, its creditors and all parties in interest. The Assumed Contracts being assigned to Buyer are an integral part of the Debtor's business and the Purchased Assets and accordingly, such assumption, assignment, and sale of Assumed Contracts is reasonable, enhances the value of the Debtor's estate, and does not constitute unfair discrimination. Buyer has provided adequate assurance of cure of any defaults existing prior to the Closing under any of the Assumed Contracts within the meaning of section 365(b)(1)(A) of

the Bankruptcy Code and provided adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting for a default prior to the date hereof under any of the Assumed Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. Buyer has provided adequate assurance of its future performance of and under the Assumed Contracts within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**

1.     The Sale Motion is GRANTED to the extent provided by this Order and all objections thereto are hereby overruled.

### Approval of the Asset Purchase Agreement

2.     The APA, as received by the parties in interest and presented to the Court, and all of the terms and conditions thereof,  including as may be amended by this Order, are hereby approved, including without limitation the Purchase Price, which is the sum of (a) $8,200,000.00 plus (b) the Sales Taxes plus (c) the Cure Amounts for the Assumed Contracts.  The Deposit already paid by Buyer in the amount of $100,000 shall be a credit against the sum of $8,200,000.00.

3.     Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtor is authorized and directed to consummate the sale of the Purchased Assets to the Buyer pursuant to and in accordance with the terms and conditions of the APA and this Order.  At the Closing where Mississippi River Pulp, LLC is the Buyer, payment to the Stalking Horse of the Break-up Fee in the amount of $138,000 is hereby authorized. In the event that the Stalking Horse is the Buyer, then no payment of the Break-up Fee shall be made.

4.     The Debtor is empowered to perform under, consummate and implement the APA, and is authorized and directed to take all other actions as are necessary to effectuate the Transactions, including executing and delivering all additional instruments and documents that may be reasonably necessary or desirable to implement the APA, and to take all further actions as may be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to possession, the Purchased Assets and the Assumed Contracts, or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA.

### Transfer of Assets Free and Clear of Liens

 5.     At Closing, Buyer shall acquire the Purchased Assets for the Purchase Price.  Upon the payment of the Purchase Price, the Purchased Assets shall be transferred, and title passed, to the Buyer pursuant to the fullest extent permitted by sections 105(a) and 363(f) of the Bankruptcy Code and all other applicable laws and, to the extent that such is consistent with the requirements of notice and due process, free and clear of all claims, liens, interests or encumbrances of any type whatsoever (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the chapter 11 case, and whether imposed by agreement, understanding, law, equity, or otherwise) including but not limited to those (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtor's or the Buyer's interest in the Purchased Assets, or any similar rights and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtor's business prior to the Closing date (all such liens, claims, interests, and encumbrances listed herein, other than the Assumed Liabilities and Permitted Encumbrances,  the "Liens, Claims, Interests and Encumbrances"), with all such Liens, Claims, Interests

and Encumbrances of any kind or nature whatsoever (other than the Assumed Liabilities and the Permitted Encumbrances) attaching to the proceeds of the sale ultimately attributable to the property against or in which the holder of an interest claims or may claim an interest in the order of their priority, with the same validity, force and effect which they now have.

6.      Except for the Assumed Liabilities or as otherwise expressly provided for in the APA and this Order, the Buyer is not assuming any liability or other obligation of the Debtor related to the Purchased Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided in the APA, the Buyer is not assuming the Excluded Liabilities or any other liabilities against the Purchased Assets, the Debtor or any of its predecessors or affiliates including, but not limited to, liabilities whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, whether relating to or arising out of the Debtor's Business, the Excluded Assets or the Purchased Assets or otherwise.

7.      Except as expressly permitted or otherwise specifically provided by the APA or this Order, all parties holding Liens, Claims, Interests and Encumbrances of any kind or nature whatsoever against the Debtor or the Purchased Assets, arising under or out of, in connection with, or in any way relating to, the Debtor, the Purchased Assets, the operation of the Debtor's Business prior to the Closing Date, or the transfer of the Purchased Assets to the Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting such person's or entity's Liens, Claims, Interests and Encumbrances against the Buyer, its successors or assigns, its property or assets, which claims are hereby transferred to the sale proceeds whether or not a party asserting any such claim has delivered to Buyer a release. But for the obligations under the Assumed Contracts, Buyer shall not be liable for any claims of any kind or nature, whether prepetition or postpetition, matured or unmatured, fixed or contingent, liquidated or unliquidated, known or unknown, against the Debtor or any of its predecessors or affiliates.

## Assignment of Assumed Contracts To Buyer

8.      Pursuant to sections 365(b), (c) and (f) of the Bankruptcy Code, and subject to this Order, the Debtor is authorized to assume and assign the Assumed Contracts (as defined in the APA) to Buyer which Assumed Contracts shall include but not be limited to, consistent with the APA and this Order, those identified in Paragraph 1 of the APA or Schedules 1(b), (c), and (e) of the APA , subject to the procedures established in the Bidding Procedures Order.

9.      Those Assumed Contracts to which there has been no objection to assumption, assignment, and the Cure Amount shall be deemed assumed and assigned to the Buyer as of the Closing Date and the Buyer shall be deemed to have provided adequate assurance of its future performance under the relevant Assigned Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

10.      Upon Closing, the Buyer shall assume full responsibility and liability for all Assumed Contracts, including payment of all Cure Amounts (as have been established in accordance with any applicable cure notices), and the Debtor shall have no further responsibility, financial or otherwise, under any Assumed Contracts for any defaults, breaches or other damages associated with the Assumed Contracts, whether arising or accruing prior to or subsequent to the Closing. Except for the Cure Amounts, there are no other defaults existing under the Assumed Contracts.

11.      On or as promptly after the Closing Date as practical, the Cure Amounts to which no objections have been filed, or to which the Buyer and applicable non-debtor contract party have agreed as to the

allowed Cure Amount(s), shall be paid.

12.     The Buyer shall not be required to assume any contract unless the Cure Amount with respect to such contract, if any, is acceptable to the Buyer. The Debtor shall not be deemed to have assumed any executory contract and/or unexpired lease that is not an Assumed Contract.

13.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer as a result of the assumption and assignment of any Assumed Contract.

14.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all parties to the Assumed Contracts are forever barred and enjoined from raising or asserting against the Buyer any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts existing as of the Closing or arising by reason of the Closing, except for any post-petition amounts that are Assumed Liabilities being expressly assumed by the Buyer under the APA. Payment of the Cure Amounts shall be deemed to discharge the Debtor's obligation to: (i) cure, or provide adequate assurance that the Debtor will promptly cure, any defaults under the Assumed Contracts and (ii) compensate, or provide adequate assurance that the Debtor will promptly compensate any non-debtor party to the Assumed Contracts for any actual pecuniary loss resulting from any default under the Assumed Contracts.

15.     In accordance with sections 365(b)(2) and (f) of the Bankruptcy Code, upon transfer of the Assumed Contracts to the Buyer, (i) the Buyer shall have all of the rights of the Debtor hereunder and each provision of such Assumed Contracts, including but not limited to the option to purchase contained in the Assumed Natchez Mill Lease, shall remain in full force and effect for the benefit of the Buyer notwithstanding any provision in any such Assumed Contract or in applicable law that prohibits, restricts or limits in any way such assignment or transfer, and (ii) no Assumed Contract may be terminated, or the rights of any party modified in any respect, including pursuant to any "change of control" clause, by any other party thereto as a result of the consummation of the Transactions.

**Additional Provisions**

16.     The transfer of the Purchased Assets to the Buyer pursuant to the APA and this Order constitutes a legal, valid, and effective transfer of the Purchased Assets, and shall vest the Buyer with the same right, title and interest of the Debtor in and to the Purchased Assets free and clear of all Liens, Claims, Interests and Encumbrances of any kind or nature whatsoever (but for the Assumed Liabilities and the Permitted Encumbrances) notwithstanding any requirement for approval or consent by any entity (as defined in section 101(15) of the Bankruptcy Code).

17.     From and after the entry of this Order, the Debtor, and all third parties with notice of the sale shall not take or cause to be taken any action which would interfere with the transfer of the Purchased Assets to Buyer in accordance with the terms of this Order or the APA or the use and operation by the Buyer of the Purchased Assets.

18.     The transfer of the Purchased Assets to the Buyer pursuant to the APA is an exchange for consideration by the Buyer and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

19.     On the Closing Date, each of the Debtor's creditors, secured or otherwise, are authorized and directed to execute such documents and take all other actions as may be necessary to release their Liens, Claims, Interests and Encumbrances in the Purchased Assets, if any, as such Liens, Claims, Interests and

Encumbrances may have been recorded or may otherwise exist.

20.     If any person or entity asserting any Liens, Claims, Interests and Encumbrances has filed financing statements, mortgages, construction liens, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Liens, Claims, Interests and Encumbrances with respect to the Purchased Assets, and has not delivered to the Debtor and/or the Buyer prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and/or releases of all Liens, Claims, Interests and Encumbrances which the person or entity has with respect to any of the Purchased Assets then (a) the Debtor or the Buyer are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets and (b) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, shall be effective as a determination that, other than the Assumed Liabilities and the Permitted Encumbrances, upon Closing, all Liens, Claims, Interests and Encumbrances existing as to the Purchased Assets conveyed to Buyer have been and hereby are adjudged and declared to be unconditionally released, discharged and terminated.  This Order shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets conveyed to Buyer.

21.     Any notices required to be given to the Debtor's employees pursuant to any federal or state labor or similar laws shall be the sole responsibility of the Debtor, and the Buyer shall have no liability for the Debtor's failure to do so. Except as otherwise expressly provided in the APA, the Buyer shall have no obligation to pay wages, bonuses, vacation pay, severance pay, benefits of any kind (including without limitation accrued unpaid medical benefits), or incentives, or retention payments, workers compensation, or unemployment benefits or any other payment with respect to employees or former employees of the Debtor.

22.     Article 6 of the Uniform Commercial Code governing bulk sales is not applicable to the sale of the Purchased Assets to the Buyer.

23.     All entities, including without limitation, any former vendors, suppliers or employees of the Debtor, that are presently, or on the Closing Date may be, in possession or control of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Buyer on the Closing Date.

24.     This Court shall retain exclusive jurisdiction to implement and effectuate the provisions of this Order and the APA and to resolve any issue or dispute concerning the interpretation, implementation or enforcement of this Order and the APA and any subsequent agreement as required to be entered into between the Debtor and the Buyer pursuant to this Order and as approved by the Court, or the rights and duties of the parties hereunder or thereunder, including, without limitation, any issue or dispute concerning the transfer of the Purchased Assets free and clear of Liens, Claims, Interests and Encumbrances.

25.     Any stay, modification, reversal or vacation of this Order will not affect the validity of any obligation of the Debtor to the Buyer incurred under this Order. Notwithstanding any such stay, modification, reversal or vacation, all obligations incurred by the Debtor under this Order and the APA

prior to the effective date of such stay, modification, reversal or vacation will be governed in all respects by the original provisions of this Order, and the Buyer is entitled to the rights, privileges and benefits granted in this Order with respect to all such obligations.

26.     The Transactions contemplated by the APA are undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transactions shall not affect the validity of the Transactions as to the Buyer, except to the extent such authorization is duly stayed pending such appeal prior to such consummation. The evidence presented or proffered has demonstrated that the Buyer is a purchaser in good faith of the Purchased Assets and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

27.     The terms and provisions of this Order shall be binding in all respects upon and shall inure to the benefit of, the Debtor, its estate, and their creditors, the Buyer and its affiliates, successors and assigns, and shall be binding in all respects upon any affected third parties including, but not limited to, all persons asserting Liens, Claims, Interests and Encumbrances in such Purchased Assets, notwithstanding any subsequent appointment of any Chapter 11 or Chapter 7 trustee(s), upon which such terms and provisions likewise shall be binding.

28.     The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety. Likewise, all of the provisions of this Order are non-severable and mutually dependent.

29.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing to be signed by all parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

30.     Nothing contained in any plan confirmed in this case or any Order of this Court confirming such plan shall conflict with or derogate from the provisions of the APA or the terms of this Order.

31.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order and this Order shall be effective immediately upon entry. In the event that all conditions precedent to closing have been met or waived under the APA, the Debtor and the Buyer are hereby authorized to consummate the Transactions upon entry of this Order or as soon as reasonably possible thereafter.

Copies to: Debtor shall serve All Filing Parties

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this *"Agreement"*) is entered into effective as of the 21st day of May, 2010, by and between **MISSISSIPPI RIVER CORPORATION**, an Ohio corporation (the *"Seller"*), and **MISSISSIPPI RIVER PULP, LLC**, a Delaware limited liability company (the *"Buyer"*).

Background Information

A.      Seller owns and operates a manufacturing facility in Natchez, Mississippi (the *"Natchez Mill"*) that produces various grades of market deinked recycled pulp (*"MDIP"*) that can be converted into end products such as file folders, paper towels, tissue paper, copy paper, premium grade paper and food grade paper products.  Seller has interests in real, personal and intangible property, including real estate, equipment, inventory, processes, trade secrets, intellectual property and other intangibles associated with its MDIP business.  Seller's North American Paper Company (*"NAPCO"*) division formerly served as a broker-dealer of its paper and pulp products, and was involved in the purchase, storage, distribution and sale of its paper products.  Collectively, Seller's ownership and leasehold rights in its real, personal and intangible property associated with its MDIP business and its NAPCO division broker-dealer business shall be referenced as the *"Business"*.

B.      Buyer desires to purchase from Seller substantially all of the assets and business operations of Seller associated with the Business, and Seller desires to sell those assets and business operations to Buyer on the terms and conditions set forth in this Agreement.

C.      On February 16, 2010, Seller filed a chapter 11 bankruptcy case, and is a Debtor in Possession in the United States Bankruptcy Court, Southern District of Ohio, Eastern Division Case No. 10-51480, before Judge John E. Hoffman, Jr. ("*Bankruptcy Court*").  This Agreement and the sale referenced herein will not be effective unless and until there is an order of the Bankruptcy Court confirming the sale to Buyer as set forth in §7 of this Agreement and as further provided by the Bankruptcy Court in the *Agreed Order Authorizing and Approving the Bidding Procedures for an Auction Sale of the Debtor's Assets, Scheduling an Auction Date and Sale Hearing Date and the Deadline for Objections to the Proposed Sale, and Approving Notices to Creditors and Parties in Interest*, entered by the Bankruptcy Court on April 19, 2010 (the *"Bidding Procedures Order"*), a copy of which Buyer has previously received.  To the extent that the terms of this Agreement may not be consistent with the terms of the Sale Order (as hereinafter defined in §7), the terms of the Sale Order shall control.

Statement of Agreement

The parties acknowledge the accuracy of the foregoing Background Information, and in consideration of the mutual covenants hereinafter set forth, the parties hereby agree as follows:

§1.      Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing (as hereinafter defined in §8), Seller shall sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase and assume from Seller, free and clear of all liens, claims, interests or encumbrances, except Permitted Encumbrances (as hereinafter defined in this §1) and Assumed Liabilities (as hereinafter defined in §3), all of Seller's right, title and interest in and to Seller's property and assets, real, personal or mixed, tangible or intangible, of every kind and description related to the Business, including  the following:

(a)      (i) The parcels of real estate owned by Seller which constitute part of the Natchez Mill and situated in Natchez, Mississippi, Adams County, including any and all buildings, improvements,

structures and fixtures located thereon; and all easements (including, without limitation, the effluent easements), rights-of-way, permits or licenses, and all other rights appurtenant thereto, subject to the secured debt owing to Adams County, Mississippi, and (ii) the condominium located in Bridgeport, Harrison County, West Virginia, all as more fully described on the attached Schedule l(a) (collectively, the "*Owned Real Property*").

(b)     Seller's leasehold interest in the real property leased from Adams County, Mississippi with respect to the Natchez Mill, and situated in Natchez, Mississippi, Adams County, with a nominal purchase option at end of lease, as more fully described on the attached Schedule l(b) (the "*Natchez Mill Lease*").

(c)     The leasehold interests of Seller, as lessee, in an office lease in Worthington, Ohio, and an apartment lease in Natchez, Mississippi, all as more fully described on the attached Schedule l(c) (the "*Office & Apartment Leases*").

(d)     All machinery, equipment, tools, dies, office equipment, computer hardware, furniture and office materials, replacement and spare parts, repair parts, fixtures, vehicles, supplies, materials and other items of tangible personal property of every kind owned by Seller, and used in connection with the Business, including, without limitation, the assets described on the attached Schedule l(d) (the "*Equipment*").

(e)     The executory contracts and leasehold interests of Seller (as lessee) relating to the operation of the Business identified on the attached Schedule l(e) (the "*Assumed Contracts and Leases*" and together with the Natchez Mill Lease, and the Office & Apartment Leases, the "*Assumed Contracts*").  Notwithstanding the foregoing, from May 12, 2010 through the conclusion of the auction contemplated by the Bidding Procedures Order, Buyer may add to Schedule 1(e) any additional executory contract or unexpired lease of Seller, together with a proposed cure amount in respect of such contract.

(f)     All of Seller's right, title and interest in and to permits, telephone numbers, fax numbers, internet domains and registrations, e-mail addresses, trade names, fictional business names, patents, patent applications, patent rights, trademarks, service marks, trademark and service mark applications, trademark and service mark rights, trade secrets, inventions, designs, discoveries, know-how, processes, formulas, production techniques, computer software, customer, client, supplier and distributor files and lists, copyrights, uncopyrighted works, plans, drawings and blue prints, all licenses providing the Seller rights to use any of the foregoing, and all other intangible and intellectual property, as may exist, and the goodwill associated therewith, including, but not limited to, the property which is more fully described on the attached Schedule 1(f) (the "*Intangible Property*").

(g)     [OMITTED].

(h)     All of Seller's inventory, including, without limitation, all finished goods, work-in-process, raw materials and supplies, packaging materials and boxes, spare parts, wastepaper, MDIP and end products, and all other materials and supplies to be used or consumed by Seller in the production of finished goods that has been purchased and/or manufactured for the Business prior to the Closing Date (as such term is hereafter defined in Section 8) (the "*Inventory*"); provided, however, that Inventory shall not include, and Buyer shall not purchase under this Agreement, any consigned inventory located at the Natchez Mill that is owned by International Paper Company ("*International Paper*") and which has been clearly separated and marked as being the property of International Paper.

(i)     (1)     All of Seller's accounts and notes receivable generated in connection with the Business, including the accounts receivable identified on Schedule1(i)(1) that are outstanding

and owing as of the Closing Date and (2) Amounts owing to Seller by shareholders under recourse and non-recourse note(s) as listed in Schedule 1(i)(2) (collectively with (i)(1) above, the *"Accounts and Notes Receivable"*).

(j)       All data and Records (as hereafter defined) related to the operations of the Business, including, without limitation, employee and personnel records, client and customer lists and Records, referral sources, research and development reports and Records, production reports and Records, service and warranty reports and Records, equipment logs, operating guides and manuals, financial and accounting Records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and similar documents and Records.  For purposes of this Agreement, the term "*Records*" means any information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

(k)       all insurance benefits, including rights and proceeds, arising from or relating to the Purchased Assets or the Assumed Liabilities prior to the Effective Time (as hereafter defined in §8).

(l)       all governmental authorizations, consents, licenses, registrations or permits issued, granted, given or otherwise made available by or under authority of any governmental authority or pursuant to any applicable legal requirement, including Intangible Property (the "*Permits and Licenses*").

(m)       all claims of Seller against third parties relating to the Purchased Assets, whether known or unknown, contingent or noncontingent.

(n)       all rights of Seller relating to deposits and prepaid expenses, claim for refunds and right to offset in respect thereof.

(o)       all goodwill associated with the operation of the Business.

(p)       any unexpired, transferrable, express or implied warranties, guaranties or indemnities by or from the manufacturers, distributors, sellers, lessors or other persons of any of the Purchased Assets and all maintenance records and other records (e.g., instruction manuals, maintenance manuals, etc.) relating to the Purchased Assets or the Business.

All of the property and assets to be transferred to Buyer under this Agreement are referred to collectively in this Agreement as the "*Purchased Assets*".  Seller warrants that (i) the Purchased Assets comprise substantially all of the property and assets used in the conduct and operation of the Business as of the date of this Agreement and (ii) the Purchased Assets are sufficient to operate and conduct business with respect to the Business as currently conducted, and, to the actual knowledge of Seller, no other assets or rights are needed for the operation of the Business as currently conducted.  As used in this Agreement, the phrase "actual knowledge" or "Seller's knowledge" or similar phrase applicable to Seller means the actual knowledge of the current officers of Seller or matters which such officers could be reasonably expected to know through executing the duties normally associated with their offices with reasonable care.  At the Closing, Seller shall sell, transfer, convey, assign and deliver good and marketable title to the Purchased Assets to Buyer free and clear of all security interests, liens, claims, interests and encumbrances, except for the Assumed Liabilities and for the Permitted Encumbrances.  For purposes of this Agreement *"Permitted Encumbrances"* shall mean: (i) liens for taxes, assessments, or other governmental charges or levies not yet due; (ii) applicable zoning laws and any restrictions of record; (iii) any liens reserved in leases for rent and for compliance with the terms of the leases in the case of leasehold estates; (iv) any liens, existing at the time of acquisition by Seller, upon real estate or rights in or relating to real estate acquired by Seller for transmission, distribution or right-of-way purposes; (v)

easements or reservations in any property of Seller created for the purpose of roads, railroads, railroad side tracks, water and gas transmission and distribution mains, conduits, water power rights and building and use restrictions, none of which, to the actual knowledge of Seller, would interfere with the operation of the Business as conducted as of the Closing Date; (vi) any obligations or duties affecting the property of Seller to any municipality or public authority with respect to any franchise, grant, license or permit, none of which, to the actual knowledge of Seller, would interfere with the operation of the Business as conducted as of the Closing Date; and (vi) any liens contained in the Assumed Contracts. The phrase "would interfere with the operation of the Business" as used in this Paragraph does not mean that the particular encumbrance does not exist, but rather that if the encumbrance does exist, it has not been a problem or difficulty for Seller in the operation of the Business.

Notwithstanding the foregoing, the transfer of the Purchased Assets pursuant to this Agreement shall not include the assumption of any Liability (as hereinafter defined in §3) unless the Buyer expressly assumes that Liability pursuant to §3 of this Agreement.

§2.    Excluded Assets.  Notwithstanding anything to the contrary contained herein, the following assets of Seller are not part of the sale and purchase contemplated hereunder and are explicitly excluded from the Purchased Assets: (a) Seller's interests in any amounts paid as a retainer for professional fees related to Seller's Chapter 11 bankruptcy case; (b) as set forth above in §1(h), title to the inventory held on consignment from International Paper; (c) contracts and leases which Buyer has not identified in §1, including all agreements by and between International Paper and the Seller; (d) the Debtor's golf club deposits with Wedgewood Country Club, Powell, Ohio and Pete Dye Country Club, Bridgeport, West Virginia; and (e) all rights and avoidance claims of the Seller arising under Chapter 5 of the Bankruptcy Code (collectively, the *"Excluded Assets"*).

§3.    Assumed Liabilities/Excluded Liabilities.  At the Closing, Buyer will assume:

(a)    the future payment and performance of the obligations accruing and arising after the Effective Time under the Assumed Contracts;

(b)    the amounts identified on Schedule 3(ii) owing to Adams County, Mississippi on account of the promissory notes described on Schedule 3(ii) (the *"Adams County Liabilities"*);

(c)    real and personal property taxes in the amounts identified on Schedule 10(i) owing and associated with the Owned Real Property (the *"Property Taxes"*);

(d)    sales taxes in the amounts identified on Schedule 10(i) (the *"Sales Taxes"*); and

(e)    to the extent the Bankruptcy Court makes a finding in a final order determining the amount required to be paid to cure any outstanding defaults under an Assumed Contract (or the non-debtor party to such Assumed Contract and the Buyer agree to such amount) so that the Seller may assume and assign such Assumed Contract to Buyer pursuant to section 365 of the Bankruptcy Code (the *"Cure Amounts"*), the obligation to pay such Cure Amounts upon the assignment of such Assumed Contracts.

All of the Liabilities assumed under this section are referred to collectively as the *"Assumed Liabilities."*  Except  for the Assumed Liabilities and for the Permitted Encumbrances, Buyer shall not assume or otherwise be responsible for any Liability of the Seller or any Liability against the Purchased Assets, including any Liabilities that arose out of the operation or ownership of the Business and Purchased Assets prior to the Effective Time (the *"Excluded Liabilities"*).  For purposes of this Agreement, the term "Liability" or "Liabilities" means any liability or obligation, whether known or

unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

§3.1.    Supplemental Cure Notice:  With respect to any non-debtor counterparty to an Assumed Contract that has not received a Cure Notice (as defined in the Bidding Procedures Order), the Seller shall make service of a Cure Notice on or before May 20, 2010 upon such party reflecting Buyer's intent, to the extent it is the Winning Bidder (as defined in the Bidding Procedures Order), to have such Assumed Contract assigned to it and establishing reasonable procedures and a hearing before the Bankruptcy Court, to the extent necessary, to fix the amount of such cure, all as consistent with the procedures in the Cure Notice (such supplemental notice is herein referred to as the "*Supplemental Cure Notice*"). Notwithstanding anything herein to the contrary, if the Cure Amount fixed by the Bankruptcy Court exceeds the amounts identified in Schedule 1(e) or if such amounts are not fixed on or before June 30, 2010, then Buyer shall have the option, exercisable by providing written notice to Seller, to exclude such agreement from the Assumed Contracts to be assigned hereunder.

§4.    Purchase Price.  The purchase price for the Purchased Assets shall be $8,200,000, including the Deposit and subject to the Adjustments, plus the amounts referenced in 4(d) and 4(e) below (the "*Purchase Price*").  The Purchase Price shall be paid in cash at Closing as follows:

(a)    $7,068,132.32 ($6,968,132.32 after credit for the $100,000 Deposit already received by Seller) or such lesser amount that is the remaining balance after payment of the Property Taxes identified in section (b) below, payment of the Adams County Liabilities identified in section (c) below, and payment of the Break-up Fee identified in section (f) below, to the Seller, which shall take such funds subject to the terms of the Sale Order;

(b)    $684,206.93 or such other amount as is actually due and payable as of the Closing on account of the Property Taxes which amounts shall be payable directly by Buyer to the taxing authorities of Adams County, Mississippi;

(c)    $309,660.75 or such other amount as is actually due and payable as of the Closing on account of the Adams County Liabilities, all of which shall be payable directly by Buyer to the Adams County, Mississippi Treasurer at Closing in order to pay off the Adams County Liabilities;

(d)    $17,658.00 or such amount as is actually due and payable as of the Closing on account of the Sales Taxes which amounts shall be payable directly by Buyer to the applicable taxing authorities;

(e)    Up to $24,715.60 on account of the Cure Amounts for the Assumed Contracts which amounts shall be payable directly by Buyer to the non-debtor party to such Assumed Contract; provided, however that to the extent the cure amount for any Assumed Contract is not fixed as of the Closing Date, such cure amounts shall be payable directly by Buyer to the non-debtor party to such Assumed Contract upon becoming Cure Amounts hereunder;

(f)    The amount of $138,000 shall be remitted to Mississippi Recycling Company, LLC as the "Break-up Fee" contemplated in the Bidding Procedures Order.

In any case where the Buyer is remitting any portion of the Purchase Price to any party other than the Seller, Buyer shall remit such payments at the address(es) to be provided by the Seller and verified by the Buyer.

§4.1.  Good Faith Deposit.  Within the time period set forth in the Bidding Procedures Order, Buyer has paid a deposit of $100,000.00, which Seller's counsel (identified in §20) is holding in trust in a separate non-interest bearing bank account (the "*Deposit*").  To the extent Buyer is the Winning Bidder, the Deposit shall be applied toward the Purchase Price in §4(a).  Buyer shall be entitled to the prompt return of the Deposit in the event Buyer is not the Winning Bidder pursuant to the procedure set forth in the Bidding Procedures Order.

§5.  Adjustments.  The parties shall effect the following pro-rations and adjustments to the Purchase Price at the Closing (collectively, the "*Adjustments*"):

(a)  Customer Deposits.  At the Closing, Seller shall provide Buyer with a list of deposits held by it and accrued interest on the deposits.  Seller shall give Buyer a credit against the cash portion of the Purchase Price for the amount of deposits and interest held by it and Buyer shall assume the obligation of returning any and all deposits to customers.  Attached hereto as Schedule 5(a) is a list of deposits and accrued interest as of the date of this Agreement, which Schedule shall be updated as of the Closing Date.

(b)  Real Estate Taxes.  Real estate taxes for the year of the Closing or any prior year which may be payable with respect to the Owned Real Property and which are not otherwise paid in accordance with §4(b)  shall not be credited against the cash portion of the Purchase Price.

(c)  Prepaid Amounts.  Prepaid amounts on existing transferable insurance policies and contracts which Buyer elects to assume, as well as on utilities (to the extent utilities are not shut off and new accounts opened), shall be prorated to the Closing Date and paid to Seller at the Closing, provided that Buyer shall have no obligation to adjust for any policies or contracts which it does not assume, including, but not limited to, any golf club deposits.

(d)  Cash Deposits; Bonds.  If Seller has made a cash deposit under an Assumed Contract, then Seller shall assign all rights to such deposit to Buyer at Closing and the Purchase Price will be increased by the amount of such cash deposit.  If Seller has posted a cash bond with any regulatory or governmental authority in connection with the ownership or operation of the Business, then Seller shall assign all rights to such bond to Buyer at Closing and the Purchase Price will be increased by the amount of such bond.  Attached hereto as Schedule 5(d) is a list of all of Seller's cash deposits, cash bonds, surety bonds, and letters of credit posted in connection with the ownership or operation of the Business as of the date of this Agreement, which Schedule shall be updated as of the Closing Date.

(e)  Cash on Hand.  The Purchase Price shall be increased by the amount of cash, or funds on deposit which is actually transferred to Buyer on the Closing Date. It is anticipated that this amount will be little or nothing, as it is expected that all cash or other funds will be used to reduce the debtor-in-possession loan obligations.

§6.  Allocation of Purchase Price.  Seller will agree to reasonably allocate the Purchase Price as requested by Buyer.  This allocation shall be binding on the parties, shall be used for all purposes on their respective federal, state and local income tax returns, and shall be supported by them in any audits or other disputes or litigation involving any such returns.  Seller and Buyer agree that they will each file Internal Revenue Service Form 8594 with their income tax return due after the date of Closing with the same allocations as requested by Buyer.

§7.  Bankruptcy Bidding/Approval Procedures.  Seller is a Debtor in Possession in a chapter 11 bankruptcy before the Bankruptcy Court.  This Agreement, and the sale contemplated herein, will not be effective, nor shall Buyer have any payment or performance obligations to anyone, unless and until

there is an order of the Bankruptcy Court substantially in the form annexed hereto at <u>Schedule 7</u>, which attached form is acceptable to Buyer and which form shall not be modified by Seller or tendered to the Bankruptcy Court for entry in a modified form absent Buyer's prior consent (the "*Sale Order*").

§8.     <u>Closing</u>.  Subject to the satisfaction or waiver by the appropriate party of all of the conditions precedent to Closing specified in §§12 and 13 hereof, the consummation of the sale and purchase of the Purchased Assets and the other transactions contemplated by and described in this Agreement (the "*Closing*") shall take place at the offices of Allen Kuehnle Stovall & Neuman, 17 South High Street, Columbus, Ohio  43215, on or before May 28, 2010, assuming that the conditions set forth in §§12 and 13 hereof are satisfied, unless extended to a later date by mutual agreement of the parties, at 10:00 a.m. local time (the "*Closing Date*").  The Closing shall be effective as of 11:59 p.m. on the Closing Date (the "*Effective Time*"), or at such other time as the parties hereto may mutually designate in writing.

§9.     <u>Representations and Warranties of Buyer</u>.  Buyer hereby represents and warrants to Seller as follows:

(a)     <u>Organization and Authority</u>.  Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware and has full limited liability company power, right and authority to own its properties and assets and to carry on its business as it is now being conducted, to purchase the Purchased Assets and to enter into and carry out the transactions contemplated by this Agreement.  Seller does not have any subsidiaries and does not have an ownership interest in any other entity.

(b)     <u>Authorization</u>.  This Agreement has been duly authorized, executed and delivered by Buyer, and no further limited liability company proceedings on the part of Buyer are or will then be necessary to authorize this Agreement and the transactions contemplated hereby.  This Agreement is the legal, valid and binding obligation of Buyer, enforceable in accordance with its terms, and in all respects, subject to the approval of the Bankruptcy Court.

(c)     <u>Regulatory Filings</u>.  No material filing with, authorization of, exemption by, or consent or approval of, any regulatory authority is necessary for the consummation by Buyer, of the transactions contemplated by this Agreement.

(d)     <u>Satisfaction of Conditions</u>.  Buyer has no actual knowledge, as of the date hereof, of any reason why the conditions set forth in §12 hereof would not be satisfied on the Closing Date.

(e)     <u>Litigation</u>.  As of the date of this Agreement, there is no action, suit or proceeding pending against, or to the actual knowledge of Buyer threatened against or affecting, Buyer or any affiliate of Buyer or any of their respective properties before any court or arbitrator or any governmental body, agency or official which in any manner challenges or seeks to prevent, enjoin, alter or materially delay any of the transactions contemplated hereby.

(f)     <u>Brokers and Finders</u>.  Neither Buyer nor any of its officers, directors, managers, members, or employees has employed any broker or finder or incurred any liability for any financial advisory fees, brokerage fees, commissions or finder's fees, and no broker or finder has acted directly or indirectly for Buyer in connection with this Agreement or the transactions contemplated hereby.

(g)     <u>Financing</u>.  Buyer will have adequate capital and available funds to fulfill its obligations hereunder on the Closing Date.

§10.   Representations and Warranties of Seller.  Seller represents and warrants to Buyer as follows:

(a)   Organization and Authority.  Seller is a corporation organized, validly existing and in good standing under the laws of the State of Ohio and has full corporate power, right and authority to own its properties and assets and to carry on its business as it is now being conducted and to enter into and carry out its obligations under this Agreement.  Seller has all necessary governmental authorizations to own or lease its properties and assets and to carry on its Business as now being conducted in all respects material to the financial condition or business of Seller.

(b)   Authorization.  Subject to the entry of the Sale Order, this Agreement will be duly authorized, executed and delivered by Seller and no further corporate proceedings on the part of Seller are or will then be necessary to authorize this Agreement and the transactions contemplated hereby.  This Agreement is the legal, valid and binding obligation of Seller, enforceable in accordance with its terms, and in all respects, subject to the approval of the Bankruptcy Court.

(c)   Regulatory Filings.  Except as may be required for the transfer of certain of the Intangible Property described in 1(f), Seller does not need to provide any material notice to, or obtain the authorization of,  exemption by, or consent or approval of, any regulatory authority for the consummation by Seller of the transactions contemplated by this Agreement.

(d)   Satisfaction of Conditions.  Seller has no actual knowledge, as of the date hereof, of any reason why the conditions set forth in §13 hereof would not be satisfied on the Closing Date.

(e)   Title to Purchased Assets.  Seller, subject to the approval of the Bankruptcy Court, now owns or will convey on the Closing Date marketable title to the Purchased Assets free and clear of all mortgages, security interests, leases, liens, encumbrances, restrictions, conditions, encroachments, and other defects or claims except the Permitted Encumbrances and Assumed Liabilities.

(f)   Litigation.  Other than with respect to the Seller's chapter 11 bankruptcy case and any actions by Seller and other parties with respect to such case, as of the date of this Agreement, to the actual knowledge of Seller, there is no action, suit or proceeding pending against Seller or any affiliate of Seller or any of their respective properties before any court or arbitrator or any governmental body, agency or official which in any manner affects the Business or the Purchased Assets or challenges title to or operation of the Business or Purchased Assets, or challenges or seeks to prevent, enjoin, alter or materially delay any of the transactions contemplated hereby.

(g)   Purchased Assets.  The assets referenced herein and set forth in the schedules attached hereto sets forth a list of all assets owned by the Seller within the Business.  The Purchased Assets comprise substantially all of the property and assets used in the conduct and operation of the Business as of the date of this Agreement.  The Purchased Assets are sufficient to operate and conduct business with respect to the Business as currently conducted, and, to the actual knowledge of Seller, no other assets or rights are needed for the operation of the Business as currently conducted.  The Inventory included in the Purchased Assets will, as of the Closing, be located at the Natchez Mill, with the exception of some remaining NAPCO inventory located in Wisconsin.

(h)   Contracts.  Except for the Assumed Contracts and contracts that are Excluded Assets, Seller is not a party to or otherwise subject to any leases, contracts, agreements (oral or written), or documents which are material to the conduct of the Business.  Except as otherwise disclosed on Schedule 10(h): (i) the Assumed Contracts are in full force and effect in all material respects and, as of the date of this Agreement, to the actual knowledge of Seller, (other than for the failure to pay the Cure

8

Amounts) Seller has not received a notice of default, and Seller has not received a notice of termination with respect to such Assumed Contracts, (ii) (other for the failure to pay the Cure Amounts) there has not occurred any event which would constitute a breach by the Seller of, or default by the Seller in, the performance of any covenant, agreement or condition contained in any of the Assumed Contracts, which breach or default would have a material adverse effect on the financial condition or business of the Seller and (iii) to Seller's knowledge, Seller has not taken any action related to its Chapter 11 bankruptcy case or otherwise, that would infringe or otherwise impair upon Buyer's right to exercise the purchase option set forth in the Natchez Mill Lease.

(i)     Tax Returns; Audits.  Except as otherwise disclosed on Schedule 10(i): (i) Seller has filed with all appropriate governmental agencies all tax returns which it is required to file as of the date of this Agreement, including any tax returns pertaining to the Purchased Assets; and (ii) to the Seller's actual knowledge, the amounts shown as owing on the returns are true and correct amounts and Seller has paid all taxes shown as due on such returns and all other taxes due and owing in the operation of the Business, and is not delinquent in the payment of any taxes claimed to be due and owing by any federal, state or local taxing authority.  Seller has not given any waiver or extension of any statute of limitations governing the time for assessment or collection of any federal, state or local tax which has not expired prior to the date hereof on the Purchased Assets to be transferred pursuant to this Agreement.  There have been no audits other than routine audits by any taxing or regulatory authority of the Seller, and none are pending, proposed, or threatened pertaining to the Purchased Assets.

(j)     Employees and Benefits.  Seller has provided to Buyer a complete list (as of the date set forth therein) of names, positions, and current annual salaries or wage rates and bonus and other compensation arrangements as of the date thereof of all full-time and part-time employees of Seller employed in connection with the Business.  The list indicates whether each such employee is a part-time or full-time employee.  There is no pending or, to Seller's actual knowledge, threatened, employee strike, work stoppage or labor dispute.  No collective bargaining agreement exists or is currently being negotiated by Seller, no demand has been made to Seller for recognition by a labor organization by or with respect to any employees employed by the Seller, and no union organizing activities, to Seller's actual knowledge, are taking place.  There is no unfair practice claim against the Seller with respect to the Business before the State Employees Relation Board or National Labor Relations Board, or any strike, dispute, slowdown, or stoppage pending or, to Seller's actual knowledge, threatened against or involving the Business.  To Seller's actual knowledge, Seller is in material compliance with all federal and state laws respecting employment and employment practices, terms and conditions of employment, and wages and hours. Seller is not engaged in any unfair labor practices.

(k)     Regulatory Matters.  Seller has all permits, licenses, certificates of authority, orders and approvals of, and has made all filings and applications with, all state and federal public authorities required in order to permit Seller to carry on the business of the Business as presently conducted. Seller is not in violation of, and has not infringed, any statute, regulation, ordinance, license or been subject to any judgment, ruling, injunction or order of any such authorities which violation, infringement, judgment, ruling, injunction or order would have a material adverse effect on the ability of Seller to consummate the transactions contemplated hereby or the ability of the Buyer to operate the Business following the Effective Time in substantially the same manner as the Business are currently conducted.

(l)     Brokers and Finders.  Neither of Seller nor any of its officers, directors or employees has employed any broker or finder or incurred any liability for any financial advisory fees, brokerage fees, commissions or finder's fees, and no broker or finder has acted, directly or indirectly, for Seller in connection with this Agreement or the transactions contemplated hereby.

(m)     [Intentionally Omitted]

(n)     <u>Environmental and Regulatory Matters</u>.  To Seller's actual knowledge: (i)  Seller has all required material permits, licenses, certificates of authority, orders and approvals of, and has made all material filings and applications with, all local, state and federal regulatory agencies charged with regulating human health, workplace health, the environment, natural resources and energy, including, without limitation, the United States Environmental Protection Agency and the applicable state Department of Environmental Protection ("*Environmental Agencies*"); (ii)  Seller is in material compliance with any and all applicable environmental and safety requirements, including federal, state, local laws, statutes, regulations, ordinances, orders, approvals, determinations, authorizations, common law and codes, which address public health and safety, worker health and safety, pollution or protection of the environment ("*Environmental Requirement*"); (iii)  Except as described in the attached <u>Schedule 10(n)</u>, no spills, leaks, discharges, injections, leaching, dumping, disposing or any other releases of any Hazardous Substances has occurred at, in, by, from or related to the Purchased Assets; (iv)  Seller is not a party to any investigation, proceeding, enforcement action, corrective action, remediation, clean-up, lawsuit, negotiation or settlement initiated by any Environmental Agencies, citizens groups, individuals, entities or other person related to Hazardous Substances or any Environmental Requirement.  "Hazardous Substance" means any substance regulated by any Environmental Requirement or Environmental Agency and includes, without limitation, any flammable explosives, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum based products, methane, hazardous materials, hazardous wastes, hazardous or toxic substances, wastes, waste petroleum products, waste natural gas products, materials, compounds, pollutants, contaminants, or related materials, including those regulated by the Comprehensive Environmental Response, Compensation and Liability Act , 42 U.S.C. 9601, <u>et. seq.</u>, the Hazardous Materials Transportation Act, (49 U.S.C. 1801, <u>et seq.</u>), the Resource Conservation and Recovery Act, 42 U.S.C. 6901, <u>et. seq.</u>, the Toxic Substances Control Act, (15 U.S.C. 2601, <u>et seq.</u>), the Federal Water Pollution Control Act (33 U.S.C. Sections 1251, <u>et seq.</u>), or the Clean Air Act (42 U.S.C. 7401, <u>et seq.</u>), all as amended.

(o)     <u>Acceptance of Purchased Assets "As Is"</u>.  Seller is making no representations or warranties other than those in this §10 as to the condition, state of repair, merchantability, or fitness for any particular purpose of any of the Purchased Assets and it is understood by the parties that the Purchased Assets are being transferred to Buyer "as is", nor does Seller make any representation or warranty as to the Purchased Assets for any purposes or needs of Buyer or as to the present or any future condition of the Business. SELLER IS MAKING NO WARRANTIES TO BUYER, EITHER EXPRESS OR IMPLIED, REGARDING THE CONDITION, FITNESS FOR USE, FITNESS FOR ANY PARTICULAR PURPOSE OR MERCHANTABILITY OF ANY OF THE PURCHASED ASSETS.

§11.    <u>Pre-Closing Covenants</u>.  Prior to the Closing, the parties shall comply with the following covenants:

(a)     <u>Conduct of Business</u>.  At all times after the date of this Agreement and until the Closing Date, Seller shall use its best efforts to cause the value and/or operation of the Purchased Assets to be preserved and to operate the Business in the usual and ordinary course of Business, including, without limitation, operating the Business in accordance with good business practices and maintaining the quantity of inventory in the usual and ordinary course of Business.  During this period, Seller shall not (without Buyer's written consent): (i) purchase, sell, convey, lease, acquire, or transfer any real property, fixtures, machinery, equipment, signs, furniture, furnishings, or other assets which comprise the Purchased Assets, except inventories or supplies, or other assets purchased or sold in the usual and ordinary course of business; (ii) enter into any agreement or transaction with respect to the Business that is not in the usual and ordinary course of business; (iii) increase the compensation of any employee; (iv) enter into any material contract; (v) terminate any lease or contract or make any material amendment or

waiver of any of Seller's rights in respect thereof; or (vi) take any action to respond to any material customer outside of the normal course of business.

(b)     Governmental Approvals.  Other than Bankruptcy Court approval, no further approvals, authorizations and clearances of governmental and regulatory authorities are required to consummate the transactions contemplated hereby.

(c)     Consents.  In the case of Assumed Contracts, and in conjunction with the sale of Purchased Assets, Seller shall make all reasonable efforts to have the Sale Order approving this Agreement and the transactions contemplated herein in their entirety.  Seller shall use reasonable efforts in assisting Buyer to resolve disputes of all Cure Amounts and shall pursue all other matters incidental to the Supplemental Cure Notice.

(d)     Release of Liens.  Seller shall use its best efforts to arrange for the release prior to or as of the Effective Time of any and all pledges, liens or other encumbrances on any of the Purchased Assets by obtaining the entry of the Sale Order.

(e)     Damage or Destruction.  Until the Closing, the Purchased Assets shall remain at the risk of the Seller.  In the event of any material damage to or destruction of the Purchased Assets (other than normal wear and tear) after the date hereof and prior to the Closing (in any such case, a "*Loss*"), the Seller shall give notice thereof to the Buyer.  If any such Loss is covered by policies of insurance, Buyer shall have the option of either (i) electing not to close the transactions contemplated by this Agreement or (ii) electing to receive all right and claim of the Seller to any proceeds of insurance for such Loss, which shall be assigned and (if previously received by the Seller and not used prior to the Closing Date to repair any such damage or destruction) paid to the Buyer at Closing, in which case the Buyer shall, subject to the other terms and conditions of this Agreement, consummate the transaction as provided in this Agreement without any reduction in the Purchase Price with respect to such Loss.

(f)     Permits and Licenses.  Commencing on the date of this Agreement, the parties, cooperating in good faith, shall use commercially reasonable efforts to take such steps, including the filing of any required applications with governmental authorities, as may be necessary (i) to effect the transfer of the Permits and Licenses to the Buyer on or as soon as practicable after the Closing Date, to the extent such transfer is permissible under applicable law, and (ii) to enable the Buyer to obtain, on or as soon as practicable after the Closing Date, any additional licenses, permits, approvals, consents, certificates, registrations, and authorizations (whether governmental, regulatory, or otherwise) as may be necessary for the lawful operation of the Natchez Mill from and after the Closing Date (the actions described in the foregoing clauses (i) and (ii) being referred to herein as the "*Permitting Process*").  Any filing or other fees and other out-of-pocket expenses associated with the permitting Process shall be paid by the Buyer.  The Buyer acknowledges that it may not be possible to complete the Permitting Process prior to the Closing Date and agrees that completion of the Permitting Process prior to the Closing Date shall not be a condition to its obligation to proceed with this transaction as provided in this Agreement.

§12.     Conditions to Obligations of Buyer.  The obligations of Buyer to be performed under this Agreement at the Closing shall be subject to the satisfaction of the following conditions (unless waived in writing by Buyer):

(a)     Representations and Warranties.  Seller's representations and warranties as set forth in this Agreement shall be true and correct in all material respects as of the Closing Date as if such representations and warranties were made as of the Closing Date.

(b)     Performance of Agreement.  All covenants, conditions and other obligations under this Agreement that are to be performed or complied with by Seller on or prior to the Closing Date, shall have been fully performed and complied with in all material respects, including, without limitation, Seller's obligation to deliver the executed instruments and documents in accordance with §15.

(c)     No Adverse Proceeding.  There shall be no material adverse effect that has occurred in respect of the Purchased Assets or the Business since the date of this Agreement, and no pending or threatened claim, action, litigation or proceeding against Buyer, Seller, or the Purchased Assets for the purpose of or that would have the effect of, enjoining or preventing the consummation of this Agreement, or otherwise claiming that this Agreement or the consummation hereof is illegal.

(d)     Bankruptcy Court Approval.  The Bankruptcy Court shall have approved the sale and transfer of the Purchased Assets to Buyer free and clear of all claims and interests (except as expressly assumed by Buyer herein), and the assumption and assignment of the Assumed Contracts (except for those Assumed Contracts that are the subject of the Supplemental Cure Notice), by entry of the Sale Order.

(e)     Title Insurance.  A title company is prepared to issue, at the Buyer's sole cost and expense, an owner's standard ALTA policy of title insurance in respect of each parcel of the Owned Real Property in the amount of the Purchase Price allocated to the Owned Real Property in the Purchased Assets subject only to the Permitted Encumbrances, and such title company and the Buyer shall have reviewed and approved the legal descriptions with respect to such Owned Real Property to be attached to such policy.

§13.     Conditions to Obligations of Seller.  The obligations of Seller to be performed at the Closing under this Agreement shall be subject to the satisfaction of the following conditions (unless waived in writing by Seller):

(a)     Representations and Warranties.  Buyer's representations and warranties as set forth in this Agreement shall be true and correct in all material respects as of the Closing Date as if such representations and warranties were made as of the Closing Date.

(b)     Performance of Agreement.  All covenants, conditions and other obligations under this Agreement that are to be performed or complied with by Buyer on or prior to the Closing Date shall have been fully performed and complied with in all material respects, including, without limitation, Buyer's obligation to deliver the executed instruments and documents in accordance with §16.

(c)     No Adverse Proceeding.  There shall be no pending or threatened claim, action, litigation or proceeding against Buyer, Seller, or the Purchased Assets for the purpose of, or that would have the effect of, enjoining or preventing the consummation of this Agreement, or otherwise claiming that this Agreement or the consummation hereof is illegal.

(d)     No Change.  There shall have been no adverse material change in the financial or business condition of the business and operation of the Buyer.

(e)     Bankruptcy Court Approval.  The Bankruptcy Court shall have approved the sale and transfer of the Purchased Assets to Buyer, free and clear of all claims and interests (except as expressly assumed by Buyer herein), and the assumption and assignment of the Assumed Contracts (except for those Assumed Contracts that are the subject of the Supplemental Cure Notice), by entry of the Sale Order.

§14.    Employees.  Buyer may, in Buyer's sole discretion, offer employment to any person who is an employee of Seller to commence employment with the Buyer after the Closing Date.  Any such employment will be on terms and conditions as may be established  by Buyer in its sole discretion.

§15.    Closing Deliveries by Seller.  At the Closing, Seller shall deliver or cause to be delivered, the following closing documents:

(a)    Closing Statement.  A Closing statement showing the Purchase Price and all charges or credits to Buyer or Seller provided for herein.

(b)    [Intentionally Omitted]

(c)    Deeds.  Good and sufficient limited warranty and/or fiduciary deeds, which shall be in a form and substance reasonably satisfactory to Buyer and in recordable form, conveying good and marketable title to the Owned Real Property to Buyer, free and clear of all liens and encumbrances, except for Permitted Encumbrances and Assumed Liabilities.  Buyer shall, at its option, purchase title insurance for the Owned Real Property.

(d)    Bankruptcy Court Approvals.  The Sale Order with a fully executed copy of this Agreement attached thereto.

(e)    Schedule of Customer Deposits.  A schedule of customer deposits being held for return to Business's customers, determined as of the Closing Date.

(f)    Schedule of Accounts Receivable.  A schedule of the Accounts and Notes Receivable on the books of the Seller as of the Closing Date.

(g)    Bill of Sale.  A good and sufficient general conveyance, assignment and assumption and bill of sale, in a form reasonably acceptable to the parties, conveying all of Seller's right, title and interest in and to the Purchased Assets free and clear of all liens and encumbrances, except for Permitted Encumbrances and Assumed Liabilities.

(h)    Certificates of Title.  Motor vehicle certificates of title to any vehicles included as part of the Equipment, duly endorsed for transfer to Buyer.

(i)    Contracts.  Other than as ordered by the Bankruptcy Court, good and sufficient assignments and assumptions of the Assumed Contracts, which shall be in form and substance reasonably acceptable to the parties.

(j)    Resolutions.  Resolutions of the board of directors of Seller authorizing the execution and delivery of this Agreement by Seller and the performance of its obligations hereunder, certified by the secretary of the Seller.

(k)    Officer's Certificate.  A certificate of the vice-president of Seller dated as of the Closing Date to the effect that Seller's representations and warranties set forth in §9 of this Agreement are true and correct as of the date thereof and as to fulfillment of Seller's pre-Closing covenants and conditions.

(l)    Non-Foreign Seller Affidavit.  An affidavit that Seller is not a non-resident *"alien", "foreign corporation", "foreign partnership", "foreign trust"* or *"foreign estate"* within the

meaning of the Internal Revenue Code and Regulations thereunder, executed by the vice-president of Seller.

(m) _Intellectual Property Assignments_. Documents necessary to effectuate the assignments of any Intangible Property in a form reasonably acceptable to Buyer.

(n) _Other_. Such other separate instruments of sale, assignment or transfer that Buyer may reasonably deem necessary or appropriate in order to perfect, confirm or evidence title to all or any part of the Purchased Assets.

§16. _Deliveries by Buyer_. At the Closing, Buyer shall deliver or cause to be delivered the following Closing documents:

(a) [Intentionally Omitted]

(b) _Bill of Sale_. An executed counterpart to the Bill of Sale described in §15(g), herein.

(c) _Contracts_. Other than as ordered by the Bankruptcy Court, an executed counterpart to the assignment and assumption of Assumed Contracts described in §15(i), herein.

(d) _Officers' Certificate_. A certificate of the sole manager of Buyer dated as of the Closing Date to the effect that (i) Buyer's representations and warranties set forth in §9 hereof are true and correct as of the date hereof; and (ii) Buyer has fulfilled all pre-Closing covenants and conditions.

(e) _Resolutions_. Resolutions of the manager of Buyer authorizing the execution and delivery of this Agreement by Buyer and the performance of its obligations hereunder, certified by the secretary of Buyer's manager.

(f) _Purchase Price_. A bank check or other form of payment reasonably acceptable to Seller for the portion of the Purchase Price to be paid to Seller, with credit given to Buyer in the amount of the Deposit.

(g) _Bankruptcy Court Approvals_. The Sale Order with a fully executed copy of this Agreement attached thereto.

(h) _Other Documents_. Such other Closing documents as may be reasonably requested by Seller or its counsel.

§17. _Additional Obligations_. The parties shall comply with the following covenants, as applicable:

(a) _Further Assurances_. At or after Closing Date, the parties shall prepare, execute and deliver such further instruments of conveyance, sale, assignment, assumption or transfer, and shall take or cause to be taken such other or further action as either party shall reasonably request at any time or from time to time in order to perfect, confirm or evidence in Buyer title to all or any part of the Purchased Assets or to consummate in any other manner, the terms and conditions of this Agreement.

(b) _Closing Balance Sheet_. Within two (2) business days of the Closing, Seller shall deliver to Buyer a consolidated balance sheet as of Closing in the form filed with Seller's monthly operating reports submitted to the Bankruptcy Court.

§18.   Termination.

(a)      Termination by Buyer.  This Agreement may be terminated and cancelled prior to the Closing by the Buyer if: (i) (A) any of the representations or warranties of Seller contained in this Agreement shall prove to be inaccurate in any material respect, or any covenant, agreement, obligation, or condition to be performed or observed by Seller under this Agreement has not been performed or observed in any material respect at or prior to the time specified in this Agreement, and (B) such inaccuracy or failure shall not have been cured within fifteen (15) business days after written notice of such occurrence from Buyer to Seller;  (ii) any permanent injunction or other order of the Bankruptcy Court or other competent authority preventing consummation of the transactions contemplated by this Agreement shall have become final and non-appealable; or (iii) the Closing of the transactions contemplated by this Agreement has not occurred by June 30, 2010.

(b)      Termination by Seller.  This Agreement may be terminated and cancelled prior to the Closing by the Seller if: (i) (A) any of the representations or warranties of Buyer contained in this Agreement shall prove to be inaccurate in any material respect, or any covenant, agreement, obligation, or condition to be performed or observed by Buyer under this Agreement has not been performed or observed in any material respect at or prior to the time specified in this Agreement, and (B) such inaccuracy or failure shall not have been cured within 15 business days after written notice of such occurrence from Seller to Buyer; or (ii) any permanent injunction or other order of the Bankruptcy Court or other competent authority preventing consummation of the transactions contemplated by this Agreement shall have become final and non-appealable.

§19.   Indemnification.  The representations and warranties of the parties set forth in this Agreement shall survive the Closing. The parties shall have the following indemnification obligations:

(a)      Seller Indemnification Obligation.  Seller shall indemnify and save harmless Buyer against and from any and all losses, damages, liabilities, or claims ("*Claims*") arising directly or indirectly out of:

(i)      Any Liabilities relating to Seller's conduct of the Business prior to the Effective Time, or any Liabilities of Seller that are not Assumed Liabilities;

(ii)      Any failure of any representation or warranty by Seller to have been correct and complete when made;

(iii)      Any failure by Seller to pay any liabilities assumed by Seller at the Closing or to perform any obligations assumed by Seller pursuant to this Agreement.

(iv)      Any failure by Seller to fully perform and observe all obligations to be performed or observed by Seller under this Agreement.

(b)      Buyer Indemnification Obligation.  Buyer shall indemnify and save harmless Seller against and from any and all losses, damages, liabilities, or claims arising directly or indirectly out of:

(i)      Any liabilities resulting from Buyer's conduct of the Business after the Effective Time;

(ii)     Any failure by Buyer to pay any Assumed Liabilities by Buyer that are required to be paid at the Closing or to perform any obligations assumed by Buyer pursuant to this Agreement.

(iii)     Any failure of any representation or warranty by Buyer to have been correct and complete when made; and

(iv)     Any failure by Buyer to fully perform and observe all obligations to be performed and observed by Buyer under this Agreement.

(c)     <u>Amount Limitations</u>.  In determining the amount of losses, damages, liabilities, or claims, there shall be deducted  the amount, if any, of insurance recovered by the party seeking indemnification with respect to the indemnifiable event giving rise to such losses, damages, liabilities, or claims.

(d)     <u>Expiration of Indemnity</u>.  Notwithstanding the foregoing to the contrary, the parties' obligations of indemnity shall terminate one year after the Closing Date, except for obligations of indemnity under § 19b(i), and § 19b(ii).  If prior to the date of such termination a notice of a claim is given, then the party giving notice shall not be precluded from pursuing that claim following the expiration of such one year period.

(e)     <u>Indemnification for Third Party Claims</u>.  If either party (the *"Indemnified Party"*) determines to seek indemnification under this Section from the other party (the *"Indemnifying Party"*) with respect to a claim resulting from the assertion of liability by a third party, the Indemnified Party shall give written notice to the Indemnifying Party which notice shall set forth such material information with respect to such claim as is then reasonably available.  The Indemnifying Party shall be entitled, if it so elects by written notice to the Indemnified Party, to assume the defense of such asserted liability or claim with counsel reasonably satisfactory to the Indemnified Party.  Notwithstanding the foregoing: (i) the Indemnified Party shall have the right to employ its own counsel in any such case, but the fees and expenses of such counsel shall be payable by the Indemnified Party; and (ii) the rights of the Indemnified Party to be indemnified shall not be adversely affected by its failure to give notice pursuant to the foregoing provisions unless, and, if so, only to the extent that the Indemnifying Party is materially prejudiced by such failure.

(f)     <u>Exclusive Remedy</u>.  The parties agree that any remedies which may arise under the Asset Purchase Agreement are covered by and included within this §19.  This §19 shall provide the sole and exclusive remedy for any and all liabilities, demands, claims, actions or causes of action, assessments, losses, fines, penalties, costs (including reasonable attorneys' and expert witness fees), damages and expenses, including, without limitation, those asserted by any federal, state, local or foreign governmental entity, public utilities commission, franchise authority, third party, or former or present employee, sustained or incurred by Buyer or Seller, or their successors or assigns.

§20.     <u>Notices</u>.  Any notice or other communication required or desired to be given to any party under this Agreement shall be in writing and shall be deemed given when: (a) delivered personally to an officer of that party, or (b) deposited in the United States mail, first class, postage prepaid, express mail service, addressed to that party at the following address or at any other address hereafter designated by that party in writing to the party giving notice:

**Notice to Seller:**

Mississippi River Corporation

Attention: Ronald A. Lisko
150 East Wilson Bridge Road
Suite 250
Worthington, OH 43085

with a copy to:

Richard K. Stovall, Esq.
Allen Kuehnle Stovall & Neuman LLP
17 South High Street
Suite 1220
Columbus, OH 43215
Phone:  (614) 221-8500
Fax:      (614) 221-5988
Email:  *stovall@aksnlaw.com*

**Notice to Buyer:**

Mississippi River Pulp LLC
c/o Matthew A. Swanson and John McEvoy
Wayzata Investment Partners LLC
701 East Lake Street
Suite 300
Wayzata, MN 55391
Phone:  (952) 345-0700
Fax:      (952) 345-8901
Email:  mswanson@wayzpartners.com
Email:  jmcevoy@wayzpartners.com

with a copy to:

Randall D. LaTour, Esq.
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, OH  43215
Phone:  (614) 464-8290
Fax:      (614) 719-4821
Email:  rdlatour@vorys.com

§21.    <u>Governing Law</u>.  All questions concerning the validity or meaning of this Agreement or relating to the rights and obligations of the parties with respect to performance under this Agreement shall be construed and resolved under the laws of Ohio, exclusive of conflicts of law.  All parties to this Agreement hereby designate the Bankruptcy Court in Franklin County, Columbus, Ohio as the court of jurisdiction and venue for any action or proceedings relating to this Agreement, hereby irrevocably consent to such designation, jurisdiction and venue and hereby waive any objections or defenses relating to jurisdiction or venue with respect to any action or proceeding initiated in any such court.

§22.    <u>Recording and Transfer Fees</u>.  Except as otherwise provided in this Agreement, each party shall pay its own costs and expenses in connection with the negotiation, execution and consummation of this Agreement. All recording fees, transfer taxes, and fees and expenses relating to the conveyances, assignments and transfers under this agreement shall be paid by Buyer.

§23.     Execution of Documents.  Each party to this Agreement and its successors and assigns shall execute, acknowledge or verify and deliver any and all documents which from time to time may be reasonably requested by any other party to this Agreement to carry out the purposes and intent of this Agreement.

§24.     Severability.  The intention of the parties to this Agreement is to comply fully with all laws and public policies, and this Agreement shall be construed consistently with all laws and public policies to the extent possible.  If any court of competent jurisdiction determines it is impossible to construe any provision of this Agreement consistently with any law or public policy and consequently holds that provision to be invalid, such holding shall in no way affect the validity of the other provisions of this Agreement, which shall remain in full force and effect.

§25.     Non-waiver.  No failure by any party to insist upon strict compliance with any term of this Agreement, to exercise any option, enforce any right, or seek any remedy upon any default of any other party shall affect, or constitute a waiver of, the first party's right to insist upon such strict compliance, exercise that option, enforce that right, or seek that remedy with respect to that default or any prior, contemporaneous, or subsequent default; nor shall any custom or practice of the parties at variance with any provision of this Agreement affect, or constitute a waiver of, any party's right to demand strict compliance with all provisions of this Agreement.

§26.     No Third Party Benefit.  This Agreement is intended for the exclusive benefit of the parties to this Agreement and their respective successors and assigns, and nothing contained in this Agreement shall be construed as creating any rights or benefits in or to any third party.

§27.     Captions.  The captions of the various sections of this Agreement are not part of the context of this Agreement, but are only labels to assist in locating those sections, and shall be ignored in construing this Agreement.

§28.     Complete Agreement.  This document (including its schedules and exhibits), contains the entire agreement between the parties and supersedes all prior or contemporaneous discussions, negotiations, representations, or agreements relating to the subject matter of this Agreement.  No changes to this Agreement shall be made or be binding on any party unless made in writing and signed by each party of this Agreement.

§29.     Successors.  This Agreement shall be binding upon, inure to the benefit of, and be enforceable by and against the respective heirs, personal representatives, successors and assigns of each party to this Agreement, provided that Buyer shall not assign its rights under this Agreement except to an affiliate with the express written consent of Seller, provided that Buyer shall remain liable for all obligations under this Agreement following any permitted assignment.

§30.     Execution. This Agreement may be executed in one or more counterparts, including by email and facsimile, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the date first above.

**SELLER**

**MISSISSIPPI RIVER CORPORATION**, an Ohio corporation

By: _____
     Ronald A. Lisko, Vice-President

**BUYER**

**MISSISSIPPI RIVER PULP, LLC,** a Delaware limited liability company

By: Wayzata Investment Partners, LLC, its manager

By: _____
Its: Authorized Signatory

**Owned Real Property**

1. Natchez Mill:  30 Majorca Road, Natchez, MS, in name of Seller, located in Adams County, Mississippi and including buildings and land (approximately 470,000 square footage, not including leased property) which are further described in Mississippi Valley Title Insurance Company/Old Republic National Title Insurance Company Title Commitment File No. *MRC* 12 09 Owners (Natchez Mill Title Commitment).  Property will be sold subject to Deed of Trust debt securing Promissory Note in original amount of $1,000,000 to Adams County, Mississippi, with an approximate balance as of January 2010 of $114,271 and to Deed of Trust debt securing Promissory Note in the original amount of $720,000 to Adams County, Mississippi, with an approximate balance as of January 2010 of $181,161.00, the liability for which is being assumed by Buyer.

Also the Natchez Mill is subject to the lien for personal and real estate taxes owing for 2008 and 2009 in the approximate amount of $658,781.54, as detailed in schedule 10(i) hereof, the liability for which is being assumed by Buyer.  The Natchez Mill is also subject to Permitted Encumbrances, as set forth in the Natchez Mill Title Commitment.

The legal description to the Natchez Mill is as follows:

Situated in ADAMS County, State of MISSISSIPPI, to wit:

## TRACT 1:

Description of a 96.77 acre tract, portion of a 102.12 acre tract, American Tissue Corporation of Majorca Plantation, situated in Township 7 North, Range 3 West, Adams County, Mississippi.

Beginning at southeast corner of a 102.12 acre tract, acquired by American Tissue Corp. per deed recorded in Deed Book 17-E, on Page 411, of the Records of Adams County, Mississippi.

Thence from said point of beginning, go along the westerly right-of-way of Majorca Road N 21º 12' 46" E for 289.56 feet; N 68º 47' 14" W for 50.00 feet; along the arc of a curve to the right, having a radius of 968.12 feet for a distance of 245.00 feet; N 35º 42' 46" E for 208.60 feet; and N 54º 17' 14" W for 50.00 feet; thence leaving said right-of-way go S 88º 36' 05" W for 162.86 feet; thence N 73º 34' 00" W for 263.47 feet; thence S 30º 18' 00" W for 143.36 feet; thence N 87º 27' 06" W for 85.11 feet; thence N 36º 48' 46" W for 154.98 feet; thence N 44º 37' 18" E for 160.04 feet; thence N 44º 43' 45" E for 526.04 feet; thence S 37º 27' 45" E for 48.80 feet; thence S 36º 43' 55" E for 166.26 feet; thence S 35º 33' 06" E for 207.95 feet to the westerly right-of-way of Majorca Road; thence along the westerly right of way of Majorca Road N 02º 02' 14" W for 100.00 feet along the arc of a curve to the right, having a radius of 915.65 feet for a distance of 126.63 feet; S 84º 06' 48" E for 85.00 feet; along the arc of a curve to the right, having a radius of 830.65 feet for a distance of 298.31 feet; N 26º 27' 46" E for 100.00 feet along the arc of a curve to the left, having a radius of 596.11 feet for a distance of 561.82 feet, N 27º 32' 14" W for 247.00 feet, along the arc of a curve to the right, having a radius of 505.74 feet for a distance of 81.48 feet to the northeast corner of within described tract; thence leaving the westerly right-of-way of Majorca Road go N 72º 47' 22" W along the southerly boundary of a 65.77 acre tract acquired by Adams County from Diamond National Corp., per deed recorded in Deed Book 10-A, on Page 347 of the Records of Adams County, Mississippi for 1436.03 feet to the center of a bayou; thence along the present centerline of said bayou the following bearings and distances:

S 37º 02' 58" W for 89.41 feet;
S 39º 14' 07" E for 85.63 feet;

S 07º 26' 33" W for 43.80 feet;
S 72º 39' 53" W for 90.60 feet;
S 52º 29' 18" W for 97.58 feet;
S 29º 08' 03" W for 47.62 feet;
S 02º 12' 28" W for 148.30 feet;
S 15º 22' 18" W for 57.40 feet;
S 80º 49' 18" W for 36.76 feet;
N 47º 56' 37" W for 85.20 feet;
S 66º 02' 18" W for 24.39 feet;
S 00º 01' 13" W for 64.04 feet;
S 39º 20' 37" E for 69.00 feet; and
S 25º 33' 17" E for 42.25 feet;

thence along the center of same bayou as existed in or prior to December 1963, the following bearings and distances:

S 34º 48' 49" W for 292.47 feet;
S 67º 18' 46" W for 43.40 feet;
S 38º 10' 46" W for 18.30 feet to the North boundary of an I.C. Railroad Tract, recorded in Deed Book 6-I, on Page 24 of the Records of Adams County, Mississippi;

thence along the Northerly and Easterly boundaries of said I.C. Railroad Tract the following bearings and distances:

N 81º 50' 46" E for 16.50 feet;
S 64º 09' 14" E for 157.90 feet;
S 54º 24' 46" W for 190.00 feet;
S 51º 39' 46" W for 110.00 feet;
S 40º 29' 46" W for 158.00 feet; and
S 62º 13' 46" W for 93.60 feet to the most southerly corner thereof;

thence S07º 48' 46" W along the easterly right-of-way of I.C. Railroad for 49.00 feet; thence along the easterly boundary of I.C. Railroad property the following bearings and distances:

S 01º 08' 46" W for 216.00 feet;
S 06º 21' 14" E for 199.80 feet;
S 12º 08' 46" W for 149.00 feet;
S 21º 24' 46" W for 111.20 feet;
N 61º 45' 14" W for 32.70 feet; and
S 07º 12' 46" W for 103.00 feet to the northerly right-of-way of Port Road;

thence along the northerly right-of-way of Port Road along the arc of a curve to the left, having a radius of 1096.62 feet for a distance of 317.29 feet; S 72º 49' 14" E for 801.30 feet; along the arc of a curve to the right, having a radius of 2914.93 feet for a distance of 179.76 feet; and S 69º 17' 14" E for 671.90 feet to the point of beginning.

Within described tract containing 96.77 acres, more or less, being a portion of a 102.12 acre tract, American Tissue Corp. portion of Majorca Plantation, situated is Township 7 North, Range 3 West, Adams County, Mississippi.  The above described tract being all lands acquired by Mississippi River corporation per deed recorded in Deed Book 19-B, on Page 171, of the records of Adams County, Mississippi, and all of the lands acquired by Mississippi River Corporation per deed recorded in Deed Book 19-A, on Page 470 of the records of Adams County, Mississippi.

**LESS AND EXCEPT** the following described real property as conveyed by Mississippi River Corporation to Adams County, Mississippi by Deed dated April 13, 1995 and recorded in Deed Book 20-D, on Page 442, of the Records of Adams County, Mississippi:

Situated in ADAMS County, State of MISSISSIPPI, to wit:

From the southeast corner of 102.12 acre tract acquired by American Tissue Corp. per deed recorded in Deed Book 17-E, on Page 411 of the records of Adams County, Mississippi, go N 00° 31' 31" E for 1669.3 feet to the most southerly corner of a 2.32 acre tract, thence along the southeasterly boundary of said 2.32 acre tract, N 44° 43' 02" E for 406.00 feet to the point of beginning, being a point on the northwesterly boundary of within described tract.

Thence from said point of beginning continue N 44° 43' 02" E along the southeasterly boundary of said 2.32 acre tract, and an extension thereof for 126.00 feet; thence S 45° 16' 58" E for 287.78 feet to the westerly right of way of Majorca Road, SAP 1(18), being also the easterly boundary of Mississippi River Corporation lands per deed recorded in Deed Book 19-B, on Page 171 of the records of Adams County, Mississippi; thence along said boundary being the arc of a curve to the right, having a radius of 596.11 feet for 339.96 feet, and S 26° 27' 46" W for 26.41 feet; thence leaving said boundary go N 76° 52' 10" W for 251.69 feet; thence N 45° 16' 58" W for 243.06 feet; thence N 44° 43' 02" E for 307.00 feet, thence N 45° 16' 58" W for 29.00 feet to the point of beginning.

Within described tract containing 3.77 acres, more or less, being a portion of Majorca Plantation, portion of lands acquired by Mississippi River Corporation, per deed recorded in Deed Book 19-B, on Page 171 of the records of Adams County, Mississippi, and further, being depicted as a portion of Parcel 70, Group A, Tax Map No. 44, Adams County, Mississippi.

The aforesaid 3.77 acre tract is set forth and depicted on that certain map prepared for the Adams County Board of Supervisors dated December, 1994, revised 12/29/94 by Luther L. Marling, R.L.S. No. 241.

**LESS AND EXCEPT** the following described real property as conveyed by Mississippi River Corporation to Board of Supervisors of Adams County, Mississippi by Deed dated December 20, 2006 and recorded in Deed Book 23-W, on Page 79, of the Records of Adams County, Mississippi:

2.00 ACRE PORTION OF MISSISSIPPI RIVER CORPORATION PROPERTY
PORTION OF PARCEL 70.1, TAX MAP 44
SITUATED IN SECTION 54, T7N-R.3W
ADAMS COUNTY, MISSISSIPPI

The following description is based on the Mississippi State Plane, West Zone, NAD 83 Projection, and the bearings shown are on this grid.

From a 1" iron rod found at the Southeasterly corner of a 102.12 acre tract as described by deed recorded in deed book 17-E, page 411, of the records of Adams County, Mississippi, being the point of intersection of the Westerly right-of-way line of Majorca Road with the Northerly right-of-way line of Port Road, run N 46° 48' 28" W for a distance of 893.47' feet to a 5/8" iron rod set at Northeasterly corner of within described tract for the point of beginning, at N 739167.45 E 1955158.98 on the above referenced coordinate system.

Thence from said point of beginning run S 21° 12' 32" W for a distance of 247.70 feet to a 5/8" iron rod set; thence run N 72° 03' 18" W for a distance of 321.41 feet to a 5/8" iron rod set; thence run N 21° 12' 32" E for a distance of 206.37 feet to a 5/8" iron rod set; thence run N 77° 13' 34" E for a distance of 218.81 feet to a 5/8" iron rod set; thence run S 44° 35' 28" E for a distance of 152.89 feet to the point of beginning.

The within describe tract contains 2.00 acres.

Map of a portion of Mississippi River Corporation property being a portion of Parcel 70.1, Tax Map 44 by Robert D. Green, RLS #1565.

TOGETHER WITH a right of access over, on and across the adjacent property of the Grantor, Mississippi River Corporation for the sole and exclusive purpose of maintaining the aforesaid 2.0 acres conveyed herein and specifically the electric utility power line area as shown and depicted on the aforesaid plat.

## TRACT 2:

The following described one acre tract of land in Township 7 North, Range 3 West, in Adams County, Mississippi more particularly described as follows:

From the southeast corner of a 102.12 acre tract, acquired by American Tissue Corp. by deed recorded in Deed Book 17-E, on page 411 of the Records of Adams County, Mississippi, run N 25º 59' 20" E for 1207.75 feet to a point on the easterly right-of-way line of Majorca Road, SAP 1(8), for the point of beginning, being the southwesterly corner of within described tract.

Thence from the said Point of Beginning, run northerly along the easterly right-of-way line of Majorca Road, SAP 1(8), being the arc of a curve to the right having a radius of 705.65 feet, for a distance of 295.28 feet; thence run N 26º 27' 46" E along said right-of-way for 85.00 feet; thence run S 72º 46' E for 98.38 feet; thence run S 30º 03' W for 116.60 feet; thence run S 15º 39' W for 56.04 feet; thence run S 11º 13' E for 110.22 feet; thence run S 6º 18' W for 104.68 feet; thence run N 75º 37' W for 146.12 feet to the point of beginning.

The within described tract contains 1.00 acre, more or less.

A map or plat of the one acre tract above described was prepared by Jordan, Kaiser & Sessions in October, 1990.

The above described Tract 2 was acquired by Mississippi River Corporation by Deed of Conveyance from Adams County, Mississippi dated October 18, 1990 and recorded in Deed Book 18-Q, on Page 147, of the Records of Adams County, Mississippi.

## TRACT 3:

That certain property situated in Township 7 North, Range 3 West, Adams County, Mississippi, and described as follows:

From the southeast corner of a 102.12 acre tract acquired by American Tissue Corp. per deed recorded in Deed Book 17-E, on page 411 of the records of Adams County, Mississippi, go N 37º 26' E for 609.67 feet to the point of beginning, being a point on the easterly right-of-way of Majorca Road, SAP 1(8), being also the southwest corner of within described tract.

Thence from said point of beginning go the following bearings and distances along the easterly right-of-way of Majorca Road, SAP 1(8):

       N 35º 42' 47" E for 109.42 feet;
       N 54º 17' 13" W for 10.00 feet;
       along the arc of a curve to the left having a radius of 567.04 feet for 373.60 feet;
       N 02º 02' 13" W for 100.00 feet; and

along the arc of a curve to the right having a radius of 705.65 feet for 55.72 feet to the southwest corner of a 1.00 acre tract, portion of property of Adams County; thence S 75° 37' E along the southerly boundary of said 1.00 acre tract for 146.12 feet; thence leaving the southerly boundary of said 1.00 acre tract, go S 35° 59' W for 13.20 feet; thence south for 585.06 feet; thence west for 197.28 feet; thence N 72° 12' W for 99.98 feet to the point of beginning.

Within described tract contains 2.47 acres, more or less.

The above described Tract 3 was acquired by Mississippi River Corporation by Warranty Deed from Adams County, Mississippi dated November 4, 1991 and recorded in Deed Book 18-Z, on Page 300, of the Records of Adams County, Mississippi.

**AND ALSO** the following described Water Well Sites located on Tract 1 herein described**:**

**_Water Well Site 1_**, portion of 102.12 acre tract, portion of Majorca Plantation, situated in Township 7 North, Range 3 West, Adams County, Mississippi, further described as follows:

From the southeast corner of a 102.12 acre tract, acquired by American Tissue Corp. per deed recorded in Deed Book 17-E, Page 411, of the records of Adams County, Mississippi, go along the northerly right-of-way of Port Road N 69° 17' 14" W for 671.90 feet; thence along the arc of a curve to the left, having a radius of 2914.93 feet for 179.80 feet; thence N 72° 49' 14" W for 801.24 feet; thence along the arc of a curve to the right, having a radius of 1096.62 feet for 295.05 feet to the point of beginning, being the southeast corner of within described tract.

Thence from said point of beginning continue along the northerly right-of-way of Port Road, being the arc of a curve to the right having a radius of 1096.62 feet for 22.75 feet to the easterly boundary of I. C. Railroad property; thence N 07° 12' 46" East along the easterly boundary of I. C. Railroad property for 20.00 feet; thence leaving said boundary, go S 82° 47' 14" E for 20.00 feet; thence S 07° 12' 46" W for 29.74 feet to the point of beginning.

Being the same property excepted as Tract 1, per deed recorded in the Deed Book 17-E, Page 411 of the records of Adams County, Mississippi.

**_Water Well Site 2_**, portion of 102.12 acre tract, portion of Majorca Plantation, situated in Township 7 North, Range 3 West, Adams County, Mississippi.

From the southeast corner of a 102.12 acre tract, acquired by American Tissue Corp. per deed recorded in Deed Book 17-E, Page 411 of the records of Adams County, Mississippi, go along the northerly right-of-way of Port Road, N 69° 17' 14" W for 671.90 feet, thence along the arc of a curve to the left, having a radius of 2914.93 feet for 179.80 feet to the point of beginning, being the southeast corner of within described tract.

Thence from said point of beginning, go N 72° 49' 14" W along the northerly right of way of Port Road for 20.00 feet; thence leaving said right-of-way N 17° 10' 46" E for 20.00 feet; thence S 72° 49' 14" E for 20.00 feet; thence S 17° 10' 46" W for 20.00 feet to the point of beginning.
Being the same property excepted as Tract 2, per deed recorded in Deed Book 17-E, Page 411 of the records of Adams County, Mississippi.

**_Water Well Site 3_**, portion of 102.12 acre tract, portion of Majorca Plantation, situated in Township 7 North, Range 3 West, Adams County, Mississippi.

From the Southeast corner of a 102.12 acre tract, acquired by American Tissue Corp. per deed recorded in Deed Book 17-E, Page 411 of the records of Adams County, Mississippi, being the Southeast corner of

within described tract.

Thence from said Point of Beginning, go N 69° 17' 14" W along the northerly right of way of Port Road for 20.00 feet; thence leaving said right of way go N 21° 12' 46" E for 20.00 feet; thence S 69° 17' 14" E for 20.00 feet to the westerly right-of-way of Majorca Road; thence S 21° 12' 46" W along the westerly right-of-way of Majorca Road for 20.00 feet to the point of beginning.

Being the same property excepted as Tract 3, per deed recorded in Deed Book 17-E, Page 411 of the records of Adams County, Mississippi.

2.      That certain condominium located in Bridgeport, Harrison County, West Virginia, as more fully described below:

Situated in the State of West Virginia and in the County of Harrison and being more particularly described as follows:

All that certain tract of land, known and designated as Townhouse Unit 209, together with all buildings and improvements thereon and appurtenances thereunto belonging, situate in Emberwood Subdivision, Simpson-Outside District, Harrison County, West Virginia, and being more particularly bounded and described as follows:

Beginning at a 3/4" iron rod set said point bears North 21° 50' 18" East, a distance of 195.46 feet from a concrete monument found; thence with a common corner of Lot No. 209 and Lot No. 208, North 21° 50' 18" East, a distance of 37.43 feet to a 3/4" iron rod set; thence leaving said 3/4" iron rod set and with a common line of Lot No. 209 and Lot No. 117, South 72° 56' 40" East, a distance of 132.61 feet to a 3/4" iron rod set at a common corner of Lot No. 209 and Lot No. 117 and the western right of way of Road "A"; thence leaving said 3/4" iron rod set and with the western right of way of Road "A", South 23° 15' 04" West, a distance of 36.00 feet to a 3/4" iron rod set at a common corner of Lot No. 209 and Lot No. 208; thence leaving said western right of way of Road "A" and with a common line of Lot No. 209 and Lot No. 208, North 73° 35' 59" West, a distance of 131.85 feet to the Place of Beginning, and containing 4,829 square feet, or 0.11 acres, more or less.

TOGETHER WITH (i) a non-exclusive easement and right of way for purposes of ingress, egress and regress to and from the lot or parcel of land above described over, upon and across those certain roadways shown and designated as road "A", "B" and "C" on the aforesaid recorded plat of Emberwood Subdivision; and (ii) a non-exclusive easement or right of way for ingress, egress and regress to and from the lot or parcel above described over, upon and across the roadway connecting said subdivision to West Virginia Secondary Route 24, commonly known as Meadowbrook Road as contained in a certain Deed from LaNat Limited Liability Company to Hart Limited Liability Company dated July 18, 1997 and recorded in Deed Book No. 1290, Page 402, Clerk of the County Commission of Harrison County, West Virginia.

ALSO TOGETHER WITH easements granted in the Second Amended Declaration of Easements, Covenants, Reservations, Conditions and Restrictions of Emberwood Subdivision dated July 14, 1997 and recorded in Deed Book No. 1290, Page 410, Clerk of the County Commission of Harrison County, West Virginia.

EXCEPTED AND RESERVED THEREFROM an easement or right of way for the installation, maintenance, removal and relocation of utility services through, over, under and across An area of a uniform and continuous ten (10) feet in width running with, inside of and parallel to all lot lines of the above described lot.

**Natchez Mill Lease**

Seller is lessee under that certain Lease with Adams County, Mississippi, dated April 13, 1995, for the lease of 3.77 acres which are part and parcel of the Natchez Mill, with building containing approximately 80,000 square feet of warehouse space. The Lease is connected to Promissory Note evidencing Seller's initial debt to Lessor of $1,000,000, upon which, as of January 2010, there is an approximate balance owing of $114,271. There is an option to purchase real estate under the Lease for $1.00 to be exercised upon payment in full of Promissory Note.

The 3.77 acre tract is more particularly described as follows:

Situated in ADAMS County, State of MISSISSIPPI, to wit:

From the southeast corner of 102.12 acre tract acquired by American Tissue Corp. per deed recorded in Deed Book 17-E, on Page 411 of the records of Adams County, Mississippi, go N 00º 31' 31" E for 1669.3 feet to the most southerly corner of a 2.32 acre tract, thence along the southeasterly boundary of said 2.32 acre tract, N 44º 43' 02" E for 406.00 feet to the point of beginning, being a point on the northwesterly boundary of within described tract.

Thence from said point of beginning continue N 44º 43' 02" E along the southeasterly boundary of said 2.32 acre tract, and an extension thereof for 126.00 feet; thence S 45º 16' 58" E for 287.78 feet to the westerly right of way of Majorca Road, SAP 1(18), being also the easterly boundary of Mississippi River Corporation lands per deed recorded in Deed Book 19-B, on Page 171 of the records of Adams County, Mississippi; thence along said boundary being the arc of a curve to the right, having a radius of 596.11 feet for 339.96 feet, and S 26º 27' 46" W for 26.41 feet; thence leaving said boundary go N 76º 52' 10" W for 251.69 feet; thence N 45º 16' 58" W for 243.06 feet; thence N 44º 43' 02" E for 307.00 feet, thence N 45º 16' 58" W for 29.00 feet to the point of beginning.

Within described tract containing 3.77 acres, more or less, being a portion of Majorca Plantation, portion of lands acquired by Mississippi River Corporation, per deed recorded in Deed Book 19-B, on Page 171 of the records of Adams County, Mississippi, and further, being depicted as a portion of Parcel 70, Group A, Tax Map No. 44, Adams County, Mississippi.

The aforesaid 3.77 acre tract is set forth and depicted on that certain map prepared for the Adams County Board of Supervisors dated December, 1994, revised 12/29/94 by Luther L. Marling, R.L.S. No. 241.

| NON-DEBTOR PARTY (last, first if non-business) | CONTRACT OR LEASE DESCRIPTION | CONTRACT OR LEASE DATE | PROPOSED CURE AMOUNT AND ADEQUATE ASSURANCE OF FUTURE PERFORMANCE |
|---|---|---|---|
| Adams County, Mississippi (Board of Supervisors) | Natchez Mill Lease, re 80,000 square warehouse connected to Promissory note with approx balance of $114,271 and option to purchase real estate of $1.00 (Contract will still need to be assumed if the underlying debt is paid) | 4/13/95 | $14,544.44 (2 months arrearage on lease/related note, but entire debt will need to be paid prior to exercising option) |

<u>**SCHEDULE 1(c)**</u>

**<u>Office & Apartment Leases</u>**

1. Worthington, OH – 2,591 square feet of office space, mainly supporting NAPCO division operations, leased at a base rent of $1,781.31 a month, expiring October 31, 2010. Last Extension of Lease dated October, 15, 2009.  (Current)

2. Natchez, MS – apartment lease dated January 5, 2010 for 125 Lower Woodville Road, Apt No. 1170, leased for a base rent of $690.09 a month. Lease expires July 2010.  (Current)

| NON-DEBTOR PARTY<br><br>(last, first if non-business) | CONTRACT OR LEASE DESCRIPTION | CONTRACT OR LEASE DATE | PROPOSED CURE AMOUNT AND ADEQUATE ASSURANCE OF FUTURE PERFORMANCE |
|---|---|---|---|
| Principal Life Insurance Company | Worthington Ohio, office lease expires 10/31/2010 | Last Extension 10/15/2009 | No Current Default |
| The Mark Apartments | Natchez MS apartment lease expires 7/05/10 | 1/5/10 | No Current Default |

<u>**SCHEDULE l(d)**</u>

<u>**Equipment**</u>

**Includes the following tangible personal property, but is not limited to:**

| Qty | Description |
|-----|-------------|
| 1 | Pulper - FiberPrep Model 40M3, High Consistency |
| 1 | Pulper Feed Conveyor - Karl W Schmidt Model SS-111-P |
| 1 | Scavenger - FiberPrep/Lamort Model V |
| 1 | Voith Contaminex |
| 1 | RimPac Skip-Hoist Loader Reject Conveyor |
| 1 | Pulper - Fiberprep Hydrapulper |
| 2 | Back-up Pulping System - Black-Clawson Hydrapulpers, 6000 pound capacity |
| 1 | Back-up Pulping System - Morden Hydrapulper 6000 pound capacity |
| 2 | Voith High Density Cleaners, 250 TPD |
| 2 | Voith Screens 420 gpm |
| 2 | Primary Coarse Screens - CH3 Fiber Prep |
| 2 | Secondary Coarse Screens - CH5 Fiber Prep |
| 3 | Fine Screens - Sunds T9 |
| 4 | Fine Screens - Sunds T6 |
| 64 | Voith Flotation Cells 1320 gallon |
| 90 | Celleco Model Cleanpac 700s |
| 158 | Celleco Model Cleanpac 350s |
| 462 | Celleco Model Cleanpac 270s |
| 1 | Voith Model RS20 Reject Sorter |
| 1 | Wedge - Fields & Boyd Model 120 -WT Dewatering Press |
| 1 | Kneader - Ahlstrom Kamyr Model H - 2000 MDR Kneader |
| 1 | Model HPA Heater, Static Pulp Heater |
| 2 | Model T-15B Mixers |
| 1 | PO Bleach Tower |
| 1 | FAS Bleach Tower |
| 1 | FAS Chemical Feed System |
| 48 | Voith Flotation Cells 1320 gallon |
| 1 | Seenumatic Flotation Cell |
| 2 | Hymac Model 96x192 Decker Filters |
| 1 | Fields & Boyd Wet Lap Machine |
| 1 | Fields & Boyd Cutter Layboy Unit |
| 1 | Cranston Baling and Handling System |
| 1 | Andritz Model Wetlap Machine |
| 1 | Andritz Model CLR 12188 Cutter Layboy Unit |
| 1 | Neilson & Hiebert Systems Baling and Handling Systems |

| | |
|---|---|
| 1 | Wastewater Treatment Clarifier 80' Diameter |
| 1 | Wastewater Treatment Clarifier 50' Diameter |
| 1 | Wastewater Treatment Clarifier 60' Diameter |
| 26 | Aeration Lagoons Aerators |
| 2 | Parkson Filter Presses |
| 1 | Press Technology Model 36200 Screw Press |
| 3 | Cleaver Brooks Boilers |
| 3 | Alfa-Laval Thermal Model 1H Heat Exchangers |
| 3 | Ingersoll-Rand Rotary Screw Air Compressor |
| 1 | Poseidon Saturn S600 DAF Clarifier |
| 1 | Poseidon Satum S1500 DAF Clarifyer |

**In addition, Seller has office equipment, such as computers, fax machines, adding machines, etc. used in each of its offices.**

## SCHEDULE 1(e)

## Assumed Contracts And Leases

| NON-DEBTOR PARTY (last, first if non-business) | CONTRACT OR LEASE DESCRIPTION | CONTRACT OR LEASE DATE | PROPOSED CURE AMOUNT AND ADEQUATE ASSURANCE OF FUTURE PERFORMANCE |
|---|---|---|---|
| Nissan Motor Acceptance Corp | 2007 Nissan Altima – 36 Month Lease, ending 11/04/10; VIN #1N4BL21E27C154505 | 10/31/07 | No Current Default |
| TechPap | Process Dirt Counter | April 2009 | $12,888 (4 months @ $3,222.00) |
| Toyota Motor Credit | Various Forklift (2 – 2009 and 9 – 2006) trucks at Natchez Mill, MI | Various- see below | $10,284.82 (2 months) |
| Xerox | 60 Month Copier lease; Ser. No. UTU-907296, ending 01/01/12 | 01/01/07 | $660.03 |
| Pitney Bowes | NAPCO (Worthington office) postage meter – 17 quarterly payments of $786 remaining | August 2007 | No Current Default |
| Pitney Bowes | MRC postage meter – Quarterly payments of $419.32 | January 2005 | No Current Default |
| CDE Integrated Systems, Inc. | CDE telephone system maintenance contract, Quarterly payments $882.75 | September 2009 | $882.75 |
| | | Total | $24,715.60 |

**Assumed Contracts And Leases (Supplemental Cure Notice may be required)**

| NON-DEBTOR PARTY (last, first if non-business) | CONTRACT OR LEASE DESCRIPTION | CONTRACT OR LEASE DATE | PROPOSED CURE AMOUNT AND ADEQUATE ASSURANCE OF FUTURE PERFORMANCE |
|---|---|---|---|
| Entergy | Electricity Contract | | $ 0.00 |

**SCHEDULE 1(e)**

**Continued**

**TOYOTA FINANCIAL SERVICES**
**FORK TRUCK LEASES: (All expired leases are**
**currently on a month to month basis)**

| YEAR | MAKE | MODEL | LEASE DATE | EXPIRES | LEASE# | SERIAL# | MONTHLY PAYMENT |
|------|------|-------|------------|---------|--------|---------|-----------------|
| 2009 | TOYOTA | 8FGU25 | 4/30/2009 | 5/31/2012 | LA70739 | 19188 | $ 470.06 |
| 2009 | TOYOTA | 8FGU25 | 6/23/2009 | 7/31/2012 | LA70739 | 19248 | $ 470.06 |
| 2006 | TOYOTA | 7FGU25 | 10/16/2006 | 10/16/2009 | LA49674 | 83952 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 10/16/2006 | 10/16/2009 | LA49674 | 84587 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 10/16/2006 | 10/16/2009 | LA49674 | 84589 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 1/29/2007 | 2/26/2010 | LA49674 | 84611 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 1/29/2007 | 2/26/2010 | LA49674 | 84636 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 1/29/2007 | 2/26/2010 | LA49680 | 84686 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 1/29/2007 | 2/26/2010 | LA49680 | 84688 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 1/29/2007 | 2/26/2010 | LA49680 | 84698 | $ 451.77 |
| 2006 | TOYOTA | 7FGU25 | 1/29/2007 | 2/26/2010 | LA49680 | 84590 | $ 451.77 |
| | | | | | **TOTAL:** | | **$ 5,006.05** |

<u>**SCHEDULE 1(f)**</u>

<u>**Intangible Property**</u>

The following is not intended to be a complete list of Intangible Property, but an identification of specific property:

1.      Trademark of MRC initially issued on US Patent and Trademark Office Principal Register on January 10, 1995, under Registration No. 1,873,053, and renewed for additional 10 years to January 2015.

2.      Trade name of NAPCO, or North American Paper Company. NAPCO was previously a separate corporation that was merged into Seller in 1993.

3.      May 2008 United States Patent NO. 7,377,993 B2, regarding fully recycled pulp use in manufacturing food-contact paper packaging materials.

4.      Approval from FDA regarding process to manufacture food-contact paper packaging material from fully recycled pulp dated September 24, 2004.

5.      Certificate of Conformity and the like from various countries relating to recycled products for food packaging, including but not limited to letters and or certificates, and their replacements and extensions thereof:

(a)      from Bureau of Chemical Safety, Ottawa, Ontario, dated March 22, 2005 and September 13, 2005 regarding acceptability, and statement of no reason to object to the post-consumer recycled pulp for the manufacture of paperboard for food contact applications; and

(b)      from Germany approval letter of December 5, 2006, approving Uncoated Cup, Recycle Cup, Coated Aseptic, Coated Aseptic/D, PQR/Printkote/Coated Cup and Pressed Tray as board grades used for food packaging and the manufacture of drinking cups as set forth therein.

## SCHEDULE l(i)(1)

## Accounts Receivable

**See Attached**

**Notes Receivable**

**SHAREHOLDER NOTES RECEIVABLE**

**RECOURSE NOTE RECEIVABLE**

| Shareholder | Principal Amount | Balance Due at December 31, 2008 |
|---|---|---|
| Ed Logan | $181,675 | $183,390.46 |

**\* NONRECOURSE NOTES RECEIVABLE**

| Shareholder | Principal Amount | Balance Due at December 31, 2008 |
|---|---|---|
| Ed Logan | $291,326 | $400,128 |
| Ron Lisko | $291,326 | $400,128 |
| Bob Adelman | $291,326 | $400,128 |
| Bob Snyder | $58,265 | $80,024 |
| Joe Albrycht | $135,952 | $186,729 |
| BarbBurkhart | $19,422 | $26,678 |
| George Matthews | $38,843 | $53,347 |

## SCHEDULE 3(ii)

**Adams County Liabilities**


       1.      Liability in the amount of at least $114,271.00 or such greater amount that is due and payable at Closing:  Promissory Note to Adams County, Mississippi in the original amount of $1,000,000, dated April 13, 1995 (with additional loan agreements) with a January 2010 balance owing of $114,271. Loan secured by a Deed of Trust, dated April 13, 1995, to creditor granting a security interest in the Seller's interest in certain warehouse space which is part of the Natchez Mill complex, and payments on loan are also considered as payment on Lease to Adams County of a certain warehouse space referenced in Schedule 1(b).

       2.      Liability in the amount of at least $181,161.00 or such greater amount that is due and payable at Closing:  Promissory Note to Adams County, Mississippi in the original amount of $720,000 with a January 2010 balance owing of $181,161.00.  Loan secured by a Deed of Trust, dated December 21, 1992, to creditor granting a security interest in Seller's interest in certain warehouse space which is part of the Natchez Mill complex.

## SCHEDULE 5(a)

## Deposits and Accrued Interest

None.  To be updated at Closing.

**Deposits and Bonds**

None.  To be updated at Closing.

## SCHEDULE 7

## SALE ORDER

See Attached

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | Case No. 10-51480 |
| **MISSISSIPPI RIVER CORPORATION,** | |
| **Debtor.** | Chapter 11 |
| | Judge John E. Hoffman, Jr. |

**ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS TO SUCCESSFUL BIDDER AT AUCTION; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING OTHER RELATED RELIEF**

This matter coming before the Court on the Motion of Debtor for an Order (I) Authorizing the Sale of Substantially all its Assets Free and Clear of Liens, Claims and Encumbrances under Asset Purchase Agreement, Subject to Higher and Better Offers, (II) Approving the Procedures for an Auction, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (IV) Scheduling an Auction and a Hearing Date Relating Thereto, (V) Approving Break-Up Fee, and (VI) Approving the Forms of Notice Thereof (the "Sale Motion") seeking approval of, among other things, (i) the institution of bidding procedures (the "Bidding Procedures") to be employed in connection with the Debtor's proposed sale of substantially all of the Debtor's assets to

Mississippi Recycling Company, LLC (the "Stalking Horse") pursuant to the terms and conditions of an Asset Purchase Agreement ("Stalking Horse APA") subject to higher or otherwise better bids, and (ii) the scheduling of a bid submission deadline, auction, and sale hearing and objection deadline and the approval of the sale of substantially all of the Debtor's assets to the Stalking Horse under the Stalking Horse APA subject to higher and better bids being received at auction, and the Debtor's assumption and assignment of certain of its executory contracts and unexpired leases in connection therewith, and the Court having entered its *Agreed Order Authorizing and Approving the Bidding Procedures for an Auction Sale of the Debtor's Assets, Scheduling an Auction Date and Sale Hearing Date and the Deadline for Objections to the Proposed Sale and Approving Notices to Creditors and Parties In Interest* on April 19, 2010 [Docket No. 106] (the "Bid Procedures Order"), and Mississippi River Pulp, LLC ("Buyer") having been determined by the Debtor and the Official Committee of Unsecured Creditors (the "Committee") to be the bidder whose asset purchase agreement ("APA," a copy of which is attached hereto as <u>Exhibit A</u>) reflected the highest and best bid (the "Winning Bid"), and a hearing ("Sale Hearing") having been held on the Debtor's Motion and to consider approval of the Winning Bid on May 21, 2010; and all creditors and parties in interest having been afforded an opportunity to be heard with respect to the Motion and all relief sought thereunder, and the Court being otherwise duly advised and informed in the premises and all objections having been resolved or overruled for the reasons stated on the record and all capitalized terms not defined in this Order having the same meanings as in the Motion, APA and Bidding Procedures Order,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue of this case and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought in the Motion are sections 105(a), 363(b), (f), (m) and (n), and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*., as amended (the "Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      On March 22, 2010 this Court entered the Final Order Under 11 U.S.C. §§ 105(a), 361, 362, 363 and 364, Federal Bankruptcy Rules 2002, 4001 and 9014, And Local Rules 4001-2 And 4001-3: (I) Authorizing Debtor To Obtain Secured Post-Petition Financing And Use Cash Collateral; (II) Granting Adequate Protection; (III) Modifying The Automatic Stay; And (IV) Granting Related Relief (the

"Financing Order"), approving, among other things, the use of cash collateral and the extension of the postpetition financing on a secured basis by the Lender (as defined in the Financing Order).

C.      The Lender has a security interest in substantially all of Debtor's prepetition and postpetition assets to secure the prepetition indebtedness and the Post-Petition Obligations (as defined in the Financing Order).

D.      The Debtor has conducted a thorough and adequate search for potential purchasers for the Purchased Assets.  The Debtor and its professionals marketed the Purchased Assets and conducted the sale process in accordance with the Bid Procedures.  Based upon the record of these proceedings, all creditors and equity holders, all other parties-in-interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Purchased Assets.

E.      Proper, timely, adequate and sufficient notice of the Motion, the Bidding Procedures, the Sale Hearing, and the transactions contemplated by the APA and this Order (the "Transactions"), including, where appropriate, notice with respect to the assumption and assignment of the Assumed Contracts, has been provided in accordance with sections 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006, and 9014 of the Bankruptcy Rules to, inter alia: (a) all entities known to have expressed an interest in the Purchased Assets; (b) all entities known to have asserted any Lien, Claim, Interest or Encumbrance in or upon any of the Purchased Assets; (c) all federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Sale Motion; (d) Adams County, Mississippi; (e) counsel for the Committee; and (f) counsel for the Lender.  Such notice was good, sufficient and appropriate under the circumstances, a reasonable opportunity to object and be heard with respect to the Sale Motion and the relief requested therein was afforded to all interested persons and entities, and no other or further notice of the Sale Motion, the Sale Hearing, or the Transactions, including, without limitation, notice regarding the assumption and assignment of the Assumed Contracts is or shall be required.

F.      As demonstrated by (i) the testimony and/or other evidence proffered at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtor has conducted the sale process fairly and openly in a manner reasonably calculated to produce the highest and best offer for the Purchased Assets under the circumstances and in compliance with the Bidding Procedures Order, including holding an Auction on May 18, 2010 at which Buyer was determined to be the Winning Bidder with the Winning Bid by the Debtor and Committee.  The Sale Hearing was held and the highest and best offer received by the Debtor for the Purchased Assets at or before the Sale Hearing was the offer by Buyer, as such offer is reflected in the APA.

G.      Approval of the APA and consummation of the Transactions, including the sale of the Purchased Assets to Buyer at this time, is in the best interests of the Debtor, its creditors, its estate, and other parties in interest.  The Debtor has established that strong business reasons exist for (i) selling the Purchased Assets to Buyer outside the ordinary course of business and outside a plan and (ii) the assumption and assignment of the Assumed Contracts as specified in the APA.  Such business reasons include, but are not limited to the following: (i) the APA constitutes the highest or otherwise best offer for the Purchased Assets; (ii) the APA and the closing thereon will present the best opportunity to realize the value of the Purchased Assets and avoid decline and devaluation of the Debtor's business; (iii) there is substantial risk of deterioration of the value of the Purchased Assets; and (iv) the APA and the closing thereon will produce higher value than could be obtained in a liquidation sale or any other presently available restructuring alternative.  Pursuant to the APA, Buyer is not purchasing all of the Debtor's assets in that Purchaser is not purchasing any of the Excluded Assets and Buyer is not holding itself out to the public as a continuation of the Debtor.  Those of the Debtor's employees who are to be employed by Buyer pursuant to section 14 of the APA are being hired under new employment contracts or other arrangements

to be entered into or to become effective at or after the time of the Closing. The Transactions do not amount to a consolidation, merger or de facto merger of Buyer and the Debtor and/or the Debtor's estate, there is not substantial continuity between Buyer and the Debtor, there is no continuity of enterprise between the Debtor and Buyer, Buyer is not a mere continuation of the Debtor or the Debtor's estate, and Buyer does not constitute a successor to the Debtor or the Debtor's estate.

H.     Upon review of the evidence presented or proffered, the Court finds that the APA was negotiated, proposed and entered into by the Debtor and the Buyer without collusion, in good faith, and from arm's-length bargaining positions. The terms of the APA are fair and reasonable and the total consideration provided by Buyer for the Purchased Assets constitutes (a) reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Conveyance Act, and (b) fair value under the Uniform Fraudulent Transfer Act for the Purchased Assets. Neither the Debtor, nor the Buyer have engaged in any conduct that would cause or permit the APA or any part of the Transactions provided for herein to be avoided, or for the imposition of costs and damages against the Buyer, under section 363(n) of the Bankruptcy Code. The Buyer is not an insider of the Debtor as that term is defined in section 101(31) of the Bankruptcy Code. The Court finds that Buyer has fully disclosed that an affiliate of Buyer has an ownership interest in Caraustar Industries, Inc., one of the Debtor's creditors, and the Court finds that such fact does not cause the sale to be not in good faith, particularly considering that there is an opportunity for other parties to bid on the assets of the Debtor.

I.     Upon review of the evidence presented or proffered, the Court finds that the Buyer is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. The Buyer will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the sale of the Purchased Assets pursuant to the APA.

J.     Except as otherwise set forth herein, the Debtor is the sole and lawful owner of the Purchased Assets. Subject to certain exceptions set forth herein, the Debtor may sell the Purchased Assets to the Buyer free and clear of all Liens, Claims, Interests and Encumbrances (as defined herein) in accordance with, and to the extent permitted by, section 363(f) of the Bankruptcy Code because, with respect to each creditor asserting a Lien, Claim, Interest or Encumbrance, one or more of the standards set forth in section 363(f)(1)-(5) has been satisfied. As a condition of purchasing the Purchased Assets, the Buyer requires that the Purchased Assets be sold free and clear of all Liens, Claims, Interests and Encumbrances, except those explicitly and expressly assumed by the Buyer in the APA. Accordingly, the transfer of the Purchased Assets to the Buyer is or will be a legal, valid and effective transfer of the Purchased Assets, and will vest the Buyer with all right, title and interest in and to the Purchased Assets, free and clear of all Liens, Claims, Interests and Encumbrances except those explicitly and expressly assumed by the Buyer in the APA pursuant to, and to the fullest extent permitted by, section 363(f) of the Bankruptcy Code and all other applicable laws. Except as otherwise expressly set forth in the APA, the transfer of the Purchased Assets to Buyer does not and will not subject Buyer to any liability whatsoever with respect to the operation of the Debtor's business and/or the ownership of the Purchased Assets prior to the Closing.

K.     Except as set forth herein, non-debtor parties holding valid Liens, Claims, Interests and Encumbrances in or with respect to the Purchased Assets who did not object to the Sale Motion or those whose objections were withdrawn are deemed to have consented to the sale of the Purchased Assets free and clear of their Liens, Claims, Interests and Encumbrances in or with respect to the Purchased Assets pursuant to section 363(f)(2) of the Bankruptcy Code.

L.     The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assumed Contracts to Buyer in connection with the consummation of the Transactions, and the assumption, assignment, and sale of the Assumed Contracts is in the best interest of the Debtor, its estate,

its creditors and all parties in interest. The Assumed Contracts being assigned to Buyer are an integral part of the Debtor's business and the Purchased Assets and accordingly, such assumption, assignment, and sale of Assumed Contracts is reasonable, enhances the value of the Debtor's estate, and does not constitute unfair discrimination. Buyer has provided adequate assurance of cure of any defaults existing prior to the Closing under any of the Assumed Contracts within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and provided adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting for a default prior to the date hereof under any of the Assumed Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. Buyer has provided adequate assurance of its future performance of and under the Assumed Contracts within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.

M.      The Debtor has demonstrated in the exercise of its sound business judgment that each and every executory contract or unexpired lease that has not been identified in the APA as an Assumed Contract, should be rejected.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**

1.      The Sale Motion is GRANTED by this Order and all objections thereto are hereby overruled.

<u>**Approval of the Asset Purchase Agreement**</u>

2.      The APA, as received by the parties in interest and presented to the Court, and all of the terms and conditions thereof, as may be amended, including as may be amended by this Order, are hereby approved, including without limitation the Purchase Price, which is the sum of (a) $8,200,000.00 plus (b) the Sales Taxes plus (c) the Cure Amounts for the Assumed Contracts. For the avoidance of doubt, the Deposit already paid by Buyer in the amount of $100,000 shall be a credit against the sum of $8,200,000.00.

3.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtor is authorized and directed to consummate the sale of the Purchased Assets to the Buyer pursuant to and in accordance with the terms and conditions of the APA and this Order. At the Closing where Mississippi River Pulp, LLC is the Buyer, payment to the Stalking Horse of the Break-up Fee in the amount of $138,000 is hereby authorized. In the event that the Closing is ultimately the Back-up Bid such that the Stalking Horse is the Buyer, then no payment of the Break-up Fee shall be made.

4.      The Debtor is empowered to perform under, consummate and implement the APA, and is authorized and directed to take all other actions as are necessary to effectuate the Transactions, including executing and delivering all additional instruments and documents that may be reasonably necessary or desirable to implement the APA, and to take all further actions as may be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to possession, the Purchased Assets and the Assumed Contracts, or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA.

<u>**Transfer of Assets Free and Clear of Liens**</u>

 5.      At Closing, Buyer shall acquire the Purchased Assets for the Purchase Price, which shall include such sums required to satisfy all Cure Amounts for the Assumed Contracts. Upon the payment of the Purchase Price, the Purchased Assets shall be transferred, and title passed, to the Buyer pursuant to the fullest extent permitted by sections 105(a) and 363(f) of the Bankruptcy Code and all other applicable laws, free and clear of all claims, liens, interests or encumbrances of any type whatsoever (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected,

allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the chapter 11 case, and whether imposed by agreement, understanding, law, equity, or otherwise) including but not limited to those (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtor's or the Buyer's interest in the Purchased Assets, or any similar rights, (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtor's business prior to the Closing date and (iii) that relate to or arise under doctrines of successor liability, including without limitation any liability or obligations under any state or federal environmental law (all such liens, claims, interests, and encumbrances listed herein, the "Liens, Claims, Interests and Encumbrances"), other than the Assumed Liabilities and Permitted Encumbrances, with all such Liens, Claims, Interests and Encumbrances of any kind or nature whatsoever (other than the Assumed Liabilities and the Permitted Encumbrances) attaching to the proceeds of the sale ultimately attributable to the property against or in which the holder of an interest claims or may claim an interest in the order of their priority, with the same validity, force and effect which they now have.

6.      Except for the Assumed Liabilities or as otherwise expressly provided for in the APA and this Order, the Buyer shall not have any liability or responsibility for any liability or other obligation of the Debtor related to the Purchased Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided in the APA, the Buyer shall not be liable for the Excluded Liabilities or any other liabilities against the Purchased Assets, the Debtor or any of its predecessors or affiliates including, but not limited to, liabilities whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, whether relating to or arising out of the Debtor's Business, the Excluded Assets or the Purchased Assets or otherwise.

7.      Except as expressly permitted or otherwise specifically provided by the APA or this Order, all parties holding Liens, Claims, Interests and Encumbrances of any kind or nature whatsoever against the Debtor or the Purchased Assets, arising under or out of, in connection with, or in any way relating to, the Debtor, the Purchased Assets, the operation of the Debtor's Business prior to the Closing Date, or the transfer of the Purchased Assets to the Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting such person's or entity's Liens, Claims, Interests and Encumbrances against the Buyer, its successors or assigns, its property or assets, which claims are hereby transferred to the sale proceeds whether or not a party asserting any such claim has delivered to Buyer a release. But for the obligations under the Assumed Contracts, Buyer shall not be liable for any claims of any kind or nature, whether prepetition or postpetition, matured or unmatured, fixed or contingent, liquidated or unliquidated, known or unknown, against the Debtor or any of its predecessors or affiliates, and the Buyer shall have no successor liability to any party.

## Assignment of Assumed Contracts To Buyer

8.      Pursuant to sections 365(b), (c) and (f) of the Bankruptcy Code, and subject to this Order, the Debtor is authorized to assume and assign the Assumed Contracts (as defined in the APA) to Buyer which Assumed Contracts shall include but not be limited to, consistent with the APA and this Order, those identified in Paragraph 1 of the APA or Schedules 1(b), (c), and (e) of the APA , subject to the procedures established in the Bidding Procedures Order.

9.      Those Assumed Contracts to which there has been no objection to assignment, assumption and the Cure Amount shall be deemed assumed and assigned to the Buyer as of the Closing Date and the Buyer shall be deemed to have provided adequate assurance of its future performance under the relevant Assigned Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy

Code.

10.     Upon Closing, the Buyer shall assume full responsibility and liability for all Assumed Contracts, including payment of all Cure Amounts (as have been established in accordance with any applicable cure notices), and the Debtor shall have no further responsibility, financial or otherwise, under any Assumed Contracts for any defaults, breaches or other damages associated with the Assumed Contracts, whether arising or accruing prior to or subsequent to the Closing.  Except for the Cure Amounts, there are no other defaults existing under the Assumed Contracts.

11.     On or as promptly after the Closing Date as practical, the Cure Amounts to which no objections have been filed, or to which the Buyer and applicable non-debtor contract party have agreed as to the allowed Cure Amount(s), shall be paid.

12.     The Buyer shall not be required to assume any contract unless the Cure Amount with respect to such contract, if any, is acceptable to the Buyer.  The Debtor shall not be deemed to have assumed any executory contract and/or unexpired lease that is not an Assumed Contract.  Each and every executory contract and unexpired lease that is not an Assumed Contract is hereby deemed rejected by the Debtor.

13.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer as a result of the assumption and assignment of any Assumed Contract.

14.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all parties to the Assumed Contracts are forever barred and enjoined from raising or asserting against the Buyer any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts existing as of the Closing or arising by reason of the Closing, except for any post-petition amounts that are Assumed Liabilities being expressly assumed by the Buyer under the APA.  Payment of the Cure Amounts shall be deemed to discharge the Debtor's obligation to: (i) cure, or provide adequate assurance that the Debtor will promptly cure, any defaults under the Assumed Contracts and (ii) compensate, or provide adequate assurance that the Debtor will promptly compensate any non-debtor party to the Assumed Contracts for any actual pecuniary loss resulting from any default under the Assumed Contracts.

15.     In accordance with sections 365(b)(2) and (f) of the Bankruptcy Code, upon transfer of the Assumed Contracts to the Buyer, (i) the Buyer shall have all of the rights of the Debtor hereunder and each provision of such Assumed Contracts, including but not limited to the option to purchase contained in the Assumed Natchez Mill Lease, shall remain in full force and effect for the benefit of the Buyer notwithstanding any provision in any such Assumed Contract or in applicable law that prohibits, restricts or limits in any way such assignment or transfer, and (ii) no Assumed Contract may be terminated, or the rights of any party modified in any respect, including pursuant to any "change of control" clause, by any other party thereto as a result of the consummation of the Transactions.

**<u>Additional Provisions</u>**

16.     The transfer of the Purchased Assets to the Buyer pursuant to the APA and this Order constitutes a legal, valid, and effective transfer of the Purchased Assets, and shall vest the Buyer with the same right, title and interest of the Debtor in and to the Purchased Assets free and clear of all Liens, Claims, Interests and Encumbrances of any kind or nature whatsoever (but for the Assumed Liabilities and the Permitted Encumbrances) notwithstanding any requirement for approval or consent by any entity (as defined in section 101(15) of the Bankruptcy Code).

17.     From and after the entry of this Order, the Debtor, and all third parties with notice of the sale shall not take or cause to be taken any action which would interfere with the transfer of the Purchased Assets to Buyer in accordance with the terms of this Order or the APA or the use and operation by the Buyer of the Purchased Assets.

18.     The transfer of the Purchased Assets to the Buyer pursuant to the APA is an exchange for consideration by the Buyer and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia, and the sale may not be avoided, or costs or damages imposed or awarded, under section 363(n) or any other provision of the Bankruptcy Code.

19.     On the Closing Date, each of the Debtor's creditors, secured or otherwise, are authorized and directed to execute such documents and take all other actions as may be necessary to release their Liens, Claims, Interests and Encumbrances in the Purchased Assets, if any, as such Liens, Claims, Interests and Encumbrances may have been recorded or may otherwise exist.

20.     If any person or entity asserting any Liens, Claims, Interests and Encumbrances has filed financing statements, mortgages, construction liens, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Liens, Claims, Interests and Encumbrances with respect to the Purchased Assets, and has not delivered to the Debtor and/or the Buyer prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and/or releases of all Liens, Claims, Interests and Encumbrances which the person or entity has with respect to any of the Purchased Assets then (a) the Debtor or the Buyer are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets and (b) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, shall be effective as a determination that, other than the Assumed Liabilities and the Permitted Encumbrances, upon Closing, all Liens, Claims, Interests and Encumbrances existing as to the Purchased Assets conveyed to Buyer have been and hereby are adjudged and declared to be unconditionally released, discharged and terminated.  This Order shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets conveyed to Buyer.

21.     Any notices required to be given to the Debtor's employees pursuant to any federal or state labor or similar laws shall be the sole responsibility of the Debtor, and the Buyer shall have no liability for the Debtor's failure to do so. Except as otherwise expressly provided in the APA, the Buyer shall have no obligation to pay wages, bonuses, vacation pay, severance pay, benefits of any kind (including without limitation accrued unpaid medical benefits), or incentives, or retention payments, workers compensation, or unemployment benefits or any other payment with respect to employees or former employees of the Debtor.

22.     Article 6 of the Uniform Commercial Code governing bulk sales is not applicable to the sale of the Purchased Assets to the Buyer.

23.     All entities, including without limitation, any former vendors, suppliers or employees of the Debtor, that are presently, or on the Closing Date may be, in possession or control of some or all of the

Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Buyer on the Closing Date.

24.     This Court shall retain exclusive jurisdiction, even after the closing of the Debtor's case, to implement and effectuate the provisions of this Order and the APA and to resolve any issue or dispute concerning the interpretation, implementation or enforcement of this Order and the APA and any subsequent agreement as required to be entered into between the Debtor and the Buyer pursuant to this Order, or the rights and duties of the parties hereunder or thereunder, including, without limitation, any issue or dispute concerning the transfer of the Purchased Assets free and clear of Liens, Claims, Interests and Encumbrances.

25.     Any stay, modification, reversal or vacation of this Order will not affect the validity of any obligation of the Debtor to the Buyer incurred under this Order. Notwithstanding any such stay, modification, reversal or vacation, all obligations incurred by the Debtor under this Order and the APA prior to the effective date of such stay, modification, reversal or vacation will be governed in all respects by the original provisions of this Order, and the Buyer is entitled to the rights, privileges and benefits granted in this Order with respect to all such obligations.

 26.     The Transactions contemplated by the APA are undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transactions shall not affect the validity of the Transactions as to the Buyer, except to the extent such authorization is duly stayed pending such appeal prior to such consummation. The evidence presented or proffered has demonstrated that the Buyer is a purchaser in good faith of the Purchased Assets and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

27.     The terms and provisions of this Order shall be binding in all respects upon and shall inure to the benefit of, the Debtor, its estate, and their creditors, the Buyer and its affiliates, successors and assigns, and shall be binding in all respects upon any affected third parties including, but not limited to, all persons asserting Liens, Claims, Interests and Encumbrances in such Purchased Assets, notwithstanding any subsequent appointment of any Chapter 11 or Chapter 7 trustee(s), upon which such terms and provisions likewise shall be binding.

28.     Based upon the evidence presented or proffered, it has been determined that the Buyer shall not be deemed to (a) be the successor in interest of the Debtor; (b) have, de facto or otherwise, merged with or into the Debtor; or (c) be a continuation of the Debtor.

29.     The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety. Likewise, all of the provisions of this Order are non-severable and mutually dependent.

30.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing to be signed by all parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

31.     Nothing contained in any plan confirmed in this case or any Order of this Court confirming such plan shall conflict with or derogate from the provisions of the APA or the terms of this Order.

32.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order and this Order shall be effective immediately upon entry. In the event that all conditions precedent to closing have been met or waived under the APA, the Debtor and the Buyer are hereby authorized to consummate the Transactions upon entry of this Order or as soon as reasonably possible thereafter.

Copies to: All Filing Parties

###

**SCHEDULE 10(h)**

**Contract Issues**

Seller is not aware of any contract issues, other than the fact that Seller is in default of those contracts that are both scheduled on <u>Schedule 1(b)</u> and such schedule sets forth a proposed "cure amount" and as follows:

<u>Seller is in default on its lease and other payments as set forth in follows:</u>

| Lease Name | Amount | Month Past Due | Description |
|---|---|---|---|
| Adams County, MS Board of Supervisors | | | 720,000 Bond CDBGEDL |
| | $5,262.68 | December | |
| | $5,262.68 | January | |
| | $5,262.68 | February | |
| | | | |
| | $7,272.22 | December | 1,000,000 MDECD CAP Loan |
| | $7,272.22 | January | |
| | $7,272.22 | February | |

<u>**SCHEDULE 10(i)**</u>

**<u>Tax Issues</u>**

<u>Personal and Real Property Taxes Related to Natchez Mill</u>:  **$684,206.93**

See Attached Schedule From Adams County Tax Collector

<u>Sales Taxes Related to Natchez Mill:</u>

| | | | |
|---|---|---|---|
| Mississippi Tax Commission | $5,970.00 | October | Mississippi Sales Tax |
| | $5,194.00 | November | |
| | $3,341.00 | December | |
| | $273.00 | January | |
| | $14,778.00 | | |
| State Tax Commission | $2,880.00 | December | Estimated tax payment for 4th Q 09 |
| TOTAL | $17,658.00 | | |

In addition, Seller has not yet filed its 2009 and 2010 federal and applicable state tax returns.

## <u>SCHEDULE 10(n)</u>

**<u>Environmental Matters</u>**

Seller is not aware of any Environmental Matters to be disclosed.

# # #